IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHERWIN T. WRIGHT | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:15-cv-02363 |
| | § | |
| CHEVRON PHILLIPS CHEMICAL | § | |
| COMPANY LP | § | |
|     Defendant. | § | |
| | § | |
| | § | JURY DEMANDED |

---

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Dated: June 12, 2017

Respectfully Submitted,

*/s/ Scott R. McLaughlin*
Scott R. McLaughlin
State Bar No. 00791234
Fed ID No. 18138
Marlene C. Williams
State Bar No. 24001872
Fed ID No. 22824
JACKSON WALKER L.L.P.
1401 McKinney, Suite 1900
Houston, Texas  77010
(713) 752-4200
(713) 308-4221 (Fax)
smclaughlin@jw.com
mcwilliams@jw.com

**ATTORNEYS FOR DEFENDANT
CHEVRON PHILLIPS CHEMICAL
COMPANY LP**

## <u>TABLE OF CONTENTS</u>

I.      NATURE AND STAGE OF PROCEEDINGS ...................................................1

II.     STATEMENT OF UNDISPUTED FACTS ......................................................2

        A.      Wright's Employment at Chevron Phillips Chemical ............................2

        B.      Chevron Phillips Chemical Learns of and Investigates Wright's Violation
                of the Lock, Tag, Try Process in September/October 2014.....................6

        C.      Approximately Three Weeks After the Lock, Tag, Try Violation, Chevron
                Phillips Chemical Investigates Wright for Violating Company Rule
                Prohibiting Sleeping On the Job ...........................................................10

        D.      Just Days After the Sleeping Violation, Chevron Phillips Chemical
                Investigates and Terminates Wright for Violating the Company's
                Reporting Off and Returning to Work Policy.........................................12

        E.      Wright's Specific Allegations Against Chevron Phillips Chemical .......15

III.    STANDARD OF REVIEW ..........................................................................16

IV.     ARGUMENT AND AUTHORITIES............................................................17

        A.      Wright's Claim for Race Discrimination Fails as a Matter of Law.......17

                1.      Wright Cannot Make a Prima Facie Case of Race Discrimination ..........18

                        a.      The Only Adverse Employment Action at Issue is Wright's
                                Termination in December 2014 ....................................................18

                        b.      Wright Cannot Establish that Chevron Phillips Chemical
                                Treated Him Less Favorably than Similarly Situated
                                Employees Under Nearly Identical Circumstances ......................20

                2.      Chevron Phillips Chemical had a Legitimate Nondiscriminatory
                        Reason for Wright's Termination ..............................................21

                3.      Wright Cannot Show that Chevron Phillips Chemical's Reason for
                        Terminating His Employment was Pretext for Discrimination ................22

        B.      Plaintiff's Claim for Retaliation Fails as a Matter of Law....................24

                1.      Wright Cannot Make a Prima Facie Case of Retaliation.........................25

                        a.      Wright Did Not Engage in Protected Activity..............................25

i

    b.  There is No Causal Connection ......................................................26

  2.  Chevron Phillips Chemical had Legitimate Non-Retaliatory Reasons for its Actions Against Wright, Including His Termination .....................27

  3.  Wright Cannot Show that Chevron Phillips Chemical's Reason for Terminating His Employment was Pretext for Retaliation.......................28

V.  CONCLUSION AND RELIEF SOUGHT .......................................................................29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agoh v. Hyatt Corp.*,
   992 F.Supp. 2d 722 (S.D. Tex. 2014) ......................................................................19

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 106 S. Ct. 2505 (1986)......................................................................17

*Arrington v. Sw. Bell Tel. Co.*,
   93 Fed. Appx. 593 (5th Cir. 2004)(per curiam)(unpublished)................................20

*Auguster v. Vermillion. Parish Sch. Bd.*,
   249 F.3d 400 (5th Cir. 2001) ...................................................................................22

*Boudreaux v. Swift Transp. Co., Inc.*,
   402 F.3d 536 (5th Cir. 2005) ...................................................................................17

*Breaux v. City of Garland*,
   205 F.3d 150 (5th Cir. 2000) ...................................................................................19

*Bryan v. McKinsey & Co.*,
   375 F.3d 358 (5th Cir. 2004) ...................................................................................18

*Burger v. Central Apartment Mgmt., Inc.*,
   168 F.3d 875 (5th Cir. 1999) ...................................................................................19

*Byers v. Dallas Morning News, Inc.*,
   209 F.3d 419 (5th Cir. 2000) ...................................................................................25

*Carthon v. Johnson Controls, Inc.*,
   100 Fed. Appx. 993 (5th Cir. 2004)..........................................................................19

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 106 S. Ct. 2548 (1986)..............................................................16, 17

*Cervantez v. KMGP Servs. Co.*,
   349 Fed. Appx. 4 (5th Cir. 2009)(unpublished).......................................................22

*Chamblee v. Miss. Farm Bureau Fed'n*,
   551 Fed. Appx. 757 (5th Cir. 2014)..........................................................................18

*Clark County Sch. Dist. v. Breeden*,
   121 S.Ct. 1508 (2001)...............................................................................................27

iii

*Corley v. Jackson Police Dep't,*
566 F.3d 994 (5th Cir. 1978) ...........................................................................23

*Davis v. Dallas Indep. Sch. Dist.,*
448 Fed. Appx. 485 (5th Cir. 2001)...................................................................25

*Deines v. Texas Dept. of Protective & Regulatory Servs.,*
164 F.3d 277 (5th Cir. 1999) ............................................................................23

*Duff v. Farmers Ins. Exch.,*
2014 U.S. Dist. LEXIS 54835 (N.D. Tex. Apr. 21, 2014).................................23

*Forsyth v. Barr,*
19 F.3d 1527 (5th Cir. 1994) ............................................................................17

*Harris-Childs v. Medco Health Sols., Inc.,*
169 Fed. Appx. 913 (5th Cir. 2006)...................................................................25

*Harvey v. Chevron USA, Inc.,*
961 F. Supp. 1017 (S.D. Tex. 1997) .................................................................25

*Heggemeier v. Caldwell Cty.,*
826 F.3d 861 (5th Cir. 2016) ............................................................................20

*Hernandez v. Yellow Transportation, Inc.,*
670 F.3d 644 (5th Cir. 2012) ............................................................................25

*Hockman v. Westward Comm'ns, LLC,*
407 F.3d 317 (5th Cir. 2004) ............................................................................24

*Hockman v. Westward Communications, LLC,*
282 F.Supp. 2d 512 (E.D. Tex. 2003) ...............................................................20

*Kinsey v. City of Jacksonville,*
No. 3:01-785, 2005 U.S. Dist. LEXIS 31870 (M.D. Fla. Dec. 6, 2005) ..................................19

*Laxton v. Gap, Inc.,*
333 F.3d 572 (5th Cir. 2004) ............................................................................22

*Lee v. Kansas City S. Ry. Co.,*
574 F.3d 253 (5th Cir. 2009) ......................................................................18, 20

*Little v. Republic Refining co.,*
924 F.2d 93 (5th Cir. 1991) ..............................................................................22

*Long v. Eastfield Coll.,*
88 F.3d 300 (5th Cir. 1996) ..............................................................................24

iv

*M.D. Anderson Hosp. and Tumor Inst. v. Willrich*,
   28 S.W.3d 22 (Tex. 2000)..................................................................................24

*Mack v. John L. Wortham & Son, L.P.*,
   2013 U.S. App. LEXIS 18507, 2013 WL 4758052 (5th Cir. Sept. 5, 2013)..........................22

*Martin v. Kroger Co.*,
   65 F. Supp. 2d 516 (S.D. Tex. 1999) ..................................................................18

*Martinez v. Bohls Bearing Equip. Co.*,
   361 F.Supp.2d 608 (W.D. Tex. 2005)..................................................................28

*McCoy v. City of Shreveport*,
   492 F.3d 551 (5th Cir. 2007) ......................................................................19, 24

*McCullough v. Houston County, Texas*,
   297 Fed. Appx. 282 (5th Cir. 2008).....................................................................27

*Moini v. Univ. of Texas at Austin*,
   832 F.Supp. 2d 710 (W.D. Tex. 2011).................................................................26

*Moore v. United Parcel Serv., Inc.*,
   150 Fed. Appx. 315 (5th Cir. 2005).....................................................................25

*Moss v. BMC Software*,
   610 F.3d 917 (5th Cir 2010) ...........................................................................18

*Mota v. Univ. of Texas Houston Health Science Ctr.*,
   261 F.3d 512 (5th Cir. 2001) ...........................................................................25

*Obasogie v. Harris Cty. Hops. Dist.*,
   2013 U.S. Dist. LEXIS 182405 (Dec 31, 2013) ......................................................17

*Okoye v. Univ. of Tex. Houston Health Science Ctr.*,
   245 F.3d 507 (5th Cir. 2001) ...........................................................................22

*Payne v. McLemore's Wholesale & Retail Stores*,
   654 F.2d 1130 (5th Cir. 1981) ..........................................................................25

*Pennington v. Tex. Dept. of Family & Protective Servs.*,
   469 Fed. Appx. 332 (5th Cir. 2012).....................................................................28

*Pierce v. Texas Dept. of Criminal Justice*,
   37 F.3d 1146 (5th Cir. 1994) ...........................................................................25

*Pineda v. United Parcel Serv., Inc.*,
   360 F.3d 483 (5th Cir. 2004) ...........................................................................23

v

*Prewitt v. Continental Automotive*,
2014 U.S. Dist. LEXIS 22306 (W.D. Tex. 2014)....................................................................28

