# EXHIBIT A

```
 1                   REPORTER'S RECORD
                   VOLUME 1 OF 1 VOLUMES
 2          IN THE MATTER OF THE ARBITRATION OF:
      SHERWIN TYRELL WRIGHT        )
 3                                 )
            GRIEVANT,              )
 4                                 )
      VS.                          )
 5                                 )
      CHEVRON PHILLIPS CHEMICAL    )
 6    COMPANY                      )
                                   )
 7       EMPLOYER                  )
                                   )
 8                                 )
                                   )
 9                                 )
   ***********************************************************
10
                          *****
11                ***ARBITRATION HEARING***
                          *****
12
   ***********************************************************
13      BE IT REMEMBERED that on June 10, 2015, the
14 following proceedings came on to be heard in the
15 above-entitled and numbered cause before the Honorable
16 T. Zane Reeves, Ph.D, Arbitrator presiding, held in
17 Houston, Harris County, Texas;
18            Proceedings reported by computerized
19 stenotype machine; Reporter's Record produced by
20 computer-assisted transcription.
21
22
23
24
25
```

```
 1                    A P P E A R A N C E S
 2
 3  FOR THE UNION:
 4    Patrick M. Flynn
      Hale Cullom
 5    BLAKENEY FLYNN & MUMEY
      1225 N. Loop West, Suite 1000
 6    Houston, Texas 77091
      Tel: 713.861.6163
 7    Fax:  713.222.9114
      E-mail:  pat@pmfpc.com
 8
 9  FOR THE EMPLOYER:
10    Marlene C. Williams
      JACKSON WALKER LLP
11    1401 McKinney, Suite 1900
      Houston, Texas 77010
12    Tel:  713.752.4447
      Fax:  713.308.4171
13    E-mail:  Mcwilliams@jw.com
14
    ALSO PRESENT:
15       Karen R. Monroe
         Senior Counsel/Chevron Phillips
16
         Lisa Laurin
17       HR Manager/Chevron Phillips
18       April Danford
         HR Business Partner/Chevron Phillips
19
         Michael Reedy
20       Chief Steward IBEW Local 716
21       D. Dale Wortham/IBEW Local 716
         Bob Priest/IBEW Local 716
22       Carlos Villarreal/IBEW Local 716
23
24
25
```

```
 1                      I N D E X
 2                                              PAGE
 3  June 10, 2015
 4  Appearances....................................   2
 5
    Proceedings....................................   7
 6
 7  KEITH BRABENEC
        Direct Examination by Ms. Williams........  16
 8      Cross-Examination by Mr. Flynn............  41
        Redirect Examination by Ms. Williams......  54
 9
    DEAN MERRITT
10      Direct Examination by Ms. Williams........  56
        Cross-Examination by Mr. Flynn............  63
11
    JOHN SMITH
12      Direct Examination by Ms. Williams........  67
        Cross-Examination by Mr. Flynn............  81
13      Redirect Examination by Ms. Williams......  87
        Recross-Examination by Mr. Flynn..........  89
14      Redirect Examination by Ms. Williams......  90
        Recross-Examination by Mr. Flynn..........  91
15
    VIRGINIA HUBBARD
16      Direct Examination by Ms. Williams........  93
        Cross-Examination by Mr. Flynn............ 129
17      Redirect Examination by Ms. Williams...... 148
        Recross-Examination by Mr. Flynn.......... 152
18
    ANDY WOODS
19      Direct Examination by Ms. Williams........ 153
        Cross-Examination by Mr. Flynn............ 163
20
    ADAM SAINATO
21      Direct Examination by Ms. Williams........ 167
        Cross-Examination by Mr. Flynn............ 190
22      Redirect Examination by Ms. Williams...... 198
23  LISA LAURIN
        Direct Examination by Ms. Williams........ 200
24      Cross-Examination by Mr. Flynn............ 213
        Cross-Examination by Mr. Flynn............ 221
25      Redirect Examination by Ms. Williams...... 223
```

1 MICHAEL REEDY
       Direct Examination by Ms. Williams........ 226
2      Cross-Examination by Mr. Flynn............ 234
3 JON DAVID HIGGINS
       Direct Examination by Mr. Flynn........... 245
4      Cross-Examination by Ms. Williams......... 250
       Redirect Examination by Mr. Flynn......... 255
5      Recross-Examination by Ms. Williams....... 256
6 SHERWIN TYRELL WRIGHT
       Direct Examination by Mr. Flynn........... 257
7      Cross-Examination by Ms. Williams......... 283
8
  Reporter's Certificate........................ 315
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                     E X H I B I T S
 2  Exhibit           Description                    Page
 3  Exhibit    COLLECTIVE BARGAINING AGREEMENT          7
    J1         OF 2012-2015
 4
    Exhibit    INTERNATIONAL BROTHERHOOD OF             8
 5  J2,        ELECTRICAL WORKERS GRIEVANCE FORM
               AND RECORD OF PROCEEDINGS
 6
    Exhibit    CHEVRON PHILLIPS LETTER OF DENIAL        8
 7  J3         DATED DECEMBER 23, 2014 RE: S.
               TYRELL WRIGHT TERMINATION HEARING
 8
    Exhibit    INTERNATIONAL BROTHERHOOD OF             8
 9  J4         ELECTRICAL WORKERS MOVE TO
               ARBITRATION LETTER DATED DECEMBER
10             23, 2014
11  Exhibit    ISOLATION LIST #42 PREPARED BY S.       30
    M1         PATTON 9/19/14 LOCK BOX #42
12
    Exhibit    FINAL WRITTEN WARNING AND              112
13  M2         TWO-WEEK SUSPENSION LETTER DATED
               OCTOBER 30, 2014 FROM ANDY WOODS
14             TO TYRELL WRIGHT
15  Exhibit    WORKING RULES & DISCIPLINE POLICY      124
    M3         PASADENA PLASTICS COMPLEX
16
    Exhibit    COLOR POSTER/ONE CALL DOES IT          131
17  U1         ALL!
18  Exhibit    LAST CHANCE LETTER DATED NOVEMBER      161
    M4         18, 2014 FROM ANDY WOODS TO
19             TYRELL WRIGHT
20  Exhibit    PASADENA PLASTICS COMPLEX              181
    M5         EMPLOYEE PROCESS FOR REPORTING
21             OFF OF AND RETURNING TO WORK
22  Exhibit    TOTAL ABSENCE MANAGEMENT UPMC          186
    M6         WORK PARTNERS
23
    Exhibit    E-MAIL FROM TYRELL WRIGHT TO PETE      262
24  U2         L. CELLA DATED OCTOBER 27, 2014
               RE: PASADENA FACILITY INCIDENT
25
```

```
 1              E X H I B I T S (Continued)
 2  Exhibit    CLINIC VISIT PROGRESS NOTES          272
    U3         REPORT DATED 02/05/2015 RE:
 3             SHERWIN WRIGHT
 4  Exhibit    SPRINT CALL DETAILS RE: (832)        279
    U4         969-6193 SHERWIN WRIGHT
 5
    Exhibit    EAST HOUSTON MEDICAL GROUP RETURN    282
 6  U5         TO WORK LETTER DATED 11/20/2014
               FROM DR. LORIE CRAM
 7
    Exhibit    EMPLOYEE ACKNOWLEDGEMENT OF          307
 8  M7         RECEIPT OF PLANT WORKING RULES
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          THE WITNESS:  I'm doing fine.

2          THE ARBITRATOR:  Good.  Will you raise

3 your right hand?

4          THE WITNESS:  (Complies.)

5          (Oath administered; witness sworn.)

6          THE ARBITRATOR:  And would you give us

7 your full name for the record and job title?

8          THE WITNESS:  Keith Brabenec, Senior

9 Instrument Engineer, projects group.

10         THE ARBITRATOR:  Would you spell your

11 last name, please?

12         THE WITNESS:  B-R-A-B-E-N-E-C.

13         THE ARBITRATOR:  E-N-E-C?

14         THE WITNESS:  Uh-huh.

15         THE ARBITRATOR:  And you are the chief

16 engineer?

17         THE WITNESS:  Yeah, senior engineer.

18         THE ARBITRATOR:  Senior engineer.  And

19 where is your place of employment?

20         THE WITNESS:  The Woodlands, Chevron

21 Phillips.

22         THE ARBITRATOR:  Okay.  Thank you.

23 Ms. Williams?

24

25

1 Chevron Phillips.

2     Q.    And in that position, where did you report to

3 work?

4     A.    I reported to the Pasadena Plastics facility.

5     Q.    How long were you in that position?

6     A.    I was in that position for approximately four

7 years.

8     Q.    During the time period 2014, were you the IEC

9 controls manager?  Did I get that correct?

10     A.    Instrument Electrical Controls Maintenance

11 Superintendent.

12     Q.    Maintenance Superintendent.  Okay.  Throughout

13 the entire period of 2014, correct?

14     A.    Correct.

15     Q.    What were your responsibilities in that

16 position?

17     A.    My responsibilities was the management of all

18 instrumentation, electrical and controls activity for

19 the Pasadena facility.  So I managed the engineering

20 aspects and the day-to-day maintenance aspects.

21     Q.    Can you briefly describe the -- the Pasadena

22 Plastics -- the Pasadena Plastics Complex; exactly the

23 business involved there?

24     A.    Yes.  The Pasadena Plastics Complex in 2014

25 comprised of three polyethylene production units.  And

1 along with utility units, electrical distribution,

2 things like that.

3    Q.    In your role at Pasadena, did you -- were

4 there -- did you have employees reporting to you?

5    A.    Yes.

6    Q.    What positions reported to you?

7    A.    I had four direct reportees.  That was the

8 tech shop supervisor, the maintenance engineering team

9 leader position, and then two instrument and electrical

10 maintenance supervisors.