*Rachid v. Jack in the Box, Inc.*,
376 F.3d 305 (5th Cir. 2004) .......................................................................................17, 18

*Reed v. Neopost USA, Inc.*,
701 F.3d 434 (5th Cir. 2012) .......................................................................................17, 18

*Septimus v. Univ. of Houston*,
399 F.3d 601 (5th Cir. 2005) ................................................................................................28

*Shakelford v. Deloitte & Touche*,
190 F.3d 398 (5th Cir. 1999) .......................................................................................17, 18

*Sparks v. L.M. Berry & Co.*,
1999 U.S. App. LEXIS 40637 (5th Cir. June 8, 1999)(per
curiam)(unpublished)............................................................................................................20

*St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502, 113 S.Ct. 2742 (1993) ..................................................................................18

*Tex. Dep't of Cnty. Affairs v. Burdine*,
450 U.S. 248, 101 S. Ct. 1089 (1981)..................................................................................18

*Thompson v. Exxon Mobil Corp.*,
344 F. Supp. 2d 971 (E.D. Tex. 2004)..................................................................................19

*TIG Ins. Co. v. Sedgwick James of Wash.*,
276 F.3d 754 (5th Cir. 2002) ...............................................................................................17

*Tratree v. BP N. Am. Pipelines, Inc.*,
277 Fed. Appx. 390 (5th Cir. 2008).....................................................................................25

*Turner v. Novartis Pharm. Corp.*,
442 Fed. Appx. 139 (5th Cir. 2011) (unpublished)..............................................................19

*Univ. of Tex. SW Med. Ctr. v. Nassar*,
113 S.Ct. 2517 (2013)...........................................................................................................28

*Vadie v. Mississippi State Univ.*,
218 F.3d 365 (5th Cir. 2000) ...............................................................................................18

*Vasquez v. Nueces County, Texas*,
551 Fed. Appx. 91 (5th Cir. Dec. 19, 1994) .......................................................................24

vi

*Vaughn v. Woodforest Bank*,
    665 F.3d 632 (5th Cir. 2011) ............................................................22

*Waggoner v. City of Garland*,
    987 F.2d 1160 (5th Cir. 1993) ........................................................22

*Walker v. Thompson*,
    214 F.3d 615 (5th Cir. 2000) ..........................................................17

*West v. Nabors Drilling USA, Inc.*,
    330 F.3d 379 (5th Cir. 2003) ..........................................................18

*Willis v. Cleco Corp.*,
    749 F.3d 314 (5th Cir. 2014) ..........................................................24

*Willis v. Roche Biomed. Labs.*,
    61 F.3d 313 (5th Cir. 1995) ............................................................17

**Statutes**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*,................................................1

Section 1981, 42 U.S.C. §1981.................................................................1, 2, 17, 24

Texas Commission on Human Rights Act, Texas Labor Code §21.051, *et seq.*............................1

**Other Authorities**

FED. R. CIV. P. 56.................................................................................1, 16, 17

18221733v.3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHERWIN T. WRIGHT | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:15-cv-02363 |
| | § | |
| CHEVRON PHILLIPS CHEMICAL | § | |
| COMPANY LP | § | |
| Defendant. | § | |
| | § | |
| | § | JURY DEMANDED |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Chevron Phillips Chemical Company LP ("Chevron Phillips Chemical" or "Company") files this Motion for Summary Judgment on Plaintiff's Claims, pursuant to Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE. In support, Chevron Phillips Chemical respectfully shows as follows:

## I.     NATURE AND STAGE OF PROCEEDINGS

Plaintiff Sherwin Wright ("Wright") filed this lawsuit on August 14, 2015.[1] Wright asserts race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* ("Title VII"), 42 U.S.C. §1981 ("Section 1981") and the Texas Commission on Human Rights Act §21.051(1) ("Texas Labor Code"). He also asserts a retaliation claim under Title VII.[2] The crux of Plaintiff's claims is that Chevron Phillips Chemical discriminated and

---

[1] *See* Complaint ("Compl."), Dkt. No. 1.

[2] In his Complaint, Wright sometimes describes his claim as "race/color/ethnicity" discrimination. Because Wright appears to be using these terms interchangeably for "race" discrimination, Chevron Phillips Chemical will refer to them collectively as "race discrimination." To the extent Wright is attempting to assert separate claims for color discrimination and ethnicity discrimination, those claims are barred because Wright did not assert or pursue such claims before the Equal Employment Opportunity Commission and, therefore, has not exhausted his administrative remedies on those claims. If necessary, Chevron Phillips Chemical moves for summary judgment on any color and/or ethnicity claim for this reason, as well as for the other reasons stated in this Motion. In addition, Wright did not assert any claims under the Texas Labor Code or the Texas Commission on Human Rights Act before either the

1

retaliated against him when it disciplined and ultimately terminated his employment after he violated three different company working rules within a span of approximately three months.

Chevron Phillips Chemical filed its Answer denying all of Wright's claims on November 20, 2015.[3]  Discovery in this matter closed on April 22, 2017.  Chevron Phillips Chemical now files this Motion for Summary Judgment seeking dismissal with prejudice of all of Wright's claims.

## II.    STATEMENT OF UNDISPUTED FACTS[4]

### A.    Wright's Employment at Chevron Phillips Chemical

Chevron Phillips Chemical is a chemical manufacturing company.[5]  Wright was employed as a maintenance electrician at the Company's Pasadena Plastics Complex ("Pasadena Site") from approximately 2008 until his termination in December 2014.[6]  Throughout his employment, Wright was aware of and trained on various company policies, including the anti-

---

EEOC or the Texas Workforce Commission.  Accordingly, Wright has not exhausted his administrative remedies on such claims and they are barred for this additional reason.  Finally, although Wright refers to Section 1981 in the opening page of his Complaint, he does not assert it or refer to it as a cause of action elsewhere in his Complaint.  Because Wright has not set forth specific elements of a Section 1981 claim in his Complaint, it should be dismissed for this additional reason.  Out of an abundance of caution, in the event the Court considers Wright's Section 1981 and Texas Labor Code claims, Chevron Phillips Chemical includes them in this Motion and seeks summary judgment on them in their entirety for all the reasons stated herein.

[3] *See* Answer, Dkt. No. 7.

[4] The facts set forth in this Motion are undisputed for purposes of this Motion only.

[5] *See* Arbitration Hearing Transcript from *In the Matter of the Arbitration of Sherwin Tyrell Wright v. Chevron Phillips Chemical Company LP*, FMCS Case No. 15-52517-3(Arbitrator T. Zane Reeves, PhD), attached hereto as Exhibit A, at 18-19.  Citations to the Arbitration Hearing Transcript will be referred to herein as "Arb. Hrg. Transcript [witness name] at _____."  Certain exhibits to Arbitration may be attached and referred to as "Arbitration Ex. ___, attached hereto as ___."  The Arbitration Hearing Transcript was also produced in condensed format during discovery in this case at CPCHEM000646-CPCHEM000724.  For the Court's ease of reference, Chevron Phillips Chemical cites to the full-page format throughout this Motion.

[6] *See* Deposition of Sherwin Wright, attached hereto as Exhibit B, at 5, 33-34.  Citations to the Deposition of Sherwin Wright will be referred to herein as "Wright Dep. at ___."  Certain exhibits to Wright's deposition may be attached and referred to as "Wright Dep. Ex. ___, [Name of Document and Bates Number], attached hereto as ___."

discrimination and anti-retaliation polices contained in the Company's Code of Conduct, as well as various work rules related to the performance of his job as a maintenance electrician.[7]

During his employment, Wright was a member of the International Brotherhood of Electrical Workers, which was party to a collective bargaining agreement ("CBA") with Chevron Phillips Chemical during the relevant time period.[8]   Thus, in addition to Chevron Phillips Chemical's internal policies and procedures, Wright's employment was also governed by the terms and conditions of the CBA.[9]

As a maintenance electrician at Chevron Phillips Chemical, Wright was generally responsible for the maintenance, troubleshooting and repair of electrical systems at the Pasadena Site.[10]   He worked in multiple areas of the Polyethylene Unit, including Plant 6, Plant 7 and Plant 8.[11]   Although Wright worked with other employees, including operators, he did not report to those individuals.[12]   Rather, Wright and other maintenance electricians reported to the Maintenance Electrical Supervisor, while Operators reported to the Operations Supervisor.[13] During the period in question in this lawsuit, Darryn Barnes ("Barnes") was Wright's supervisor.[14]

---

[7] Wright Dep. at 55-61; 219-220; *see* Wright Dep. Ex. 1, Training Record, CPCHEM000032–CPCHEM000039, attached hereto as Ex. B-1.

[8] *See* Working Agreement Between Chevron Phillips Chemical Company, Pasadena, Texas and International Brotherhood of Electrical Workers, Local No. 716 AFL-CIO, effective February 1, 2012 to January 31, 2015, CPCHEM000172-CPCHEM000201, attached hereto as Exhibit C.   The Working Agreement will be referred to herein as "the CBA."

[9] The Union filed a grievance regarding Wright's termination, although neither the Union nor Wright raised the issue of discrimination or retaliation in that proceeding.   The matter was arbitrated on June 10, 2015.   *See e*xcerpts from Arbitration Transcript, attached hereto as Exhibit A.   The arbitrator determined that there was just cause to terminate Wright's employment.   *See* Arbitrator's Award, attached hereto as Exhibit D.