11    Q.    Who were the two instrument and electrical

12 maintenance supervisors that reported to you?

13    A.    That was Jerry Kelly and Darren Barnes.

14    Q.    There were obviously electricians who worked

15 at the Pasadena complex as well?

16    A.    Yes.

17    Q.    And the electricians at Pasadena, to whom did

18 those positions report?

19    A.    The electricians reported to either Jerry

20 Kelly or Darren Barnes.

21    Q.    In 2014, were there any major projects going

22 on at the Pasadena complex?

23    A.    In 2014, we did have a large turnaround that

24 was going on in our Plant 8, polyethylene plant unit.

25    Q.    What's a turnaround?

1      A.    A turnaround is a major activity where the --
2 the unit will be shut down and brought to a safe state
3 so several maintenance and project work can be executed
4 within the plant.

5      Q.    The Plant 8 turnaround in 2014, what
6 specifically was happening with respect to that
7 turnaround?

8      A.    In that turnaround, the main thing we were
9 doing was implementing a project.  It was called the
10 Plant 8 Margin Improvement Project, where we were making
11 several modifications to the process unit.

12     Q.    And what type of modifications were involved
13 with this?

14     A.    There was some demo work that was going on.
15 We were going to replace what's called the flash line
16 heaters.  We were going to install a new pelletizer on
17 our extruder.  We installed a new load-out system and a
18 new co-catalyst feed system, were the main portions of
19 the project.

20     Q.    These activities that you've just described,
21 did it involve electrical work?

22     A.    Yes.

23     Q.    Okay.  In what respect did it involve
24 electrical work?

25     A.    From an electrical standpoint, going into a

1  turnaround, the first thing -- one of the first things

2  we do is we have to go do lock, tag, try; which is,

3  again, an OSHA mandated policy to where you have to

4  bring all energy sources to a safe state before

5  maintenance can begin.

6                    And so from an electrical standpoint, what

7  we do is we support our operations group. We as the

8  electrical department, support the operations group to

9  go through and de-energize and get all electrical

10  hazards to a safe state.

11      Q.   And with respect to this project, there were

12  actual components that required de-energizing within the

13  turnaround project?

14      A.   Yes.

15      Q.   Can you describe for us the process of

16  de-energizing on a process like this?

17      A.   Yes.  The process is -- it starts with

18  identifying all of the isolation components.  And that

19  is done via an isolation list.  And so the scope of work

20  that's going to be involved is evaluated, and all of the

21  electrical isolation points are identified.

22                    And then once that identification is done

23  and checked by a second set of eyes, once the -- once

24  the unit comes down, the craftsmen and the operations

25  group will work together to go out and actually

1 de-energize the breakers that are associated with that
2 scope of work that are identified on the isolation list.
3     Q.    In general terms, how does one go about
4 de-energizing the breakers?
5     A.    Typically, de-energizing the breakers, you go
6 to what's called an MCC or motor control center.  And
7 you'll actually identify the breaker that needs to be
8 de-energized and turn the breaker handle to the open or
9 off position; verify that there is no power leaving from
10 the breaker, there's no energy source, no conduct.
11                 Verify voltage, current, those kind of
12 things.  And then once it's verified that it's been
13 de-energized, the physical lock will be placed on the
14 handle, per the lock tag procedure.
15     Q.    You said typically that's what happens.  Are
16 there certain circumstances where it would require
17 activity beyond what you just described?
18     A.    Yes.  There are some certain occasions where,
19 again, depending on the scope of work, that we cannot
20 actually apply a physical lock to the breaker handle.
21                 And one -- and when that happens, what we
22 will typically do is air gap what we call the T-leads.
23 Those are the wires that actually leave the breaker that
24 feed whatever device is -- like let's just say for
25 instance a motor.

1              We'll disconnect the wires going from the
2    breaker to the motor; create an air gap.  And so when
3    you do that, then your energy source is secured at that
4    point.  And then at that point in time, let's say for
5    instance you have to pull the breaker during the
6    turnaround, by disconnecting the T-leads, it now allows
7    you to do that work on two breaker itself without having
8    to remove locks.

9         Q.    In this -- do you recall for this particular
10   project whether there were instructions that involved
11   de-energizing that included disconnecting the T-leads?

12        A.    Yes.

13        Q.    And do you have an understanding as to why for
14   in particular project it would have been important to
15   disconnect the T-leads as opposed to turning the breaker
16   to the open or off position?

17        A.    Yes.

18        Q.    What is that?

19        A.    In this particular case, we had several
20   breakers that needed to be replaced as part of the scope
21   of this project.  And so it was identified on the
22   isolation list to go in and disconnect the T-leads from
23   the breaker as part of the lock, tag, try.

24        Q.    And remind us again why it was important in
25   this instance to actually disconnect the T-leads?

1      A.    Again, in order to remove the breaker, you
2 cannot remove a breaker that already has a lockout
3 device on it.  And so by removing the T-leads allowed us
4 to go in and execute the breaker removal scope of the
5 job.
6      Q.    And in the absence of removing the T-leads,
7 what were the potential problems that could have been
8 caused in this instance?
9      A.    If you do not remove the T-leads, then, again,
10 you do not have a valid locking; which basically puts
11 workers in harm's way because if you don't have a
12 lockout on 480 volts, it could lead to serious injury.
13              MS. WILLIAMS:  (Marks an exhibit.)
14              THE ARBITRATOR:  What my practice is, is
15 to mark them and see if there are any objections.  Will
16 the witness be getting one?
17              MS. WILLIAMS:  He'll be getting this one.
18              THE ARBITRATOR:  I need for him to
19 identify it.  Can you tell us what that is?
20              THE WITNESS:  Yes.  This is the lock
21 Box 42 that was executed during the Plant 8 turnaround.
22              THE ARBITRATOR:  And do you have any
23 objections?
24              MR. FLYNN:  Just still looking at it.
25              THE ARBITRATOR:  Okay.

1 reflect? Starting on page 1, I'm sorry.

2     A.     Yes.    Location of lock or tagout on equipment.

3 Again, this is the description of the isolation point

4 that needs to be basically locked out.

5     Q.     Okay.

6     A.     Lock, tag, try needs to be applied.

7     Q.     And you notice -- I think if you flip to page

8 2 and page 3, there are some rows within that column

9 that are highlighted; do you see that?

10     A.     Yes.

11     Q.     Was the highlighting actually on the original

12 isolation list during the turnaround project?

13     A.     Yes.

14     Q.     Do you have an understanding as to why those

15 sections were highlighted?

16     A.     Yes.

17     Q.     What is your understanding?

18     A.     The understanding is for that to call

19 attention, again, to the operations and maintenance

20 folks that were going to be executing the lock, tag, try

21 for these particular isolation points.

22               Again, as I described before, this was a

23 different-than-normal lockout to where the T-leads

24 needed to be removed for proper isolation.

25     Q.     Was the highlighting as -- to your

1     Q.    What is your recollection about that incident?

2     A.    The incident was when we got into the

3 turnaround in Plant 8 and this particular isolation list

4 was to be executed.  The operation folks called over to

5 our maintenance supervisor, who was Darren Barnes at the

6 time, to request assistance -- electricians to assist in

7 this isolation; in particular, the Points 3, 4, 5, 6,

8 and 7, for this exhibit.

9             And see, Tyrell Wright was actually the

10 one who reported over and met up with the operations

11 group at the MCC to execute and assist in this isolation

12 activity.

13     Q.    Do you know how Tyrell Wright was assigned to

14 meet up with the operations group?

15     A.    Darren Barnes assigned Tyrell to go over and

16 meet up with the Plant 8 operations.

17     Q.    And what did you learn about -- you know, the

18 specific incident or issue with respect to Items 3

19 through 7 on this isolation list?

20     A.    Well, what we ended up finding out was that

21 the lockout was not executed properly per the

22 instructions on the isolation list.  The T-leads were

23 not removed as per the instructions on the isolation.

24     Q.    Let me back up a little bit.  From whom did

25 you actually learn there was an issue involving the

1 T-leads here?

2      A.    I believe it was our I&E construction
3 coordinator, Mr. Scott notified me.

4      Q.    And what did he indicate to you specifically?

5      A.    He indicated to me that there were some --
6 there was some demo work that was executed by the
7 contractor that was done without a proper lockout tagout
8 or lock, tag, try.

9      Q.    And what did you do in response to receiving
10 that information?

11      A.    I immediately went down to the Plant 8
12 operating area and met up with several folks to
13 basically visually look and see what was going on and
14 start getting assessment of, you know, what potentially
15 happened and start to gather facts.

16      Q.    In your fact finding, what did you discover?

17      A.    What I discovered was that, indeed, there was
18 work that had been done on electrical conductors, again,
19 without a proper lock, tag, try.

20            I did discover that the T-leads, again,
21 were not removed properly.  And so there was not an
22 adequate lockout or lock, tag, try.

23      Q.    When did you learn that Mr. Wright was the
24 electrician who was responsible for performing those
25 tasks that are identified at 3 through 7 in this

1 isolation list?

2     A.    What I did was I went to the lock box, to Lock

3 42 and got a copy of the completed isolation list.  And

4 under the electrical de-energized and verified by

5 column, I saw the initial "TW," which represented Tyrell

6 Wright.  And that's how I knew Tyrell was actually

7 involved in this lock, tag, try.

8     Q.    What did you do in terms of your fact finding?

9     A.    Basically, what I did was start to identify

10 all the folks that were involved in this incident, and

11 did impromptu interview sessions with those folks and

12 actually took notes, again, based on certain questions

13 and their responses to, again, gather facts and try to

14 build a chronological set of events as to, you know, how

15 this incident -- you know, how we got to this incident.

16     Q.    Do you recall when the incident happened in

17 relation to when you learned that there was a problem

18 where the T-leads had not been disconnected?  About how

19 much time had passed?