[10] Wright Dep. at 33-35.

[11] Wright Dep. at 31-32.

[12] Wright Dep. at 34, 38-39.

[13] Wright Dep. at 37, 39.

[14] Wright Dep. at 37-38; Prior to Darryn Barnes, Jerry Kelly was Wright's supervisor.   Wright Dep. at 37-38.

3

From 2011 to 2012, Wright was on a leave of absence from Chevron Phillips Chemical due to injuries he suffered in a motorcycle accident.[15]   Wright did not have any issues with Chevron Phillips Chemical regarding his leave and does not recall that there were any problems with Chevron Phillips Chemical approving his leave after his accident or during his recovery.[16] Following his recovery, Wright returned to work with one restriction – he would work with a second electrician at all times.[17]   According to Wright, this restriction was in place from his return to work in 2012 until his termination in December 2014.[18]

In 2014, the Company was engaged in a turnaround project in Plant 8 of the Pasadena Site ("the 2014 Turnaround Project" or "the Turnaround Project").[19]   A turnaround is a project where the Company shuts down a section of the facility for a period of time in order to conduct equipment maintenance and other work.[20]   Wright worked during turnaround projects "all the time" during his employment at the Pasadena Site and was familiar with the electrical processes and procedures required during a turnaround, including various safety procedures.[21]

As part of the 2014 Turnaround Project, the Plant 8 Process Unit was shut down so that maintenance and other work could be completed.[22]   The Turnaround Project required a variety of electrical work, including the OSHA-mandated process of "Lock, Tag, Try", where all affected energy sources are de-energized and brought to a safe state before actual maintenance work

---

[15] Wright Dep. at 40-43.

[16] Wright Dep. at 43.

[17] Wright Dep. at 44-45.  Wright claims that his physical therapist at TIRR told him that this  restriction was worked out between TIRR and Chevron Phillips Chemical and that Chevron Phillips Chemical wanted him to be with a second electrician at "all times."  Wright Dep. at 45.  For purposes of this Motion only, Chevron Phillips Chemical does not dispute this assertion, although it is clearly hearsay.

[18] Wright Dep. at 45.

[19] Wright Dep. at 87, 123.

[20] Wright Dep. at 35-36.

[21] Wright Dep. at 36, 49-59.

[22] Arb. Hrg. Transcript [Bravenec] at 20.   Keith Bravenec was the Instrument Electrical Controls Maintenance Superintendent at the Pasadena Site at the time.  *See infra.*

4

begins.[23]   Chevron Phillips Chemical had a special procedure that employees were required to follow to complete the Lock, Tag, Try process.[24]   In general terms, the Lock, Tag, Try process is "a way of turning off or de-energizing equipment" so that it cannot be turned on during maintenance or other work.[25]   In some cases, the isolation process includes additional steps, including the disconnection of wires (called "T-leads") from various energy sources so that the sources are completely de-energized.[26]   Wright was aware of and trained on these additional procedures throughout his employment at Chevron Phillips Chemical.[27]   Indeed, Chevron Phillips Chemical trained Wright on this process throughout his employment, starting when he was hired and continuing every year until his termination.[28]   The Lock, Tag, Try Procedure was such an important safety process that Chevron Phillips Chemical specifically incorporated it into its Working Rules and stated that violations could result in immediate termination.[29]   As Wright himself described it, failure to correctly follow the Lock, Tag, Try and isolation process could result in serious injury to an employee, including death. [30]

As an electrician completing a Lock, Tag, Try on equipment, Wright was required to complete various forms, including an Isolation List, documenting that he had followed and

---

[23] Wright Dep. at 50–52; Arb. Hrg. Transcript [Bravenec] at 20-23.
[24] Wright Dep. at 51.
[25] Wright Dep. at 50.
[26] *See* Deposition of David Higgins, attached hereto as Exhibit E, at 71-72.  Citations to the Deposition of David Higgins will be referred to herein as "Higgins Dep. at ___."  Certain exhibits to Higgins' deposition may be attached and referred to as "Higgins Dep. Ex. ___, [Name of Document and Bates Number], attached hereto as ___."
[27] Wright Dep. at 51-53, 57-58.
[28] Wright Dep. at 51-53, 57-58; *see also* Wright Dep. Ex. 1, Training Record, CPCHEM000032–CPCHEM000039, attached hereto as Ex. B-1.
[29] Wright Dep. at 59-61; *see also* Wright Dep. Exs. 2 and 3, Working Rules and Discipline Policy with Wright's Signed Acknowledgment, CPCHEM000725–CPCHEM000729 and CPCHEM000202, attached hereto as Exhibit B-2.
[30] Wright Dep. at 69, 196-197.  Wright's union representation, David Higgins, also agreed that serious injury or death could result from failure to properly follow the Lock, Tag, Try and isolation process, including disconnection of T-leads.  Higgins Dep. at 93.

completed the appropriate steps for de-energizing equipment.[31]  Wright's initials on an Isolation List confirmed that he had "turned off and locked and tagged" the equipment to "put it into a safe state, as instructed."[32]   As Wright put it, "you don't initial it if you haven't performed that part of the job" because someone could be injured.[33]

**B.      Chevron Phillips Chemical Learns of and Investigates Wright's Violation of the Lock, Tag, Try Process in September/October 2014**

At the start of the 2014 Turnaround Project, all electrical isolation sources were identified and placed on an Isolation List so that the electrical breakers associated with those sources could be properly de-energized.[34]  Because certain electrical breakers were actually being removed and replaced during the Turnaround Project, the only way to safely and completely de-energize those breakers was to remove the T-leads in the breakers (*i.e.*, the wires leaving the breakers that feed a particular device or piece of equipment).[35]  Wright's supervisor, Darryn Barnes, assigned Wright to assist the Operations group in completing a portion of the isolation work for the turnaround.[36] Wright was provided an Isolation List that instructed him, as the assigned electrician, to disconnect the T-leads from a number of breakers.[37]   In fact, the specific tasks assigned to Wright were highlighted in yellow and marked by capital letters to emphasize the importance of *physically* disconnecting the T-leads on certain equipment, as opposed to only turning the breakers to the "off" position.[38]  However, Wright did not disconnect the T-leads as instructed on

---

[31] Wright Dep. at 66-67.
[32] Wright Dep. at 76.
[33] Wright Dep. at 68, 76.
[34] Arb. Hrg. Transcript [Bravenec] at 21-22.
[35] Wright Dep. at 71-72; Arb. Hrg. Transcript [Bravenec] at 22-24.
[36] Wright Dep. at 48; Arb. Hrg. Transcript [Bravenec] at 33-34.
[37] Wright Dep. 62, 67, 69-76; 112-116.
[38] Wright Dep. at 114-115; Arb. Hrg. Transcript [Bravenec] at 23, 31; s*ee* Wright Dep. Ex. 6, Isolation List # 42, CPCHEM000062–CPCHEM000073, attached hereto as Exhibit B-3.

6

the Isolation List, even though he initialed the Isolation List as if he had properly completed all the instructions on the List.[39]

Shortly thereafter, Keith Bravenec ("Bravenec"), who at the time was the Instrument Electrical Controls Maintenance Superintendent, learned that certain procedures identified on the Isolation List had not been properly completed.[40]   Bravenec specifically learned that a proper Lock, Tag, Try had not been completed and T-leads had not been removed on a number of breakers identified on the Isolation List.[41]   Bravenec gathered some initial facts regarding the incident and notified Virginia Hubbard, Human Resources ("HR") Business Partner, who started an investigation.[42]   Upon reviewing the Isolation List, Bravenec learned that Wright was the electrician who incorrectly verified that the T-leads had been removed.[43]   As part of the investigation, Bravenec and Hubbard reviewed the Isolation List and talked to multiple witnesses involved in the incident, including Wright.[44]   During the investigation, Wright did not dispute that the Isolation List required him to remove T-leads from certain equipment.[45]   Wright also did not dispute he that initialed and signed off on the Isolation List indicating that the work had been done.[46]   Wright also admitted to Bravenec and Hubbard that he did not bother to read anything on the Isolation List pertaining to the T-leads, even though the information was highlighted on the list for its importance.[47]

---

[39] Wright Dep. at 75-76, 86, 91, 115-116, 124-125.
[40] Arb. Hrg. Transcript [Bravenec] at 34.
[41] Arb. Hrg. Transcript [Bravenec] at 35-36.
[42] Arb. Hrg. Transcript [Hubbard] at 100.
[43] Arb. Hrg. Transcript [Bravenec] at 36.
[44] Wright Dep. at 77-79; 92-96; Arb. Hrg. Transcript [Bravenec] at 36-41; Arb. Hrg. Transcript [Hubbard] at 102.
[45] Wright Dep. at 124-125; Arb. Hrg. Transcript [Hubbard] at 102-103.
[46] Wright Dep. at 124-125; Arb. Hrg. Transcript [Hubbard] at 102-103.
[47] Wright Dep. at 124-125; Arb. Hrg. Transcript [Hubbard] at 105.