20     A.    Can you rephrase that, please?

21     Q.    Can you recall from the date of the actually

22 activity that's on the isolation list, when Mr. Wright

23 went out to perform the activities listed in 3 through

24 7, from that period of time until the time you actually

25 learned that there was an issue where the T-leads had

1 not been disconnected?  Do you know about how much time

2 passed between those two events?

3      A.    It was several days, I believe.

4      Q.    Okay.  Did you -- in gathering your facts, did

5 you speak to Mr. Wright himself?

6      A.    Yes.

7      Q.    Okay.  And do you recall Mr. Wright's response

8 to the questions you raised about these events and how

9 the activities or the tasks were completed?

10      A.    Yes.

11      Q.    What did he say?

12      A.    Basically, when we talked with Mr. Wright,

13 asked him several questions about whether he was

14 actually the person that was called over to disconnect

15 the T-leads and execute this isolation list.  He did

16 agree that yes, he was there.

17                And, again, in his statements, basically

18 he said that he went over, he turned the breakers off,

19 and then signed off on the isolation list.

20      Q.    Did he have an explanation as to why he did

21 not disconnect the T-leads?

22      A.    I don't recall.

23      Q.    Upon talking to Mr. Wright and hearing his

24 explanation, I mean, what were your -- what was your

25 reaction to that?

1      A.    I guess my reaction was when asked about,

2 again, the highlighted sections of the isolation list

3 and the explicit instructions to call electricians to

4 disconnect T-leads, why that wasn't executed.

5            Again, he didn't have a very clear answer

6 for that.  And so it was, I guess, surprising to me that

7 no questions were asked.  Typically, what would happen

8 is if you get into a situation where something is not

9 understood, the expectation for the company that is

10 following our tenets of operation is to stop and ask

11 questions.  Get people involved.

12            That did not happen.  Tyrell did not

13 contact his supervisor, which would have been the

14 expected response if a situation was not understood; nor

15 did he have any further discussions with other

16 electricians or operations folks or anybody.

17      Q.    And just to be clear, in your discussion with

18 him, he never suggested to you that he was confused by

19 these instructions, did he?

20      A.    No.

21      Q.    Okay.  And in your experience, is there

22 anything ambiguous about the instructions that are

23 listed in Items 3 through 7?

24      A.    No.

25      Q.    Okay.  After you gathered your initial facts,

1  did you do anything else with respect to this issue?

2      A.   Again, we did -- you know, a formal sit-down

3  fact gathering with Mr. Wright and others from our HR

4  department.  Followed up with some other folks to get

5  objective clarifications after all the fact finding, and

6  then had a second meeting with Mr. Wright just to

7  clarify -- clarify some things and get a better

8  understanding.

9      Q.   What -- during the second meeting, what

10 specifically were you trying to clarify; do you recall?

11     A.   Again, trying to clarify why the T-leads,

12 again, were not disconnected as per the isolation list.

13          There was some disagreements or I guess

14 inconsistencies in testimonies in terms of whether

15 Tyrell told the operator that everything was fine versus

16 whether Tyrell told the operator that it's okay; I'll

17 take care of it.  I need to go back to the shop and get

18 some tools.

19          So, again, there were some

20 inconsistencies, and we tried to clarify them.

21     Q.   Were you ever able to clarify those

22 inconsistencies?

23     A.   Not 100 percent, no.

24     Q.   At the end of the day, did those

25 inconsistencies impact your decision as to whether or

1  not there was a serious violation here?

2      A.    Yes.

3      Q.    And explain that.

4      A.    Well, again, there were inconsistencies; but

5  it was a clear violation of lock, tag, try.  And, again,

6  it is the expectation of our electrical group and

7  basically everybody within Chevron Phillips to follow

8  the tenets of operation and those tenets were not

9  followed.

10     Q.    Speaking of the tenets of operation, Chevron

11 Phillips Chemical operates under a process where an

12 electrician or anybody within your facility, if they

13 have any question about something that impacts the

14 safety of the operation or coworkers, it's their

15 obligation to actually stop and ask questions before

16 they proceed; is that correct?

17     A.    Yes.

18     Q.    Okay.  And is that something that you discuss

19 with employees in your capacity at both -- at Pasadena

20 in your current role?

21     A.    Yes.

22     Q.    Did Mr. Wright ever indicate that there was

23 anything preventing him from raising questions with

24 respect to any confusion he might have about this

25 project?

```
 1      A.    No.

 2      Q.    Was it your expectation that if he had

 3 questions about these particular tasks that he would

 4 have stopped and actually addressed them with someone?

 5      A.    Yes.

 6      Q.    And in your verification, did you ever

 7 discover that he actually did that?

 8      A.    No.

 9            MS. WILLIAMS:   I'll pass the witness.

10            THE ARBITRATOR:   Go ahead.

11                    CROSS-EXAMINATION

12 BY MR. FLYNN:

13      Q.    Mr. Brabenec, do you know if Mr. Wright was

14 sent home from the company at any point in time

15 involving around this issue?

16      A.    Yes.

17      Q.    And when was that?

18      A.    It was -- I don't know the -- recall the exact

19 date.   I believe it was around September 29th or

20 September 30th.

21      Q.    Okay.   And were you involved in that or you

22 just heard about it?

23      A.    No, I was involved in the decision to send

24 Mr. Wright home.

25      Q.    And was it without pay?
```

1       A.    Yes.

2       Q.    And then at some point subsequent to that,

3  Mr. Wright was brought back.    Are you aware of that?

4       A.    Yes.

5       Q.    And what do you know about that?

6       A.    What I do know is that it was discussed and

7  that he was allowed to come back to the facility with

8  certain restrictions; that I'm not privy to the details

9  of those specific restrictions.

10      Q.    And do you recall when that occurred?

11      A.    Approximately three weeks from the time that

12 he left.

13      Q.    And you weren't involved in administering any

14 discipline to him?

15      A.    No.

16      Q.    Who is Pete Cella?

17      A.    Pete Cella is the Chief Executive Officer for

18 Chevron Phillips.

19      Q.    Is that C-E-L-L-A?

20      A.    Yes, I believe so.

21      Q.    And where does he office?    Is he up at the

22 Woodlands?

23      A.    He is up at the Woodlands, yes.

24      Q.    And do you know that while Mr. Wright was out

25 after September 29 or 30, he wrote an e-mail to

1          THE ARBITRATOR:  Who is your next

2 witness?

3          MS. WILLIAMS:  Dean Merritt.

4          (Oath administered; witness sworn.)

5          THE ARBITRATOR:  Will you give us your

6 full name for the record, please?

7          THE WITNESS:  Dean Allen Merritt.

8          THE ARBITRATOR:  And spell your last

9 name, please.

10          THE WITNESS:  M-E-R-R-I-T-T.

11          THE ARBITRATOR:  And what is your job

12 title and place of employment?

13          THE WITNESS:  Project Controls Manager

14 with Zachary Industrial.  Housed at the Chevron

15 Chemicals plant in Pasadena.

16          THE ARBITRATOR:  Okay.  Ms. Williams?

17              DEAN MERRITT,

18 having been first duly sworn, testified as follows:

19              DIRECT EXAMINATION

20 BY MS. WILLIAMS:

21     Q.  Good morning, Mr. Merritt.  My name is Marlene

22 Williams and I represent the Company in this matter.  I

23 just want, for housekeeping purposes, to let you know we

24 have a court reporter here who's taking down my

25 questions and your answers.

1 you came to learn that an employee was sleeping?

2      A.    Okay.   I was sitting in my office working.   I

3 had three ladies from the hallway next -- the next

4 hallway over that came to my office who said there's

5 somebody out here snoring.

6                 So I got up from my desk, walked around

7 the corner to verify that there was somebody snoring.

8 And sure enough, as soon as I got to the corner I could

9 hear somebody snoring.

10                So I proceeded over to the cubicle.   At

11 that time, I tried to wake the guy by saying, "Hey, wake

12 up.   Hey, get up."   There was no response.   So then I

13 nudged him a little bit on the shoulder and got a

14 response from him.

15                And at that time I heard a commotion

16 behind me, and I think there were four or five people

17 standing behind me outside the cubicle.   And I believe

18 it was Stan Zisman that said, "I got it from here."   And

19 I said okay.   No problem.

20                'Cause I was just trying to wake the guy

21 up, you know, get him up, go get some water, go get some

22 fresh air, move around, whatever.

23      Q.    Describe for us again where the employee was

24 located?

25      A.    In a cubicle.

1    Q.    Was it an African American employee?

2    A.    Yes, it was.

3    Q.    And you testified that you had never met this

4 employee before, correct?

5    A.    No.

6    Q.    You did not interact with him as a part of

7 your responsibilities, correct?

8    A.    No.

9    Q.    Okay.  When you -- and I think you testified

10 that when you were approaching the cubicle you could

11 hear?

12    A.    Yes.

13    Q.    What specifically did you hear?

14    A.    I heard a person snoring.  I mean, that's

15 basically what I heard.

16    Q.    And when you turned around the cubicle, you

17 saw the individual sleeping?

18    A.    Yes.  He was leaned back in a chair snoring.

19    Q.    Did you try to wake the individual up

20 verbally?

21    A.    Verbally I did, yes.

22    Q.    And did that work?

23    A.    No.

24    Q.    And so what did you do after that?

25    A.    I believe I nudged him on the shoulder.

1      Q.   Did he wake after that?

2      A.   Yes.  He responded after that.

3      Q.   Did he say anything when you woke him?

4      A.   No.  'Cause as soon as I woke him and he

5  looked up.  Like I said, there were people standing

6  behind me.  And that's when Stan said, "I have this."  I

7  said okay.

8      Q.   Did it appear to you that the individual was

9  in a deep sleep or was just nodding off?