18221733v.3

In an effort to justify his conduct, Wright claims that the operator, Billy Donnell ("Donnell"), told him not to put the lock or tag on the equipment.[48]   Notably, Wright admits that he had already initialed the Isolation List (indicating he had already performed his portion of the work) **before** he actually completed the work and **before** Donnell allegedly told him not to lock or tag the breakers.[49]   Moreover, Wright admits that he did not disconnect the T-Leads as indicated on the Isolation List.[50]   Wright claims that he tried to get the Isolation List back from Donnell to correct it, but Donnell did not return the list to him and was "already moving to – to leave from the – from the MCC.  The motor control center."[51]   Wright admits that he did not bring this issue to his supervisor's attention, even though he knew this was a violation of the Lock, Tag, Try process and not "the normal course of how the lock and tag works."[52]   In fact, Wright admits that it was his "mistake" that he did not escalate the situation to his supervisor when it happened.[53]   He also admits that "[y]es, it was wrong" for him to put his initials on the Isolation List when he had not, in fact, properly completed the lock and tag process."[54]   Wright's only excuse for falsely verifying that he disconnected the T-leads is that "there would have been a second electrician to disconnect 'T' leads."[55]

---

[48] Wright Dep. at 80.  Interestingly, Wright's Complaint does not mention that Donnell told him not to put the lock on the equipment.  Rather, he only asserts that Donnell "ordered him to work alone." Compl. at p. 3.

[49] Wright Dep. at 81-82.

[50] Wright Dep. at 91, 115-116, 124-125.

[51] Wright Dep. at 82, 84-85.

[52] Wright Dep. at 88-89.

[53] Wright Dep. at 89-90.  Even Wright's union representative, Higgins, admits that an electrician in Wright's position should have raised questions about the instructions before signing off on the work.  Higgins Dep. at 95.

[54] Wright Dep. at 95.  During the Company's investigation, Wright did not provide a clear explanation for his failure to follow the highlighted instructions on the Isolation List.  Arb. Hrg. Transcript [Bravenec] at 38; Arb. Hrg. Transcript [Hubbard] at 102.  He also never indicated that he had questions about the instructions on the Isolation List or that he was somehow confused about the tasks assigned to him.  Arb. Hrg. Transcript [Bravenec] at 38, 40-41; Arb. Hrg. Transcript [Hubbard] at 105.  Instead, Wright admitted that he probably did not pay attention to the instructions on the Isolation List.  Arb. Hrg. Transcript [Hubbard] at 102.  In fact, Wright admits that he agreed with Bravenec's assessment that Wright should have raised any issues he had with the operator at the time he completed the assignment.  Wright Dep. at 89-90.

[55] Wright Dep. at 91.

8

After meeting with Wright, Chevron Phillips Chemical suspended him without pay during the pendency of the investigation.[56]  During his suspension, Wright contacted Chevron Phillips Chemical's Chief Executive Officer, Pete Cella, to inquire about the status of his suspension.[57]  According to Wright, in his email to Cella he outlined how the suspension "went about" and asked Cella to look into the situation.[58]  Wright did not raise any other issues in his email to Cella.[59]

After the Company completed its fact-gathering regarding the incident, Hubbard met with her boss, Lisa Laurin ("Laurin"), Human Resources Manager, to discuss the Company's findings.[60]  Laurin subsequently met with the Pasadena Plant's leadership team, including Department Manager Andy Woods and Plant Manager Mike Gilbert, to discuss the investigation and the proper discipline.[61]  Based on its investigation, Chevron Phillips Chemical ultimately concluded that Wright committed a serious safety violation when he (1) failed to properly follow the Lock, Tag, Try procedure, (2) did not remove the T-leads according to the instructions on the Isolation List and (3) improperly verified that the work had been completed as directed.[62]  Although the Company could have terminated Wright under its Working Rules for violating the Lock, Tag, Try safety procedure, the Company ultimately concluded that Wright should receive

---

[56] Wright Dep. at 92.  Arb. Hrg. Transcript [Bravenec] at 41-42; Arb. Hrg. Transcript [Hubbard] at 110.

[57] Wright Dep. at 103, *see* Wright Dep. Exs. 4 and 5, Email correspondence between Wright and Cella, Plaintiff 002-003, attached hereto as Exhibit B-4.

[58] Wright Dep. at 105-106.

[59] Wright Dep. at 106; *see* Wright Dep. Exs. 4 and 5, Email correspondence between Wright and Cella, Plaintiff 002-003, attached hereto as Exhibit B-4.

[60] *See* Deposition of Lisa Laurin, attached hereto as Exhibit F, at 9, 14.  Citations to the Deposition of Lisa Laurin will be referred to herein as "Laurin Dep. at ___."  Certain exhibits to Laurin's deposition may be attached and referred to as "Laurin Dep. Ex. ___, [Name of Document and Bates Number], attached hereto as ___."  *See also* Arb. Hrg. Transcript [Hubbard] at 108.

[61] Arb. Hrg. Transcript [Laurin] at 205.

[62] Arb. Hrg. Transcript [Hubbard] at 109; Arb. Hrg. Transcript [Laurin] at 206.

a suspension, retraining, and a Final Written Warning.[63]  Hubbard subsequently met with Wright and presented him with a letter dated October 30, 2014 describing the Company's investigation, its findings and the discipline being issued, including the Final Written Warning.[64]  Wright signed the letter, although he indicated that he disagreed with its content.[65]  Wright was subsequently assigned to report to the Central Business Office at the Pasadena Site to undergo his retraining.[66]  Tom Shomette was assigned as Wright's Training Representative during the retraining process.[67]

C.      **Approximately Three Weeks After the Lock, Tag, Try Violation, Chevron Phillips Chemical Investigates Wright for Violating Company Rule Prohibiting Sleeping On the Job**

Approximately three weeks after the Company issued the Final Written Warning to Wright for the Lock, Tag, Try incident, Wright was investigated for sleeping on the job in violation of the Pasadena Site's Working Rules.[68]  On or about November 11, 2014, two contract employees reported to their supervisor, Dean Merritt, that someone was snoring loudly in a cubicle near their offices.[69]  After entering Wright's cubicle and tapping him to awaken him, Merritt documented his observations in a written statement, which he provided to Adam Sainato ("Sainato"), an HR Business Partner at the Pasadena Site.[70]  According to Wright, this was a case

---

[63] Wright Dep. at 116-121; Arb. Hrg. Transcript [Hubbard] at 205; *see* Wright Dep. Ex. 2, Working Rules and Discipline Policy, CPCHEM000725–CPCHEM000729, attached hereto as Exhibit B-2.
[64] Wright Dep. at 117; Arb. Hrg. Transcript [Hubbard] at 111; s*ee* Wright Dep. Ex. 7, Final Written Warning, CPCHEM000027, attached hereto as Exhibit B-5.
[65] Wright Dep. at 122; *see* Wright Dep. Ex. 7, Final Written Warning, CPCHEM000027, attached hereto as Exhibit B-5.
[66] Wright Dep. at 128-129.
[67] Wright Dep. at 130.  Shomette took a leave of absence and John Smith took over as the Training Representative for Wright near the end of November 2014.  Wright Dep. at 133.
[68] Wright Dep. at 134; *see* Wright Dep. Ex. 2, Working Rules and Discipline Policy, CPCHEM000725–CPCHEM000729, attached hereto as Exhibit B-2.
[69] Arb. Hrg. Transcript [Merritt] at 59-61.
[70] Arb. Hrg. Transcript [Merritt] at 62.

of mistaken identity, because another individual "in a pink shirt" was actually sleeping and snoring in a different cubicle near Wright's cubicle.[71]

Sainato and Hubbard conducted an investigation regarding the incident, which included interviews with Wright, Merritt, and the two contract employees who reported the incident to Merritt.[72] When Sainato and Hubbard met with Wright, he initially denied that he was sleeping but eventually admitted that "it was possible" that he may have fallen asleep.[73] Sainato prepared a report regarding the investigation and subsequently met with his boss, Laurin, to discuss how to proceed.[74] As she had previously done during the Lock, Tag, Try incident, Laurin reviewed the Company's investigation and findings with the Plant Leadership team, who ultimately determined that Wright should be suspended and given a last chance warning regarding this second violation of the Pasadena Site's Working Rules.[75] Like his prior violation of the Lock, Tag, Try procedures, Wright's violation of the Company's Working Rule prohibiting sleeping on the job could have resulted in his immediate termination.[76] However, Chevron Phillips Chemical gave Wright the benefit of the doubt and issued him a three-day suspension and a last chance warning.[77] Laurin met with Wright on November 18, 2014 to discuss the Company's decision regarding the sleeping incident.[78] The last chance warning, which Wright signed during the

---

[71] Wright Dep. at 137-138.
[72] Arb. Hrg. Transcript [Hubbard] at 116-118.
[73] Wright Dep. at 141-143; Arb. Hrg. Transcript [Hubbard] at 119; Arb. Hrg. Transcript [Sainato] at 172; Arb. Hrg. Transcript [Wright] 293-294.
[74] Arb. Hrg. Transcript [Sainato] at 173-174.
[75] Arb. Hrg. Transcript [Hubbard] at 205, 207-209.
[76] *See* Wright Dep. Ex. 2, Working Rules and Discipline Policy, CPCHEM000725–CPCHEM000729, attached hereto as Exhibit B-2.
[77] Arb. Hrg. Transcript [Laurin] at 207-209; s*ee* Wright Dep. Ex. 8, Last Chance Letter, CPCHEM000152, attached hereto as Exhibit B-6.
[78] Wright Dep. at 244; Arb. Hrg. Transcript [Laurin] at 209.

meeting, informed Wright that he was required to (1) avoid any warnings for attendance and/or tardiness and (2) follow all procedures, policies and Working Rules, among other things.[79]

### D. Just Days After the Sleeping Violation, Chevron Phillips Chemical Investigates and Terminates Wright for Violating the Company's Reporting Off and Returning to Work Policy

Within a few days of receiving the last chance warning, Wright was investigated for violating Chevron Phillips Chemical's Reporting Off and Returning to Work Policy.[80]   The Pasadena Site had a long-standing policy requiring employees to notify their supervisors when they were going to be absent from work.[81]   This policy was incorporated into the Working Rules of the Pasadena Site and was in effect at all times during Wright's employment.[82]   Wright was aware of this policy during his employment at Chevron Phillips Chemical.[83]

On or about November 20, 2014, Wright did not show up for work.[84]   At that time, Wright had been working with John Smith, Training Superintendent, on his retraining from the Lock, Tag, Try incident.[85]   When Smith could not locate Wright at the Pasadena Site, he tried to contact Wright by telephone.[86]   When Smith finally reached Wright by telephone, Wright indicated that he would be absent from work that day.[87]   Smith asked Wright if he had tried to contact Smith or any supervisors, and Wright confirmed that he had not.[88]

---

[79] Wright Dep. at 143-144; *see also* Wright Dep. Ex. 8, Last Chance Letter, CPCHEM000152, attached hereto as Exhibit B-6.