10     A.   That, I don't know.  Like I said, I had a

11 minute to make that determination.  But to me, I would

12 assume he was asleep.

13     Q.   You heard the snoring after all?

14     A.   Yes, I heard the snoring.

15     Q.   The individuals who reported this to you, that

16 prompted you to go and see this, did they describe to

17 you what they observed before they reported it to you?

18     A.   They didn't walk around the corner.  They just

19 said they heard somebody snoring in the cubicle.  It was

20 distracting them.  And they came and told me.

21     Q.   Did they identify for you about how long this

22 had been going on, the snoring that they heard?

23     A.   Not that I recall.  But it was loud enough and

24 long enough that it bothered them.

25     Q.   After this -- and I think you indicated that

1  Stan Zisman said he had it from there.  You left?

2      A.    Yes.

3      Q.    Did you have any other involvement with

4  respect to this incident after this?

5      A.    I was asked to write statement.

6      Q.    Did you do that?

7      A.    Yes.

8      Q.    And what did your statement describe?

9      A.    Pretty much what I just discussed or just

10 stated.

11     Q.    And to whom did you provide that statement; do

12 you recall?

13     A.    To Adam "Santiato" (phonetic).

14     Q.    You don't recall his last name?

15     A.    No, I don't recall his last name.

16     Q.    Do you know his position or title?

17     A.    I believe he's in HR.

18     Q.    And I understand that you're an employee at

19 Zachary; but in your experience working at the Pasadena

20 complex, did you have an understanding as to whether

21 sleeping on the job violates Chevron Phillips' work

22 rules?

23     A.    Yes.

24     Q.    And does it?

25     A.    Yes.

1  or is Chevron paying?

2       A.    I'm assuming Zachary.

3       Q.    And you didn't get a subpoena to come down

4  here today?

5       A.    No.

6       Q.    All right.  Thank you.

7                 MR. FLYNN:  That's all I have.

8                 THE ARBITRATOR:  Ms. Williams?

9                 MS. WILLIAMS:  I have nothing further.

10                THE ARBITRATOR:  Thank you for coming

11  here today.

12                THE WITNESS:  Sure.

13                THE ARBITRATOR:  Your next witness?

14                MS. WILLIAMS:  The next witness is the

15  individual we'll have to get on the phone.

16                THE ARBITRATOR:  Okay.  Do we have

17  everything set up?  Yes.

18                MR. FLYNN:  What's his name again?

19                MS. WILLIAMS:  John Smith.

20                (Oath administered; witness sworn.)

21                THE ARBITRATOR:  Would you give us your

22  full name for the record and your place of employment

23  and your job title.

24                THE WITNESS:  My name is John Charles

25  Isaac Smith.  And I work for Chevron Phillips Pasadena,

1    Training Superintendent.

2                 THE ARBITRATOR:   Okay.   Thank you.   I'll

3    turn you over to Ms. Williams.

4                 THE WITNESS:   Okay.

5                        JOHN SMITH,

6    having been first duly sworn, testified as follows:

7                      DIRECT EXAMINATION

8    BY MS. WILLIAMS:

9        Q.    Hi, Mr. Smith.   This is Marlene Williams.   And

10   I represent the Company in this arbitration matter that

11   the Union has brought regarding a grievance related to

12   the termination of Tyrell Wright; do you understand

13   that?

14       A.    Yes.

15       Q.    Okay.   I just wanted to let you know and --

16   first of all, we appreciate you being flexible and being

17   available by phone today during your vacation and your

18   time off.   We do have a court reporter here.   She will

19   be taking down my questions and your answers.

20                 And, you know, because you're on the phone

21   as well, I'll just ask that you please allow me to

22   finish my question before you start your answer so that

23   she can get it -- everything down correctly, okay?

24       A.    Okay.

25       Q.    Okay.   How long have you been the training

1 went over the new training material. And we sat at the
2 computer to see if he could get logged on. And by the
3 end of the day when we saw that we were going to be
4 successful, we said okay; tomorrow we're going to start.
5 He'd do one module, and then we're going to go outside.
6               So the actual material was never -- the
7 next day is when he was locked back out for a no-call,
8 no-show incident.
9        Q.   Okay.  That next day where he -- the no-call
10 no-show incident occurred, can you tell us how you
11 became aware of that?
12       A.   Yes.  I was planning on him or expecting him
13 to be in the training area for 7:00 o'clock, 7:30.  And
14 I -- I show up at 7:00 o'clock, and I know that he was
15 supposed to report at 7:30.  So I thought that maybe a
16 little earlier he may come.
17               But I waited.  And by 7:45, he hadn't made
18 it.  But I expected to -- potentially there may be a
19 train that had him caught up.  So I had him checked and
20 I had the material set up 'cause I had a meeting that I
21 had to attend.
22               I attended the meeting.  Got out of it at
23 about 8:30.  Went to the area that the day before I told
24 him to meet me at, and saw that the material wasn't
25 moved at all.  So I thought that maybe he misunderstood

1 and went to the shop 'cause I told him we would be doing
2 certain things at the shop.

3          So I called down at the shop.  They hadn't
4 seen him.  They said no, he has not reported there.  So
5 I went and tried to see (inaudible) maybe if he grabbed
6 Tyrell to have a conversation with him.  And he said he
7 had not spoken to him.  So at that time, I went to one
8 of our payroll employees, Ms. Deborah Petry, and asked
9 if she could possibly give me his contact information so
10 I could try to call his cell or home phone or whatever
11 he had listed.

12          She gave me a phone number, and I called
13 him.  And he answered the phone.  And I asked him if he
14 planned on coming to work.  And he said no, that he was
15 sick.  And I asked him if he had tried to call me or did
16 he try to call anybody.  And he said no, he called UTMC,
17 the Pittsburg Medical Center, which is who he -- who we
18 call if you have -- if you miss more than two days of
19 work.

20          And at that time, I asked him -- I said
21 well, he -- well, I told him that, you know, you're
22 supposed to call your supervisor, you know.  If it was
23 not me, the night sup or somebody.

24          And he said, well, well, he didn't know that.  I
25 mean, that's not normal to call UPMC.  He said he didn't

1 know that.

2      Q.    Did it surprise you that he said he didn't

3 know that he was supposed to call his supervisor to

4 report his absence from work?

5      A.    Yes, it did.

6      Q.    Why did it surprise you?

7      A.    It's in the rules, no matter what, to call

8 your supervisor, as long as I've been with the company

9 and at that facility.  And I've been there since 1995.

10      Q.    This UPMC that he indicated to you that he had

11 called, under the company's rules, does calling UPMC on

12 a day-one absence replace calling your supervisor?

13      A.    No.

14      Q.    What did you do after -- did Mr. Wright tell

15 you anything else about his absence during this phone

16 call?

17      A.    I think he told me that his allergies were

18 messing up and, you know, that at the end of the day

19 yesterday, his allergies had flared up.  And that was

20 the reason why he was off.

21      Q.    After your call with Mr. Wright, what did you

22 do next with this information?

23      A.    I went to HR because I was trying to -- I was

24 confused why Mr. Wright, who had been employed for as

25 long as he did, didn't know that you're supposed to call

1  whoever you report to at that time.

2              And just to see if there was something

3  that was communicated differently that I didn't

4  understand; and -- because I knew that -- what the rules

5  were.  And I talked to -- I think that it was April

6  Danford.  I think.  Like I said, there's a lot of

7  different HR.  Whether it was Virginia, April or Adam,

8  I'm not sure a hundred percent.

9              But I talked to one of the HR business

10 partners.  And, of course, what had been the rules for

11 at least the last 20 years is still the same rule.  And

12 at that time, I was informed, well, you know, he had

13 actually missed about five months before that.

14             And didn't call UPMC for that.  And it was

15 actually -- called the supervisor.  So. . .

16     Q.    I'm sorry.  You had learned that Mr. Wright

17 had prior absences where he followed the work rule and

18 called a supervisor and did not contact UPMC in those

19 instances?

20     A.    Yes.

21     Q.    And what did that indicate to you?

22     A.    It indicated that he knew the rules.  And this

23 particular time either was negligent in following the

24 rules or I just wasn't getting the truth.

25     Q.    After you brought this issue to the attention

```
 1                  MS. WILLIAMS:  No further questions.
 2                  THE ARBITRATOR:  Thank you for your time
 3  here today, Mr. Smith.
 4                  MS. WILLIAMS:  Thank you.
 5                  THE WITNESS:  Bye-bye.
 6                  THE ARBITRATOR:  We'll take a five-minute
 7  break.
 8                  (A break was taken from 11:12 a.m. to
 9                  11:21 a.m.)
10                  (Oath administered; witness sworn.)
11                  THE ARBITRATOR:  Will you give us your
12  full name for the record?
13                  THE WITNESS:  Virginia Hubbard.
14                  THE ARBITRATOR:  Spell your last name,
15  please.
16                  THE WITNESS:  H-U-B-B-A-R-D.
17                  THE ARBITRATOR:  And what is your job
18  title or place of employment?
19                  THE WITNESS:  I'm currently retired.
20                  THE ARBITRATOR:  Okay.  And where was
21  your former place of employment?
22                  THE WITNESS:  Chevron Phillips Chemical
23  Company.
24                  THE ARBITRATOR:  Ms. Williams?
25
```

```
 1                    VIRGINIA HUBBARD,
 2 having been first duly sworn, testified as follows:
 3                    DIRECT EXAMINATION
 4 BY MS. WILLIAMS:
 5      Q.   Hello Ms. Hubbard.  My name is Marlene
 6 Williams, and I represent the Company in this matter.
 7 As you can see, we have a court reporter here who's
 8 going to take down my questions and your answers.
 9                So if you'll allow me to finish my
10 questions before you start to answer, that will make her
11 job easier, okay?
12      A.   Okay.
13      Q.   And if you'll speak up and provide oral
14 responses as opposed to shaking your head or nodding
15 your head or saying "uh-huh" or "huh-uh" so that the
16 transcript can accurately reflect your testimony, okay?
17      A.   Yes.
18      Q.   Okay.  You've indicated that you're retired,
19 correct?
20      A.   Yes.
21      Q.   Recently?
22      A.   Yes.
23      Q.   As of when?
24      A.   June 4th, 2015.
25      Q.   Congratulations.
```

1   sometime later around November, what is the subject of

2   that investigation?