[80] Wright Dep. at 147.

[81] Wright Dep. at 148-149; *see* Wright Dep. Ex. 9, Pasadena Plastics Complex Employee Process for Reporting Off and Returning to Work, CPCHEM000134 – CPCHEM000137, attached hereto as Exhibit B-7.

[82] Wright Dep. at 154-155; *see also* Wright Dep. Ex. 2, Working Rules and Disciplinary Policy, CPCHEM000728, attached hereto as Ex. B-2 (indicating that "[f]ailure to follow plant procedures for reporting off from work" could result in  disciplinary action including discharge depending on the circumstances).

[83] Wright Dep. at 155.

[84] Wright Dep. at 165-166; Arb. Hrg. Transcript [Wright] at 305.

[85] Wright Dep. at 167-169.

[86] Arb. Hrg. Transcript [Smith] at 77-78.  Wright does not recall receiving a phone call from Smith, but confirmed that it could have happened.  Wright Dep. at 169.

[87] Arb. Hrg. Transcript [Smith] at 78.

[88] Arb. Hrg. Transcript [Smith] at 78-80.

Wright notified Smith that he had tried to contact the University of Pittsburg Medical Center, Work Partners' Division (UPMC), a third party that assisted in managing the Company's medical leave and Family and Medical Leave Act (FMLA) programs.[89]   Smith subsequently notified Sainato and the HR Group that he had reached Wright, and that Wright would be absent from work that day.[90]   Smith also informed Sainato and HR that Wright indicated that he had called UPMC to report his absence.[91]

Sainato subsequently investigated the incident.[92]   As part of the investigation, Sainato personally contacted UPMC and learned that UPMC did have a record of a call from Wright, although the call appeared to have been placed to a voicemail or message line.[93]   Sainato also learned that Wright had five (5) other absences in 2014 but had never contacted UPMC to report any of those absences.[94]   Moreover, Sainato learned that Wright did not have any prior disciplinary history related to a violation of the Company's absence-reporting procedures.[95]   All of these facts indicated to Sainato that Wright was not only aware of the policy requiring him to notify a supervisor of his absence but had previously followed the procedure without any confusion earlier in 2014.[96]

Sainato also talked to Wright regarding the incident.[97]   During their discussion, Wright informed Sainato that he was absent because he had a doctor's appointment.[98]   Wright admitted

---

[89] Arb. Hrg. Transcript [Smith] at 79.
[90] Arb. Hrg. Transcript [Smith] at 79-80; Arb. Hrg. Transcript [Sainato] at 176.
[91] Arb. Hrg. Transcript [Sainato] at 176.
[92] Arb. Hrg. Transcript [Sainato] at 176.
[93] Arb. Hrg. Transcript [Sainato] at 177.
[94] Arb. Hrg. Transcript [Sainato] at 177.
[95] Arb. Hrg. Transcript [Sainato] at 178.
[96] Arb. Hrg. Transcript [Sainato] at 178.
[97] Wright Dep. at 172-173.
[98] Wright Dep. at 173.

18221733v.3

to Sainato that he did not call anyone at the Company about his absence.[99]   Wright informed

Sainato that he had called UPMC, instead.[100]   Wright claims that he complied with company

policy because under the Total Absence Management Program, where the Company introduced

UPMC as a third-party source for managing certain employee illness and work-related absences,

he was *only* required to call UPMC.[101]   During his deposition, however, Wright admitted that

under the Total Absence Management Program, employees were still required to follow site-

specific rules regarding their absences from work, including the long-standing rule requiring

employees to notify a supervisor of any absences.[102]

Following Sainato's investigation, the Company reviewed Wright's most recent

infraction and his recent disciplinary history.[103]   In light of Wright's repeated violations of

Company Working Rules, including the final written warning he received for the Lock, Tag, Try

incident and the last chance warning he received just days earlier for the sleeping incident, the

Company, with the input of Laurin, Woods and Gilbert, determined that Wright's employment

should be terminated.[104]   According to Wright, Hubbard and several other employees attended

the termination meeting and notified him of his termination.[105]   Chevron Phillips Chemical did

not hire anyone to replace Wright and he has not been replaced by anyone since his

termination.[106]

---

[99] Wright Dep. at 166.
[100] Wright Dep. at 173-174.
[101] Wright Dep. at 177.
[102] Wright Dep. at 158-164; *see* Wright Dep. Ex. 10, Total Absence Management Presentation, CPCHEM000118-CPCHEM000133, attached hereto as Exhibit B-8.
[103] Arb. Hrg. Transcript [Laurin] at 210.
[104] Arb. Hrg. Transcript [Laurin] at 205, 210-211.
[105] Wright Dep. at 182-184.
[106] Higgins Dep. at 57.

14

### E.    Wright's Specific Allegations Against Chevron Phillips Chemical

A few days following his termination, Wright filed a Charge of Discrimination with the Equal Employment Opportunity Commission and complained for that first time that the Company had retaliated against him and discriminated against him based on an alleged disability.[107]    Nowhere in this first Charge does Wright mention any alleged race discrimination.[108]  Approximately eight months later, on August 19, 2015, Wright filed a second Charge of Discrimination claiming for the first time that Chevron Phillips Chemical discriminated against him because of his race.[109]  Notably, Wright omitted key facts regarding his disciplinary history from both Charges, including the fact that he had been disciplined for sleeping on the job and for violating the Company's no call/no show policy.[110]

During his deposition, Wright struggled to explain the basis for his discrimination claim against Chevron Phillips Chemical.[111]  Initially, he testified that he could not "put [his] finger on any one particular incident" of race discrimination and could not describe anything Chevron Phillips Chemical did to discriminate against him based on his race.[112]  Later, he testified that Bravenec, Woods and Laurin each discriminated against him in various ways, including:

- In 2012, he "just felt" that Bravenec "never gave [him] just that fair or equal chance to prove [himself];[113]

---

[107] *See* Wright Dep. Ex. 11, December 8, 2014 Charge of Discrimination, CPCHEM000102, attached hereto as Exhibit B-9.  Wright does not assert disability discrimination in his Complaint.

[108] Wright Dep. at 206; *see* Wright Dep. Ex. 11, December 8, 2014 Charge of Discrimination, CPCHEM000102, attached hereto as Exhibit B-9.

[109] Wright Dep. at 205-206; *see* Wright Dep. Ex. 12, August 19, 2015 Charge of Discrimination, Plaintiff 011, attached hereto as Exhibit B-10.

[110] Wright Dep. at 188-194.

[111] Wright testified that he is suing Chevron Phillips Chemical for disability discrimination in this case, but no such claim is asserted in his lawsuit.  Wright Dep. at 194; *See* Compl. at pp. 5-6.

[112] Wright Dep. 194-195.

[113] Wright said this was not regarding the Lock, Tag, Try incident; rather, he felt that Bravenec treated him differently just compared "to everyone else that was there."  Wright Dep. at 231.  However, earlier in his deposition Wright testified that he never had any issues with Bravenec.  Wright Dep. at 78.