3       A.    Failure to call in.

4       Q.    Mr. Wright had -- was reported to have failed

5   to call in?

6       A.    Yes.

7       Q.    Okay.  I want to turn your attention to the

8   first investigation involving the lock, tag, try or lock

9   tagout process.  How did you become aware of that

10  incident?

11      A.    Keith Brabenec, who was the I&E superintendent

12  at that time, contacted me and said that he needed an HR

13  rep to participate in an investigation on a lockout,

14  tagout procedure that had been violated.

15               And it was in reference to removing the

16  T-leads and isolating out -- de-energizing breakers.

17      Q.    Were you a technical specialist about the

18  specification of the de-energizing and the T-leads in

19  this investigation?

20      A.    No.

21      Q.    But you have a general understanding of that

22  process and what's involved?

23      A.    Yes.

24      Q.    Okay.  When Mr. Brabenec contacted you, did he

25  report to you at that time that Mr. Wright was involved

1 removal of the T-leads.

2                    And he had the copy of the isolation list

3 that was being used for the process.  And he led the

4 questions on -- to Mr. Wright about what was the process

5 and what happened and what did he do when was he doing

6 that job.

7     Q.   Do you recall Mr. Wright's response during

8 this meeting to the questions that Mr. Brabenec proposed

9 to him?

10     A.   Yes.

11     Q.   And what did Mr. Wright say about this task

12 and this incident?

13     A.   When he was questioned -- when he was shown

14 the isolation list that had his initials on it and

15 Mr. Brabenec asked him, did you read what you initialed,

16 and he said no, he guess he didn't pay attention to --

17 he just signed off on it after he de-energized the

18 breakers.

19     Q.   He did not dispute that those were his

20 initials on the isolation list; is that correct?

21     A.   Right.  Yes.

22     Q.   And did he indicate during this meeting that

23 he was confused about the instructions on the isolation

24 list?

25     A.   He did make a statement that he was maybe

1  confused because he didn't go back and actually read it.

2      Q.    So his confusion was based on -- during this

3  meeting, what you heard from him was that his confusion

4  was based on the fact that he didn't read the list?

5      A.    Or he didn't completely read the list to

6  understand what was completely to be done.

7      Q.    Did he have any other complaints during this

8  meeting about the scope of the work that was reflected

9  on the isolation list that he signed off on?

10     A.    No, he didn't.

11     Q.    Did anyone else in this meeting have

12  complaints about the work on the isolation list?

13     A.    Mr. Higgins spoke up.

14     Q.    And what did Mr. Higgins say?

15     A.    Mr. Higgins -- I don't want say interrupted

16  the questioning.  And said that the isolation list was

17  not normally used in the process, and that it was a work

18  order.

19     Q.    Did Mr. Wright bring up any complaints in this

20  meeting about the isolation list versus the work order?

21     A.    No.

22     Q.    Do you recall anything else from your

23  discussion during this meeting with Mr. Wright?

24     A.    No.

25     Q.    After this meeting with Mr. Wright, what

1 pay enough attention. Mr. Brabenec asked him if he was
2 confused, did he ask -- if he had any confusion, did he
3 ask anyone or did he go to his supervisors and ask his
4 supervisors if -- you know, about anything. Mr. Wright
5 responded no.

6      Q.    As a part of your investigation, did you
7 discover any fact that suggested that Mr. Wright was
8 confused about the instructions on the isolation list?

9      A.    No.

10     Q.    Did Mr. -- apart -- I asked you whether he had
11 any comments. Do you recall him asking -- Mr. Wright
12 asking any questions during this meeting?

13     A.    The only question that he asked was he said
14 that he couldn't remember the name of the operator that
15 had -- that had been working with him.

16           And also that during that -- the second
17 day of the investigation, Mr. Brabenec had found out the
18 name of the person, the operator that had went over with
19 Mr. Wright to do the work. And one of the questions
20 that Mr. Brabenec asked Mr. Wright was that Mr. -- that
21 the operator stated that -- that he was there when
22 Mr. Wright signed off on the isolation list.

23           And he said that he had to go back and get
24 some -- some more tools to come back to finish the job.
25 And Mr. Wright denied that he said that.

1    A.    Yes.

2    Q.    What else did Mr. Donnell say about this?

3    A.    Basically, that was it.  And he just said that

4 he never saw him come back.  And so that was his only

5 involvement with it.

6    Q.    After your meeting with Mr. Donnell, what

7 happened next with respect to your investigation of this

8 issue?

9    A.    I met with my supervisor, Lisa Laurin, HR

10 Manager.

11    Q.    Do you normally -- did you feel like at that

12 point when you met with Ms. Laurin that you had

13 completed your fact finding?

14    A.    Yes.

15    Q.    Is that -- is it normal for you at this point

16 to meet with Ms. Laurin to discuss the investigation?

17    A.    Yes.

18    Q.    And what did you discuss with Ms. Laurin?

19    A.    I discussed with her the information that we

20 had received in the meetings and -- on both days of the

21 meetings; of what had happened and that who was

22 involved, the employees, you know, that was involved.

23             And also kind of gave a brief description

24 of what had -- what had been told to us and what had

25 happened and who the witnesses were.

1     Q.    And what happened next in the investigation?

2     A.    After that, Ms. Laurin talked with her boss

3 and also the Pasadena Plastics leadership team.

4     Q.    When you went to Ms. Laurin to meet with her

5 about the investigation, had you reached a conclusion

6 based on the facts that you investigated as to whether

7 or not Mr. Wright had followed the isolation list

8 according to his initials there?

9     A.    Yes.

10     Q.    And what was your conclusion?

11     A.    That he had signed off on the -- on the list

12 on the isolation list.

13     Q.    Did you reach a conclusion as to whether or

14 not the work that he signed off, whether it had actually

15 been completed according to the instructions?

16     A.    We reached a conclusion that since the T-leads

17 were still intact that it had not been completed.

18     Q.    After -- at some point after your meeting with

19 Ms. Laurin when she went to her boss in leadership team,

20 did you take any further action with respect to this

21 investigation?

22     A.    No.  Waited on their recommendation from my

23 management.

24     Q.    And did you ultimately receive that?

25     A.    Yes.

1    Q.    Their recommendation?

2    A.    Yes.

3    Q.    And what was that?

4    A.    That he would be suspended -- well, let me

5 back up.  Before that, he was sent home till further

6 investigation was done.  And so we contacted him -- I

7 mean, we sent him home, sent Mr. Wright home.

8    Q.    And let me stop you there.  When -- Mr. Wright

9 was sent home at what point of the process?  Was it

10 after the second meeting?

11    A.    After the second meeting.

12    Q.    And -- okay.  And so you were saying that he

13 had been sent home.  So when you got word of the

14 recommendation, what -- what did you do next?

15    A.    At the -- after we got the recommendation, at

16 first he was sent home because it had to go all the way

17 up to our VP of manufacturing.

18              And so we had to wait until we got the

19 recommendation or approval from our VP of our

20 manufacturing and our corporate HR Manager along with

21 our leadership team.  And he was suspended and issued a

22 final warning letter.

23    Q.    After the leadership team's review, the

24 recommendation then that you received -- did you talk to

25 Lisa Laurin about this recommendation?

1      A.    Lisa Laurin was the one told me what the
2 decision had been.
3      Q.    And the decision that she communicated to you
4 was that he would be suspended; but he had already been
5 sent home, correct?
6      A.    Correct.
7      Q.    And he would also be issued a final written
8 warning?
9      A.    Letter, yes.
10     Q.    Letter.  And was there any other component to
11 the discipline that you recall?
12     A.    The other component was stated in the letter.
13     Q.    There was a letter that was drafted?
14     A.    There was a letter that was drafted saying
15 that, you know, about the suspension and that he would
16 have to go through retraining as part of the
17 disciplinary process of -- that was stated in the
18 letter.
19     Q.    Who prepared the letter?
20     A.    I did.
21     Q.    I'm going to get an exhibit together here in a
22 minute, Ms. Hubbard, and talk to you about it.
23           THE ARBITRATOR:  This will be Management
24 Exhibit 2?
25           MS. WILLIAMS:  Yes, sir.

1 Stan Zisman?

2     A.    Yes.

3     Q.    What did you -- did you and Adam Sainato come

4 up with some protocol as to how you were going to handle

5 the investigation together?

6     A.    Yes.  We were to -- yes.  We decided to talk

7 to the people that actually saw him sleeping.  And it

8 was reported that someone -- that one of our contractors

9 on the facility was the person the actually woke him up.

10             So we were instructed to talk to that

11 person and anyone else that was in the cubicle area at

12 that time that might have heard or seen anything.

13    Q.    And did you actually speak to these

14 individuals?

15    A.    Yes, we did.

16    Q.    How many people in total did you speak to

17 about the sleeping incident?

18    A.    The three contractors and Mr. Zisman.

19    Q.    What did you learn from the three contractors

20 as a part of your investigation?

21    A.    The contractor said that -- the female

22 contractor said that she -- we were trying to determine,

23 you know, the timing of when it happened or whatever.

24 And she said that she was on a conference call and she

25 heard this snoring.  She didn't know it was snoring at

1  first, and she heard this noise coming from the cubicle.