- In 2012 or 2013, Woods was "dismissive" and asked him why he had not informed Woods that he had applied for a night supervisor job;[114]

- During the labor arbitration following his termination, Laurin allegedly provided false testimony that she did not know about his email to Cella regarding the Lock, Tag, Try incident.[115]

Wright also testified that he believes the Company retaliated against him when it terminated his employment.[116] Wright specifically explained that his retaliation claim is based on the fact that he "made one mistake where [he] did not ask enough questions and . . . just followed through enough and it's – it has snowballed on [him] since then with other incidents."[117] When asked whether he thought Chevron Phillips Chemical set out to terminate his employment or retaliate against him because of the Lock, Tag, Try violation, Wright responded "I hope not."[118] In any event, Wright testified that he had no evidence that the Company was retaliating against him for any particular thing he did (other than the "one mistake" with the Lock, Tag, Try incident).[119]

## III.    STANDARD OF REVIEW

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-movant, the record shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.[120] "Importantly, 'the mere existence of *some*

---

[114] Wright Dep. at 235-238.
[115] Wright Dep. 231-240. Wright admitted that Laurin did not discriminate against him during his employment. Wright Dep. at 239-240. Further, contrary to what Wright recalled in his deposition, during the arbitration Laurin testified that she was aware of the Cella email but could not recall the specific date. Arb. Hrg. Transcript [Laurin] at 213. Laurin also confirmed that she did not have any feelings "whatsoever" about Wright's email to Cella and did not think Wright "overstepped her authority" by emailing Cella. Laurin Dep. at 48-49.
[116] Wright Dep. at 195.
[117] Wright Dep. at 195.
[118] Wright Dep. at 202.
[119] Wright Dep. at 200-201. In his Complaint, Wright identifies three different acts of alleged retaliation after he emailed Cella: (1) the final written warning that was issued following the Lock, Tag, Try incident; (2) the last chance warning issued following the sleeping incident; and (3) the termination following the no call/no show incident. *Compl.* at pp. 3-4.
[120] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548 (1986); FED. R. CIV. P. 56(a).

factual dispute will not defeat a motion for summary judgment; Rule 56 requires that the fact dispute be *genuine* and *material.*'"[121]   Facts are material when the resolution of those facts "might affect the outcome of the suit under the governing law . . . ."[122]   A plaintiff's unsubstantiated opinions and beliefs are not competent summary judgment evidence.[123] Similarly, "[c]onclusory allegations and denials, speculation, [and] improbable inferences . . ." are not sufficient to defeat summary judgment.[124]

If a plaintiff fails to show a genuine issue of material fact on an essential element of his claims, summary judgment in the defendant's favor is warranted.[125]   In other words, to survive a defendant's motion for summary judgment the plaintiff must produce specific evidence upon which a jury could reasonably base a verdict in his favor on the claims asserted.[126]   As explained below, summary judgment is warranted because Wright cannot meet this burden on any of his claims against Chevron Phillips Chemical.

## IV.   ARGUMENT AND AUTHORITIES

### A.   Wright's Claim for Race Discrimination Fails as a Matter of Law[127]

To establish race discrimination, Wright ultimately must establish that race was a motivating factor in Chevron Phillips Chemical's decision to terminate his employment.[128]   In the absence of direct evidence of discrimination, Wright must establish his race discrimination

---

[121] *Obasogie v. Harris Cty. Hops. Dist.,* 2013 U.S. Dist. LEXIS 182405, *2 (Dec 31, 2013)(quoting *Willis v. Roche Biomed. Labs.,* 61 F.3d 313, 315 (5th Cir. 1995))(emphasis added).

[122] *Willis v. Roche Biomed. Labs.,* 61 F.3d 313, 315 (5th Cir. 1995).

[123] *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir. 1994).

[124] *TIG Ins. Co. v. Sedgwick James of Wash.,* 276 F.3d 754, 759 (5th Cir. 2002); *see also Boudreaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir. 2005).

[125] *Celotex,* 477 U.S. at 322.

[126] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986).

[127] To the extent they are viable here, Wright's Section 1981 and Texas Labor Code claims are analyzed under the same evidentiary standard and burden-shifting framework as his Title VII claims.  *Walker v. Thompson,* 214 F.3d 615, 625 (5th Cir. 2000); *Shakelford v. Deloitte & Touche,* 190 F.3d 398, 403 n. 2 (5th Cir. 1999); *Reed Neopost USA, Inc.,* 701 F.3d 434, 439 (5th Cir. 2012)(quoting *Mission Consol. Indep. School Dist. v. Garcia,* 372 S.W.3d 629, 633 (Tex. 2012).

[128] *Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 312 (5th Cir. 2004).

claim by circumstantial evidence using the three-part "modified *McDonnell Douglas* approach."[129] Under this framework, Wright must first establish a *prima facie* case of race discrimination.[130] If Wright makes a *prima facie* case, the burden then shifts to Chevron Phillips Chemical to articulate a legitimate nondiscriminatory reason for the adverse employment action it took against Wright.[131] Chevron Phillips Chemical's burden in this second stage is one of production, not persuasion.[132] Once Chevron Phillips Chemical articulates a legitimate nondiscriminatory reason, the burden shifts back to Wright to prove pretext.[133] Throughout this entire process, the ultimate burden of persuasion remains with Wright.[134]

### 1. Wright Cannot Make a *Prima Facie* Case of Race Discrimination

To establish a *prima facie* case of race discrimination, Wright must show that he: (1) was a member of a protected class; (2) was qualified for the position in question; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees under nearly identical circumstances.[135]

### a. The Only Adverse Employment Action at Issue is Wright's Termination in December 2014.

"Not everything that makes an employee unhappy is actionable as an adverse employment action."[136] To be actionable, the conduct at issue must be an "ultimate" employment decision that involves "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision

---

[129] *Rachid,* 376 F.3d at 312; *Chamblee v. Miss. Farm Bureau Fed'n,* 551 Fed. Appx. 757 (5th Cir. 2014).

[130] *Tex. Dep't of Cnty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089 (1981); *Moss v. BMC Software*, 610 F.3d 917, 922 (5th Cir 2010).

[131] *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506-07, 113 S.Ct. 2742 (1993).  *Moss,* 610 F.3d at 922.

[132] *West v. Nabors Drilling USA, Inc.,* 330 F.3d 379, 385 (5th Cir. 2003).

[133] *Reed v. Neopost USA, Inc.,* 701 F.3d 434, 439 (5th Cir. 2012).

[134] *See Reed,* 701 F.3d at 439; *Vadie v. Mississippi State Univ.,* 218 F.3d 365, 374, n.4 (5th Cir. 2000).

[135] *See Lee v. Kansas City S. Ry. Co.,* 574 F.3d 253, 259 (5th Cir. 2009); *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004); *Shackelford v. Deloitte & Touche, L.L.P.,* 190 F.3d 398, 404 (5th Cir. 1999).

[136] *Martin v. Kroger Co.,* 65 F. Supp. 2d 516, 535 (S.D. Tex. 1999).

causing a significant change in benefits.'"[137]  Routine disciplinary matters such as suspensions and written warnings are not "ultimate" employment actions and, therefore, do not qualify as adverse employment actions for purposes of race discrimination claims.[138]

Wright complains of a number of alleged employment actions in this case.  For example, he complains that (1) Keith Bravenec discriminated against him by not giving him a "fair or equal chance to prove" himself, (2) Andy Woods discriminated against him because he was "dismissive" and asked Wright why he did not tell Woods that he had applied for a night supervisor job,[139] and (3) Lisa Laurin discriminated against him "to some extent" when she testified during the labor arbitration that she was not aware of Wright's email to Pete Cella following the Lock, Tag, Try incident.[140]  He also appears to complain about the suspensions he received for the Lock, Tag, Try incident and the sleeping incident.  However, none of this conduct qualifies as an adverse employment action for purposes of Wright's race discrimination claim because none of them involves an "ultimate" employment decision.  Accordingly, to the extent Wright seeks to base his race discrimination claim on any action other than his termination in December 2014, his claim fails as a matter of law.

---

[137] *Agoh v. Hyatt Corp.*, 992 F.Supp. 2d 722, 732 (S.D. Tex. 2014)(citing 42 U.S.C. §§ 2000e-2(a)(1), 2000e(k)(1(A) and *Green v. Administrators of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002)); *see also Burger v. Central Apartment Mgmt., Inc.*, 168 F.3d 875, 878 (5th Cir. 1999) ("Title VII was only designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions.").

[138] *McCoy v. City of Shreveport*, 492 F3d 551, 559 (5th Cir. 2007); *Breaux v. City of Garland*, 205 F.3d 150, 164 (5th Cir. 2000) (suspensions are not adverse employment actions); *Carthon v. Johnson Controls, Inc*., 100 Fed. Appx. 993, 997 (5th Cir. 2004); *Kinsey v. City of Jacksonville*, 2005 U.S. Dist. LEXIS 31870, at *22-23 (M.D. Fla. Dec. 6, 2005) (requiring signature to acknowledge receipt of reprimand form not an adverse employment action); *Turner v. Novartis Pharm. Corp*., 442 Fed. Appx. 139, 141 (5th Cir. 2011) (unpublished) (placing employee on performance improvement plan is not an ultimate employment decision); *Thompson v. Exxon Mobil Corp*., 344 F. Supp. 2d 971, 981 (E.D. Tex. 2004).

[139] These alleged incidents with Bravenec and Woods occurred sometime in 2012 and/or 2013.  Even if they were actionable as adverse employment actions, they are clearly time barred under the applicable statute of limitations.

[140] Even assuming this is correct, Laurin's alleged testimony occurred after Wright's termination and, therefore, could not be a discriminatory reason *for* his termination.

19

      **b.**     **Wright Cannot Establish that Chevron Phillips Chemical Treated Him Less Favorably than Similarly Situated Employees Under Nearly Identical Circumstances.**

To establish the fourth element of his *prima facie* case for race discrimination, Wright must show that there are similarly situated employees outside his protected class who were treated more favorably under nearly identical circumstances.[141]  In the Fifth Circuit, the "nearly identical" standard is a stringent one; that is, the comparator employees must have the same job or responsibilities, share the same supervisor, and have the same capabilities, comparable work rule violations and essentially the same disciplinary record.[142]

Wright claims that Chevron Phillips Chemical treated Billy Donnell, an operator at the Pasadena Site, more favorably because the Company did not suspend Donnell for the Lock, Tag, Try violation.  Wright also claims that Chevron Phillips Chemical treated an unidentified male in a pink shirt more favorably during the sleeping incident.  But neither of these individuals is a proper comparator for purposes of Wright's race discrimination claim.  First, regarding the unidentified individual in the pink shirt, Wright does not have any information about the person's identity or history at Chevron Phillips Chemical.  Indeed, Wright confirmed that he did not even know who this person was.  Similarly, regarding Billy Donnell, Wright admits that Donnell held a different position, had different duties, worked in a different department and reported to a different supervisor than he did.  Wright also admits that Donnell, as an operator, belonged to a completely different union than the one to which Wright belonged.  Further, Wright admits that he has no knowledge of Donnell's past performance at Chevron Phillips

---

[141] *Lee v. Kansas City Southern Ry,* 574 F.3d 253, 259-260 (5th Cir. 2009).