2  She sits in an office, and the cubicle was

3  in the center of that space. And so she asked another

4  coworker to come over to see if she was hearing the same

5  thing. And they reported it to their -- I don't know if

6  he's their supervisor; but Dean -- I can't remember his

7  last name. Dean Merrill -- Dean Merrill went over and

8  woke him up, woke up Mr. Wright and told him to get up

9  and move around or get some water.

10  Q.  And so in your meetings with the contractors,

11  did you learn the duration of this incident; about how

12  long they had heard the snoring noise coming from the

13  cubicle?

14  A.  Yes. One of them reported that she think it

15  had been 15 or 20 minutes.

16  Q.  And you said just a minute ago it was Dean

17  Merrill. Does Dean Merritt -- does that ring a bell?

18  A.  Dean Merritt. I didn't recall his last name.

19  Q.  And she reported that it had gone on for 15 or

20  20 minutes?

21  A.  Yes.

22  Q.  What did you learn from Mr. Zisman when you

23  heard from him?

24  A.  That his admin had reported to him that she

25  had also heard the snoring. And -- but I think by the

1 time he made it around to the cubicle, Dean Merritt had

2 already woke up Mr. Wright.

3       Q.   Did he describe for you anything else that he

4 did?  Do you know if Mr. Zisman spoke to Mr. Wright?

5       A.   No.

6       Q.   But Mr. Zisman explained to you that he

7 actually approached the scene where Mr. Merritt was

8 approaching Mr. Wright?

9       A.   He was already up.  He had already gotten up

10 when he made it around there, I think.

11       Q.   Other than the three contractors and

12 Mr. Zisman, did you speak to anyone else about the

13 incident?

14       A.   No.

15       Q.   Did you speak to Mr. Wright?

16       A.   Yes, we did.

17       Q.   Okay.  And did you set up a meeting with

18 Mr. Wright to discuss this?

19       A.   Yes.  Adam Sainato and I met with him.

20       Q.   Was anyone else present in the meeting with

21 you and Adam and Mr. Wright?

22       A.   We got him union representation, which was

23 Mr. Ed Armand.  I think it's A-R-M-A-N-D.  I think I'm

24 spelling it right.

25       Q.   And describe for us that meeting with

1 Mr. Wright regarding the sleeping incident.

2     A.   And, well, we had a meeting with him. And we

3 told him it had been reported that, you know, he was

4 sleeping. He denied -- originally he denied that he was

5 sleeping.

6           And then when he was told that there were

7 three witnesses and that the guy actually woke him up,

8 he said that he -- and that he was snoring, he said that

9 it was his allergies; that he was -- he said that he was

10 watching something -- watching something on the -- on

11 the monitor. And when we talked about the snoring, he

12 said that were his allergies that were acting up.

13     Q.   At some point during this meeting you said he

14 originally denied that he was sleeping. At some point

15 during this meeting, did he admit that he was sleeping?

16     A.   He just said that he maybe had dozed off.

17     Q.   Do you recall anything else that Mr. Wright

18 said during this meeting about that incident?

19     A.   No.

20     Q.   Did Mr. Armand have any comments during this

21 meeting?

22     A.   No.

23     Q.   Did he ask any questions?

24     A.   No.

25     Q.   After your meeting with Mr. Wright regarding

1      Q.   Is that what Ms. Laurin told him?

2      A.   I believe so, yes.

3           MR. FLYNN:   That's all the questions I

4 have for this witness.

5           THE ARBITRATOR:   Ms. Williams?

6           MS. WILLIAMS:   I have nothing further.

7           THE ARBITRATOR:   Okay.   Thank you for

8 coming here today.   Who's your next witness?

9           MS. WILLIAMS:   Adam Sainato.

10          (Oath administered; witness sworn.)

11          THE ARBITRATOR:   Give us your full name.

12          THE WITNESS:   Adam Sainato.

13          THE ARBITRATOR:   S-A-I-N-A-T-O?

14          THE WITNESS:   Correct.

15          THE ARBITRATOR:   What is your job title

16 and place of employment.

17          THE WITNESS:   HR Business Partner,

18 Chevron Phillips Pasadena Plastics Complex in Pasadena,

19 Texas.

20          THE ARBITRATOR:   Okay.   Thank you.

21              ADAM SAINATO,

22 having been first duly sworn, testified as follows:

23

24              DIRECT EXAMINATION

25 BY MS. WILLIAMS:

1     Q.    Mr. Sainato, my name is Marlene Williams.  I

2 represent the Company in this proceeding.

3           How long have you been HR business partner

4 at Pasadena?

5     A.    Since August 2014.

6     Q.    Prior to August 2014, what was your position?

7     A.    I was HR business partner for Chevron Phillips

8 at the Woodlands headquarters location.

9     Q.    And before that, what was your position?

10    A.    I was working in HR for another company,

11 Bechtel Engineering, an oil and gas and chemical global

12 business unit in Houston.

13    Q.    What years did you work for Bechtel?

14    A.    2011 to 2013.

15    Q.    Were you employed prior to 2011?

16    A.    No, ma'am.

17    Q.    What were you doing prior to 2011?

18    A.    I was in graduate school.

19    Q.    Where did you go to graduate school?

20    A.    West Virginia University.

21    Q.    And what was your course of study in graduate

22 school at West Virginia University?

23    A.    It was a dual masters program.  Masters in

24 Business Administration and Master of Science in

25 Industrial Labor Relations.

1  with Mr. Wright, correct?

2      A.  Correct.

3      Q.  When did that meeting take place?

4      A.  I believe it was the same day.

5      Q.  And who attended that meeting?

6      A.  It was myself, Virginia Hubbard, Mr. Wright

7  and Ed Armand.

8      Q.  And who is Ed Armand?

9      A.  Ed Armand is another electrician that we have

10 on site represented by IEW.  He has a role within their

11 committee.  I'm not sure what his official title was

12 then.  And he was there as a representative.

13     Q.  And he was there as Mr. Wright's rep during

14 that meeting?

15     A.  Yes.

16     Q.  Tells us what happened during that meeting.

17     A.  During that meeting, we brought up the claim

18 that Mr. Wright had been identified asleep in the COB by

19 contractors.  At first Mr. Wright denied that he was

20 asleep; stating that he was very nasally due to his

21 allergies.  After presenting him with more information

22 on the claim, he did admit that he might have dozed off.

23 Virginia explained to him that he would be sent home

24 pending investigation.  And at this point, he said that

25 he wasn't asleep.

1    Q.   So he initially denied it, correct?

2    A.   Yes.

3    Q.   And then he admitted it, correct?

4    A.   Yes.

5    Q.   And then by the conclusion of the meeting, he

6 denied it again?

7    A.   Yes.

8    Q.   Do you recall Mr. Armand making any comments

9 during this meeting?

10    A.   No.

11    Q.   Did Mr. Armand ask any questions during this

12 meeting?

13    A.   When Virginia explained to him about being on

14 the final written warning status, Ed commented that he

15 wasn't sure of the exact verbiage in that letter; that

16 he would get with Mr. Reedy on that.

17    Q.   Is there anything else that you recall?

18    A.   From Ed Armand, no.

19    Q.   After your meeting with Mr. Wright and

20 Mr. Armand regarding the sleeping incident, what did you

21 do next regarding this sleeping incident?

22    A.   We prepared a report.

23    Q.   Who prepared the report?

24    A.   I prepared the report.

25    Q.   And what did you do next?

1      A.    I submitted it to Lisa Laurin.

2      Q.    And did you have a meeting with Ms. Laurin to
3 talk about your findings in the investigation?

4      A.    I believe myself, Lisa Laurin, and
5 Ms. Hubbard.

6      Q.    And after you met with Lisa Laurin about your
7 findings, what happened next in your investigation?

8      A.    Lisa took the action from there.

9      Q.    Did you have any further involvement in this
10 investigation after meeting with Lisa Laurin?

11      A.    No, ma'am.

12      Q.    And then within a few days, another incident
13 involving Tyrell Wright came to your attention, right?

14      A.    Yes.

15      Q.    Was this the no-call, no-show incident?

16      A.    Yes.

17      Q.    Tell us how you learned about that.

18      A.    On Tuesdays, we have a safety tailgate within
19 the HR department.  John Smith, our training
20 superintendent, had asked us if any of us had seen or
21 heard from Mr. Wright 'cause he had not reported in to
22 work for that day.

23      Q.    You-all were in a group together?

24      A.    Yes, ma'am.

25      Q.    Had you seen or heard from Mr. Wright that

1  if he had called any of the maintenance supervisors, the

2  maintenance shop, the maintenance voicemail line, to

3  which Mr. Wright said that he had not.  He had called

4  UPMC work partners.

5      Q.    Mr. Smith revealed to you that Mr. Wright

6  revealed to him that he had called UPMC?

7      A.    Correct.

8      Q.    Did he share anything else with you about his

9  conversation with Mr. Wright -- did Mr. Smith?

10      A.    No.

11      Q.    After you received this report from Mr. Smith,

12  what did you do next with respect to this incident?

13      A.    My next step was to reach out to UPMC work

14  partners to verify the call did occur.

15      Q.    And did you do that?

16      A.    Yes.

17      Q.    And tell us about that call to UPMC.

18      A.    I was able to reach out to UPMC work partners

19  to verify whether or not Mr. Wright did actually call

20  them.  My conversation with them, they explained to me

21  how their process works.  And they reminded me that on a

22  first day absence, no call is needed directly to the

23  UPMC work partners to report that absence.

24      Q.    Why is that?

25      A.    UPMC, for an employee to initiate them and

1 their services would typically be triggered through one
2 of three events; one, if an employee was absent for
3 three or more consecutive days.  Two, if the -- an
4 employee was taking any kind of medication that would
5 impair his or her judgment.