[142] *Hockman v. Westward Communications, LLC,* 282 F.Supp. 2d 512, 527-28 (E.D. Tex. 2003); *see also Heggemeier v. Caldwell Cty.,* 826 F.3d 861, 867 (5th Cir. 2016)(citing *McCoy v. City of Shreveport,* 492 F.3d 551, 556 (5th Cir. 2007)); *Arrington v. Sw. Bell Tel. Co.,* 93 Fed. Appx. 593, 599 (5th Cir. 2004)(per curiam)(unpublished*); Sparks v. L.M. Berry & Co.,* 1999 U.S. App. LEXIS 40637, *4-5 (5th Cir. June 8, 1999)(per curiam)(unpublished).

Chemical, including whether he had similar work rule violations compared to Wright (or any work rule violations at all).[143]   Moreover, there is no summary judgment evidence that Donnell was involved in any way in the sleeping incident that occurred in November 2014 or the no call/no show incident that ultimately led to Wright's termination.[144]   Moreover, Wright has not identified any similarly situated employees who were treated more favorably than he was under nearly identical circumstances with respect to the no call/no show incident that ultimately led to his termination.

Thus, when assessing Wright's race discrimination claim, neither Donnell nor the unidentified individual in the pink shirt (nor any other individual, for that matter) was similarly situated under nearly identical circumstances to Wright.   Because Wright cannot establish this critical *prima facie* element, his race discrimination claim fails as a matter of law and summary judgment is warranted.

### 2.      Chevron Phillips Chemical had a Legitimate Nondiscriminatory Reason for Wright's Termination

Even assuming Wright could make a *prima facie* case of race discrimination, his claim still fails because Chevron Phillips Chemical had a legitimate nondiscriminatory reason for terminating his employment.   Specifically, Chevron Phillips Chemical terminated Wright for violating the Company's Reporting Off and Returning to Work Policy – after he had received a final written warning for a serious safety violation a few months earlier, and just days after he

---

[143] Wright explained that he "had never even met" Donnell prior to the day of the Lock, Tag, Try incident.  Wright Dep. at 208.

[144] The same is true of the unidentified male in the pink shirt – there is no evidence that this individuals was involved in the Lock, Tag, Try incident or the no call/no show incident that ultimately led to Wright's termination.

received a last chance warning for sleeping on the job. Violation of company policy is a legitimate nondiscriminatory reason for disciplinary action, including termination.[145]

### 3. Wright Cannot Show that Chevron Phillips Chemical's Reason for Terminating His Employment was Pretext for Discrimination

Because Chevron Phillips Chemical has articulated a legitimate nondiscriminatory reason for its action, Wright can only avoid summary judgment if he produces evidence showing pretext. To establish pretext, Wright must show that Chevron Phillips Chemical's reason is false or "unworthy of credence" and motivated by discrimination.[146] To meet his burden, Wright cannot rely on unsubstantiated opinions and beliefs but instead "must produce *substantial* evidence of pretext."[147] Wright cannot meet this burden.

First, there is no credible summary judgment evidence that Chevron Phillips Chemical's reason for terminating Wright's employment is false or not credible. When an employee is terminated for violating company policy, the critical inquiry is not the employee's actual guilt or innocence, but rather whether the decision maker had a good faith belief that a policy violation occurred.[148] The fact that a decision maker may have been wrong about the violation does not, alone, make the employer's reason false or establish discriminatory motive.[149] Indeed,

---

[145] *See Cervantez v. KMGP Servs. Co.,* 349 Fed. Appx. 4, 9 (5th Cir. 2009)(unpublished); *Waggoner v. City of Garland,* 987 F.2d 1160, 1165-66 (5th Cir. 1993).

[146] *Laxton v. Gap, Inc.,* 333 F.3d 572, 578 (5th Cir. 2004); *Vaughn v. Woodforest Bank,* 665 F.3d 632, 637 (5th Cir. 2011); *Mack v. John L. Wortham & Son, L.P.,* 2013 U.S. App. LEXIS 18507, *10 (5th Cir. Sept. 5, 2013) (citing *Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1090 (5th Cir. 1995)); *Okoye v. Univ. of Tex. Houston Health Science Ctr.,* 245 F.3d 507, 514 (5th Cir. 2001)).

[147] *Auguster v. Vermillion. Parish Sch. Bd.,* 249 F.3d 400, 402-03 (5th Cir. 2001)(emphasis added).

[148] *Waggoner v. City of Garland,* 987 F.2d 1160, 1165-66 (5th Cir. 1993).

[149] *See Little v. Republic Refining co.,* 924 F.2d 93, 97 (5th Cir. 1991).

employers "can be completely mistaken in their decisions to terminate employees without violating" the law.[150]

The summary judgment record shows that Chevron Phillips Chemical investigated each incident leading up to Wright's termination for the no call/no show violation before issuing any discipline to Wright.  Moreover, it was only after Wright committed his third violation over the course of a just a few months that Chevron Phillips Chemical reached the decision to terminate his employment.  Notably, with respect to each incident leading up to his termination, Wright admits to some culpability.  Regarding the Lock, Tag, Try incident, Wright admits that he made mistakes and failed to follow the correct process.  Regarding the sleeping incident, Wright admits that during the investigation he told members of the HR team that it was "possible" he fell asleep.  Finally, regarding the no call/no show incident that led to his termination, Wright admits that he did not call a supervisor or anyone else at Chevron Phillips Chemical to report his absence, despite receiving notice that it was his responsibility to do so.  Given this record, there is no basis to second-guess Chevron Phillips Chemical's decision, or to conclude that Chevron Phillips Chemical's rationale for terminating Wright is false.[151]

Additionally, there is no evidence that Chevron Phillips Chemical was motivated by race discrimination in any way, including when it terminated Wright's employment.  As previously described, the Company terminated Wright after a series of policy violations over the course of just a few months.  Even assuming Wright was confused on the third incident when he violated the no call/no show policy, his confusion has no bearing on what motivated Chevron Phillips

---

[150] *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 489 (5th Cir. 2004); *Corley v. Jackson Police Dep't*, 566 F.3d 994, 1003 (5th Cir. 1978); *Duff v. Farmers Ins. Exch.*, 2014 U.S. Dist. LEXIS 54835, * 11 (N.D. Tex. Apr. 21, 2014).
[151] *Deines v. Texas Dept. of Protective & Regulatory Servs.*, 164 F.3d 277, 281 (5th Cir. 1999) ("[D]iscrimination laws [are not] vehicles for judicial second-guessing of business decisions.").

Chemical when it made the decision to terminate his employment.  Further, Wright's subjective beliefs or opinions are not enough to establish that Chevron Phillips Chemical was motivated by some discriminatory animus.[152]  The summary judgment record shows that Chevron Phillips Chemical terminated Wright after it investigated and concluded (based, in part, on Wright's own admission) that he failed to contact a supervisor or anyone else at the Company regarding his absence from work, after having previously received a final written warning and a last chance warning for other violations.  Based on this evidence, Wright cannot show pretext and his race discrimination claim fails as a matter of law.

## B.   Plaintiff's Claim for Retaliation Fails as a Matter of Law

The Fifth Circuit also applies the *McDonnell Douglas* burden-shifting framework to retaliation claims under Title VII.[153]  To succeed on his retaliation claim, Wright must first make a *prima facie* case of retaliation.[154]  If Wright establishes a *prima facie* case of retaliation, the burden then shifts to Chevron Phillips Chemical to articulate a legitimate non-retaliatory reason for its action.[155]  Once Chevron Phillips Chemical articulates a legitimate non-retaliatory reason, Wright must prove that Chevron Phillips Chemical's stated reason is actually pretext for retaliation.[156]  To prove pretext, Wright must ultimately show that his act of engaging in protected activity was the "***but for***" cause of the adverse employment action.[157]

---

[152] *Vasquez v. Nueces County, Texas,* 551 Fed. Appx. 91, 94 (5th Cir. Dec. 19, 1994).
[153] The same analysis applies under Section 1981 and the Texas Labor Code.  *Willis v. Cleco Corp.,* 749 F.3d 314, 317 (5th Cir. 2014); *M.D. Anderson Hosp. and Tumor Inst. v. Willrich,* 28 S.W.3d 22, 24 (Tex. 2000).
[154] *McCoy,* 492 F.3d at 556-57.
[155] *Id. at 557.*
[156] *Id.*
[157] *Hockman v. Westward Comm'ns, LLC,* 407 F.3d 317, 331 (5th Cir. 2004); *Long v. Eastfield Coll.,* 88 F.3d 300, 305 (5th Cir. 1996) (emphasis added).