6                    And, third, any type of medical procedure
7 done which involved any type of anesthesia or
8 anesthetic.

9      Q.    Does this UPMC process that you've just
10 described supersede the company's normal call-in
11 procedures for absences?

12      A.    No, it does not.

13      Q.    Did you and the UPMC representative discuss
14 anything else with respect to Mr. Wright's absence?

15      A.    Yes, we did.  Based on the time that
16 Mr. Wright would have needed to call, there's not a live
17 representative to take that call.  All calls are
18 directed to a voicemail line that are then answered when
19 the employees at the call-in center start their shift.

20                    They did have a call from Mr. Wright.
21 But, however, they also noted that he had five other
22 absences that occurred in 2014, I believe in January or
23 April, that they had no call from him documented either.

24      Q.    What did you do with the information regarding
25 Mr. Wright's other absences in 2014?

1    A.    I looked through our discipline log to make
2 sure there was no outstanding discipline for Mr. Wright
3 involving those absences.

4    Q.    Did you find any outstanding disciplines or
5 any disciplines related to the five other absences he
6 had in 2014?

7    A.    No, ma'am, I did not.

8    Q.    And did you reach a conclusion regarding the
9 process that he followed as a result of that
10 information?

11    A.    Yes.   That Mr. Wright would have correctly
12 followed our reporting off from work process for those
13 five absences in 2014.

14    Q.    Because if he had not, what would have
15 happened?

16    A.    We would have been contacted by his supervisor
17 to launch an investigation for his no-call or no-show
18 for reporting to work.

19    Q.    And so this indicated to you that Mr. Wright
20 had -- was aware and had actually followed the call-in
21 procedures reporting off to work to a supervisor on
22 these five other occasions?

23    A.    For at least those five times, yes.

24    Q.    Did you do anything else with respect to your
25 investigation of the call-in incident with Mr. Wright?

1 for absences in the past?

2    A.    That would be with UPMC to confirm the dates

3 of the absence.  And then in checking our database for

4 discipline, there were no discipline records for those

5 specific absences in 2014.

6    Q.    Okay.  And, again, your conclusion based on

7 that information was what?

8    A.    Was that on those five other absences in 2014,

9 Mr. Wright followed the correct Pasadena Plastics

10 Complex procedures to report off of work; which did not

11 result in any discipline for him in a no-call, no-show.

12    Q.    And that would have been to call his

13 supervisor to report the absence, correct?

14    A.    Correct.

15             MS. WILLIAMS:  I pass the witness.

16             MR. FLYNN:  No further questions.

17             THE ARBITRATOR:  Thank you for coming

18 here today.  Next witness?

19             MS. WILLIAMS:  Lisa Laurin, who is in the

20 room.

21             (Oath administered; witness sworn.)

22             THE ARBITRATOR:  Would you give us your

23 full name for the record, please?

24             THE WITNESS:  Lisa Laurin, Pasadena

25 complex.

 1                  THE ARBITRATOR:   And what is your job
 2 title?
 3                  THE WITNESS:   Human Resources Manager.
 4                  THE ARBITRATOR:   Okay.   Thank you.
 5 Ms. Williams?
 6                       LISA LAURIN,
 7 having been first duly sworn, testified as follows:
 8                     DIRECT EXAMINATION
 9 BY MS. WILLIAMS:
10     Q.   Good afternoon, Ms. Laurin.   My name is
11 Marlene Williams.   As you know, I represent the company
12 in this matter.
13                  How long have you been HR Manager at
14 Pasadena?
15     A.   Two years.
16     Q.   Prior to that, what was your position?
17     A.   HR Director.
18     Q.   And where was that?
19     A.   For Pasadena refining, owned by Petrobras.
20     Q.   And where did you report to work in that
21 position?
22     A.   Pasadena.
23     Q.   And as HR Manager, you report to Pasadena?
24     A.   Currently?   Now?
25     Q.   Yes.

1        Q.    Okay.  What did you do?

2        A.    So I would meet with the department manager,

3   Andy Woods, and plant manager, Mike Gilbert, and discuss

4   a path forward.

5        Q.    At some point in the process, were you

6   involved in making decisions regarding appropriate

7   discipline for these three incidents?

8        A.    Yes.

9        Q.    Okay.  With respect to the safety policy

10  violation, do you recall what the discipline --

11  disciplinary action that was decided upon, what that

12  was?

13       A.    Yes.

14       Q.    What was that?

15       A.    A final written warning with training and

16  suspension.

17       Q.    And with respect to the sleeping incident, do

18  you recall what the discipline -- disciplinary action

19  decided upon was?

20       A.    Yes.  It was a last-chance letter.

21       Q.    And then for the failure to follow the call-in

22  procedure, that's the incident that actually resulted in

23  termination?

24       A.    Yes, it is.

25       Q.    Can you generally describe for us the basis

1 for the decision to administer a final written warning

2 with training and suspension for the safety violation?

3     A.    Sure.    The conversation started out with

4 myself and Andy Woods and the plant manager.    And then

5 we rescheduled the conversation for later in the day.

6              I'm sorry.    The next day, because I wanted

7 to include other management and our leadership team at

8 the plant to make sure that we were consistent across

9 our -- our facility.    And the original recommendation

10 was to terminate.

11     Q.    And ultimately, obviously, you didn't decide

12 to terminate during that -- for that particular

13 incident, correct?

14     A.    That's correct.

15     Q.    The final written warning that was decided

16 upon, did you consider that to be a serious disciplinary

17 action?

18     A.    It was a serious violation of a serious policy

19 that we have and we take very, very seriously.    So yes.

20     Q.    And you thought that the final written warning

21 ultimately reflected the serious nature of the

22 infraction?

23     A.    Absolutely.

24     Q.    Did you also believe that the retraining was

25 necessary in light of the safety violation?

1    A.    Yes.

2              MR. FLYNN:    I object to leading.

3 BY MS. WILLIAMS:

4    Q.    Did you make any conclusions with respect --

5              MS. WILLIAMS:    I'm sorry?

6              THE ARBITRATOR:    Let her put it in her

7 own words; reach a conclusion.

8    A.    Yes, we did believe that he needed to retrain

9 on some process and procedures before we allowed him

10 back out into the plant.

11 BY MS. WILLIAMS:

12    Q.    And why was that?

13    A.    Because he violated a safety -- safety -- a

14 safety policy.    It was severe.

15    Q.    And then with respect to the sleeping

16 incident, the decision to provide Mr. Wright a last

17 chance coming off the heels of a final warning, can you

18 explain why that decision was made?

19    A.    I can.    Essentially, he should have been fired

20 then because someone on a final written warning should

21 have tried much harder to -- to not fall asleep.    But we

22 took into account the fact that he wasn't in his normal

23 position out on his feet outside.    And he was inside in

24 a cubicle.    And so we decided one last chance.

25    Q.    I want to back up a little bit with respect to

1  the sleeping incident.  How did you first become aware

2  of that?

3       A.   Stan Zisman told me.

4       Q.   And what did Stan Zisman tell you?

5       A.   He told me his admin had seen Tyrell sleeping.

6  And he went to go check it out, and that's when he saw

7  Dean waking him up.

8       Q.   Waking who up?

9       A.   Tyrell.

10      Q.   Did Mr. Zisman actually identify Mr. Wright as

11 the person that Dean Merritt was waking up?

12      A.   Yes.

13      Q.   And when you received this information from

14 Mr. Zisman, what did you do?

15      A.   I told my business partners, Adam and

16 Virginia, to investigate.

17      Q.   And, again, you said you were not a part of

18 that investigation process, right?

19      A.   I was not.

20      Q.   Okay.  Did you attend and/or participate --

21 well, did you attend a meeting when the last-chance

22 discipline was administered to Mr. Wright?

23      A.   I was.

24      Q.   Who -- can you recall who attended that

25 meeting?

1    A.    Yes.    It was myself, Andy Woods, Tyrell, and
2 Jon Higgins.

3    Q.    And could you describe for us what happened
4 during that meeting?

5    A.    Sure.    Andy gave him the letter.    Explained
6 the letter to him.    At some point, Mr. Higgins told him
7 not to sign it.    And I told him that he couldn't tell
8 him that; that this was his last chance to keep
9 employment with us.    That if he didn't sign it, then we
10 would terminate him.

11    Q.    And then what happened after that?

12    A.    Tyrell said he would sign it.    J D Higgins
13 asked him, do you want to sign it?    He said, "Yes, I
14 want to sign it."    And he did.

15    Q.    Do you recall Mr. Wright, during this meeting,
16 ever indicating that he was not the person who Stan
17 Zisman indicated to you had been caught sleeping?

18    A.    It was never mentioned or brought up.

19    Q.    He never denied that?

20    A.    We didn't --

21    Q.    That he was the person?

22    A.    No, he did not.

23    Q.    Did you participate -- at some point you
24 learned of yet a third incident involving Mr. Wright,
25 the no-call, no-show; is that correct?

1 A. Yes.

2 Q. How did you learn about that?

3 A. It was originally when John Smith came into
4 our meeting and said he was looking for him.  I got up
5 and left at that point; had something else to deal with.
6 And then Jon later told me that he called in.  He called
7 Tyrell at home.

8 Q. Did you participate in the termination
9 meeting --

10 A. No.

11 Q. -- related to that incident?  Do you know who
12 did?

13 A. Andy Woods -- I'm sorry.  It wasn't Andy.
14 Andy was gone.  Alaric and Adam.

15 Q. Can you describe the basis for the company's
16 decision to proceed to termination after the no-call,
17 no-show incident?

18 A. Yes.  We had given him multiple opportunity to
19 change his behaviors and to try to do his best.  And we
20 didn't see that happening, and we didn't feel that there
21 was anymore room to offer him.