### 1.      Wright Cannot Make a *Prima Facie* Case of Retaliation

To establish a prima facie case of retaliation, Wright must show that (1) he engaged in protected activity; (2) he experienced an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action.[158]

### a.      Wright Did Not Engage in Protected Activity.

Title VII does not protect every activity or complaint made by an employee at work. Rather, "protected activity" includes conduct where an employee has (1) opposed an employment practice that is protected by the law, (2) made a charge of discrimination, or (3) testified, participated in or assisted with an investigation or proceeding under the law.[159]  To prove the "opposition" clause, the employee must show more than subjective good faith and instead prove that he had an objectively "reasonable belief that the employer was engaged in unlawful employment practices."[160]  Generic complaints about workplace interactions do not qualify as protected activity under Title VII.[161]  Moreover, complaints that fail to mention a race-related component (or some other protected class component) are not deemed to be protected activities.[162]

Here, Wright admits that he never complained to anyone in management or to HR about any alleged discrimination.  Wright apparently bases his entire retaliation claim on the single email communication he had with Pete Cella following the Lock, Tag, Try incident, which

---

[158] *Hernandez v. Yellow Transportation, Inc.,* 670 F.3d 644, 657 (5th Cir. 2012); *Pierce v. Texas Dept. of Criminal Justice,* 37 F.3d 1146, 1151 (5th Cir. 1994).

[159] *Mota v. Univ. of Texas Houston Health Science Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427-28 (5th Cir. 2000).

[160] *Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1140 (5th Cir. 1981); *Harvey v. Chevron USA, Inc.,* 961 F. Supp. 1017, 1032 (S.D. Tex. 1997).

[161] *See Harvey*, 961 F.Supp. at 1032-33.

[162] *See Davis v. Dallas Indep. Sch. Dist.,* 448 Fed. Appx. 485, 492 (5th Cir. 2001); *Tratree v. BP N. Am. Pipelines, Inc.,* 277 Fed. Appx. 390, 396 (5th Cir. 2008); *Harris-Childs v. Medco Health Sols., Inc.,* 169 Fed. Appx. 913, 916 (5th Cir. 2006); *Moore v. United Parcel Serv., Inc.,* 150 Fed. Appx. 315, 319 (5th Cir. 2005).

occurred approximately two months prior to his termination (and before the intervening sleeping and no call/no show incidents).  However, Wright's communication with Cella does not qualify as "protected activity" under the law.  First, Wright explained that when he was describing "the situation" to Cella, he was only inquiring about the status of his suspension, nothing more.  Second, nowhere in Wright's communication to Cella does he complain about any alleged discrimination or unlawful conduct, particularly based on race.  To the contrary, Wright only notifies Cella of the incident leading to his suspension and asks Cella to check on the status of the pending investigation and his return to work.  The email itself clearly shows that Wright never raised any complaints to Cella about how he was treated compared to anyone else, including Donnell, or about any perceived discrimination.  In other words, all Wright did in his email to Cella was inquire about a pending disciplinary matter, which does not amount to protected activity under the law.  Because Wright does not have any summary judgment evidence showing that he engaged in protected activity, his retaliation claim fails as a matter of law at the *prima facie* stage and summary judgment is proper.

### b.    There is No Causal Connection.

Even if Wright could show that he engaged in protected activity when he emailed Cella about the Lock, Tag, Try incident, he still cannot show a sufficient causal link between that activity and any adverse employment action he experienced, including his termination approximately two months later.  First, temporal proximity and mere chronology of events are not sufficient, without more, to establish a causal link between an alleged protected activity and an adverse action.[163]  Thus, the fact that Wright was disciplined for other work rule violations after he emailed Cella is not sufficient by itself to demonstrate that his email to Cella was

---

[163] *See Moini v. Univ. of Texas at Austin,* 832 F.Supp. 2d 710, 714 (W.D. Tex. 2011)(it is a "well-known logical fallacy" to conclude that two events are connected just because they follow one another in chronological order).

causally linked to any subsequent discipline, including his termination.  Additionally, Wright's termination occurred approximately two months after his email to Cella, and after two intervening events related to other policy violations Wright committed.  Even assuming there is sufficient temporal proximity between the events, the intervening policy violations defy any suggestion of a connection between Wright's email to Cella and his ultimate termination.[164]

Further, the summary judgment evidence shows that Chevron Phillips Chemical's policies prohibited sleeping on the job, and that the Company suspended Wright and issued a last chance warning after it investigated the sleeping incident.  During the investigation, Wright actually conceded that he may have fallen asleep.  The summary judgment record also shows that Chevron Phillips Chemical's policies required employees to call their supervisors or someone else at the Company to report their absences from work, even after the implementation of the Total Absence Management Program/UPMC process.  Wright acknowledged (albeit reluctantly) that the Company expected him to follow the usual policies for reporting off from work even after the introduction and implementation of the UPMC system.  In light of this, Wright simply cannot establish any connection at all between his communication with Cella and any of the discipline he received leading up to and including his termination.  Accordingly, Wright's retaliation claim fails at the *prima facie* stage and summary judgment is proper.

### 2. Chevron Phillips Chemical had Legitimate Non-Retaliatory Reasons for its Actions Against Wright, Including His Termination

Even assuming Wright could establish a *prima facie* case of retaliation, his claim still fails because Chevron Phillips Chemical had legitimate non-retaliatory reasons for the actions it took.  As previously described, Chevron Phillips Chemical disciplined Wright, and ultimately

---

[164] *See McCullough v. Houston County, Texas*, 297 Fed. Appx. 282, 289 (5th Cir. 2008); *see also Clark County Sch. Dist. v. Breeden*, 121 S.Ct. 1508 (2001)(citing cases holding that three and four months between protected activity and adverse employment action were insufficient to show causal link).

terminated his employment, when he violated the Company's no call/no show policy, after previously receiving a final written warning and a last chance warning for other policy violations.  Violating company policy is a legitimate non-retaliatory reason for terminating an employee's employment, and erases any presumption of retaliation that may have been arisen during the *prima facie* stage.[165]

### 3. Wright Cannot Show that Chevron Phillips Chemical's Reason for Terminating His Employment was Pretext for Retaliation

Because Chevron Phillips Chemical has articulated a legitimate non-retaliatory reason for its action, Wright can only avoid summary judgment if he produces evidence showing pretext. To establish pretext, Wright must show that Chevron Phillips Chemical's reasons for its adverse employment actions are false and that the Company was motivated to retaliate against him.[166] Wright's subjective beliefs are not sufficient to establish pretext.[167]   Rather, Wright must produce evidence showing that his protected activity was the "***but for***" cause of Chevron Phillips Chemical's actions against him.[168]

For the reasons previously described, Wright cannot show that Chevron Phillips Chemical's actions were pretext for retaliation.  The summary judgment record shows that Chevron Phillips Chemical investigated Wright for two different and independent policy violations after he emailed Cella about the Lock, Tag, Try incident.  The summary judgment record also shows that Wright admitted to some culpability during each incident.  Although Wright believes that he was singled out because of his email to Cella, his subjective beliefs and opinions are not enough to show a "but for" connection between his communication with Cella

---

[165] *Prewitt v. Continental Automotive,* 2014 U.S. Dist. LEXIS 22306 (W.D. Tex. 2014).

[166] *Martinez v. Bohls Bearing Equip. Co.*, 361 F.Supp.2d 608, 617 (W.D. Tex. 2005).

[167] *Pennington v. Tex. Dept. of Family & Protective Servs.,* 469 Fed. Appx. 332, 339 (5th Cir. 2012).

[168] *Univ. of Tex. SW Med. Ctr. v. Nassar,* 113 S.Ct. 2517, 2534 (2013); *Septimus v. Univ. of Houston,* 399 F.3d 601, 608 (5th Cir. 2005).

18221733v.3

and any subsequent adverse employment action he experienced, including his termination.  Thus,

there is clearly no credible summary judgment evidence supporting Wright's claim for retaliation

and summary judgment is proper.

## V.        CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, Chevron Phillips Chemical Company LP respectfully requests

that the Court grant its Motion for Summary Judgment, dismiss Plaintiff's claims in their entirety

with prejudice, and grant Chevron Phillips Chemical Company LP such other and further relief,

at law and in equity, to which it is justly entitled.

Respectfully submitted,

By:     /s/ *Marlene C. Williams*
        Scott R. McLaughlin
        State Bar No. 00791234
        Fed ID No. 18138
        Marlene C. Williams
        State Bar No. 24001872
        Fed ID No. 22824
        JACKSON WALKER L.L.P.
        1401 McKinney, Suite 1900
        Houston, Texas  77010
        (713) 752-4200
        (713) 308-4221 (Fax)
        smclaughlin@jw.com
        mcwilliams@jw.com

        **ATTORNEYS FOR DEFENDANT
        CHEVRON PHILLIPS CHEMICAL
        COMPANY LP**

29

## CERTIFICATE OF SERVICE

This is to certify that on this 12th day of June, 2017, a true and correct copy of the foregoing was served electronically through the Court's ECF System to:

Marrick Armstrong
Attorney-in-Charge
State Bar No. 24057695
Email: marrick@srapllc.com
SMITH REED & ARMSTRONG PLLC
Robert L. Woods
WOODS LAW FIRM, P.C.
1920 Country Place Pkwy, Suite 350
Pearland, Texas 77584
Telephone: (281) 489-3934
Facsimile: (281) 809-8735

***ATTORNEYS FOR PLAINTIFF***
***SHERWIN WRIGHT***

/s/ *Marlene C. Williams*
Marlene C. Williams

18221733v.3