22 Q. The last-chance letter that was presented to
23 him after -- to Mr. Wright after the sleeping incident,
24 do you know who prepared that letter?

25 A. I did.

1          Q.   And you recall Mr. Woods actually conveying

2     the message, the contents of that letter in its entirety

3     to Mr. Wright during the meeting?

4          A.   Yes.

5          Q.   You indicated that Mr. Higgins, during the

6     meeting regarding the last-chance letter, after the

7     sleeping incident, that he said something to the effect

8     of, "Mr. Wright, are you sure you want to sign that?"

9     Is that right?

10         A.   He asked him if he wanted to sign it.

11         Q.   Did he say -- Mr. Higgins identify any problem

12    he had with the letter?

13         A.   I don't remember any objections.

14         Q.   So did you have an understanding as to why he

15    was trying to instruct Mr. Wright not to sign that

16    letter?

17         A.   Instructing him to sign it like he had last

18    time.  And that's all I remember of that -- on that.

19         Q.   You don't recall him providing a basis for

20    that or any particular objection to the contents of

21    letter?

22         A.   No basis.  I cut him off pretty early when he

23    was trying to object.

24         Q.   During the course of your -- of the

25    participation of the discipline --

1  him during the meeting?

2      A.   Yes.

3              MS. WILLIAMS:  I'll pass the witness.

4              THE ARBITRATOR:  Mr. Flynn?

5              MR. FLYNN:  Thank you.

6                  CROSS-EXAMINATION

7  BY MR. FLYNN:

8      Q.   Ms. Laurin, when did you find out that

9  Mr. Wright had e-mailed Pete Cella, the CEO of the

10 company?

11     A.   I don't really recall the exact date or time

12 frame.  I really don't, but I was aware.

13     Q.   Do you recall the witness who testified that

14 you had, you know, told her about that when you were at

15 some offsite meeting October 20, 21?

16     A.   Yes.

17     Q.   Okay.  So does that refresh your memory?

18     A.   I don't remember our meetings being October 20

19 and 21.  I really thought it was around the end of

20 October because I remember being there.  It was on my

21 anniversary.  So actually the end of month.  My

22 anniversary's on the 30th.

23     Q.   So it was before Mr. Wright got the October 30

24 letter, Company's Exhibit 2?

25     A.   Yes.

1  to your side of the room.  Who's your next witness?

2                  MS. WILLIAMS:  We have no further

3  witnesses at this time, but reserve for rebuttal.

4                  THE ARBITRATOR:  Let's go off the record

5  for a minute.

6                  (A break was taken from 3:00 p.m. to

7                  3:19 p.m.)

8                  (Oath administered; witness sworn.)

9                  THE ARBITRATOR:  What is your -- please

10 state your full name for the record and your place of

11 employment and your job title, please.

12                  THE WITNESS:  My name the Michael Reedy

13 R-E-E-D-Y.  I'm a maintenance electrician and the chief

14 union steward for the IBW Local 15 for Chevron Phillips.

15                  THE ARBITRATOR:  Okay.  Good.

16                       MICHAEL REEDY,

17 having been first duly sworn, testified as follows:

18                    DIRECT EXAMINATION

19 BY MR. FLYNN:

20     Q.   Okay.  Now, Mr. Reedy, we've had that

21 instruction, let me ask you about --

22                  MR. FLYNN:  Do you have the witness

23 exhibits handy?  Are they all at the front?

24                  MS. WILLIAMS:  I think they're all here.

25                  THE ARBITRATOR:  Which one are you

1          MS. WILLIAMS:  I -- it's not -- frankly,
2 I mean, the record will reflect what he's saying.  I
3 think to make the record, I want to understand whether
4 or not in his position he thought this was not actually
5 safe.  And he's suggesting that I'm proposing
6 hypotheticals to him.

7              I want to understand if he understands
8 the safety rules are actually intended to address
9 potential hypotheticals so they don't happen.

10     A.    Yes.

11 BY MS. WILLIAMS:

12     Q.    Okay.  That was it.

13     A.    The purpose of safety rules is to always try
14 to make jobs as safe as possible.

15     Q.    Is it your understanding that the failure to
16 follow the lock, tag, try procedure is a violation of
17 the Pasadena work rules?

18     A.    Correct.

19     Q.    Is it your understanding that that violation
20 could have resulted immediately in termination?

21     A.    Correct.

22     Q.    And if he had actually gotten termination
23 instead of including this where was he being allowed to
24 recertify retrain to get back, would you have had an
25 objection to that?

1              THE ARBITRATOR:   Anything else?

2              MR. FLYNN:   No.

3              THE ARBITRATOR:   Thank you for coming

4 here today.

5              THE WITNESS:   Thank you.

6              MR. FLYNN:   Can we take a break?

7              THE ARBITRATOR:   Yes, we can.   Certainly.

8              (A break was taken from 4:02 p.m. to

9              4:07 p.m.).

10              (Oath administered; witness sworn.)

11              THE ARBITRATOR:   If you could give us

12 your full name for the record, job title, and place of

13 employment.

14              THE WITNESS:   Sherwin Tyrell Wright.   My

15 job title right now is maintenance electrician for

16 Houston Independent School District.

17              THE ARBITRATOR:   Okay.   Maintenance

18 electrician?

19              THE WITNESS:   Yes.

20              THE ARBITRATOR:   Thank you.   Mr. Flynn?

21              SHERWIN TERRELL WRIGHT,

22 having been first duly sworn, testified as follows:

23                    DIRECT EXAMINATION

24 BY MR. FLYNN:

25     Q.   Mr. Wright, please keep your voice up so

1      Q.    Did you talk to Mr. Zisman?

2      A.    Just briefly in passing.

3      Q.    What did you-all talk about?

4      A.    I don't remember exactly what we talked about;

5  but we just -- it was not a real conversation.  Just

6  friendly words, hey, you know.  That kind of thing.  And

7  he went -- and I went and he went.

8      Q.    And at some point, obviously, you had a

9  meeting about the sleeping incident where you were asked

10  questions about the incident, right?

11      A.    Correct.

12      Q.    And that was before the last-chance letter was

13  introduced to you; is that right?

14      A.    It was -- yes, I think -- I'm not exactly sure

15  of the timeline.  But I think it was before the letter,

16  yes.

17      Q.    Do you recall in that meeting denying that you

18  were sleeping?

19      A.    Yes, I do.

20      Q.    And do you recall at some point saying maybe

21  you were sleeping?

22      A.    I didn't say maybe I was sleeping.  I said

23  well -- because they were -- it almost felt like I was

24  being almost -- almost attacked.  Like I was -- it had

25  -- there was no other -- nobody else it could have been.

 1  It had to be me. So I felt that pressure.

 2              And I went "Well, I guess it's possible --

 3  it's maybe possible I could have dozed off." But -- and

 4  I just basically said that to -- to stop the pressure.

 5      Q.   So you lied in this meeting that it was

 6  possible that you were sleeping?

 7      A.   I lied at what meeting?

 8      Q.   In the meeting to investigate the sleeping

 9  incident. You lied during the meeting so that you could

10  just avoid the pressure?

11      A.   No, I didn't lie.

12      Q.   You said it was possible that you were

13  sleeping, but I think you've also testified that you

14  know you weren't sleeping.

15      A.   I know I wasn't sleeping.

16              MR. FLYNN: I'm going to object. The

17  witness said he possibly dozed off. He didn't say he

18  was possibly sleeping.

19              THE WITNESS: Yes, sir.

20              THE ARBITRATOR: You said you possibly

21  dozed off?

22              THE WITNESS: Yes, sir.

23              THE ARBITRATOR: Did you say anything

24  else?

25              THE WITNESS: Yes, sir.

1      Q.   And what time were you scheduled to report to
2  work that day?
3      A.   Well, because I was off that day.  I had a
4  doctor's appointment that day.
5      Q.   Who knew -- who at Chevron Phillips Chemical
6  knew that you were off that day?
7      A.   I don't think anybody knew because I had
8  called UPMC, who was -- UPMC whatever the name of it.
9  And they were -- that was what they were going to do was
10 to report that I was off that day.
11     Q.   Okay.  You never talked to a live person at
12 UPMC?
13     A.   No.
14     Q.   Okay.  So nobody ever told you at UPMC that
15 they were going to contact Chevron Phillips to report
16 that you were off; is that right?
17     A.   That particular day, no.
18     Q.   Okay.  And so my question again, you were
19 scheduled to work on November 20th, correct?
20     A.   Correct.
21     Q.   What time were you scheduled to report to work
22 on November 20th?
23     A.   7:00 a.m.
24     Q.   And so your first contact at 9:09 a.m. with
25 someone at Chevron Phillips would have been a little bit

1                    REPORTER'S CERTIFICATE
2  THE STATE OF TEXAS   )
   COUNTY OF HARRIS     )
3
4       I, TOYLORIA LANAY HUNTER, Certified Court Reporter
5  in and for the Harris County, State of Texas, do hereby
6  certify that the above and foregoing contains a true and
7  correct transcription of all portions of evidence and
8  other proceedings requested in writing by counsel for
9  the parties to be included in this volume of the
10 Reporter's Record, in the above-styled and numbered
11 cause, all of which occurred in an Arbitration Hearing
12 and were reported by me.
13      I further certify that this Reporter's Record of the
14 proceedings truly and correctly reflects the exhibits,
15 if any, admitted by the respective parties.
16
17      WITNESS MY OFFICIAL HAND this the 25th day of June,
18 2015.
19
20      _____
        TOYLORIA LANAY HUNTER
21      Texas CSR No. 7978
        Expiration Date:  12/31/2015
22      US LEGAL SUPPORT
        FIRM REGISTRATION NO.
23      363 N. Sam Houston Parkway East
        Suite 1200
24      Houston, Texas 77060
        Tel: 713.653.7100
25      Fax: 713.653.7144