# EXHIBIT B

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                    HOUSTON DIVISION

3     SHERWIN T. WRIGHT,          )
                    Plaintiff,    )
4                                 ) CIVIL ACTION
      VS.                         )
5                                 ) NO.: 4:15-cv-02363
      CHEVRON PHILLIPS CHEMICAL   )
6     COMPANY, LP,                )
                    Defendant.    ) JURY DEMANDED
7
      -----------------------------------------------------------
8              ORAL AND VIDEOTAPED DEPOSITION OF

9                  SHERWIN TYRRELL WRIGHT

10                   FEBRUARY 23, 2017

11    -----------------------------------------------------------

12

13        ORAL AND VIDEOTAPED DEPOSITION OF SHERWIN TYRRELL

14    WRIGHT, produced as a witness at the instance of the

15    Defendant, and duly sworn, was taken in the above-styled

16    and numbered cause on the 23rd of February, 2017, from

17    10:18 a.m. to 5:01 p.m., before Stacie M. Conner, CSR in

18    and for the State of Texas, reported by machine

19    shorthand, at the offices of Smith Reed & Armstrong,

20    PLLC, 1920 Country Place Road, Suite 350, Pearland,

21    Texas, pursuant to the Federal Rules of Civil Procedure

22    and the provisions stated on the record or attached

23    hereto.

24

25

1                          A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4        Mr. Marrick Armstrong
         SMITH REED & ARMSTRONG, PLLC
5        1920 Country Place Parkway, Suite 350
         Pearland, Texas  77584
6        281.489.3934
         marrick@srapllc.com
7

8
     FOR THE DEFENDANT:
9
         Ms. Marlene C. Williams
10       Mr. John Hays
         JACKSON WALKER, LLP
11       1401 McKinney, Suite 1900
         Houston, Texas  77010
12       713.752.4200
         mwilliams@jw.com
13       jhays@jw.com

14

15
     ALSO PRESENT:
16
         Mr. Brent Moore, Videographer
17       Ms. Karen Monroe
         Ms. Lisa Laurin
18

19

20

21

22

23

24

25

INDEX

PAGE

Appearances........................................ 2

Stipulations....................................... 4

SHERWIN TYRRELL WRIGHT
    EXAMINATION BY MS. WILLIAMS.................... 4

Signature and Changes............................ 247
Reporter's Certificate........................... 249

EXHIBITS

NO.            DESCRIPTION                        PAGE

Exhibit 1      Record of Wright's training at
               Chevron............................  55
Exhibit 2      Working Rules & Discipline Policy
               for Pasadena Plastics Complex......  59
Exhibit 3      Employee Acknowledgment of Receipt
               of Plant Working Rules.............  60
Exhibit 4      10/27/14 e-mail from Wright to
               Cella, subject "PLEASE
               READ_Pasadena, Tx Facility"........ 110
Exhibit 5      10/27/14 e-mail from Cella to
               Wright, subject "PLEASE
               READ_Pasadena, Tx Facility"........ 110
Exhibit 6      Isolation List #42................. 112
Exhibit 7      10/30/14 letter to Wright Re: "Final
               Written Warning and Two-week
               suspension"........................ 117
Exhibit 8      11/18/14 letter to Wright Re: "Last
               Chance Letter"..................... 143
Exhibit 9      Pasadena Plastics Complex Employee
               Process for Reporting Off Of and
               Returning to Work.................. 154
Exhibit 10     PowerPoint presentation titled
               "Total Absence Management"......... 157
Exhibit 11     12/8/14 EEOC Charge of
               Discrimination filed by Wright..... 188
Exhibit 12     8/9/15 EEOC Charge of Discrimination
               filed by Wright.................... 192

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | (The reading of Federal Rule 30(b)(5)(A)                                 |
|       | 2  | into the record was waived by all parties present)                       |
|       | 3  | THE VIDEOGRAPHER:  Today's date is                                       |
|       | 4  | February 23, 2017.  The time is 10:18 a.m., and we are                   |
| 10:18 | 5  | now on the record.                                                       |
|       | 6  | THE REPORTER:  Would y'all like to state                                 |
|       | 7  | stipulations for the record?                                             |
|       | 8  | MS. WILLIAMS:  By the Rules.                                             |
|       | 9  | MR. ARMSTRONG:  Just by the Rules is fine.                               |
| 10:18 | 10 | THE REPORTER:  Signature?                                                |
|       | 11 | MR. ARMSTRONG:  Yes.                                                     |
|       | 12 | SHERWIN TYRRELL WRIGHT,                                                  |
|       | 13 | having been first duly sworn, testified as follows:                      |
|       | 14 | EXAMINATION                                                              |
| 10:19 | 15 | BY MS. WILLIAMS:                                                         |
|       | 16 | Q.  Would you state your full name, please?                             |
|       | 17 | A.  My full name is Sherwin T. Wright.                                   |
|       | 18 | Q.  What is the T for?                                                   |
|       | 19 | A.  T is for Tyrrell.                                                    |
| 10:19 | 20 | Q.  And that's T-Y-R-E-L-L?                                              |
|       | 21 | A.  Two R's, T-Y-R-R-E-L-L.                                              |
|       | 22 | Q.  Okay.  Have you gone sometimes by just Tyrrell                      |
|       | 23 | Wright?                                                                   |
|       | 24 | A.  Yes.                                                                 |
| 10:19 | 25 | Q.  Okay.  You understand that you've just given an                     |

1    oath today to provide truthful -- truthful and honest

2    answers?

3        A.  Yes.

4        Q.  Okay.  You understand that the oath you took is

10:19    5    the same as if you were in front of a judge or a jury in

6    court?

7        A.  Yes.

8        Q.  You understand that we're here today in

9    connection with a lawsuit that you filed against Chevron

10:19   10    Phillips Chemical?

11        A.  Yes.

12        Q.  You were formerly employed by Chevron Phillips

13    Chemical, correct?

14        A.  Yes, I was.

10:19   15        Q.  What -- what were the dates of your employment?

16        A.  I'm not sure of the exact dates.  I think I

17    started -- it was in April, 2008, I think, 2008 --

18        Q.  Okay.

19        A.  -- I think it was.

10:20   20        Q.  Until when?

21        A.  Until December 1, 2014.

22        Q.  Okay.  And we'll come back and talk more

23    specifically about your employment at Chevron Phillips

24    Chemical.  I just wanted to kind of get that on the

10:20   25    record.

1          Q.   Okay.   Did you work at Pasadena the entire time

2     you were employed at Chevron Phillips Chemical?

3          A.   Yes, I did.

4          Q.   Were you assigned to a particular unit or

10:49     5     department when you were at Chevron Phillips Chemical as

6     a maintenance electrician?

7          A.   I was -- I was.   I'm not sure exactly which one

8     it was.   I started off initially at -- yes, actually, I

9     started in the polyethylene unit and then later I was --

10:50    10    I worked in the -- oh, gah, what is it?   I can't -- I

11    don't remember the other name now, the -- the other

12    unit --

13         Q.   Okay.

14         A.   -- there.

10:50    15         Q.   Was it just those two units?

16         A.   Yes.   Polypropylene.   That's it.

17         Q.   Okay.   So there was some period of time where

18    you were working -- okay.   There was some time where you

19    were working in the polyethylene unit, and then there

10:50    20    was another time where you were working in the

21    polypropylene unit?

22         A.   Yes.

23         Q.   Okay.   Are -- are -- do you recall that there

24    were three polyethylene units at Chevron Phillips

10:50    25    Chemical?

              1         A.   Yes, I do.

              2         Q.   Okay.  Tell me what those three units were.

              3         A.   Those were Plant 6, Plant 7, and Plant -- and

              4    cat activator.  Actually, excuse me.  Yes, Plant 6,

10:51         5    Plant 7, and Plant 8 with the cat activator.

              6         Q.   Did you work in Plant 6?

              7         A.   I worked in all three --

              8         Q.   All three.

              9         A.   -- of the plants at different times.

10:51        10         Q.   Okay.

             11         A.   It just depended on what -- what job was going

             12    on.

             13         Q.   So when you were working the polyethylene unit,

             14    you were in -- you worked at various times in Plant 6,

10:51        15    Plant 7, and Plant 8?

             16         A.   That's correct.

             17         Q.   Okay.  And what about the polypropylene unit?

             18    Did it -- did it have different kind of plants

             19    underneath or units underneath?

10:51        20         A.   No.  Polypropylene was just one unit.

             21         Q.   Okay.

             22         A.   But they had -- they had a group of guys that

             23    were -- not specifically, but they were the primary

             24    people who -- who performed work in that unit.

10:52        25         Q.   The polypropylene unit?

1          A.   Polypropylene, yes.

2          Q.   Were you ever one of those primary guys who

3    worked in the polypropylene unit?

4          A.   Not initially but later on I was, yes.

10:52    5          Q.   At what period of time were you one of the

6    primary employees working in the polypropylene unit?

7               MR. ARMSTRONG:   (Coughing) excuse me.

8          A.   It would have been right -- not right -- just

9    before they shut down the polypropylene unit.

10:52   10          Q.   (BY MS. WILLIAMS)   What year was that?

11          A.   I don't know what year it was that they shut it

12    down.

13          Q.   Do you recall whether it was prior to your

14    accident or after your accident?

10:52   15          A.   That they shut it down?

16          Q.   Yes, sir.

17          A.   I'm sorry.  I don't recall.

18          Q.   Okay.  Can you describe for us what you did as

19    a maintenance electrician at Chevron Phillips Chemical?

10:53   20          A.   I had various jobs.  It basically depended on

21    what was needed at the time.  I mean, there were times

22    where you would have -- there would be a problem and I

23    was in mainly troubleshooting and then repair.  There

24    were times that I did -- performed maintenance on

10:53   25    lighting inside the units; and then there were times

         1   where, you know, we would have to -- they would have an

         2   issue where -- what is the right word?  They would --

         3   there would be maintenance required on different

         4   sections of the plant.  So we would have to pull motors

10:53    5   and remove motors for maintenance work on different

         6   equipment.

         7       Q.  You said pull motors and repair them?

         8       A.  Not -- not so much repair them but just pull

         9   them so that they could work on the equipment.

10:54   10       Q.  Who's "they"?  Who would work on the equipment?

        11       A.  It's different people.  Chevron has different

        12   people, different personnel.  They have mechanics; they

        13   have instrument techs.  It's -- they have different

        14   people to work on all of the equipment that's out there.

10:54   15       Q.  So as a maintenance electrician with respect to

        16   this respons -- you know, job duty where you would pull

        17   motors, you weren't a part of the -- the group that

        18   actually would work on the equipment but you would pull

        19   the equipment so that some other employees could work on

10:54   20   it?

        21       A.  Correct.

        22       Q.  Okay.  Were -- just in order to get an

        23   understanding of kind of what your day to day is, is it

        24   fair to say or not fair to say that, you know, from day

10:55   25   to day you had different responsibilities.  So Day 1

1    might not look the same as Day 2 or were there occasions

2    where you would be doing the same job for a stretch of

3    time and then rotate on to a different assignment or all

4    of that, frankly?

10:55    5        A.    All of that.

6        Q.    Okay.  So let me get -- get it clear on the

7    record.  Sometimes you would be doing different jobs as

8    a maintenance electrician from one day to the next,

9    correct?

10:55    10        A.    Correct.

11        Q.    And then there were some times where you might

12    be working on a longer project where you'd be working on

13    that project for some extended period of time; is that

14    correct?

10:55    15        A.    That's correct.

16        Q.    Okay.  Do you know what a turnaround is?

17        A.    Yes.

18        Q.    Tell us what a turnaround is.

19        A.    A turnaround is -- let me think of the exact

10:55    20    wording, or not exact, but -- a turnaround is an event

21    in which Chevron Phillips will shut down a section of

22    the facility for maintenance to -- for different things.

23            Sometimes it's cleaning the pipes.

24    Sometimes it is -- well, most -- mainly it is for the

10:56    25    maintenance of that equipment because after -- they can

1    only run for so long and then by law they have to shut

2    the equipment down to perform maintenance work on it.

3        Q.   Did you perform work as a maintenance

4    electrician related to turnaround projects at Chevron

10:56    5    Phillips Chemical --

6        A.   Oh, yes.

7        Q.   -- in Pasadena?

8        A.   Yes, all the time.

9        Q.   Okay.

10:56    10        A.   Actually, since -- after I hired on, I

11    performed -- I worked on every turnaround.

12        Q.   Do you recall when you were -- when you first

13    started in Pasadena, who your -- well, who did the

14    maintenance electricians report to when you started?

10:57    15        A.   Who was the supervisor then?  I apologize.

16    I -- I don't recall exactly who it was when I -- when I

17    initially hired on, who it was, who the supervisor was.

18        Q.   How many -- do you recall when you started how

19    many other maintenance electricians you -- were working

10:57    20    out there?

21        A.   When I initially started, I think there were 22

22    electri -- maint -- other maintenance electricians

23    there.

24        Q.   Did these maintenance electricians, including

10:57    25    yourself, all report to the same person?

         1        A.   The same people, yes, because there were --

         2    there were normally two supervisors there, two or more,

         3    because, as I said, they were -- were separated into two

         4    facilities.   There was a polyethylene unit and a

10:58    5    polypropylene unit.

         6        Q.   Okay.  Do you remember the title -- and I know

         7    you -- you could not recall the person, but when you

         8    started, do you recall the title of -- that your

         9    supervisor had when you started as a maintenance

10:58    10   electrician?  Did that person have a specific title,

         11   that you remember?

         12       A.   As far as I remember, just maintenance --

         13   maintenance electrical supervisor.

         14       Q.   Okay.  And was that always the case, that you

10:58    15   reported to a maintenance electric -- electrical

         16   supervisor through -- until the time of your

         17   termination?

         18       A.   Yes.

         19       Q.   Okay.

10:58    20       A.   (Coughing) excuse me.

         21       Q.   Do you recall the names of any of your

         22   supervisors during your employment at Chevron Phillips

         23   Chemical?

         24       A.   Yes.  I know -- as I said, I'm -- I'm cloudy at

10:59    25   the beginning but I know at the end, Darryn Barnes was a

1    supervisor -- was one of my supervisors and also Jerry

2    Kelly was a supervisor.

3        Q.  And Jerry and Darryn both were maintenance

4    electrical supervisors or something --

10:59    5        A.  Yes.

6        Q.  -- similar to that?

7        A.  Correct.

8        Q.  Do you know who they reported to?

9        A.  Who did they report to?  I'm not sure exactly

11:00   10    who they reported to, no.  I'm sorry.

11        Q.  Okay.  As your supervisors, then at some point

12    Darryn Barnes would have been evaluating your work,

13    correct?

14        A.  Correct.

11:00   15        Q.  And when Jerry Kelly was your supervisor, he

16    also would have been evaluating your work, correct?

17        A.  Correct.

18        Q.  Okay.  Which one of these was the last

19    maintenance electrical supervisor you had?

11:00   20        A.  Darryn Barnes was my last supervisor.

21        Q.  You did not report to any operators, correct?

22        A.  Report to an --

23        Q.  Yeah.  I mean, they weren't your boss?

24        A.  No.  Operators --

11:00   25        Q.  Okay.

1   A. -- were not our boss, no. They were in charge

2 of the equipment on -- in each facility, but they were

3 not our bosses.

4   Q. Okay. Do you know who the operators reported

11:01 5 to?

6   A. Yes. The operators had a -- an operations

7 supervisor that they reported to.

8   Q. Did any of the operators report to the

9 maintenance electrical supervisors?

11:01 10   A. Report to them?

11   Q. Were the maintenance electrical supervisors the

12 bosses of the operators?

13   A. No.

14   Q. Okay.

11:01 15   A. (Coughing) excuse me.

16   Q. I'm probably going to jump around a little bit,

17 but I want to kind of just capture some period -- a few

18 chunks of time before we get into the details related to

19 your lawsuit.

11:01 20     But from 2008 to 2011, you were working in

21 one of these two units that we described as a

22 maintenance electrical super -- maintenance electrician,

23 correct?

24   A. Correct.

11:02 25   Q. In 2011 I understand you had an -- a motorcycle

1          accident?

2               A.   Correct.

3               Q.   And you were away from work on leave from 2011

4          to 2012, correct?

11:02    5               A.   Correct.

6               Q.   Okay.  Can you just give us in general a

7          description of the motorcycle accident, what happened?

8               A.   I can give you what I have -- what I have read

9          and been told about it because I -- I still -- I don't

11:02    10         remember the accident to this day.

11              Q.   Okay.  Can you just generally -- and I -- I

12         don't need specific details --

13              A.   Okay.

14              Q.   -- but what you've read in general what -- what

11:02    15         occurred --

16              A.   Okay.

17              Q.   -- in the accident?

18              A.   What I read was that a person ran a stop sign

19         adjacent to a road that I was traveling on and what I

11:03    20         understand is that I swerved to miss him and I was in

21         the oncoming traffic so I swerved back and when I

22         swerved back, I hit a guardrail at a small bayou.  The

23         bike and I flipped over.  The bike flipped over into the

24         bushes.  I flipped up and hit a tree and landed down on

11:03    25         the side of the bayou.

| | 1 | So then the person who caused the accident |
|---|---|---|
| | 2 | was -- from what I have read, was -- he had enough |
| | 3 | decency there for a moment, he called the ambulance for |
| | 4 | me, but at some point he robbed me.  But he did stay |
| 11:03 | 5 | there until the ambulance got there.  He gave them his |
| | 6 | name and number and everything and then -- and that |
| | 7 | is -- that's how my -- that was the gist of my accident. |
| | 8 | Q.  Were you wearing a helmet at the time of your |
| | 9 | accident? |
| 11:04 | 10 | A.  No, I was not. |
| | 11 | Q.  Were you hospitalized for some period after the |
| | 12 | accident? |
| | 13 | A.  Yes, I was. |
| | 14 | Q.  For about how long? |
| 11:04 | 15 | A.  Seemed like forever.  It was -- oh, God, I |
| | 16 | was -- I'm not -- I'm not sure exactly how long it was, |
| | 17 | but I would say about -- about seven months, I think. |
| | 18 | Q.  And when I say "hospital," is this -- this is |
| | 19 | not TIRR? |
| 11:04 | 20 | A.  No, this is not TIRR. |
| | 21 | Q.  Okay. |
| | 22 | A.  This is just the hospital. |
| | 23 | Q.  Okay.  But at some point you started receiving |
| | 24 | treatment at TIRR? |
| 11:04 | 25 | A.  That's correct. |

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | Q.   Okay.   As a result of this accident, you -- you            |
|       | 2  | endured some brain injury or head injury?                       |
|       | 3  | A.   Yes, I -- I received what is called traumatic              |
|       | 4  | brain injury.                                                     |
| 11:05 | 5  | Q.   And I think you were saying earlier that it               |
|       | 6  | affects your short-term memory?                                  |
|       | 7  | A.   It affects my short-term, yes.                             |
|       | 8  | Q.   I assume you -- you -- you suffered other                 |
|       | 9  | injuries in the accident, as well?                              |
| 11:05 | 10 | A.   Well, just bruising and scratches.                         |
|       | 11 | Q.   Okay.   Did you -- was there a lawsuit related           |
|       | 12 | to this accident?   Did you file a lawsuit, or did anyone       |
|       | 13 | file a lawsuit in connection with this accident?               |
|       | 14 | A.   No.                                                         |
| 11:05 | 15 | Q.   Did you make any type of claims in connection            |
|       | 16 | with this accident, you know, with an insurance company        |
|       | 17 | or with -- against anybody personally?                          |
|       | 18 | A.   No.   Well, I was unconscious for three weeks;            |
|       | 19 | and then I was in the hospital for, like I said, about         |
| 11:06 | 20 | seven months.                                                    |
|       | 21 | Q.   Okay.   But just so that I'm clear, you didn't           |
|       | 22 | pursue any insurance claims in connection with this            |
|       | 23 | lawsuit [sic]?                                                   |
|       | 24 | A.   No.                                                         |
| 11:06 | 25 | Q.   Did anybody make any claims against you in               |

1    connection with this lawsuit [sic]?

2        A.  No.

3        Q.  You -- you understand that while you were out

4    recovering from your injuries, that you were placed on

11:06    5    leave at Chevron Phillips Chemical?

6        A.  Yes.

7        Q.  Okay.

8        A.  Yes.

9        Q.  You did not have any issues with respect to

11:06    10    your leave at Chevron Phillips Chemical.  They granted

11    you the leave that you needed and requested to recover,

12    correct?

13        A.  Correct.

14        Q.  Okay.  Did you have any problems with the

11:06    15    company associated with the leave that you took?

16        A.  Now, that, I can't say because I -- I really

17    don't recall.  That part is -- I'm not -- I'm not very

18    clear on that part of it still.

19        Q.  Sitting here today, you don't recall that there

11:07    20    were ever any issues that you had getting the leave that

21    you needed from Chevron Phillips Chemical after your

22    accident; is that correct?

23        A.  No, I don't recall that, no.

24        Q.  Okay.  And I think I -- I mentioned earlier

11:07    25    that after you were released from the hospital, you

1    received treatment at TIRR, T-I-R-R, correct?

2        A.  Correct.

3        Q.  And how long were you receiving treatment from

4    TIRR?

11:07    5        A.  I don't remember exactly how long it was.  It

6    was -- oh, God, it was months and months.

7        Q.  Were you still receiving treatment at TIRR when

8    you returned to work at Chevron Phillips Chemical?

9        A.  No.  When I returned to Chevron, I was -- they

11:08   10    said that they had went as far as I needed to go -- or

11    as they could go with me, I should say.

12        Q.  When you were released to go back to work

13    following your accident, did you have any restrictions?

14        A.  Yes.

11:08   15        Q.  What were those restrictions?

16        A.  Those restrictions, that was something -- the

17    way I understand it, it was worked out between TIRR and

18    Chevron that I would work with a second electrician at

19    all times.

11:08   20        Q.  Where did you get this understanding from?

21        A.  From my -- oh, God, what was she?  She was my

22    physical therapist at TIRR.

23        Q.  Do you recall her name?

24        A.  I knew you were going to ask.  Christine

11:09   25    Heckman, I think it was.  I'm not -- don't ask me how to

             1    spell it.

             2        Q.   Okay.   So Christine Heckman told you that it

             3    had been worked out between TIRR and Chevron Phillips

             4    Chemical that when you returned to work, that you would

11:09        5    work with a second electrician at all times?

             6        A.   At all times, yes.

             7        Q.   How long was that restriction supposed to last?

             8        A.   She never told me a -- a limit or a time limit

             9    as to how far -- how long that was going to be.   She

11:09       10    just said that Chevron wanted that at all times I would

            11    be with a second electrician.

            12        Q.   She told you Chevron Phillips Chemical wanted

            13    that?

            14        A.   Yes.   That was their -- that is what -- how

11:10       15    they agreed that I would come back into the plant.

            16        Q.   Okay.

            17        A.   But never how long it would last.

            18        Q.   Did you work with the -- under that restriction

            19    from the time you returned in 2012 until your

11:10       20    termination in December, 2014?

            21        A.   Yes.

            22        Q.   So you were always working with a second

            23    electrician?

            24        A.   Yes.

11:10       25        Q.   Did you have any problems with this arrangement

1       A.    No.

2       Q.    Were there times where you performed jobs where

3  there wasn't a second electrician working with you?

4       A.    Just the one time and I got in trouble for --

11:13    5  ended up being terminated behind it.

6       Q.    "The one time," what are you referring to?

7       A.    When there was a -- a job where I was called

8  over the radio to go and perform a lockout/tagout and I

9  asked over the radio, "Is there another electrician?"

11:13   10             I was told, "No, you can do it."

11             And so I -- I mean, I wasn't going to

12  question it, my supervisor.  I just -- I went and did

13  it.

14       Q.    Who was your supervisor who called you about

11:13   15  this assignment?

16       A.    Darryn Barnes.

17       Q.    And Darryn Barnes specifically said to you,

18  "No, there's no other electrician.  You can do it"?

19       A.    Yes.

11:14   20       Q.    Did you disagree with that?

21       A.    No, I didn't dis -- I just -- I'm not -- I'm

22  not going to -- I'm not a person to question my

23  supervisor when he -- if he gives me a task, then, okay,

24  I'll perform my task.

11:14   25       Q.    Did you think you were capable of performing

1    the task without a second electrician?

2        A.   I thought I was.

3        Q.   Do you recall this particular incident?  We're

4    going to talk about it in some more detail, but do you

11:14   5    recall when that occurred?

6        A.   I don't remember when it occurred, no.

7        Q.   Does September -- late September, early

8    October, 2014, sound about right to you?

9        A.   I apologize.  I --

11:15   10       Q.   Okay.

11       A.   I don't really recall.

12       Q.   Okay.  We'll -- we'll come back to that.

13            And so it's your testimony that this

14   particular incident where you went out alone for the

11:15   15   lockout/tagout -- and I'll just kind of state for the

16   record and we'll clear it up with some documents later,

17   but that this occurred sometime in late September, early

18   October, 2014.  Okay?

19       A.   Okay.

11:15   20       Q.   This incident that you're referring to, you're

21   saying that's the only time that you ever -- from 2012

22   until the time of your termination, that was the only

23   occasion that you worked without a second electrician

24   with you?

11:15   25       A.   Correct.

1     Q.   What is a lockout/tagout?

2     A.   A lockout/tagout is -- it is a way of turning

3   off or de-energizing equipment so that it -- it will

4   not -- it cannot come back -- come back on or be turned

11:16    5   on without physically removing that equipment, that lock

6   and tag.

7     Q.   What is the lock part of this process?

8     A.   The lock part is to turn off the electricity --

9   the electrical -- hold on.  Let me think of -- the

11:16   10   electrical -- the electricity being provided to that --

11   that equipment and locking that out with a physical lock

12   so that it cannot be turned back on.

13     Q.   How do you actually turn off the electricity

14   that's being provided to the equipment as a part of this

11:17   15   process?

16     A.   In the -- it's not a mechanical room.  I'm

17   trying to think of the exact terminology of it.  In

18   the -- in the MCCs we go over and we turn off at the

19   switchgear the power feeding that equipment and then

11:17   20   we -- there is a scissor hasp that we hang into the

21   lock -- lock part of it and hang a lock so that it

22   cannot be turned back on.

23     Q.   And what did you say that hangs, a --

24     A.   It's a -- it's called a -- a scissor -- it's a

11:17   25   scissor device where -- with holes in it so that you can

1       hang a lock in those holes so that it can't be turned

2       back on.

3           Q.  And so what you've been describing, is that the

4       lock part of the lockout/tagout?

11:18   5           A.  Uh-huh.

6           Q.  What's the tag part of the lockout/tagout?

7           A.  The tag part is when you hang a -- when a

8       individual, whatever craft they are in, put -- hangs a

9       tag, a "do not operate" tag, on the equipment with their

11:18  10       name and craft identification on it, so that way they

11       can identify who turned the equipment off and what craft

12       they work for -- or they work in.

13           Q.  Did Chevron Phillips Chemical have special

14       procedures for lockout/tagout of equipment?

11:18  15           A.  Special procedures?

16           Q.  Did they have a process that you were supposed

17       to follow for locking out and tagging out equipment?

18           A.  Yes.

19           Q.  Okay.  Were you trained on the lockout/tagout

11:18  20       process at Chevron Phillips Chemical?

21           A.  Yes.

22           Q.  When were you trained on this process?

23           A.  I was trained -- oh, God, it would have been

24       right after my initial hiring, is when I was trained and

11:19  25       we had -- yeah, it was right after -- I'm not sure

|       |    |                                                                |
|-------|----|----------------------------------------------------------------|
|       | 1  | what -- how to explain that correctly, but it was right        |
|       | 2  | after I was initially hired.                                   |
|       | 3  | You go through what's called an LMS                            |
|       | 4  | module -- modules where you -- there's training that           |
| 11:19 | 5  | it -- it explains the steps that need to be taken for          |
|       | 6  | the lockout/tagout procedure.                                  |
|       | 7  | Q.  And that's training you would have first taken             |
|       | 8  | in 2008 right after you were hired?                            |
|       | 9  | A.  Correct.                                                   |
| 11:19 | 10 | Q.  Were there times throughout your employment                |
|       | 11 | after 2008 where you were periodically retrained or            |
|       | 12 | reminded about this process, where you would have to           |
|       | 13 | kind of participate in these modules just to stay              |
|       | 14 | up-to-date about the process?                                  |
| 11:20 | 15 | A.  Yes, there were computer modules that -- for               |
|       | 16 | update training that we went through, yes.                     |
|       | 17 | Q.  And you were -- you completed these computer --            |
|       | 18 | A.  (Coughing) excuse me.                                      |
|       | 19 | Q.  -- modules from time to time with respect to               |
| 11:20 | 20 | the lockout/tagout process throughout your entire              |
|       | 21 | employment at Chevron Phillips Chemical, correct?              |
|       | 22 | A.  Correct.                                                   |
|       | 23 | Q.  And there were other topics that you were                  |
|       | 24 | trained on throughout your employment, as well, correct?       |
| 11:20 | 25 | A.  Correct.                                                   |

1      Q.   Some of those other topics would have been

2   other safety issues, correct?

3      A.   Correct.

4      Q.   Were you trained, as well, on other work rules

11:20      5   at Chevron Phillips Chemical as a part of this computer

6   module training?

7      A.   Yes.

8      Q.   How often, if you can recall, did you

9   participate in training regarding the lockout/tagout

11:21     10   process at Chevron Phillips Chemical?

11      A.   In the training?  I'm not sure what you --

12      Q.   Where you would have -- you -- so we have one

13   initial training that you would have received, right, at

14   the -- near the time that you were hired, correct?

11:21     15      A.   Correct.

16      Q.   Did you have to go through that training every

17   year, every six months?  How would you describe that

18   based on your recollection?

19      A.   The way I recall it, it was a yearly training

11:21     20   on the computer.

21      Q.   Did you consider your work at Chevron Phillips

22   Chemical to be safety-sensitive?

23      A.   Safety-sensitive?

24      Q.   Yeah.

11:21     25      A.   I'm not sure what you mean.

1          Q.  Were -- well, did the work that you do involve

2     potential safety hazards if the job wasn't done

3     correctly?

4          A.  Yes.

11:22    5          Q.  And as a part of your annual training, did you

6     receive updates from Chevron Phillips Chemical about

7     safety protocols at the facility, how to work safely at

8     the facility?

9          A.  Yes.

11:22   10          Q.  And that would have been on an annual basis?

11          A.  I do -- I believe, yes.

12          Q.  Do you agree that you would have participated

13     in training -- safety -- some form of safety training at

14     Chevron Phillips Chemical throughout your employment --

11:23   15     every year throughout your employment except for the

16     period that you were on medical leave?

17          A.  Yes.

18               (Coughing) excuse me.

19          Q.  Do you also agree that you -- by the time that

11:23   20     you -- this lockout/tagout issue that developed in

21     October -- September or October, 2014, that you were

22     familiar with the lockout/tagout process at Chevron

23     Phillips Chemical?

24          A.  Yes.

11:23   25          Q.  Would you say you were very familiar with it?

```
         1        A.  Yes.

         2                MS. WILLIAMS:  Can we take a -- a break?  I

         3    think --

         4                THE VIDEOGRAPHER:  Time -- time is 11:23.

11:24    5    We're off the record.

         6                (Break taken 11:23 a.m. to 11:40 a.m.)

         7                THE VIDEOGRAPHER:  Time is 11:40 a.m.  This

         8    is the beginning of Disc No. 2, and we are back on the

         9    record.

11:40   10        Q.  (BY MS. WILLIAMS)  Mr. Wright, when -- before

        11    we took the break, we were talking about some aspects of

        12    your job.  We -- do you recall my questions about the

        13    training that you participated in while you were at

        14    Chevron Phillips Chemical?

11:40   15        A.  Some of them, yes.

        16        Q.  Okay.

        17                (Exhibit 1 marked)

        18        Q.  (BY MS. WILLIAMS)  I'm going to show you what

        19    I'm marking as Exhibit 1 to your deposition.  It's a

11:40   20    multipage document.  I don't think the pages are

        21    numbered, but there is a Bates numbering on them.  These

        22    are records that we produced to your lawyer.

        23        A.  Okay.  It's small.

        24                MS. WILLIAMS:  There you go, Marrick.

11:41   25                MR. ARMSTRONG:  Thank you.
```

1          A.   Okay.

2          Q.   (BY MS. WILLIAMS)   This is a report from

3     Chevron Phillips Chemical.  If you'll look to the left

4     side of it, it has "First Name," "Last Name," and

11:41    5     "Middle Initial" -- or "Middle Initial" columns.

6          A.   Okay.

7          Q.   It has your name throughout, if you look on all

8     of the pages.  This is the record of the training that

9     you participated in during your employment at Chevron

11:41   10     Phillips Chemical.

11          A.   Okay.

12          Q.   And I don't need you to go through -- I know

13     the print's very small.  I don't need you to go through

14     each -- each item, but there are a number of different

11:41   15     training topics described.  There's a "Description"

16     column.  Do you see that kind of near the middle of the

17     page?

18          A.   Yes.

19          Q.   The first item, for example, says "Ladder

11:41   20     Safety."  A little bit farther down, it says "Employee

21     Safety Process"?

22          A.   Yes --

23          Q.   Right under --

24          A.   -- I see it.

11:42   25          Q.   -- that it says "OSHA Rights"?

1          A.   Yes.

2          Q.   Does this kind of help you to recall this would

3     be some of the type of training that you participated in

4     throughout your employment at Chevron Phillips Chemical?

11:42     5          A.   Yes.

6          Q.   Okay.   If you'll turn to the second page of

7     that document, which has Bates No. CPCHEM 33 at the

8     bottom.

9          A.   Okay.

11:42    10          Q.   And if you'll turn your attention sort of --

11     it's near the bottom of the page.   There are several

12     entries that say "Lock, Tag, Try."   Do you see that near

13     the bottom?

14          A.   Yes, I see it.

11:42    15          Q.   "Pasadena Site Specific"?

16          A.   Yes.

17          Q.   And it shows, if you look over at the

18     "Completion Date" there, it shows, you know, multiple

19     dates for each entry or a date for each entry reflecting

11:43    20     the completion date you participated in that training.

21                    Do you see that?

22          A.   Yes, I see it.

23          Q.   Okay.   Is it fair to say that this would

24     reflect the training that we were discussing, the

11:43    25     computer module training that you participated in

|      |    |                                                           |
|------|----|-----------------------------------------------------------|
|      | 1  | throughout your employment at Chevron Phillips Chemical    |
|      | 2  | with respect to the lock, tag, try process?               |
|      | 3  | A.  Yes, it looks like it is.                             |
|      | 4  | Q.  Okay.  And then there are other entries just         |
| 11:43 | 5 | underneath that.  For example, it says "Electrical        |
|      | 6  | Safety."  From time to time you would participate in      |
|      | 7  | electrical safety training, correct?                      |
|      | 8  | A.  Correct.                                              |
|      | 9  | Q.  Do you also recall receiving training on what        |
| 11:43 | 10 | Chevron Phillips Chemical called its Code of Conduct?    |
|      | 11 | A.  Yes.                                                  |
|      | 12 | Q.  Okay.  If you'll flip to the very last page of       |
|      | 13 | this document and, again, near the bottom -- (coughing)  |
|      | 14 | excuse me -- there are multiple entries showing "Code of |
| 11:44 | 15 | Conduct - Practical Ethics."                              |
|      | 16 | Do you see that?                                          |
|      | 17 | A.  Yes, I see it.                                        |
|      | 18 | Q.  And, again, under the "Completion Date" there        |
|      | 19 | would be dates reflecting the date that you completed    |
| 11:44 | 20 | that training, correct?                                   |
|      | 21 | A.  Correct.                                              |
|      | 22 | Q.  And you recall receiving on an annual basis a        |
|      | 23 | training on Chevron Phillips Chemical Code of Conduct?   |
|      | 24 | A.  Yes, I remember.                                      |
| 11:44 | 25 | Q.  Okay.  I -- and I know this document -- I mean,      |

| | 1 | it has a number of entries.  It's multiple pages.  You |
| | 2 | were receiving quite a bit of training throughout your |
| | 3 | employment at Chevron Phillips Chemical as reflected on |
| | 4 | these pages, correct? |
| 11:44 | 5 | A.  Yes, that's correct. |
| | 6 | Q.  Okay.  Okay.  Do you recall when you started at |
| | 7 | the company that you also received a set of work rules |
| | 8 | for the Pasadena complex? |
| | 9 | A.  Yes, work rules, yes. |
| 11:45 | 10 | Q.  Okay. |
| | 11 | (Exhibit 2 marked) |
| | 12 | Q.  (BY MS. WILLIAMS)  I'm going to show you what |
| | 13 | I'm marking as Exhibit 2; and you can start taking a |
| | 14 | look at that, just to get yourself familiar again with |
| 11:45 | 15 | it. |
| | 16 | MS. WILLIAMS:  (Tenders document) |
| | 17 | MR. ARMSTRONG:  Thank you. |
| | 18 | MS. WILLIAMS:  Uh-huh. |
| | 19 | THE WITNESS:  (Coughing) excuse me. |
| 11:45 | 20 | Q.  (BY MS. WILLIAMS)  Can you describe for us what |
| | 21 | that -- what that document is, Exhibit 2? |
| | 22 | A.  It looks like the -- the working rules. |
| | 23 | Q.  For Chevron Phillips Chemical at the Pasadena |
| | 24 | Plastics Complex? |
| 11:46 | 25 | A.  Yes. |

1     Q.   Does this look like the work rules that you

2   would have received when you were working at Chevron

3   Phillips Chemical?

4     A.   Yes, it -- it looks like it is.

11:46   5     Q.   Okay.

6                (Exhibit 3 marked)

7     Q.   (BY MS. WILLIAMS)  Okay.  And I'm going to show

8   you -- it's related to -- to those working rules, but

9   I'm going to show you what's been marked as Exhibit 3.

11:46   10                MS. WILLIAMS:  Oh, I'm sorry.  I marked on

11   the bottom of that for you.

12                MR. ARMSTRONG:  Okay.  Less work for me.

13     Q.   (BY MS. WILLIAMS)  And this Exhibit 3 is -- the

14   title of it is "Employee Acknowledgment of Receipt of

11:46   15   Plant Working Rules."

16                Did I read that correctly?

17     A.   Yes, you did.

18     Q.   And it has your signature on it, correct?

19     A.   That is correct.

11:46   20     Q.   This acknowledges that you did receive those

21   working rules that are reflected in Exhibit 2, correct?

22     A.   That would be correct.

23     Q.   Okay.  And you recall signing this

24   acknowledgment reflecting your receipt of the working

11:46   25   rules?

1    A.   Yes, I do.

2    Q.   Okay.  When you received the working rules, did

3  you review those?

4    A.   Yes, I did.

11:47    5    Q.   Were you familiar with and aware of what the

6  working rules were at Chevron Phillips Chemical

7  throughout your employment?

8    A.   Yes.

9    Q.   Okay.  We were talking before the break about

11:47   10  the lockout/tagout issue that developed in September or

11  October, 2014.  Do you recall --

12    A.   Yes.

13    Q.   -- that?  Okay.

14    A.   Yes.

11:47   15    Q.   And I think you indicated, you know, that there

16  was some issue, obviously, that -- that developed with

17  that with respect to the work that you did, correct?

18    A.   That's correct.

19    Q.   How did you learn that there had been an issue

11:47   20  regarding the work that you did on -- well, first of

21  all, tell us what -- what the actual work was with

22  respect to this lockout/tagout issue that developed.

23    A.   Tell us -- I'm sorry.  Say it again.

24    Q.   What -- do you recall what your job assignment

11:48   25  was with respect to this lockout/tagout issue that

           1    developed?

           2        A.   Yes --

           3        Q.   Okay.

           4        A.   -- I recall.

11:48      5        Q.   What were -- what was your job responsibility?

           6    What were you supposed to be doing?

           7        A.   The job responsibility was to go over and

           8    actually lock out -- lock and tag some equipment out for

           9    a contractor that was in the plant.

11:48     10        Q.   What equipment did you have to lock and tag?

          11        A.   I locked out -- it was the electrical -- an

          12    electrical disconnect switch that provided power to some

          13    equipment that was outside.

          14        Q.   What equipment outside was it providing power

11:48     15    to?

          16        A.   I'm not -- I don't know specifically what

          17    equipment it was providing power to.

          18        Q.   So what -- you -- who -- and I think you said

          19    that Darryn Barnes contacted you and instructed you to

11:49     20    go over and perform this -- this function, correct?

          21        A.   That's correct.

          22        Q.   What do you recall Darryn Barnes telling you?

          23        A.   He told me to go over and -- and lock out some

          24    equipment for -- for the -- I don't think he -- I don't

11:49     25    recall him saying the name.  He just said he needed me

1          A.   The equipment --

2          Q.   -- or --

3          A.   -- outside the unit.

4          Q.   Okay.   When you lock out and tag out equipment,

11:54    5    is there any paperwork involved in that process?

6          A.   Sometimes there is; sometimes there's not.   It

7    depends on how much equipment has to be locked out.

8          Q.   So if there's a certain number or -- or number

9    of equipment that has to be locked out, there will be

11:54   10   paperwork associated with that because of the number of

11   equipment involved -- or the amount of equipment

12   involved?

13         A.   That's correct.

14         Q.   And if it's -- I don't know.   If it's a smaller

11:54   15   number, there would not be equipment -- I'm sorry --

16   paperwork involved with the lockout/tagout of a small

17   amount of equipment?

18         A.   Yes, for a smaller number.   Just one -- one to

19   two pieces of equipment, yes, then there's --

11:54   20   sometimes -- there's not going to be paperwork.   The

21   operator will just -- they'll give us -- they'll show us

22   specifically what they need locked out and we will lock

23   that equipment out.

24         Q.   In this case regarding this particular

11:55   25   incident, was there paperwork associated with this

1    lockout/tagout?

2        A.    Yes, there was.

3        Q.    What was that paperwork called?

4        A.    That paperwork was -- what is the name of it

11:55    5    now?  It's been a while since I've been in the plant.  I

6    apologize.

7        Q.    That's okay.

8        A.    I can't think of the specific name of that

9    paperwork right now.

11:55   10        Q.    Do you -- is it an isolation --

11        A.    It's --

12        Q.    -- list?

13        A.    That's what --

14        Q.    Does that sound right?

11:55   15        A.    Yes.  It's --

16        Q.    Okay.

17        A.    -- an isolation list.  I apologize.

18        Q.    And describe for us what the isolation list is,

19    what the point of it is, and in particular with respect

11:55   20    to your role in the lockout/tagout process.

21        A.    The isolation list is -- it is a piece of paper

22    with specific names and numbers of -- of items to be

23    locked out for different equipment that they need to be

24    turned off so that they can perform maintenance or

11:56   25    whatever needs to be done to that equipment.

1          Q.   Why is it important that equipment be locked

2    out and tagged out?

3          A.   It's important because you -- that way you

4    don't have a situation where you just turn off a -- a

11:56    5    piece of equipment and then someone else can come behind

6    you and turn it back on and then someone working on it

7    outside could possibly get hurt.

8          Q.   Okay.  I want to make sure that I understand

9    what you're saying.  So if -- if -- the lockout/tagout

11:57   10    is necessary so that -- in this case do you recall that

11    equipment was being removed?

12          A.   I'm not sure what they -- I never got any

13    specific detail on what they were going to do with the

14    equipment.

11:57   15          Q.   Okay.  But in any event, you agree that it was

16    important that whatever was happening with this

17    equipment, that it be locked out and tagged out,

18    correct?

19          A.   That's correct.

11:57   20          Q.   One of the things that could have happened if

21    it had not been locked out and tagged out properly is

22    that somebody could have turned it back on and energized

23    it again, correct?

24          A.   That's correct.

11:57   25          Q.   And someone who was working with it would not

        1   have realized that it was turned on and could have been

        2   injured as a result of that, correct?

        3       A.  That's correct.

        4       Q.  And what type of injury -- as, you know, a

11:57   5   career electrician, what type of injury could occur if

        6   someone's working with equipment that is energized when

        7   it's not supposed to be?

        8       A.  It's various what could happen.  It just

        9   depends on how much voltage is going to it, how much

11:58   10  power is available at that equipment.  I mean, it could

        11  be anything from a small pinch up to death.

        12      Q.  So it's a big deal, right, to lock out and tag

        13  out to --

        14      A.  Yes.

11:58   15      Q.  -- avoid injury?

        16      A.  Yes, it is.

        17      Q.  Do you recall working with the isolation list

        18  for this lockout/tagout?

        19      A.  Yes, I recall.

11:58   20      Q.  Okay.  And I think you mentioned that Billy

        21  Donnell, he pointed out the equipment to you, right?

        22  There were two pieces of equipment or was...

        23      A.  Yes, I think it was two pieces of equipment.

        24      Q.  I think you said there were two specific points

11:59   25  or parts to lock out?

1        A.   Yes.

2        Q.   Okay.   Billy Donnell pointed that out to you

3    or --

4        A.   Yes.

11:59    5        Q.   -- Donnell?

6        A.   Yes, he pointed those out to me.

7        Q.   And then what did you do next after he pointed

8    those out to you?

9        A.   I don't remember my next specific step.   I -- I

11:59   10    apologize.

11        Q.   Well, what would be your next specific step

12    when some -- when an operator says this is the equipment

13    that needs lockout/tagout, what would be the next step

14    that you would be doing as an electrician on that

11:59   15    assignment?

16        A.   Well, when he has an isolation list, he will

17    give -- I will check the isolation list to verify that

18    the numbers, they match, and then I will turn those --

19    that equipment off.   Then I will grab a -- a lock and

11:59   20    tag, and I will lock and tag those out.

21        Q.   And you say you were going to match the

22    numbers.   You're matching the numbers on the isolation

23    list to the numbers that are on the equipment?

24        A.   That's correct.

12:00   25        Q.   That you're locking and tagging?

          1         A.   That's correct.

          2         Q.   And that's something that always has to be

          3    done, correct?

          4         A.   Yes.

 12:00    5         Q.   Okay.  And then you said you would turn the

          6    equipment off, correct?

          7         A.   That's correct.

          8         Q.   That's also something that always has to be

          9    done?

 12:00   10         A.   That's correct.

         11         Q.   How do you actually turn the equipment off?

         12         A.   The equipment is turned off -- there is a -- a

         13    switch.  I guess I would liken it to a light switch in a

         14    room where you just turn a handle and turn that

 12:00   15    equipment off, and then there is a -- a lockout

         16    mechanism in that -- in that handle that you would press

         17    out.  It's usually a metal bar and you will put your

         18    scissor hasp on there, hang a tag and a lock, and then

         19    that equipment cannot be turned back on.

 12:01   20                   (Coughing) excuse me.

         21         Q.   Do you know what "T" leads are?

         22         A.   Yes.

         23         Q.   What are "T" leads?

         24         A.   "T" leads are the electrical wiring that is

 12:01   25    coming into the -- that -- that electrical -- let me

1    think of how -- the -- the "T" leads are the electrical

2    wires that terminate to where the electricity generates

3    to go out to -- into the facility wherever that

4    equipment is to provide power to it.

12:01    5         Q.    If "T" leads are still connected, then

6    technically the equipment is still energized?

7         A.    No, that's not correct.

8         Q.    Why is that not correct?

9         A.    Because if you turn the power off at the -- at

12:02    10    that handle, then there could be no power -- no power

11    will reach the -- will get to the "T" leads.

12         Q.    Unless somebody turns the power back on?

13         A.    Unless it's turned back on.

14         Q.    But if somebody turned the power back on and

12:02    15    the "T" leads were disconnected, would there be power to

16    that equipment?

17         A.    If the "T" leads were disconnected?

18         Q.    Yes, sir.

19         A.    No, there would not be.

12:02    20         Q.    Okay.    Are there times where disconnecting the

21    "T" leads is also a part of the lockout/tagout process

22    in your work at Chevron Phillips Chemical?

23         A.    No.

24         Q.    That has never happened?

12:02    25         A.    I'm not going to say never, but I haven't done

1    it.

2         Q.   Okay.   And so you were saying that you match

3    the numbers, you turn the equipment off -- you described

4    how you turn the equipment off -- and then you said you

12:03   5    grab a lock and tag, correct?

6         A.   That's correct.

7         Q.   And you put the lock and tag on the equipment?

8         A.   That's correct.

9         Q.   Okay.   When you complete those tasks, what do

12:03  10    you do next as a part of this lockout/tagout process?

11         A.   After you -- you turn the equipment off, hang a

12    lock and a tag, the next thing to do would be to

13    verify -- not verify -- well, yes, verify on the

14    isolation list that those items have been turned off,

12:03  15    locked, and tagged.

16         Q.   How do you verify that on the isolation list?

17         A.   It's normally just -- because that -- the

18    isolation list has the name of that equipment and the

19    number on it and it's just a matter of checking it off

12:03  20    and/or just initialing on the side of it.

21         Q.   So as a part of the process once you've

22    actually -- well, let me back up and make -- when you

23    get the isolation list, is it important for you to

24    actually review the isolation list in order to confirm

12:04  25    what you're supposed to be doing with what equipment?

1          A.   I'm not sure what you mean.  Say it again,

2     please.

3          Q.   When you -- when you get the isolation list --

4          A.   Uh-huh.

12:04  5          Q.   -- is it important for you to review that list

6     in order to start the lockout/tagout process?

7          A.   Not so much review it because we don't -- as an

8     electrician, we don't -- we are not specifically in

9     touch with every -- every aspect of the -- the -- the

12:04  10    isolation list.  We don't have anything to do with if

11    there is another piece of equipment, something that is

12    just oil or something that doesn't have electricity to

13    it, then, no, we're -- we don't have anything to do with

14    that part -- that part of the isolation list.

12:05  15         Q.   The part of the isolation list that involves

16    the equipment you're working on, is it important for you

17    to review that part in order to get started with the

18    lockout/tagout process?

19         A.   Yes, review it in the point to verify that you

12:05  20    have the right equipment, that the numbers -- name and

21    numbers match, yes.

22         Q.   Okay.  Does the isolation list also include

23    instructions or other information just besides the --

24    the number of the equipment that you would review in

12:05  25    order to start the lockout/tagout process?

1          A.   Information as far as?

2          Q.   Just information that you might need to know as

3     an electrician when you're performing, if there's

4     special instructions or directions regarding the

12:05    5     function that you are supposed to be performing in this

6     process.

7          A.   No, ma'am, usually not.  It's just --

8          Q.   Does it --

9          A.   The isolation list is normally going to be the

12:06   10     name and number of that equipment.

11          Q.   Are there times where it does have more

12     information besides just the name and the number of the

13     equipment?

14          A.   I'm not sure.  I haven't experienced that.

12:06   15          Q.   Okay.  And then -- so you look at -- you -- you

16     get started by looking at the isolation list to confirm

17     the number to match it to the number on the equipment,

18     correct?

19          A.   Correct.

12:06   20          Q.   And then you go through your lockout/tagout

21     process that you described.  And then I think you were

22     saying once you're completed with -- you complete that

23     process, you go back to the isolation list and you put

24     initials on it?

12:06   25          A.   That's correct.

1          Q.   Tell -- what -- what are you actually

2     initialing on the isolation list at the end of this

3     process?

4          A.   You are initialing that you have turned off and

12:07      5     locked and tagged that equipment to put it into a safe

6     state.

7          Q.   And if the isolation list has more details

8     about it other than just -- you know, just do the lock

9     and tag part of this, are you also initialing that you

12:07     10     performed those functions, as well, with respect to your

11     part of the job?

12          A.   Well, you don't initial it if you haven't

13     performed that part of the job.

14          Q.   Okay.  Your initial reflects that you've

12:07     15     performed whatever job that isolation list is asking you

16     or instructing you to perform, correct?

17          A.   Correct.

18          Q.   And if your initial is on there, then that

19     means that you're telling the company, "I've done this

12:07     20     as specified on this isolation list," correct?

21          A.   Correct.

22          Q.   And if it had not been done as specified on the

23     isolation list, then your initials on there would be

24     inaccurate, frankly, in terms of the work that you were

12:07     25     supposed to perform, correct?

```
       1          A.  If someone did that, yes, that would -- that
       2   would not be correct.  I wouldn't put my initials on
       3   something that I haven't done.
       4          Q.  So after -- for this particular incident that
12:08  5   we're talking about in 2014, after you performed the
       6   isolation -- or the lockout/tagout on this particular
       7   equipment, at some point you heard back from the company
       8   that there was an issue related to that work, correct?
       9          A.  Correct.
12:08  10         Q.  Tell -- who did you hear from that there had
      11   been an issue regarding that work?
      12          A.  I don't know.  I don't remember who
      13   specifically told me that there was a problem.
      14          Q.  Were you -- (coughing) excuse me.  Were you at
12:08  15   work when you learned that there had been an issue?
      16          A.  Yes, I was at work.
      17          Q.  What did you learn -- well, at some -- do you
      18   recall meeting with anyone in relation to this issue?
      19   Did anybody call you into a meeting and say, "Let's talk
12:09  20   about something that happened with this lockout/tagout
      21   process on this equipment"?
      22          A.  Yes, later -- later on someone did.
      23          Q.  Do you recall who that was?
      24          A.  I believe -- I'm not -- I can't say for sure --
12:09  25   for certain, but I believe it was Keith Bravenec.
```

1        Q.   And who is Keith Bravenec?

2        A.   He is the instrument and electrical -- I think

3   his title is -- superintendent, I think is his title.

4   I'm not sure.

12:09    5        Q.   Okay.  Had you -- did you know Keith Bravenec

6   before this time in October or -- 2014, when he called

7   you in about the lockout/tagout issue?

8        A.   Well, yes, we had -- we had seen each other

9   plenty of times, yes.

12:09   10        Q.   Did you have any issues with Keith Bravenec?

11        A.   No, I didn't have any issues with him.

12        Q.   On what occasions would you have seen Keith

13   Bravenec before this incident in October of 2014?

14        A.   How do you mean?

12:10   15        Q.   Just -- would you have been working with him,

16   reporting to him, or would you just see him at the

17   facility?

18        A.   I would see Keith -- he would come sometimes

19   to -- to our tailgate meetings.  I would see him just in

12:10   20   passing.  It was -- there would be various times I would

21   see him.  Sometimes he may just be moving through the

22   facility and I would see him.

23        Q.   Okay.  So when you talked to Keith -- Keith

24   Bravenec about this lockout/tagout incident, what did he

12:10   25   tell you?  What's your recollection of -- of the

 1    discussion that you had with him when you first learned

 2    about -- that there had been an issue?

 3        A.   I apologize.   I -- I don't remember exactly

 4    what happened or what his specific comments --

12:11    5    conversation was.

 6        Q.   Well, in general what was he calling you in to

 7    talk to you about?

 8        A.   He was calling me in because there was an issue

 9    with the -- with the lockout/tagout.

12:11   10        Q.   And do you recall what he said the issue was?

11        A.   He said that there was not a lock and tag on

12    the equipment, at which point I tried to explain to him

13    what happened with the operator.

14        Q.   What happened with the operator?

12:11   15        A.   When I initialed that I did -- I had turned off

16    the equipment and tried -- I then went to try to get a

17    lock and tag and the operator told me, "No, don't do

18    that," because they were going to reuse that equipment.

19    And then he pointed at a sticker that was on the

12:12   20    equipment and I -- it was new.   I had never seen that --

21    that sticker before.   We had never -- in the facility --

22    I had never seen that in the facility before.

23        Q.   Who pointed to a sticker, Keith or --

24        A.   No, the -- Keith wasn't there.   It was the

12:12   25    operator.

1      Q.   Who -- and that's --

2      A.   Billy -- yes, Billy Donnell, Donnell.  I'm not

3   sure how to say his name.

4      Q.   Okay.  So you told Keith that Billy Donnell

12:12   5   told you not to put the lock or tag on the equipment?

6      A.   Because they were going to reuse it, yes.

7      Q.   And that he also pointed to a sticker that you

8   had never seen before?

9      A.   Correct.

12:12  10      Q.   What -- what did -- what did the sticker look

11   like?

12      A.   I don't remember exactly what it looked like.

13   I don't even -- I don't remember exactly what it looked

14   like, but it was --

12:13  15      Q.   Do you remember a color?

16      A.   It was -- it was just a little white sticker

17   with black letters, black lettering.

18      Q.   And where was the sticker?

19      A.   It was on the -- the actual -- the lock -- not

12:13  20   lockout but the -- oh, gah, what is that?  What is it

21   called?  It was on the -- the electrical disconnect

22   switch, and I later found out that that was something

23   brand-new.  It was only supposed to be for the

24   operators.

12:14  25      Q.   What was only supposed to be for the operators?

1    A.   That sticker.

2    Q.   But you don't know what the sticker did or what

3    it said or --

4    A.   I don't recall specifically what it said, no.

12:14   5    Q.   And do you know what the purpose of the sticker

6    was?

7    A.   No, I don't.

8    Q.   Did Billy Donnell -- or Donnell -- we'll say

9    Donnell and if we're getting it --

12:14   10   A.   Okay.

11   Q.   -- wrong, we'll apologize to him later.

12        But did -- did he tell you not to lock and

13   tag the equipment before you signed the isolation list?

14   A.   No.  He told me after I signed the list.  After

12:14   15   I initialed the list, he told me not to -- to -- to lock

16   and tag it.  Because I would not have signed it if I

17   knew that I was not going to be able to lock and tag

18   because that's the rule.  When you sign something,

19   you -- you sign it that you are actually performing a

12:15   20   lock and tag.

21   Q.   So you signed the isolation list saying that

22   you had performed those functions before you had

23   actually completed them?

24   A.   Before they were completed, yes.

12:15   25   Q.   So when you signed it, the work had not been

1    done?

2        A.   Not com -- not fully, no.

3        Q.   And, in fact, according to you, the work never

4    got done because you say that Billy Donnell told you not

12:15    5    to put the lock and tag on it; is that right?  Is that

6    your testimony?

7        A.   Yes, it never -- it was never completed.

8        Q.   And did you do anything to correct the initials

9    that you put on the isolation list to reflect that you

12:15   10    did not do the work that you were actually initialing on

11    the list that you had done?

12        A.   Did I do anything --

13        Q.   Did you correct the isolation list to -- to

14    reflect that you had not done the work that you said you

12:15   15    had done on the isolation list?

16        A.   No, I didn't.  He wouldn't give me the list

17    back to get my initials off of it.

18        Q.   Did you ask for it back?

19        A.   Yes, I asked; but he wouldn't --

12:16   20        Q.   When did you ask for it back?

21        A.   I asked for it -- when he wouldn't let me put a

22    lock and tag on it, I asked for it back.

23        Q.   So you -- you had not completed the lock and

24    tag; but you proceeded to go ahead and initial the

12:16   25    isolation list indicating that you had completed it,

1    lock and tag.

2        Q.   And so you said you went outside to get the

3    lock and tag, you came back in to put the lock and tag

4    on.   Billy Donnell told you not to put the lock and tag

12:18    5    on?

6        A.   That's correct.

7        Q.   Okay.   And then you said, "Well, give me the

8    list back," correct?

9        A.   Yes.   I said, "I -- I want to take my initials

12:18    10    off."

11             He said, "Well, no, I need to go get --

12    finish this lockbox up."

13        Q.   Okay.   And -- and he -- did you say, "But, no,

14    I need the list back because I've got to get my initials

12:18    15    off"?

16        A.   Yeah.   That's why I asked back -- asked for it

17    back, was I --

18        Q.   How many times did you ask for it back?

19        A.   I only told him once and -- I mean, I didn't

12:18    20    want to -- I didn't want to create a confrontation with

21    him.   I asked for it back.   He told me no, and he was

22    already moving to -- to leave from the -- from the MCC.

23             The motor control center, that's what MCC

24    is.   It -- it just came back to me.

12:19    25        Q.   Motor control center?

```
           1        A.   Motor control center, yes.

           2        Q.   You were not required to give Billy Donnell the

           3   isolation list before you actually completed the

           4   process, right, meaning before you actually put the lock

12:19      5   and tag on it?  You could have had the lock and tag with

           6   you, put it on there, signed the isolation list, and

           7   then turned it over to Billy Donnell after the

           8   completion of that whole process, right, if you wanted

           9   to?

12:19     10        A.   Well, no, because I didn't know how many points

          11   initially were going to be locked out.

          12        Q.   Well, when you got there and he told you how

          13   many points -- right?

          14        A.   He pointed to the two that he needed, yes.

12:19     15        Q.   And you could have then gone to get the lock

          16   and tag and then come back, completed the -- the

          17   process, put the lock and tag on, completed the

          18   isolation list, and then given it to Billy Donnell?

          19   That's -- that's another --

12:19     20        A.   That is --

          21        Q.   -- way to do this, right?

          22        A.   That is another way.

          23        Q.   And, in fact, that would have been a way that

          24   really would have been correct because the -- before you

12:20     25   initialed it, you would have completed that entire
```

           1    process, including putting the lock and tag on before

           2    you put your initials on, correct?

           3         A.   Correct.

           4         Q.   But you decided to put your initials on before

12:20      5    you actually completed the -- the entire process; is

           6    that correct?

           7         A.   Yes, that's correct.

           8         Q.   When Billy Donnell refu -- according to you,

           9    you said Billy Donnell refused to give you the -- the

12:20     10    isolation list back?

          11         A.   That's correct.

          12         Q.   When he refused to do that, did you go and talk

          13    to your supervisor about that?

          14         A.   No, I didn't.  No, I didn't.

12:20     15         Q.   Did you talk to anyone about the fact that your

          16    initials were sitting on an isolation list reflecting

          17    work that you said you had done that you had, in fact,

          18    not done?

          19         A.   Yes.  I talked to -- I don't remember

12:20     20    specifically.  There were a couple electricians back in

          21    the -- in the -- in the electrical maintenance area that

          22    I told about it.

          23         Q.   Who were they?

          24         A.   I don't remember who was -- there were -- there

12:21     25    was a group of people there.  I don't remember

1    specifically the electricians.

2        Q.   They would have been electricians who were on

3    duty with you, though, at the same time that this

4    incident occurred?

12:21    5        A.   That's correct.

6        Q.   What was your -- what -- what was your work

7    schedule at Chevron Phillips Chemical?  What time did

8    you report to work and what time did you get off, in

9    your regular hours?

12:21    10        A.   My regular hours were 7:00 a.m. to 5:30 p.m.

11            (Coughing) excuse me.

12        Q.   And did that stay the same throughout your

13    employment at Chevron Phillips Chemical?

14        A.   No.  It would change.  Whenever there was a

12:21    15    turnaround, we would work 7:00 to 7:00.

16        Q.   During this period, was -- there was a

17    turnaround, the October, 2014, time frame?

18        A.   I -- I do believe, yes.

19        Q.   Okay.  So to -- to your recollection, would you

12:22    20    have been on a 7:00 a.m. to 7:00 p.m. schedule?

21        A.   Yes.

22        Q.   When you'd spoke to these other electricians in

23    the maintenance area, what did you tell them?

24        A.   I told them that -- I explained to them what

12:22    25    happened, that I went to turn off the breakers for the

1    equipment and there was some new sticker on the

2    equipment that I didn't -- I had never seen before and I

3    told them that -- that the operator told me not to hang

4    a lock and tag because they were going to reuse it.  And

12:22    5    they were -- they all just had this puzzled look like,

6    "Well, why would he not let you hang a tag, hang a lock

7    and tag?"

8        Q.  Did you think there was something wrong with

9    him telling you not to hang a lock and tag?

12:23    10        A.  Yes.

11        Q.  What was wrong with that?

12        A.  That was not the way -- that was not the -- the

13    normal course of how the lock and tag works.

14        Q.  Did you understand that to be a violation of

12:23    15    the lock and tag -- lockout/tagout process at Chevron

16    Phillips Chemical?

17        A.  I didn't think of it as a violation at the

18    time.  I -- I was actually just somewhat -- I was

19    puzzled as to why he would not want me to hang a lock

12:23    20    and tag.

21        Q.  Well, you were puzzled because that -- you're

22    supposed to hang a lock and tag as a part of the

23    process, right?

24        A.  That's correct.

12:23    25        Q.  And if you're not hanging it as a part of the

1  process, then that's a violation of the process, right?

2      A.  Well, yeah, to look back at it, yeah, that's --

3  that's exactly what it is.

4      Q.  Okay.  And although, according to your

12:24  5  testimony, he's telling you to do something that is

6  against the policy or the process of Chevron Phillips

7  Chemical, you didn't escalate this up to your superior

8  or anyone other than these maintenance electricians to

9  try to get that corrected, correct?

12:24  10      A.  That's correct.  That was my mistake, that I

11  didn't do that.  I didn't ask -- I didn't make enough --

12  enough of a situation about the whole -- the whole

13  situation.

14      Q.  And so when you're talking to Keith Bravenec

12:24  15  later and he comes to you and says there's been this

16  issue, you tell him about this exchange you had with

17  Billy Donnell, correct?

18      A.  Correct.

19      Q.  And do you have any complaints about how Keith

12:24  20  Bravenec went about this discussion with you?  I mean,

21  did he let you provide your side of the story regarding

22  this incident?

23      A.  Yeah, he -- he let me provide my side of the

24  story but he told me that it was my fault, I shouldn't

12:25  25  have let the situation get that far, which -- and I

1  really shouldn't have, but at the time I didn't -- I

2  didn't make enough of an issue about it.

3       Q.  So you did not disagree with Keith Bravenec's

4  assessment that you should not have let the situation go

12:25   5  that far.  You agreed with him on that, correct?

6       A.  Yes, I agreed because it -- looking back, it --

7  it actually -- it was my fault.  I should have -- I

8  should have taken it further to -- to at least, if

9  nothing else, get the isolation list back to take my --

12:25   10  remove my initials, whereas if -- well, that's just

11  speculation.  If I had been working with the second

12  electrician as I was supposed to be, that situation

13  would have never occurred.

14       Q.  Well, you're speculating, right?  You don't

12:26   15  know that?

16       A.  No, I -- that's -- because the second

17  electrician would have been there to -- to make more of

18  an issue of it.

19       Q.  You said that you thought you were capable of

12:26   20  going out and handling this job, though, right?

21       A.  I thought I was, yes.

22       Q.  Okay.  And you agree with Keith that you should

23  have escalated this to address the issue when it

24  developed, correct?

12:26   25       A.  Yes.

1          Q.   Okay.  Did Keith tell you that there was

2     anything else that you did wrong with respect to this

3     lockout/tagout process?

4          A.   I don't think he did.

12:26    5          Q.   Do you recall there being instructions on this

6     isolation list that as a part of the lockout process,

7     that you were also -- also supposed to disconnect the

8     "T" leads from the breaker?

9          A.   I don't recall that.

12:27   10          Q.   Do you recall disconnecting "T" leads on -- for

11     this particular job that you've been talking about that

12     occurred in September or October, 2014?

13          A.   No, I didn't disconnect "T" leads because

14     that -- then there would have been a second electrician

12:27   15     to disconnect "T" leads.  To do work -- for an

16     electrician to do work inside of a -- a hot panel,

17     there's supposed to be a second electrician there.

18          Q.   After you -- where did you and Keith Bravenec

19     meet to discuss this issue when he came to you about it?

12:27   20          A.   Oh, I -- I don't recall.

21          Q.   Okay.  Was it just the two of you present at

22     that time?

23          A.   I don't think it was.

24          Q.   Who else was there?

12:27   25          A.   I'm not sure.

1  Q. Do you recall how many other people were there?

2  A. I don't.  I apologize.

3  Q. That's okay.

4    After this meeting with Keith, what

12:28 5 happened next with respect to this issue?

6  A. I -- I don't -- I don't recall.

7  Q. Do you recall at some point having a meeting

8 with human resources about this?

9  A. I don't recall.  I'm -- it -- I don't recall

12:28 10 it.

11  Q. Okay.  Do you -- do you recall who Virginia

12 Hubbard is?

13  A. Yes, I know Virginia, yes.

14  Q. Who's that?

12:28 15  A. She -- she was the HR representative.

16  Q. Do you recall ever meeting with Virginia

17 Hubbard with respect to this lockout/tagout issue?

18  A. Yes, I met with Virginia.

19  Q. And tell us what you recall about that meeting.

12:29 20  A. I think during that meeting, I was -- if I

21 recall correctly, I think I was suspended.

22  Q. So your recollection is that you met with Keith

23 one time, or do you think that you may have met with

24 Keith more than one time?

12:29 25  A. If I met with him more than once, it would have

             1   been -- I think Virginia would have been there if I met

             2   with Keith more than once.

             3        Q.   Okay.   How many times do you recall meeting

             4   with Virginia regarding this lockout/tagout issue?

12:29        5        A.   I only recall one.

             6        Q.   Okay.   When you met with Virginia, did Virginia

             7   have questions for you about the issue?

             8        A.   Yes.

             9        Q.   Did you answer those questions?

12:30       10        A.   I tried to.

            11        Q.   Did she allow you to tell your side of the

            12   story about the lockout/tagout issue?

            13        A.   Yes.   But then after I told her my side,

            14   nothing ever -- nothing else happened after that, that I

12:30       15   ever heard about or anything that I ever knew of

            16   happening.   Nothing ever happened.

            17        Q.   Do you recall when you met with Virginia and

            18   Keith, either together or separately, did anybody show

            19   you any documents like the isolation list and talk to

12:30       20   you about what was on the isolation list?

            21        A.   I don't recall.   I apologize.

            22        Q.   No problem.

            23             And I'm sorry.   I know I asked you this.   I

            24   want to make sure I recall it correctly.   How many

12:31       25   meetings do you recall having with Virginia?

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | A.   With Virginia I only recall --                          |
|        | 2  | Q.   Regarding the lockout/tagout.  I'm sorry.               |
|        | 3  | A.   I only recall one.                                      |
|        | 4  | Q.   Okay.  And in this meeting she asked you                |
| 12:31  | 5  | questions; you answered those, correct?                      |
|        | 6  | A.   Yes.                                                    |
|        | 7  | Q.   Virginia allowed you to tell your side of the           |
|        | 8  | story, correct?                                              |
|        | 9  | A.   Correct.                                                |
| 12:31  | 10 | Q.   And then did anybody else -- was anybody else           |
|        | 11 | present during this meeting that Virginia and Keith          |
|        | 12 | participated in?                                             |
|        | 13 | A.   In that meeting, yes.  That was the meeting             |
|        | 14 | where Ed was there, Ed Armand was there with me.  He was     |
| 12:31  | 15 | my acting union steward at the time.                         |
|        | 16 | Q.   He was the union rep who attended that --               |
|        | 17 | A.   Union rep, yes.                                         |
|        | 18 | Q.   Okay.                                                   |
|        | 19 | A.   Excuse me.                                              |
| 12:31  | 20 | Q.   That's okay.  I just wanted to make sure we're          |
|        | 21 | using the same --                                            |
|        | 22 | A.   Okay.                                                   |
|        | 23 | Q.   -- terminology.                                         |
|        | 24 |          Did Ed Armand have questions during this           |
| 12:32  | 25 | meeting that you had with Virginia and Keith Bravenec?       |

1          A.   I don't think he did.

2          Q.   During this meeting with Virginia and Keith

3    Bravenec, did you admit that you made mistakes with

4    respect to that lockout/tagout incident?

12:32    5          A.   I admitted that I didn't -- I didn't ask enough

6    questions.

7          Q.   Did you admit that you should not have put your

8    initials on the isolation list when the lockout/tag --

9    when the lock and tag actually had not been completed?

12:32    10          A.   No, I didn't.  I don't think I admitted that.

11          Q.   Was it wrong for you to have done that, to put

12    your initial on the isolation list when, in fact, you

13    had not completed the lock and tag process?

14          A.   Yes, it was wrong, to look back at it, because

12:33    15    he didn't -- the -- my operator would not allow me to --

16    to complete the process.

17          Q.   During this meeting, you said Ed Armand -- you

18    don't recall him having any questions or comments,

19    correct?

12:33    20          A.   I don't recall, no.

21          Q.   What happened at the conclusion of this

22    meeting, or how did it end?

23          A.   I'm -- I think that was -- I think I was

24    suspended after that -- at that -- after that meeting.

12:33    25          Q.   Do you recall whether you met with Virginia and

1    Keith on the same day that you had the first meeting

2    with Keith; or was it, you know, sometime later?

3         A.   I don't recall meeting with Virginia the same

4    day.

12:34   5         Q.   So you think you met with Keith one day and

6    sometime after that on a different day you met with

7    Keith and Virginia together and Ed Armand was present

8    during that meeting?

9         A.   I think so.

12:34  10         Q.   Okay.  Do you recall what Virginia told you

11   about your suspension at -- at that meeting?

12        A.   I was -- hold on.  I was suspended but there

13   was no -- there was never a -- a time limit set for how

14   long I was suspended, which was strange, but it -- I

12:34  15   mean, when you're getting disciplined like that, you --

16   you can't just, you know, stand there and keep trying to

17   question when you're -- you're already under discipline.

18   So I was just told to -- I was told to call back on

19   Monday, I think it was.

12:35  20         Q.   What day of the week do you think this meeting

21   took place with Virginia and Keith and Ed Armand?

22        A.   I -- I'm not sure specifically but I -- I

23   think -- I would say Wednesday or Thursday.  I'm not

24   sure which one but I -- I think Wednesday or Thursday.

12:35  25         Q.   Do you recall Virginia telling you that you

1    remember the gentleman's last name.  His name is Reuben.

2    I don't know his last name.

3          Q.   Okay.

4          A.   He was in The Woodlands.

12:42   5    Q.   Do you know what department he worked in?

6          A.   Human resources.

7          Q.   And what did Reuben tell you?

8          A.   Reuben told me to return to work the next day.

9          Q.   Between the time that you were suspended and

12:42  10    sent home and then the time that Reuben called you, we

11    said that there might have been -- you might have had

12    some communications with Virginia Hubbard, correct?

13          A.   It's possible, yes.

14          Q.   Did you have any communications with anybody

12:42  15    else at the company during your suspension?

16          A.   Any verbal communications or --

17          Q.   Any kind.

18          A.   Yes.

19          Q.   With whom?

12:43  20          A.   Pete Cella.

21          Q.   Who's Pete Cella?

22          A.   Pete Cella is the CEO of Chevron Phillips.

23          Q.   Okay.  And tell us about your communica --

24    how -- how many times did you communicate with Pete

12:43  25    Cella during your suspension?

        1    e-mail went.  It was something to the fact that what I

        2    was saying was at least partially correct, and then he

        3    said that someone would be in contact with me.

        4         Q.  Okay.  And you said you explained the situation

12:44   5    to Pete Cella in your --

        6         A.  Yes.

        7         Q.  -- e-mail?  What situation --

        8         A.  Correct.

        9         Q.  -- did you explain to him?

12:44   10        A.  The situation -- just the outline of how the --

        11   the suspension went about -- or came about.

        12        Q.  What -- were -- and what were you asking Pete

        13   Cella to do, if anything?

        14        A.  I was asking Pete to just look into the

12:45   15   situation and tell me that it was -- the way it was

        16   being handled was correct.

        17        Q.  And by "the way it was being handled," do you

        18   mean the amount of time that you were on suspension?

        19        A.  I mean the whole situation, the way it was

12:45   20   being handled.

        21        Q.  Okay.  And -- so "whole situation," is what in

        22   your mind?  I want to understand.

        23        A.  Is the -- is the entire situation, the

        24   suspension, the -- just the -- the entire situation.

12:45   25        Q.  So you were telling him -- the situation that

1  you told him you didn't think was being handled

2  correctly was the fact that you had been suspended; is

3  that right?  I mean -- I mean, that's one of the things?

4      A.  Wait.  Say that again.  I'm sorry.

12:46  5      Q.  The situation that you were telling Pete Cella

6  you did not think was correct was the fact that you had

7  been suspended?  That was a part of the situation that

8  you were describing to him?

9      A.  No, not the fact that I had been suspended but

12:46  10  that I had been suspended and no one could tell me how

11  long I was going to be suspended.

12      Q.  Okay.  Other than telling him that -- that you

13  disagreed with the fact that you had been suspended and

14  no one could tell you how long you would be suspended,

12:46  15  did you tell him that you had issues with anything else?

16      A.  With anything -- no, I don't think I did.

17      Q.  And I think you testified earlier the next day

18  you got a call from Reuben, you believe?

19      A.  No, the same day.

12:47  20      Q.  You e-mailed Pete Cella, Pete Cella responded

21  to you the same -- responded to you the same day, and

22  then that same day you got a call from Reuben in HR?

23      A.  Correct.

24      Q.  Had you talked to Reuben before?

12:47  25      A.  Yes, because Reuben -- I had talked to him just

|         |    |                                                               |
|---------|----|---------------------------------------------------------------|
|         | 1  | A.    (Coughing) excuse me.                                    |
|         | 2  |         (Exhibit 6 marked)                                     |
|         | 3  |         MS. WILLIAMS:   Okay.   Thank you.                     |
|         | 4  |         THE REPORTER:   Uh-huh.                                |
| 01:18   | 5  | Q.   (BY MS. WILLIAMS)   I'm going to show you what           |
|         | 6  | I'm marking as Exhibit 6.                                      |
|         | 7  |         MS. WILLIAMS:   (Tenders document)                     |
|         | 8  |         MR. ARMSTRONG:   Thank you.                            |
|         | 9  |         MS. WILLIAMS:   Uh-huh.                                |
| 01:19   | 10 | Q.   (BY MS. WILLIAMS)   Does this look like the              |
|         | 11 | isolation list regarding the October -- September or          |
|         | 12 | October, 2014, lockout/tagout that we were discussing         |
|         | 13 | earlier?                                                       |
|         | 14 | A.   Yes, it looks like it.                                    |
| 01:19   | 15 | Q.   Okay.   And I think you were describing that             |
|         | 16 | this was a multipage document, correct?   I mean, it has      |
|         | 17 | multiple pages --                                             |
|         | 18 | A.   Yes.                                                      |
|         | 19 | Q.   -- Exhibit --                                             |
| 01:19   | 20 | A.   Correct.                                                  |
|         | 21 | Q.   -- 6.                                                     |
|         | 22 |         At the top it's called "Isolation List               |
|         | 23 | #42."                                                          |
|         | 24 |         Do you see that?                                      |
| 01:19   | 25 | A.   Yes, I --                                                 |

1          Q.   What --

2          A.   -- see it.

3          Q.   What does that refer to, "#42," if you know?

4          A.   I don't know.

01:19    5          Q.   Okay.   But if you flip through to the second

6     page of Isolation List #42, there's some highlighting on

7     it.   And I apologize because I know that the copying is

8     a bit faint, but you see the yellow highlighting across?

9          A.   Yes, I --

01:20    10         Q.   Okay.

11         A.   -- see it.

12         Q.   There are different columns.   One of them says

13    "Location of Lock or Tagout Tag on Equipment."

14              Do you see that column at the top?

01:20    15         A.   I'm sorry.   Say it again.

16         Q.   It's lock -- "Location of Lock."

17         A.   Okay.

18         Q.   That column.

19         A.   Yes.

01:20    20         Q.   And then underneath that it identifies, for

21    example, certain motor numbers.   Do you see that?   So,

22    for example, here there's a motor number listed -- a

23    motor and --

24         A.   Yes, I see it.

01:20    25         Q.   -- number listed?

1        A.   Yes.

2        Q.   And then if you move over, there are columns

3   that says "Electrical De-Energized & Verified By

4   [Initial]."

01:20    5              Do you see that column?

6        A.   Yes.

7        Q.   Okay.  And under that, that would be where you

8   as the electrician would put your initial to verify that

9   the work had been done, correct?

01:21   10        A.   Correct.

11        Q.   Okay.  And I know it's really faint but if you

12   look -- if you squint and look hard, there's some

13   initials there, "TW."

14              Do you see that?

01:21   15        A.   Yes.

16        Q.   And it -- "TW" -- the initial for "TW" shows up

17   for Item No. 3, Item No. 4, Item No. 5, and if you flip

18   to the next page, Item No. 6, and Item No. 7, correct?

19        A.   Correct.

01:21   20        Q.   "TW," is that your initial?  Are those your

21   initials?

22        A.   Yes, those are my initials.

23        Q.   And the "TW" would be for Tyrrell Wright,

24   correct?

01:21   25        A.   That's correct.

1    Q.    Because you said sometimes you go by Tyrrell?

2    A.    That's correct.

3    Q.    Okay.  If you'll flip back to the second page

4    of that document, Item No. 3 says "Deenergize and

01:21    5    lockout loadout blower" and then there's a motor number,

6    "30-311."  It says, "Do not lock out breaker...call

7    electricians to disconnect 'T' leads."

8                   Do you see that?

9    A.    Yes, I see it.

01:22    10    Q.    Okay.  Is that something that you would have

11    referred to in order -- when you were, you know, placing

12    your initials there to kind of confirm that you were

13    performing the right job for this isolation list?

14    A.    Say it again.  I'm sorry.

01:22    15    Q.    Is -- the information that's under Column

16    No. 3, is that something -- I guess does that relate to

17    the job that you were doing, the lockout/tagout process

18    that you were doing, with respect to this isolation

19    list?

01:22    20    A.    Yes.

21    Q.    Okay.  And the same thing for No. -- No. 4.

22    All of those there relate to the work that you did with

23    respect to this particular lockout/tagout, correct?

24    A.    That's correct.

01:22    25    Q.    Okay.  And do you see there that it refers to

|       |    |                                                               |
|-------|----|---------------------------------------------------------------|

1    electricians disconnecting "T" leads?

2         A.   Yes, I see it.

3         Q.   Okay.   I think you testified earlier that you

4    didn't disconnect any "T" leads with respect to -- to

01:23    5    this equipment, correct?

6         A.   That's correct.

7         Q.   This isolation list reflects that "T" leads

8    were supposed to be disconnected, though, correct?

9         A.   That is correct.

01:23    10        Q.   Okay.   Just before we took the -- the break, we

11   were talking about your return to work; and I think I

12   asked you whether you recalled meeting with anyone when

13   you returned to work after your suspension?

14        A.   Yes.

01:23    15        Q.   Do --

16        A.   You said it.

17        Q.   Do you recall meeting with anyone when you

18   returned to work --

19        A.   No, I --

01:23    20        Q.   -- after your suspension?

21        A.   -- I don't recall.

22        Q.   Okay.   Do you recall meeting with Virginia

23   Hubbard to discuss a final written warning that the

24   company was going to issue you as a result of the

01:24    25   lockout/tagout issue?

|      |    |                                                      |
|------|----|------------------------------------------------------|
|      | 1  | A.   I don't recall it.                              |
|      | 2  | Q.   Okay.                                            |
|      | 3  |           (Exhibit 7 marked)                          |
|      | 4  | Q.   (BY MS. WILLIAMS)   I'm going to show you       |
| 01:24 | 5 | what's --                                             |
|      | 6  |           MS. WILLIAMS:   Sorry.                      |
|      | 7  |           THE REPORTER:   That's okay.                |
|      | 8  | Q.   (BY MS. WILLIAMS)   -- what's been marked as    |
|      | 9  | Exhibit 7.                                            |
| 01:24 | 10 |           MS. WILLIAMS:   (Tenders document)         |
|      | 11 |           MR. ARMSTRONG:   Thank you.                 |
|      | 12 |           MS. WILLIAMS:   Uh-huh.                     |
|      | 13 | Q.   (BY MS. WILLIAMS)   This is a "Final Written    |
|      | 14 | Warning and Two-week suspension," dated October 30th. |
| 01:24 | 15 | It has -- addressed to you, Tyrrell Wright, electrician. |
|      | 16 |           Do you see that?                            |
|      | 17 | A.   Yes, I see it.                                   |
|      | 18 | Q.   Do you recall receiving this document?          |
|      | 19 | A.   I don't recall it, but obviously I did.         |
| 01:24 | 20 | Q.   You -- that's your signature at the bottom of   |
|      | 21 | it, correct?                                          |
|      | 22 | A.   That's correct.                                 |
|      | 23 | Q.   Do you recall having a meeting with -- where    |
|      | 24 | you -- you attended a meeting with Virginia and Keith |
| 01:25 | 25 | where Andy Woods was also present?                   |

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | A.   I -- I think I -- it's fuzzy, but, yes, I think                |
|       | 2  | I do.                                                               |
|       | 3  | Q.   Do you -- do you recall Virginia being at this                 |
|       | 4  | meeting where this final written warning notice was                |
| 01:25 | 5  | provided to you?                                                    |
|       | 6  | A.   Yes.                                                           |
|       | 7  | Q.   Okay.  Do you recall Keith being there?                        |
|       | 8  | A.   Yes, Keith was there.                                          |
|       | 9  | Q.   Do you recall Andy Woods being there?                          |
| 01:25 | 10 | A.   I don't recall but I -- obviously he was.                      |
|       | 11 | Q.   Who is Andy Woods?                                             |
|       | 12 | A.   He is the maintenance manager.                                 |
|       | 13 | Q.   Okay.  Do you recall anybody else being there?                 |
|       | 14 | A.   It says here that David Higgins was there.                     |
| 01:25 | 15 | Q.   Okay.  Do you think David Higgins was at this                  |
|       | 16 | meeting that you had about -- where -- where this notice            |
|       | 17 | was presented to you?                                               |
|       | 18 | A.   It seems that he was, yes.                                     |
|       | 19 | Q.   This note is referring to an investigatory                     |
| 01:26 | 20 | meeting that was held on October 8th and it indicates               |
|       | 21 | that Keith Bravenec, Virginia Hubbard, and David Higgins            |
|       | 22 | were at the October 8th meeting?                                    |
|       | 23 | A.   Okay.                                                          |
|       | 24 | Q.   Did -- do you recall that?                                     |
| 01:26 | 25 | A.   I don't recall it specifically, but okay.                      |

         1          Q.   Would that have been one of the meetings that

         2     we discussed earlier where you were describing meeting

         3     with Virginia and Keith and they asked you questions

         4     about the lockout/tagout incident?

01:26    5          A.   I would say it was, yes.

         6          Q.   Okay.  And does this help refresh your

         7     recollection that David Higgins also was in that

         8     meeting?

         9          A.   Yes, somewhat.

01:26   10          Q.   Okay.  All right.  And I'm not talking about

        11     the October 8th meeting that's discussed here but it

        12     looks like this meeting -- there was a meeting on

        13     October 30th when you returned to work from the

        14     suspension where this final written warning was

01:27   15     presented to you and you signed off on this.  Do you

        16     recall that?

        17          A.   October 30th?

        18          Q.   Yes, the date of this letter.

        19          A.   No, I don't recall the meeting.

01:27   20          Q.   Okay.  You don't recall meeting with anyone at

        21     all when you returned from your suspension to go over

        22     the final written warning?

        23          A.   I can't recall at this time.

        24          Q.   Okay.

01:27   25          A.   But obviously -- it looks like I did, though.

1       Q.   Okay.  And I'll direct your attention to the

2   fourth paragraph --

3       A.   Uh-huh.

4       Q.   -- of Exhibit 7.  It starts off, "The above

01:27      5   mentioned incident is a violation of the Pasadena"

6   work -- "Working Rules, specifically Working Rule I.(G)

7   Violations of, or disregard of safety rules, procedures,

8   regulations, or common safety practices; for example,

9   the Lock, Tag and Try Procedure."

01:27   10            Do you see that?

11       A.   I see it.

12       Q.   Okay.  Do -- was it your understanding that the

13   suspension that you received and the final written

14   warning that's reflected here was because of a violation

01:28   15   of a safety -- the -- one of the working rules, in

16   particular this safety rule that's reflected in I.(G)?

17       A.   That's the way it's written, yes.

18       Q.   Was that your understanding?

19       A.   Yes.

01:28   20       Q.   Okay.  And that was communicated to you

21   certainly through this letter, correct?

22       A.   Correct.

23       Q.   There's also a paragraph just below that one.

24   It indicates as a part of your return to work, that you

01:28   25   were going to go through a recertification process.

1                    Do you see that?

2          A.   I see it.

3          Q.   Okay.  And, in fact, the company did require

4     you to go through a recertification process following

01:28    5     the lockout/tagout incident, correct?

6          A.   That's correct.

7          Q.   And lastly, I mean, the company was notifying

8     you that you were on a final written warning because of

9     the lockout/tagout incident, correct?

01:28   10          A.   That's correct.

11          Q.   What is your understanding of a final written

12    warning?

13          A.   My understanding of a final written warning

14    is -- I mean, that is your final warning.

01:29   15          Q.   And so if there's something else that happens

16    after that, you could be terminated.  Is that your

17    understanding?

18          A.   Yes, anything -- yes, any -- any ep -- not

19    episode but any violation of work or anything, yes,

01:29   20    that's my understanding.

21          Q.   And when you received this, was that your

22    understanding, that you were on a final written warning

23    and that if you violated any other work rules while you

24    were on this final written warning, that you could be

01:29   25    terminated?

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | A.  Yes.                                                           |
|       | 2  | Q.  Okay.  Under your signature there is a note and                |
|       | 3  | you indicate that, "I disagree with what is stated in              |
|       | 4  | this letter."                                                      |
| 01:29 | 5  |              Do you see that?                                       |
|       | 6  | A.  Yes, I see it.                                                  |
|       | 7  | Q.  Did someone instruct you to write that on this                 |
|       | 8  | letter?                                                             |
|       | 9  | A.  No, no one instructed me to do it.                             |
| 01:29 | 10 | Q.  Was there someone from the union at this                       |
|       | 11 | meeting with you?                                                  |
|       | 12 | A.  Yes.                                                           |
|       | 13 | Q.  Who was that?                                                  |
|       | 14 | A.  David Higgins.                                                 |
| 01:30 | 15 | Q.  And do you recall David Higgins raising any                   |
|       | 16 | issues about the discipline that was described in this            |
|       | 17 | letter?                                                            |
|       | 18 | A.  Yes.  He -- he was trying to but he was told                  |
|       | 19 | that it was not a meeting for him to -- to speak at, he           |
| 01:30 | 20 | was just there, he was just to be present.                        |
|       | 21 | Q.  Okay.  Did David Higgins instruct you to -- to                |
|       | 22 | write down that you disagreed with what -- what was              |
|       | 23 | stated in this letter?                                             |
|       | 24 | A.  No, he didn't.                                                 |
| 01:30 | 25 | Q.  That was your idea?                                            |

1        A.   Yes, it was.

2        Q.   Okay.  What specifically did you disagree with

3   in the letter?

4        A.   Hold on because I'm -- it's -- it's jumbling up

01:30    5   on me.

6             I -- I wrote that because I disagreed.  At

7   the time it -- it's cloudy to me but it seems that they

8   were saying -- they were trying to put everything

9   together into one situation to make it as though I was

01:31   10   just constantly making mistakes and that was not the

11   case and that's why I wrote that I disagreed with the

12   letter.

13        Q.   So what you disagreed with was the fact that

14   you thought that they were trying to suggest that you

01:31   15   were constantly making mistakes?

16        A.   Yes.

17        Q.   Okay.  Did you disagree with anything else

18   other than that?

19        A.   There was something else.  I don't recall at

01:31   20   this -- there was something else.  I -- I just don't

21   recall right now what it was.

22        Q.   Okay.  Well, let me go through.  The second

23   paragraph of this letter says:  "On September 30, 2014,

24   you were called by operations to perform isolation of

01:31   25   motors work in Plant 8 which include the removal of

         1    t-leads."

         2                  That's accurate, correct?

         3        A.  It says that, yes.

         4        Q.  Well, that was accurate that you were called to

01:32    5    perform isolation of motors in Plant -- motors work in

         6    Plant 8, correct?

         7        A.  Correct.

         8        Q.  And it's also accurate that a part of that

         9    isolation work required the removal of "T" leads,

01:32   10    correct?

        11        A.  Yes, I see that.

        12        Q.  We saw that on the isolation list, correct?

        13        A.  Yes, I saw it on the --

        14        Q.  Okay.

01:32   15        A.  -- isolation.

        16        Q.  And then it also says, "You signed off on the

        17    isolation list which indicates" that "the work had been

        18    done."

        19                  That's correct, you did sign off on the

01:32   20    isolation list indicating that the work had been done,

        21    correct?

        22        A.  That's correct.

        23        Q.  Okay.  And then it says, "It was discovered by

        24    a contractor that the t-leads had not been removed,

01:32   25    although the isolation list was signed off" on -- "off

```
         1    by you."

         2                    That's also correct, right?  The "T" leads

         3    had not been removed even though the isolation list was

         4    signed off by you, correct?

01:33    5         A.   That is correct.

         6         Q.   Okay.  And then it's also correct that you had

         7    a meeting with Keith, Virginia, and David Higgins,

         8    correct, to discuss this incident?

         9         A.   That's correct.

01:33   10         Q.   Do you disagree that that meeting happened on

        11    October 8, 2014?

        12         A.   No, I don't disagree.

        13         Q.   Okay.  And it's also correct -- do you agree

        14    that you told them during the meeting that you looked at

01:33   15    the numbers on the list but you never read anything in

        16    the highlighted section about the "T" leads to be

        17    disconnected?  Do you recall telling them that in the --

        18    the meeting?

        19         A.   Yes, I recall that.

01:33   20         Q.   So -- so that's accurate, correct?

        21         A.   That's correct.

        22         Q.   And then do you also recall telling them that

        23    you only did the de-energizing part?

        24         A.   Yes, that's correct --

01:33   25         Q.   Okay.
```

|     |    |                                                          |
|-----|----|----------------------------------------------------------|
|     | 1  | company's perspective.  So -- and you've just agreed     |
|     | 2  | with me that those things are accurate.  So I'm trying   |
|     | 3  | to just pinpoint exactly specifically what you disagreed |
|     | 4  | with when you said, "I disagree with what is stated in   |
| 01:36 | 5 | this letter."                                          |

1  company's perspective.  So -- and you've just agreed

2  with me that those things are accurate.  So I'm trying

3  to just pinpoint exactly specifically what you disagreed

4  with when you said, "I disagree with what is stated in

01:36     5  this letter."

6          A.  I don't recall exactly the situation that --

7  that -- what -- the situation -- what the situation was

8  when I wrote this under the bottom.  I don't recall that

9  right now.

01:36    10          Q.  Okay.  All right.  So after you received this

11  final written warning and notice that you were going to

12  go through recertification, what happened next with

13  respect to your work?  Did you go back out and perform

14  electrician work?

01:37    15          A.  I'm sorry.  Say it again.

16          Q.  After you received this final written

17  warning --

18          A.  Uh-huh.

19          Q.  -- did you go back out immediately and start

01:37    20  performing electrician work at the Pasadena complex?

21          A.  No, I don't think I did.

22          Q.  What did you do?

23          A.  I think I was -- I was removed from working --

24  being out in the -- the working area of the plant and

01:37    25  placed in the COB to start doing computer modules for

1    retraining.

2        Q.   That's a part of the recertification that's

3    described in this final written warning letter?

4        A.   Yes.

01:37   5        Q.   What's COB?

6        A.   The central office building.

7        Q.   It's the central office building at the

8    Pasadena complex?

9        A.   Correct.

01:37   10       Q.   And so you were required to report to the COB

11   for retraining for some period of time?

12       A.   Correct.

13       Q.   How long were -- was the retraining?

14       A.   I don't recall exactly.  It was -- it took

01:38   15   quite some time.  I don't remember exactly how long.

16   Part of it was because they didn't -- they didn't

17   actually have updated or current information for me to

18   retrain on, was part of the problem.

19       Q.   Was it your understanding that they -- the

01:38   20   company was working with the union to come up with that?

21       A.   Yes, it was my understanding.

22       Q.   When you were engaged in this retraining or

23   recertification as a part of your discipline for the

24   lockout/tagout incident, to whom were you reporting at

01:39   25   that time?

1      A.   I was not reporting to anybody.  I was --

2      Q.   Were you working with anyone?

3      A.   No, I was not working with anyone.  I was

4  going -- I would come in in the mornings and a gentleman

01:39   5  named Tom Shomette, his -- he had his office door open.

6  He would have -- the booklets that I was to -- to go

7  through during the day, he would have those in his

8  office on his desk for me to just pick up so that I

9  could go to my cubicle and start -- and work those --

01:39  10  those booklets.

11      Q.   So every day you would go to Tom Shomette's

12  office to get the -- the work that you were supposed to

13  work on for that day?

14      A.   Yes, whether he was there or not.

01:39  15      Q.   And so was it your understanding that you at

16  least had to report to him to get this material so that

17  you would know what to be working on a particular day as

18  a part of the retraining?

19      A.   Not necessarily report to him, but the info --

01:40  20  the information was in his office.

21      Q.   Did you have any discussions or other

22  interactions with Tom Shomette other than just picking

23  up the material and then going to the cubicle?

24      A.   Well, yes, I mean, I'm -- I'm a people person.

01:40  25  I would -- just polite conversations with Tom and then

1    was allowed to go back into the plant to watch --

2        Q.  Okay.

3        A.  -- other electricians perform work.

4        Q.  Other than Tom Shomette did you work with

01:43    5    anybody else with respect to the retraining process?

6        A.  Other than Tom.  Yes.  Oh, God, what's his

7    name?  John, John Smith.

8        Q.  Okay.

9        A.  That's a name that's original, John Smith.

01:43   10       Q.  Not generic at all, huh?

11       A.  No.

12       Q.  Tom Shomette, do you recall what his job

13   position was or his title?

14       A.  I'm not sure of his exact title.  He was

01:44   15   training -- something in training, a coordinator or

16   something in training.

17       Q.  And what about John Smith?

18       A.  I have no idea.  John was -- John was an

19   operations supervisor or something.

01:44   20       Q.  Do you recall John Smith taking over and

21   working with you for the -- with the retraining after

22   Tom went out on leave or was absent for some period?

23       A.  Yes, I remember John would -- his -- I started

24   going to his office to pick up the booklets and I think

01:44   25   John was the one who actually started with the -- the

1   computer-based training.

2       Q.  Okay.  Okay.  After the final written warning,

3   you had another incident where the company investigated

4   another work rule violation.  Do you recall that?

01:45   5   A.  No.

6       Q.  You don't recall being investigated for

7   violating any other work rules after the lockout/tagout

8   incident?

9       A.  No.

01:45   10      Q.  Do you recall being investigated for sleeping

11  on the job?

12      A.  I recall that, yes.

13      Q.  Okay.  You recall meeting with HR about that?

14      A.  Yes, with Virginia.  And I explained to

01:45   15  Virginia that that was -- I was not who they thought was

16  sleeping.  I also explained to her that I actually --

17  there was a gentleman who I walked up to who was

18  sleeping and snoring in a cubicle.  I somewhat described

19  him to her.

01:45   20          He was a gentleman in a -- in a pink shirt.

21  He was across the cubicle -- on the other side -- excuse

22  me -- on the other side of the cubicle wall, like two

23  cubicles down and he was snoring and I -- I woke him up.

24      Q.  This was on the same day as you were reported

01:46   25  to be sleeping?

1    he turned and walked off.

2                    And I'm like, what is that about?

3         Q.  He just said "hey" and turned and walked off?

4         A.  Exactly.  So I stood up and I was getting ready

01:48    5    to go outside and that's when I heard this -- this guy

6    across the wall in the cubicle -- as I said, two -- two

7    cubicles down snoring.  So I went around there and I

8    tapped this guy and I -- "Hey, man, you loud."

9                    "Oh, man, thank" -- and he was -- "Thank

01:48   10    you.  Was I loud?"

11                    "Yes, sir, you were."

12                    And he was an older gentleman in a pink

13    shirt, is what I -- that's how I remembered him.  He --

14    he was sitting behind the desk in a pink shirt and I'm

01:49   15    thinking, this dude --

16         Q.  So when -- when this gentleman came up to you

17    and tapped you and said "hey," this other gentleman was

18    in a cubicle snoring --

19         A.  Snoring --

01:49   20         Q.  -- at that same time?

21         A.  At that same time.

22         Q.  And you could hear it --

23         A.  I could --

24         Q.  -- while -- when you --

01:49   25         A.  -- hear it.

1      Q.  -- were tapped --

2                THE REPORTER:  Wait, sir.  I'm sorry.

3                THE WITNESS:  Oh, I'm sorry.  I'm sorry.

4                MS. WILLIAMS:  It's okay.

01:49    5      Q.  (BY MS. WILLIAMS)  You could hear him snoring

6   when this other gentleman came in and tapped you and

7   said "hey"?

8      A.  Yes, I could.

9      Q.  Okay.

01:49   10      A.  It was very obvious and that's why it -- I

11   guess that's part of what startled me, because he walked

12   up and he tapped me and, "hey," and he turned and walked

13   off.  And I'm thinking, well, who was this.

14      Q.  Okay.

01:49   15      A.  So I stood up -- as I said, I stood up and I --

16   I could hear this guy.  So I walked around to see what

17   was going on, and I see this guy sleeping.  So I tap

18   him, "Hey, you're -- you're loud."

19                "Oh, well, thank you.  Was I snoring?"

01:49   20   Well, he said, "Was I loud?"

21                "Yes, sir."

22      Q.  Okay.  And then after that, what happened?

23   Then -- did you see anybody else that --

24      A.  After that, yes.  It was -- I don't know

01:50   25   exactly how much longer but later on Virginia came by

1      meeting, and then Adam took over and did most of the

2      talking.  Yeah.

3          Q.  Did they ask you questions about the incident?

4          A.  I don't -- I don't think she asked -- I don't

01:53  5      think they asked me any questions.

6          Q.  Were you allowed to provide your side of the

7      story during this meeting?

8          A.  Yes.  I told her that I was not sleeping and

9      that I had waken up another gentleman who was sleeping

01:53  10     but she --

11         Q.  And you're sure you told that to Virginia in

12     this meeting?

13         A.  I'm positive.

14         Q.  Do you recall also during -- so you told

01:53  15     Virginia that you were not -- and -- and Adam you were

16     not sleeping, correct?

17         A.  Correct.

18         Q.  You told them about this other person that you

19     said you heard sleeping?

01:53  20         A.  Yes.

21         Q.  Did you at some point during this meeting tell

22     them that you thought you might have fallen asleep?

23         A.  No, I didn't tell them.  I said that -- I told

24     them -- the -- the way that they presented it to me,

01:53  25     "Well, if you" -- how did she -- how did it go?  "If you

1    were that bored, was it possible?"

2              "It's possible, but I was not sleeping."

3        Q.   But do you recall at some point conceding with

4    them that you might have actually fallen asleep?

01:54    5        A.   No, I didn't -- I never said I might have.  I

6    said it was possible.

7        Q.   Okay.  So is it true that it was possible that

8    you might have fallen asleep?

9        A.   Yes, it was possible; but it -- it didn't

01:54   10   happen.

11       Q.   So why did you tell them it was possible if it

12   didn't happen?

13       A.   Because the way it was presented to me was that

14   it -- it -- it could have happened because --

01:54   15       Q.   So it could have happened, that you might have

16   fallen asleep?

17       A.   As I just said, it was possible, yes.

18       Q.   Okay.  And this is what you told them when

19   they're investigating the sleeping --

01:54   20       A.   Right.

21       Q.   -- incident, correct?

22       A.   That's correct.

23       Q.   Okay.  And so the information they received

24   from you at first was that, "No, I didn't fall asleep";

01:54   25   but then you said, "It's possible that I might have

1    fallen asleep"?

2         A.   Correct.

3         Q.   Okay.

4              (Exhibit 8 marked)

01:55   5    Q.   (BY MS. WILLIAMS)   I'm going to show you what's

6    marked as Exhibit 8.

7              MS. WILLIAMS:   (Tenders document)

8              MR. ARMSTRONG:   Thank you.

9         Q.   (BY MS. WILLIAMS)   Do you recall receiving this

01:55  10    document?   It's dated November 18, 2014, regarding "Last

11    Chance Letter."

12         A.   Yes.

13         Q.   Do you recall receiving this as a result of the

14    sleeping incident that the company investigated that

01:55  15    we -- we just discussed?

16         A.   Yes.

17         Q.   Okay.   Now, the date of this last chance letter

18    is November 18th, right?

19         A.   Correct.

01:56  20    Q.   We looked at the final written warning.   I

21    think you have it in the front of you.   That one's dated

22    October 30, 2014, correct?

23         A.   Correct.

24         Q.   So the time between the final written warning

01:56  25    for the lockout/tagout incident and the last chance

         1   letter for the sleeping incident, it was approximately

         2   two or three weeks.  Is that about right based on

         3   those --

         4        A.  Yes --

01:56    5        Q.  -- dates?

         6        A.  -- about three weeks.

         7        Q.  And you signed the last chance letter, correct?

         8        A.  The last chance --

         9        Q.  Exhibit 8 that's in front of you, you -- that's

01:56   10   your signature on the document --

        11        A.  Oh, I'm --

        12        Q.  -- correct?

        13        A.  Yes.

        14        Q.  Okay.

01:56   15        A.  Correct.

        16        Q.  Okay.  And did you understand that this last

        17   chance letter was basically giving you another chance to

        18   improve your performance and not get in trouble in order

        19   to avoid being terminated?

01:57   20        A.  Wait.  Say it again, please.

        21        Q.  Was it your understanding that the company gave

        22   you this last chance letter to give you another

        23   opportunity to improve your work so that you wouldn't

        24   get terminated?

01:57   25        A.  That's actually not the way, at the time, that

1          A.   That's correct.

2          Q.   Okay.   After --

3          A.   (Coughing) excuse me.

4          Q.   -- this last chance letter, you continued

01:59    5    obviously to work -- you were working on your retraining

6    and recertification at COB when you were put on this

7    last chance letter, right?

8          A.   That's correct.

9          Q.   Okay.   And after you received this, you

02:00   10    continued on the retraining at COB?

11          A.   That's correct.

12          Q.   By this point were you dealing with John Smith

13    on the retraining?

14          A.   I'm not sure who it was then.

02:00   15          Q.   Okay.   But at some point it would have been

16    John Smith, correct?

17          A.   Correct.

18          Q.   Okay.   Do you recall there being another

19    incident after the last chance letter where you were

02:00   20    disciplined for violating another company work rule, the

21    no-call/no-show rule?

22          A.   Yes.

23          Q.   Okay.   Okay.   Tell me what you recall about

24    that issue that the company investigated.

02:00   25          A.   I recall that the company was -- as I felt, was

1  absolutely in -- they were absolutely wrong because

2  there were flyers and posters in every building around

3  the facility and the flyer said -- because I -- I took a

4  picture of it.  The flyer said, "One call does it all,"

02:01      5  and that meant that you call this number for UPMC and

6  report to them whatever your situation is, you are sick

7  and won't show up, or whatever your situation is, had a

8  flat, you're going to be a few minutes late, and they

9  will handle the situation from there with Chevron

02:01     10  because they had been brought in as a third-party

11  contractor for that reason.

12          Q.  Apart from this UPMC poster and number that

13  you're talking about, do you understand that the company

14  had a no-call/no-show rule or a rule about reporting

02:02     15  when you were going to be off to work, they had a set of

16  procedures or rules about reporting off to work?

17          A.  Yes.

18          Q.  Okay.  What is your understanding of what those

19  work rules were with respect to reporting off to work?

02:02     20          A.  Well, I don't -- I don't understand.  I'm

21  sorry.

22          Q.  What -- what were the company's rules with

23  respect to reporting off to work.  I'm not talking about

24  this poster issue; but the rules that were in place

02:02     25  regarding how you report off to work, what is your

1    understanding of what those -- that rule was?

2        A.   They had -- there was -- you would call your

3    supervisor to report that you were going to be off work.

4        Q.   How long was that rule in place at -- was that

02:02    5    rule in place when you started working at Chevron

6    Phillips Chemical in 2008?

7        A.   I'm not sure.  I believe, but I -- I can't be

8    positive.

9        Q.   Did you actually -- outside of this particular

02:03    10   incident here that we're discussing regarding the

11   no-call/show -- no-show violation, did you use the

12   reporting off to work rule throughout your employment

13   where you would call your supervisor to report that you

14   were going to be absent from work?

02:03    15       A.   Yes, I -- I -- I had -- excuse me.  I had used

16   it before.

17       Q.   You were familiar with it?

18       A.   Yes.

19       Q.   Do you recall actually receiving like a -- kind

02:03    20   of a set of written guidelines about reporting off to

21   work?

22       A.   I don't recall.

23                (Knocking noise)

24                THE WITNESS:  That's my phone.  I'm sorry.

02:03    25                MR. ARMSTRONG:  Oh.

1      Q.  So from the time that you met with Virginia

2    Hubbard where she was introducing UPMC, you stopped

3    calling your supervisor to report your time off for

4    every absence you had from that point forward?

02:08       5      A.  I didn't have any absences.  So, yes, I would

6    have stopped calling.

7      Q.  If you did have absences, though, it's your

8    testimony that you would not have been calling your

9    supervisor for those absences because of this new

02:09      10    process.  That's your testimony?

11      A.  Yes.

12      Q.  Okay.

13      A.  I would have called UPMC.

14      Q.  Okay.  And you would not have called your

02:09      15    supervisor, correct?

16      A.  Correct, because that was the way it was

17    explained, you call UPMC; you don't call your

18    supervisor.  I try to follow the rules every time I --

19    every chance I get.

02:09      20                MS. WILLIAMS:  Oh, sorry.

21                (Exhibit 9 marked)

22      Q.  (BY MS. WILLIAMS)  I'm going to show you what's

23    marked as Exhibit 9.

24      A.  Okay.

02:10      25                MS. WILLIAMS:  (Tenders document)

         1                    MR. ARMSTRONG:   Thank you.

         2                    MS. WILLIAMS:   Uh-huh.

         3           Q.   (BY MS. WILLIAMS)   Do you recognize this as the

         4    company's reporting off and returning to work rules for

02:10    5    the Pasadena Plastics Complex where you worked?

         6           A.   Yes, it looks like it is.

         7           Q.   Okay.

         8                    MR. ARMSTRONG:   Object to form.

         9           Q.   (BY MS. WILLIAMS)   Do you recall receiving this

02:10   10    document during your employment?

        11           A.   I don't recall receiving it, but I guess I

        12    would have.   This was in 2013.

        13           Q.   Okay.   And I'll direct your attention to --

        14    it's a -- I think it's a four-page document.   On the

02:10   15    first page there's a section "Unplanned Medical Event."

        16                    Do you see that?

        17           A.   Yes --

        18           Q.   Okay.

        19           A.   -- I see it.

02:10   20           Q.   And there are guidelines or bullet --

        21           A.   (Coughing) excuse me.

        22           Q.   -- points for what folks in those areas are

        23    supposed to do to report off to work, right?

        24           A.   Right.

02:11   25           Q.   You see the first line, it says, "to report off

1          Q.   (BY MS. WILLIAMS)  I'm going to show you what

2    we're marking as Exhibit 10.  You can look through that.

3    I'll have some questions in a second.

4          A.   A thick one.

02:13    5          Q.   Yeah, that's a bigger one.

6                    MS. WILLIAMS:  (Tenders document)

7                    MR. ARMSTRONG:  Thank you.

8                    MS. WILLIAMS:  Thank you.

9                    MR. ARMSTRONG:  Before we get started with

02:13   10    this, can we go off so I can see what's going on with

11    the food?

12                    MS. WILLIAMS:  Yeah, sure, we can take a

13    break.

14                    THE VIDEOGRAPHER:  The time is 2:13.  We're

02:13   15    off the record.

16                    (Break taken 2:13 p.m. to 2:17 p.m.)

17                    THE VIDEOGRAPHER:  Time is 2:17 p.m.  This

18    is the beginning of Disc No. 4, and we are back on the

19    record.

02:17   20          Q.   (BY MS. WILLIAMS)  Mr. Wright, I -- I've handed

21    you what we've marked as Exhibit 10.  It's called "Total

22    Absence Management."

23          A.   Uh-huh.

24          Q.   Do you see that?

02:17   25          A.   Yes.

1          Q.   Okay.  Do you recall seeing this material

2     during the meeting with Virginia Hubbard where she was

3     talking about the UPMC program?

4          A.   Say it again.

02:17   5          Q.   Do you recall seeing this material -- it

6     probably -- I don't know that it was in paper form, but

7     she might have had it up on a projector or something

8     when you had the meeting with Virginia to talk about the

9     UPMC program?

02:17  10          A.   Part of it, parts of it.  It was on the -- I

11     think it was on the projector --

12          Q.   Okay.

13          A.   -- yes.

14          Q.   And this was the employee meeting that she had

02:18  15     to introduce the UPMC program, correct?

16          A.   Correct.

17          Q.   All right.  I'm going to refer to a few

18     different pages.  I'm going to refer to the page number

19     that's on this presentation.  It's in the left-hand

02:18  20     corner --

21          A.   Okay.

22          Q.   -- of the document, but if you'll turn to

23     Page 6.

24          A.   Okay.

02:18  25          Q.   We were talking earlier about the date when the

```
 1   UPMC process started.  According to this presentation,

 2   it's indicated that it's effective October 1, 2013.

 3   Does that sound about right?

 4        A.   Not really, but it says the -- October, '13,

 5   2013.

 6        Q.   What doesn't sound right about it to you?

 7        A.   It doesn't ring a bell that that's when it went

 8   into effect.

 9        Q.   Do you think it was earlier or later?

10        A.   It seemed later, but I -- I could be --

11   obviously mistaken.  So...

12        Q.   Okay.  You -- I mean, you don't have anything

13   specific to refute that it was October 1, 2013, correct?

14        A.   Correct.

15        Q.   Okay.  Okay.  And I want to go back through,

16   and we'll go to Page 2.  It says, "What is it?"  It's

17   describing what the Total Absence Management program is

18   in that first paragraph.

19             Do you see that?

20        A.   Yes, I see it.

21        Q.   It says the company is going to use a third

22   party "to help manage" "employee illness and

23   injury-related absences from work."

24             Did I read that correctly?

25        A.   Yes.
```

02:18  (line 5)
02:18  (line 10)
02:19  (line 15)
02:19  (line 20)
02:19  (line 25)

1      Q.   Okay.  And if you'll go to --

2      A.   (Coughing) excuse me.

3      Q.   -- Page 3, that page is, "What's changed and

4  what does this mean for me?"

02:19    5           Do you see that at the top of the page?

6      A.   I see it.

7      Q.   The first bullet point says, "Employee misses

8  three or more consecutive scheduled work shifts."

9  "Employee is currently taking medication," is the next

02:19   10  bullet point.  "Employee has been hospitalized," is the

11  next one.  "Employee plans to request a leave of

12  absence," that's the next one.

13           So these are kind of bullet points

14  describing when this UPMC program is to be used by

02:20   15  employees, correct?

16      A.   Yes, I would say so.

17      Q.   Okay.  And then if you'll turn to Page 4, it

18  says, "What's changed and what does this mean for me?"

19           Do you see that at the top of the page?

02:20   20      A.   I see it.

21      Q.   The first bullet point, it says, "When required

22  to contact UPMC WorkPartners, an employee must still

23  contact his or her supervisor to report the absence from

24  work and follow site specific protocols."

02:20   25           Did I read that correctly?

1        A.   Yes, you did.

2        Q.   Okay.   And so it's your testimony that you

3   think that changed; but when Virginia presented this new

4   process with UPMC, she specifically referred here to the

02:20   5   fact that the company -- that employees were still

6   supposed to contact their supervisors to report

7   absences, doesn't she?

8        A.   Wait.   Say it again.

9        Q.   You testified earlier that when this UPMC

02:21   10  program went into effect, that it was your understanding

11  that you were no longer supposed to call your supervisor

12  and you just stopped calling your supervisor for

13  absences from that point forward, correct?

14       A.   Correct.

02:21   15       Q.   All right.   But here in this presentation that

16  Virginia presented to you-all, in the first bullet point

17  on Page 4 she specifically says, "When required to

18  contact UPMC WorkPartners, an employee must still

19  contact his or her supervisor to report the absence from

02:21   20  work and follow site specific protocols," correct?

21       A.   That's what it says.

22       Q.   Okay.   And so she's not telling you to stop

23  calling your supervisor in this presentation, is she?

24       A.   No, I would say she's not.

02:21   25       Q.   Okay.   And, in fact, did you ever hear

1  specifically from anyone at HR that you were supposed to

2  stop calling your supervisor to report an absence from

3  work?

4      A.  Wait.  Say -- I'm sorry.  Say it again.

02:21  5      Q.  Did anybody in HR ever tell you that you were

6  supposed to stop calling your supervisor to report an

7  absence from work?

8      A.  I'm not sure.  I don't recall.  No, I don't

9  recall it.

02:22  10      Q.  Okay.  And then if you'll flip back on -- to

11  Page 11 --

12      A.  Okay.

13      Q.  -- the title of that page is, "What's my role?"

14          Do you see that at the top?

02:22  15      A.  I see it.

16      Q.  And then it says "Employees."  And the first

17  bullet point, "Notify supervisor of any absence and

18  follow site specific protocols."

19          Did I read that correctly?

02:22  20      A.  You did.

21      Q.  So, again, here later in this presentation

22  Virginia is kind of communicating again, "If you're

23  going to be absent, you still have to call your

24  supervisor and follow the site-specific protocols,"

02:22  25  correct?

1          A.   It seems so.

2          Q.   Okay.  And the site-specific protocols are what

3     we just went through in Exhibit 9, the reporting off to

4     work rules for Pasadena, correct?  I think you have that

02:23    5     in front of you, just below that exhibit.  Those are

6     the --

7          A.   Yes.

8          Q.   -- site-specific protocols for reporting off to

9     work for Pasadena, correct?

02:23   10          A.   Correct.

11          Q.   So this Page 11 basically is telling you to

12     continue to follow those rules, right?

13          A.   It seems so.

14          Q.   Okay.

02:23   15               MS. WILLIAMS:  Why don't we go off the

16     record?

17               THE VIDEOGRAPHER:  Time is 2:23.  We're off

18     the record.

19               (Lunch break taken 2:23 p.m. to 3:05 p.m.)

03:05   20               THE VIDEOGRAPHER:  Time is 3:05 p.m.  We

21     are back on the record.

22          Q.   (BY MS. WILLIAMS)  Mr. Wright, when we --

23     before we took the break, we were talking about the

24     Total Absence Management presentation that's in

03:06   25     Exhibit 10 and before that we had been discussing the

1   no-call/no-show incident that was investigated by the

2   company near the end of your employment at Chevron

3   Phillips Chemical.  Do you remember that?

4       A.  Yes.

03:06   5       Q.  Okay.  And we had just gone over Exhibit 10.  I

6   kind of want to pick back up where we were talking about

7   the actual incident, the no-call/no-show incident.

8       A.  Okay.

9       Q.  I think you had described that you called UPMC?

03:06   10      A.  Correct.

11      Q.  Okay.  If you'll just kind of refresh us again.

12  Tell us about the specific incident that ended up

13  getting investigated by the company regarding your

14  no-call/no-show.

03:06   15      A.  How the incident went?

16      Q.  How you learned about the fact that there was

17  an issue.

18      A.  How did I learn about it?  Hold on.  I don't

19  remember exactly how I found out about it.

03:07   20      Q.  Let me --

21      A.  I'm sorry.

22      Q.  That's okay.  That's fine.  Let me kind of walk

23  through a couple of things.

24              Does it sound about right that this was

03:07   25  sometime at the end of November that you didn't call in

          1    to a supervisor at work but you called UPMC?

          2         A.   Yes, that sounds about right.

          3         Q.   Okay.  And is it -- it is correct that when

          4    you -- on this particular date that led to the -- the

03:07     5    no-call/no-show investigation, you actually had not

          6    called anyone at Chevron Phillips Chemical to report

          7    your absence, correct?

          8         A.   No, I wasn't -- well, I wasn't able to.  I

          9    actually didn't -- I didn't know who my supervisor was

03:07    10    anymore --

         11         Q.   Okay.

         12         A.   -- because I had been taken out -- I was no

         13    longer allowed to work in the unit anymore.  I was

         14    placed back into the -- the main office building, the

03:08    15    COB, and I was just -- that's where I was reporting to

         16    every day.  So I didn't have a supervisor at that time.

         17         Q.   Okay.

         18         A.   So there was no one to really call.

         19         Q.   Okay.  And so my question was:  You did not

03:08    20    call any -- a supervisor to report your absence that

         21    day, correct?

         22         A.   Correct.

         23         Q.   And you did not call anyone at Chevron Phillips

         24    Chemical to report your absence that day, correct?

03:08    25         A.   Correct.

1        Q.   The day that you were absent, had you shown up

2   to work, you were supposed to report to John Smith to

3   get the materials for training that day, correct?

4        A.   No.

03:08    5        Q.   You were not?

6        A.   No, I was not reporting to anyone up there.  I

7   was only -- there was only people -- you know, first it

8   was Tom Shomette.  Then it was John Smith.  They just

9   had the material that I was to be going -- to review

03:09   10   while I was up there.

11        Q.   Okay.  And -- but on a daily basis, you either

12   had to go in and get the materials from Tom Shomette or

13   get the materials from John Smith, correct?

14        A.   No, not correct, not from them, just from their

03:09   15   office --

16        Q.   Okay.  They were --

17        A.   -- whether they were there or not, because

18   there was plenty of times that Tom Shomette was not

19   there and there were times that John Smith was not

03:09   20   there.

21        Q.   Before this incident when you did not call in

22   to work, had you interacted with John Smith about your

23   training?

24        A.   Not before that, no.

03:09   25        Q.   Not before the no-call/no-show, you never

1  interacted with him?

2      A.  Yes, I would speak to him because he was -- let

3  me think.  He was in Plant 6.  He was the -- I think a

4  supervisor in Plant 6.

03:09    5      Q.  Uh-huh.

6      A.  So I would see -- I would speak to him when I

7  went in because, you know, I was either going to get an

8  operator or I was working in the plant, in that -- that

9  plant.  So I would speak to him when I saw him.

03:10   10      Q.  And so your interaction with John Smith

11  throughout your retraining process was strictly just

12  speaking and saying hello.  There was no other

13  interaction you-all had specific to the retraining

14  itself?

03:10   15      A.  No.

16      Q.  Okay.  Do you recall any occasions where John

17  Smith asked you to see him to get information with

18  respect to your retraining?

19      A.  No.

03:10   20      Q.  Are you saying that never happened, or are you

21  saying you just don't remember it?

22      A.  That didn't happen.

23      Q.  The day before your absence where you didn't

24  call in to work to report your absence --

03:10   25      A.  Uh-huh.

1      Q.   -- had you seen John Smith that day -- the day

2   before?

3      A.   I don't recall.

4      Q.   If John Smith recalls you-all communicating

03:10   5   before that day, would you have any reason to disagree

6   with that?

7      A.   No, I wouldn't have reason -- it -- I'm not

8   saying it didn't happen.  It's -- I just -- I don't

9   recall that happening.

03:11  10      Q.   We -- you testified earlier that there were

11   times as a part of the retraining where you would

12   actually go out and observe employees working in the

13   plant.  You said you did that three or four times, I

14   think?

03:11  15      A.   Yes.

16      Q.   How did you know to do that?

17      A.   Tom -- Tom Shomette, he would -- he would come

18   in -- between he and -- it was Tom Shomette.  My union

19   rep, Dave Higgins, he would come up there pretty

03:11  20   frequently and visit with me, just -- I mean, he was --

21   he would come up there.  Sometimes he would just -- he

22   would make jokes, "Man, I -- I'd die if I was just up

23   here, nobody" -- because I was in an area -- there was

24   maybe a -- maybe 10 to 12 cubicles and I'm the only guy

03:12  25   in there.

1                    (Coughing) excuse me.

2        Q.  Do you recall receiving a phone call from John

3   Smith the day of your absence asking you why you had not

4   reported to work?

03:14     5        A.  No.

6        Q.  Are you saying it didn't happen or you don't

7   remember?

8        A.  I don't recall it.

9        Q.  If John Smith recalls that, do you have a

03:14    10   reason to dispute it?

11        A.  No, I don't have a -- I don't -- I don't

12   think -- I don't think it happened.  It's -- it's -- it

13   may -- he may have.  He could have called, but I don't

14   recall that happening.

03:14    15        Q.  Okay.  You would -- during this time -- I just

16   want to make sure I'm clear.  During this time, you

17   would have been scheduled to report to work at

18   7:00 a.m., correct?

19        A.  That's correct.

03:15    20        Q.  Other than John Smith, do you recall anyone

21   else from the company contacting you to ask you about

22   why you were absent and had not called in to report to

23   work?

24        A.  No.

03:15    25        Q.  Do you recall ever speaking to Adam Sainato

1    regarding your absence from work?

2        A.  I -- I spoke to Adam, but it was -- it was --

3    it was days later that I spoke to Adam.

4        Q.  Regarding your absence from work?

03:15    5        A.  Yeah.  Hold on.  He asked me -- I think it was.

6    I think he -- it was -- it was about why -- what

7    happened that I didn't come to work and I explained to

8    him that I had gone to the doctor.

9        Q.  And you're saying this was days later?

03:16    10        A.  Yes.

11        Q.  And what did Adam tell you about this?  Other

12    than just asking you why, what -- do you recall him

13    saying anything else?

14        A.  No, I don't recall anything else.

03:16    15        Q.  Do you --

16        A.  Just what happened.

17        Q.  When Adam asked you why you didn't call in to

18    work, what did you tell him?

19        A.  I told him that I -- I did call UPMC to report

03:16    20    it.

21        Q.  Did Adam tell you that you were also supposed

22    to call your supervisor?

23        A.  No.

24        Q.  Did you tell Adam that you tried to call

03:16    25    anybody at Chevron Phillips Chemical to report your

                1  absence from work?

                2      A.  No.  I told him I -- I tried to called UPMC.  I

                3  actually called -- I tried five times to call UPMC.

                4      Q.  Did you ever talk to someone live at UPMC?

03:17           5      A.  Not during my initial calls but they called me

                6  back, I think it was maybe an hour or so after I called

                7  in, and they -- to gather my information, my name and

                8  the information about it, but that was it, the only time

                9  I spoke to anybody live.

03:17          10      Q.  Your first call to UPMC with respect to this

               11  absence was when?  Did you call them the day of the

               12  absence or the day -- the night before the absence?  Do

               13  you recall when you started calling UPMC?

               14      A.  I called them the morning of.  It was -- it's

03:17          15  usually -- it was policy -- I think it was two hours

               16  ahead of time before you were going to miss that you

               17  needed to call.

               18      Q.  So when do you think your first call to UPMC

               19  was?

03:17          20      A.  It would have been -- oh, God, it would have

               21  been a quarter -- a quarter to 5:00 in the morning

               22  because I called -- as I said, I called them and I -- I

               23  was surprised because, as I said, I -- I'm not a person

               24  to take off work.  I called them the five times because

03:18          25  I never got a live person and finally I ended up leaving

1      A.  Pete Cella, he doesn't -- Pete Cella is in

2   The Woodlands.  He's --

3      Q.  Oh, okay.

4      A.  He's -- actually, I don't even know if he's in

03:20   5   The Woodlands.

6      Q.  My point is:  You knew that there were certain

7   people that you could have called at Chevron Phillips

8   Chemical, whoever they might be, in order to try to

9   reach someone to let them know that you weren't going to

03:20  10   be at work, correct?

11      A.  There was no point in calling Chevron Phillips

12   because the -- the flyer said, "One call does it all."

13   You call UPMC, and they will handle everything.

14      Q.  What does the Total Absence Management process

03:20  15   say?

16      A.  I didn't have this at the -- I never -- this is

17   the first paper copy I've seen of this.

18      Q.  Okay.  But you saw -- you saw an electronic

19   copy?

03:21  20      A.  We rushed through an electronic copy.

21      Q.  Oh, so now it was rushed?

22      A.  Well, it was -- it is what it is.

23      Q.  You felt --

24      A.  It was --

03:21  25      Q.  -- like it was rushed?

1        Q.   Virginia was there?

2        A.   Yes, Vir --

3        Q.   Is that --

4        A.   It would have been --

03:25    5        Q.   -- your recollection?

6        A.   Yeah, Virginia.  And I'm -- I'm not sure who

7    else was in that meeting.

8        Q.   Do you recall someone from the union being

9    there?

03:25   10        A.   I -- I don't recall.  It's -- who else was

11   there?

12        Q.   What was that meeting about?

13        A.   About the no-call/no-show.

14        Q.   And what -- what was discussed during the

03:25   15   meeting?

16        A.   I don't know.

17        Q.   Do you recall this -- this -- in -- in this

18   meeting being notified that you were terminated?

19        A.   I don't know if that was the same meeting.  I'm

03:26   20   not sure.  I can't --

21        Q.   Do --

22        A.   -- be for certain.

23        Q.   Do you recall after this -- (coughing) excuse

24   me -- having a meeting where you were informed that you

03:26   25   were terminated?

| | | |
|---|---|---|
| | 1 | A. Yes, I recall that. |
| | 2 | Q. Okay. Do you recall who was at that meeting? |
| | 3 | A. Myself, Dave Higgins, Virginia, and -- and |
| | 4 | Alaric. |
| 03:26 | 5 | Q. I'm sorry. You said yourself, Virginia -- |
| | 6 | A. Virginia, and Alaric. |
| | 7 | Q. Do you remember Alaric's last name? |
| | 8 | A. No. |
| | 9 | Q. Does Jackson sound right? Did I get that -- |
| 03:26 | 10 | A. I'm not sure. |
| | 11 | Q. Okay. And Dave Higgins, you said? |
| | 12 | A. Yes. |
| | 13 | Q. How did you learn about that meeting? |
| | 14 | A. Who told me? I -- I don't recall. |
| 03:27 | 15 | Q. Do you recall when that meeting took place in |
| | 16 | relation to when you came back to work from this |
| | 17 | absence? Was it a few days later, a week later? |
| | 18 | A. I -- I don't know. |
| | 19 | Q. Okay. Do you -- do you recall a lot of time |
| 03:27 | 20 | passing between the time you came back to work from this |
| | 21 | absence and then the termination meeting? |
| | 22 | A. It's been a while. I don't know. |
| | 23 | Q. Okay. And who in the meeting informed you |
| | 24 | about the termination? |
| 03:27 | 25 | A. Alaric. |

1     Q.  And what did Alaric say?

2     A.  He read a letter saying that I was being

3  terminated.

4     Q.  Do you recall what the letter said?

03:28     5     A.  I was being terminated.

6     Q.  Did it say why you were being terminated?

7     A.  I'm sure it did but when you're in shock from

8  being -- having something that traumatic happen, it's --

9  I didn't pay attention to anything else other than

03:28   10  "you're terminated."

11     Q.  Okay.  Do you recall how long the meeting

12  lasted?

13     A.  Too long.

14     Q.  Did you have any questions during the meeting?

03:28   15     A.  No.

16     Q.  Did Dave Higgins have any questions during the

17  meeting?

18     A.  I -- I don't recall.

19     Q.  Did you make any comments -- apart from asking

03:28   20  questions, did you make any comments during this

21  termination meeting?

22     A.  Yeah.  I asked -- I asked if this was for real

23  because it -- I mean, it seemed very bogus to me that I

24  was being terminated for something that was -- should

03:29   25  not have happened.

1        A.   Yes.

2        Q.   Okay.   When you prepared the EEOC charge

3   telling them about what happened during your employment

4   and leading up to your termination, were you honest with

03:33    5   the EEOC --

6        A.   Yes.

7        Q.   -- about what happened?

8        A.   Yes, I was.

9        Q.   And do you recall filing your first EEOC charge

03:33   10   after your termination?

11        A.   Yes.

12        Q.   Okay.

13        A.   That was the whole reason for the filing, was

14   because I had been terminated, that -- and I felt

03:33   15   wrongly.   I still feel I was wrongly terminated.

16        Q.   Okay.

17             MS. WILLIAMS:   I'm sorry.

18             (Exhibit 11 marked)

19        Q.   (BY MS. WILLIAMS)   I'm going to show you what's

03:34   20   marked as Exhibit 11.

21             MS. WILLIAMS:   (Tenders document)

22             MR. ARMSTRONG:   Thank you.

23             MS. WILLIAMS:   Uh-huh.

24        Q.   (BY MS. WILLIAMS)   This is an EEOC Charge

03:34   25   No. 846-2015-06190.   It's at the top right-hand corner.

          1          A.   Uh-huh.

          2          Q.   Does this look to you like the -- the first

          3     EEOC charge you filed on December 8, 2014, after your

          4     termination?

03:34     5          A.   Yes, it looks like it.

          6          Q.   Okay.   And you prepared what's in Paragraph 1

          7     and what's in Paragraph 2 of this EEOC charge?   There's

          8     a box that has "The Particulars Are," and then there are

          9     two paragraphs.

03:34    10          A.   Yes.

         11          Q.   Okay.   You prepared the information that's in

         12     each of those paragraphs?

         13          A.   Yes.

         14          Q.   Okay.   And if you'll go through this with me,

03:35    15     you indicate to the EEOC that you were an electrician,

         16     that you became disabled after your accident in 2011,

         17     and you go on to say that when you violated certain

         18     safety policies and procedures, you were not given an

         19     opportunity to rebut or grieve the employment related to

03:35    20     your -- relay -- or grieve the employment-related matter

         21     prior to your dismissal?

         22                    Do you see that?

         23          A.   Yes, I see it.

         24          Q.   And you say, "Billy (Last Name" un --

03:35    25     "Unknown), assigned to" a particular -- "to the

```
          1    same/similar job position was not similarly disciplined.

          2    I complained to the CEO Mr. Pete Cela about the unfair

          3    treatment"?

          4        A.  Yes, I see it.

03:35     5        Q.  And then you -- you go on to say that Andy

          6    Woods issued you a final written warning with a two-week

          7    suspension on October 30th for an incident that occurred

          8    on September 30th.  You denied the allegations; but on

          9    December 1st you were contacted by Virginia Hubbard and

03:36    10    Alaric Jackson who called you into their office and

         11    terminated you, correct?

         12        A.  Correct.

         13        Q.  You did not tell the EEOC that you had also

         14    been disciplined for -- and issued a last chance letter

03:36    15    for being found sleeping on the job, right?  You left

         16    that out of this charge, right?

         17        A.  Because that was --

         18        Q.  I didn't -- I'm sorry.  I didn't ask why.  I'm

         19    just asking:  You did not include that in this statement

03:36    20    to the EEOC, correct?

         21        A.  No, I did not give a false statement to them,

         22    no.

         23        Q.  Well, I asked:  Did you include any information

         24    in this charge to the EEOC letting them know that you

03:36    25    had also been disciplined for sleeping on the job?
```

1      A.   No, I did not.

2      Q.   Okay.  And did you tell the EEOC that when you

3   were terminated on December 1st, that you had also been

4   disciplined for violating the no-call/no-show policy?

03:37   5   That's nowhere in this --

6      A.   That is --

7      Q.   -- charge either?

8      A.   -- nowhere -- no, I did not.

9      Q.   Okay.  And, in fact, from this chart it looks

03:37   10   like the company disciplined you and gave you a final

11   written warning in October and then just out of the blue

12   terminated you on December 1st.

13      A.   That's basically how it happened.

14      Q.   Okay.  But it wasn't out of the blue.  I mean,

03:37   15   you had had two subsequent disciplinary actions against

16   you between the time of the lockout/tagout violation and

17   the time of your termination on December 1st; isn't that

18   right?

19      A.   Two wrongful disciplines, yes.

03:37   20      Q.   You think it's wrongful, I understand that.

21      A.   Yes, I do.

22      Q.   But the company had issued those disciplines,

23   correct?

24      A.   Yes, they did.  They issued them.

03:37   25      Q.   And you did not tell the EEOC about those,

1    correct?

2        A.   No, I didn't -- I didn't mention them in my

3    report, no.

4        Q.   Okay.

03:37    5            (Exhibit 12 marked)

6        Q.   (BY MS. WILLIAMS)   Okay.   And then I'm going to

7    show you what's been marked as Exhibit 12.

8            MS. WILLIAMS:   (Tenders document)

9            MR. ARMSTRONG:   Thank you.

03:38   10        Q.   (BY MS. WILLIAMS)   This is Charge

11    No. 460-2015-03577.   It's dated August 19, 2015; and it

12    has your signature on it at the bottom.

13            Do you see that?

14        A.   Yes, I see it.

03:38   15        Q.   And in this charge you indicate that you were

16    suspended on October 8th for a work-related incident,

17    placed on a disciplinary action, and on December 1st you

18    were terminated due to your race.

19            Do you see that?

03:38   20        A.   Yes, I see it.

21        Q.   And you say that you were suspended on -- in

22    the next paragraph, you were employed as an electrician.

23    On October 8 you were suspended following a

24    lockout/tagout incident.   The other employee was not --

03:38   25    who was white was -- and involved -- you said was

1  involved in this incident, was not suspended during the

2  company's investigation.  Upon your return you were

3  mandated to take retraining and not allowed to return to

4  fieldwork.  On December 1st you were accused of a

03:39   5  no-call/no-show even though you had indeed called in

6  your absence.  Other similarly situated employees, not

7  in your protected group, have also been at fault for

8  no-call/no-show but are not terminated.  And you believe

9  you were discriminated against due to your race.

03:39  10            Do you see that?

11      A.  I see it.

12      Q.  In this charge, which is now eight months later

13  or so from your termination, you still did not tell the

14  EEOC that there had been another disciplinary action

03:39  15  taken against you for the sleeping incident; isn't that

16  true?

17      A.  No.  I see I -- I omitted that, yes.

18      Q.  Okay.

19      A.  Because that was also a wrongful -- or --

03:39  20  wrongful incident, also.

21      Q.  It's your opinion that it was wrongful; but, in

22  fact, the company did issue that discipline to you,

23  correct?

24      A.  Yes, they'd issued that discipline, yes.

03:39  25      Q.  And you did not tell the EEOC about that

1    either?

2         A.   Correct.

3         Q.   Okay.  And then sometime after you filed these

4    charges, you -- do you understand that you filed a

03:40    5    lawsuit in court and that we're now in front of a judge

6    who's going to decide these issues?

7         A.   Yes.

8         Q.   Okay.  Can you tell me in your words what

9    you're suing the company for?

03:40   10         A.   It's right here in black and white.

11         Q.   Right.  Just tell me what you think the company

12    did to -- you think the company discriminated against

13    you?

14         A.   Yes.

03:40   15         Q.   On what basis?

16         A.   One was race, the other is disability, and the

17    third would be retaliation.

18         Q.   Okay.  Do you think that your lawsuit is

19    asserting all of these claims?

03:40   20         A.   Yes, I do.

21         Q.   Okay.  How did the company discriminate against

22    you based on your race?

23         A.   How?  I can't pin -- put my finger on any one

24    particular incident.

03:40   25         Q.   Put your finger on any for me.

                    1        A.   On any.  I mean, there have been -- well, no,

                    2   because that's -- that would just be hearsay.  So, no, I

                    3   don't have any particular right now.

                    4        Q.   Okay.  What -- so you can't describe for me

    03:41          5   right now what Chevron Phillips Chemical did to you to

                    6   discriminigate -- discriminate against you based on your

                    7   race; is that correct?

                    8        A.   Not at this minute.

                    9        Q.   Okay.  What did Chevron Phillips Chemical do to

    03:41         10   discriminate against you based on your disability?

                   11        A.   I can't give you one right now, right at this

                   12   minute.

                   13        Q.   What did Chevron Phillips Chemical do to

                   14   retaliate against you?

    03:41         15        A.   To retaliate?  I was terminated.

                   16        Q.   What did you do that -- in -- in your

                   17   estimation, what did you do that caused Chevron Phillips

                   18   Chemical to terminate you as a form of retaliation?

                   19        A.   What did I do?

    03:42         20        Q.   Uh-huh.  You did something, and they retaliated

                   21   against you for that.  Is that your -- your testimony?

                   22        A.   No.  My testimony is:  I made one mistake where

                   23   I did not ask enough questions and -- what is the --

                   24   then -- just followed through enough and it's -- it has

    03:42         25   snowballed on me since then with other incidents.

           1        Q.   And the one mistake you're saying you're -- you

           2   made is the lockout/tagout?

           3        A.   That would be correct.

           4        Q.   The one that somebody could have gotten killed

03:42      5   for if -- if they had gone in and tried to do something

           6   with this breaker and it had not been fully

           7   de-energized?

           8        A.   Nobody was going to get killed.

           9        Q.   Somebody could have, though?

03:42     10        A.   Nobody was going to.  Nobody else -- nobody

          11   goes into there, that MCC, except an electrician or an

          12   operator.

          13        Q.   You told me earlier that the point of the

          14   lockout/tagout process, all of those steps, is to --

03:42     15        A.   Uh-huh.

          16        Q.   -- make sure that the job is done safely

          17   because there are certain bad things that can happen.

          18   One of them -- depending on the voltage, somebody could

          19   get, you know, pinched or what have you; and somebody

03:43     20   could die, right?

          21        A.   Yes.  I was giving you the extremes.

          22        Q.   Right.

          23        A.   The --

          24        Q.   Right.

03:43     25        A.   The minimum to the extreme, yes.

1      Q.   Because you're always -- you're following the

2   procedure because you're trying to avoid all of those,

3   including the most extreme, which would be death, right?

4      A.   Correct.

03:43    5      Q.   Okay.  And you said that the one mistake you

6   made was not following this process that at the most

7   extreme could have resulted in somebody's death,

8   correct?

9      A.   No, I didn't --

03:43   10           MR. ARMSTRONG:  Object to form.

11      A.   -- say not following the process.  I said I did

12   not go far enough with my questioning.

13      Q.   (BY MS. WILLIAMS)  Okay.  You -- you didn't

14   follow the process because you actually marked down that

03:43   15   you had completed the lockout/tagout when, in fact, you

16   had not?

17      A.   That's not what I said.

18      Q.   Okay.  Well, I think the record will kind of --

19      A.   Okay.

03:43   20      Q.   -- stand for itself in terms of what you

21   described.

22           But the one mistake you made was the

23   lockout/tagout, and then you said it snowballed from

24   there.  What were the -- what -- how did it snowball

03:43   25   from there?

         1        Q.  Okay.  And these mistakes, based on the

         2    exhibits that we've gone through, took place sometime

         3    between September, 2014, and December 1, 2014, right?

         4        A.  Sometime in between there.

03:45    5        Q.  When you made the first mistake, you were on a

         6    final written warning, right?

         7        A.  I'm not sure if it was a final or not.  I don't

         8    know.

         9        Q.  We talked --

03:46   10        A.  I'm not sure.

        11        Q.  -- about that earlier.  We -- I showed you the

        12    final written warning document.

        13        A.  Oh, if you showed it to -- I -- if you showed

        14    it to me, then, yes, it would have been a final.

03:46   15        Q.  Okay.  And then the second one, you were given

        16    a last chance letter.  We went through that, too, right?

        17        A.  Yes, we went through a last chance letter.

        18        Q.  Okay.  And so I want to make sure that I'm

        19    understanding this as clearly as I -- I can.  You -- you

03:46   20    say that the company retaliated against you by

        21    terminating you?

        22        A.  Correct.

        23        Q.  Okay.  Did you do something that you thought

        24    caused the company to retaliate against you?

03:46   25        A.  Did I do something --

1      Q.  Yeah.

2      A.  Repeat the question.

3      Q.  Why was the -- why do you think the company was

4   retaliating against you?

03:46      5      A.  I'm really not sure why they did.

6      Q.  Uh-huh.  Do you have evidence that the company

7   was retaliating against you for some particular reason?

8      A.  I don't have physical evidence now, no.

9      Q.  Okay.  I mean, you understand that at some

03:47     10   point that we might be in front of a jury and you've got

11   to explain to the jury, "This is what I think the

12   company did wrong," right?

13      A.  That's what I'm hoping for.

14      Q.  And what I want to understand is what you're

03:47     15   going to tell this jury.  When you say that "the company

16   retaliated against me when it terminated me," what are

17   you telling the jury you did to make the company

18   retaliate against you?

19      A.  I will tell them the truth.

03:47     20      Q.  What is the truth?  What --

21      A.  I've told you the truth today.

22      Q.  I know.

23           I'm trying to understand what -- from your

24   perspective --

03:47     25      A.  Uh-huh.

1       Q.  -- the thing you did that you think made the

2   company retaliate against you.

3       A.  I made one mistake in not asking enough

4   questions and it had just -- it compiled on -- they --

03:47   5   it was compiled into termination --

6       Q.  Okay.

7       A.  -- being the final step.

8       Q.  So you think the company retaliated against you

9   because you made the lockout -- because of the

03:48   10   lockout/tagout incident?

11       A.  No, not -- not just because of the

12   lockout/tagout.  That was only one mistake.  Every --

13   anyone can make one mistake.

14       Q.  Uh-huh.

03:48   15       A.  But then it should not cause a snowball effect

16   after that.

17       Q.  So when the -- when you committed the

18   lockout/tagout, you don't think that the company was out

19   to -- to terminate you or retaliate against you because

03:48   20   you committed that one mistake, right?

21       A.  I hope not.

22       Q.  Okay.  So what is it that you think you

23   ultimately did that made the company say, "Okay, we're

24   going to terminate him"?

03:48   25       A.  I'm really not sure exactly what I did to make

                    1      A.   -- rep.

                    2      Q.   -- against.

                    3           Okay.   When was that?

                    4      A.   I'm not -- I don't remember the exact time when

          03:50     5   I told him.

                    6      Q.   Was it before or after your termination?

                    7      A.   Before -- it had to be before.

                    8      Q.   Was it --

                    9      A.   With my union reps.

          03:51    10      Q.   Was it before the no-call/no-show violation or

                   11   before the sleeping incident?   When in the sequence of

                   12   all of these events did that hap -- did that

                   13   conversation happen?

                   14      A.   I don't recall.

          03:51    15      Q.   And other than your union reps, you didn't tell

                   16   anybody else?

                   17      A.   No.

                   18      Q.   Okay.   When you were at the arbitration, do you

                   19   recall your union -- the union putting on any testimony

          03:51    20   suggesting that they thought that you had been

                   21   retaliated against with respect to any of these

                   22   disciplinary actions that we've talked about today?

                   23      A.   I don't recall that.

                   24      Q.   And, in fact, based on what we looked at with

          03:51    25   your EEOC charges, you did not raise the issue of race

1    discrimination until about eight months after, right, in

2    your second charge?  Isn't that right?

3            A.  I don't know.  I'm not sure --

4            Q.  It's right in front of you.

03:52    5            A.  -- how long ago --

6            Q.  You can take a look at Exhibit 12.

7            A.  Re -- repeat your question.

8            Q.  It was eight months after when you submitted

9    your second EEOC charge that you actually first raised

03:52   10    the issue of race discrimination; isn't that right?

11            A.  That's when it --

12                    MR. ARMSTRONG:  Object to --

13                    THE WITNESS:  I'm sorry.

14                    MR. ARMSTRONG:  -- object to form.

03:52   15            A.  That's when it was filed.

16            Q.  (BY MS. WILLIAMS)  Uh-huh.  Your previous EEOC

17    charge did not make any mention of race, correct?  You

18    can look at Exhibit 11.

19            A.  No, it doesn't.

03:52   20            Q.  Okay.  Do you think that there were individuals

21    at the company who were treated differently than you

22    were with respect to these incidents that we -- we've

23    talked about, the lockout/tagout incident, the sleeping

24    incident, and the no-call/no-show?

03:52   25            A.  Absolutely.

1          Q.   Okay.  With respect to the lockout/tagout

2     incident, who do you think was treated differently than

3     you were?

4          A.   I think the operator was treated differently.

03:53     5     He was treated better than I was.

6          Q.   And what's his name again?

7          A.   Billy -- Billy Donnell.

8          Q.   Okay.  Anybody else you think was treated

9     better than you with respect to the lockout/tagout

03:53    10     incident?

11          A.   It was only he and I involved in it.

12          Q.   Okay.  So nobody else, correct?

13          A.   Correct.

14          Q.   Okay.  With respect to the sleeping incident,

03:53    15     do you think there was somebody else who was treated

16     differently than you were?

17          A.   Yes.

18          Q.   Who was that?

19          A.   I don't know his name, the gentleman that I

03:53    20     woke up.

21          Q.   Okay.  Anybody else?

22          A.   No.  He was the only gentleman that I found

23     sleeping.

24          Q.   Okay.  And then with respect to the

03:53    25     no-call/no-show incident, was there somebody else who

1    was treated better than you with respect to that

2    incident?

3         A.  That, I'm not sure.  It was -- I'm the only

4    person that I -- that was involved in that one.

03:54    5         Q.  Do you know anything about Billy Donnell's

6    disciplinary history?

7         A.  That -- I had never even met Billy before that

8    day.

9         Q.  Do you know anything at all about him and his

03:54    10   history at the company?

11        A.  I know he's an operator out there.

12        Q.  Is --

13        A.  That's it.

14        Q.  Is that about it?

03:54    15        A.  Yes.

16        Q.  Okay.  And this gentleman who you can't -- you

17   don't know that you said you saw sleeping in a cubicle,

18   do you know anything about him -- his history at Chevron

19   Phillips Chemical?

03:54    20        A.  I have no -- I don't even know who he is.

21        Q.  Okay.

22        A.  Or who he was.

23        Q.  And then you said you were the only person

24   involved in the no-call/no-show, correct?

03:54    25        A.  Correct.

1        A.   As hard as -- I'm not sure.  I don't think so.

2        Q.   Well, which one would you -- if your notes say

3   that some -- during the sleeping incident, somebody came

4   into your cubicle and tapped you and said, "Hey, you're

04:15    5   loud," do you think that's more accurate than the

6   testimony you had -- you gave today where you said he

7   came in and he just tapped you and said, "Hey," and

8   walked away?

9        A.   I don't think so, no.

04:15   10        Q.   Which one would be more accurate?

11        A.   My testimony today would be more accurate.

12        Q.   Okay.

13        A.   I'm not even sure how that would have -- never

14   mind.

04:16   15        Q.   When you were working at Chevron Phillips

16   Chemical -- I think I mentioned this earlier, but I just

17   want to make sure I understand.  You recall

18   participating -- we talked about all of the training you

19   participated in, correct?

04:16   20        A.   Correct.

21        Q.   You recall also participating in training

22   for -- on the company's Code of Conduct?

23        A.   Yes.

24        Q.   Do you remember part of the Code of Conduct

04:16   25   also included the company's statement against

```
         1    discrimination and harassment and retaliation?  Do you

         2    remember that being a part of the Code -- Code of

         3    Conduct training?

         4        A.  Yes.

04:16    5        Q.  Okay.  And so you would have been notified of

         6    the company's policy prohibiting discrimination as a

         7    part of the Code of Conduct training, correct?

         8        A.  Correct.

         9        Q.  And you also would have been notified and

04:16   10    trained on the company's policy prohibiting harassment,

        11    correct?

        12        A.  Correct.

        13        Q.  And you also would have been notified and

        14    trained on the company's policy prohibiting retaliation

04:17   15    as a part of the Code of Conduct training, correct?

        16        A.  Correct.

        17            (Coughing) excuse me.

        18        Q.  If we're in front of a jury and you've got to

        19    ask the jury for damages in this case, what are you

04:17   20    asking the jury to award you?

        21        A.  As a -- you mean a financial number?

        22        Q.  Everything.

        23        A.  Wow.

        24        Q.  Are you asking for money as a part of --

04:17   25        A.  Yeah, I would --
```

```
            1         Q.   Who in management?

            2         A.   In management I would say Keith Bravenec and --

            3    and Andy Woods.

            4         Q.   And how did they discriminate against you?

04:40       5         A.   They just -- I think they -- I don't want to

            6    sound ugly.

            7         Q.   Actually, let me -- let me break it up and

            8    may -- see if this is a more efficient way of doing it.

            9              How did Keith Bravenec discriminate against

04:40      10    you?

           11         A.   What did he do?  What did he do?  I can't

           12    answer it right now.  He was -- I'm not sure of the

           13    right wording.

           14         Q.   Give me the best wording that you can come up

04:41      15    with on how you think Keith Bravenec discriminated

           16    against you.

           17         A.   I think he just -- he never -- it just seemed

           18    to me that he -- he never gave me just that fair or

           19    equal chance to prove myself.

04:41      20         Q.   With respect to the lockout/tagout incident?

           21         A.   No, to everyone else that was there.

           22         Q.   Okay.  And when you say "everyone else that was

           23    there," who's "everyone else"?

           24         A.   Every other electrician that was in the -- in

04:42      25    the facility.
```

1          Q.   Okay.

2          A.   I'm not sure why.  It just -- that's how it

3     felt.

4          Q.   Okay.  Did you ask Keith Bravenec for chances,

04:42      5     equal chances that other people were getting that you

6     thought you were not getting?

7          A.   Oh, I -- absolutely, I asked for -- just for --

8     to give me a chance to -- to show him what I -- that I

9     could.

04:42      10         Q.   What -- what did -- what were you asking him to

11    give you a chance to do?

12         A.   Just to show that I -- I could do the job as

13    well or better as anyone else that he had out there.

14         Q.   What was he doing to make you think that you

04:42      15    were not doing the job as well as everybody else?

16         A.   It was just conversation, like just little

17    remarks that I would -- he would make sometimes.

18         Q.   Like what?

19         A.   Just -- who -- I don't recall who he was

04:43      20    talking to; and it was something in -- in the way of,

21    "Tyrrell's not going to be able to get that done

22    like" -- who was it -- Mike -- "like Mike did that."

23    And it was --

24         Q.   Mike who?

04:43      25         A.   Smith.  And it was like, "I mean, you -- you

1    don't -- you really don't know me.  How can you make

2    that assumption?"

3         Q.  When did he say this?

4         A.  Oh, when was that?  That was -- that's been a

04:43   5    while.  It was before my accident.  So that was

6    before -- no, it was right after my accident.  I'm

7    sorry.

8         Q.  So this was sometime right after you returned

9    to work from your accident?

04:44  10         A.  Yes.

11         Q.  Sometime in '12?

12         A.  In -- yes, in '12.

13         Q.  Okay.  Other than this remark, anything else?

14         A.  Not that I could come -- that's the one that

04:44  15    sticks in my mind.

16         Q.  And what -- (coughing) excuse me.  What do you

17    think Andy Woods did to discriminate against you?

18         A.  I think Andy -- I think he -- I think that he

19    didn't give me a chance, also, because I had actually

04:44  20    applied for -- I don't remember who it was.  Someone had

21    retired from the night supe position and I applied for

22    that position and he actually told me, "Well, why didn't

23    you tell me that you were going to apply for this

24    position?"

04:45  25              "I didn't know I -- I had to tell you."

1                    And it just -- it was just very

2       uncomfortable, the way he was saying it, as if -- if I

3       had come to him and said, then if -- something would

4       have somehow changed and it's -- I'm -- it just

04:45   5       didn't -- it was -- it was never comfortable.

6                    Because I've -- I've never asked anybody --

7       anybody out there to give me anything.  Everything I --

8       everything I've ever had and gotten in life, I -- I've

9       worked for it.

04:45   10          Q.  So Andy Woods made a comment -- you feel like

11      Andy Woods didn't give you a chance because he made a

12      comment asking you why you didn't tell him you were

13      going to apply for a night supervisor position?

14          A.  Yes, as if he would have somehow -- something

04:45   15      would have changed somehow if I had come to him and told

16      him that, you know, I was interested in that position.

17          Q.  Did -- did -- did you actually apply for the

18      position?

19          A.  Yes.

04:46   20          Q.  And did you get the position?

21          A.  No.

22          Q.  Okay.  When was this application for this

23      position?

24          A.  I -- I don't recall when it was.

04:46   25          Q.  Was it before or after your accident?

|     |     |                                                                |
|-----|-----|----------------------------------------------------------------|

              1        A.  After.

              2        Q.  Was it near the time that Keith Bravenec also

              3   made this remark where you felt like he wasn't giving

              4   you a chance?

   04:46       5        A.  No, because Keith had -- I had heard Keith say

              6   that before Andy said that to me.  So no.  It -- it

              7   was -- I'm not -- I can't say exactly how -- how -- the

              8   span of time, but it wasn't right close together, no.

              9        Q.  But it would have been sometime either later in

   04:47      10   2012 or 2013?

             11        A.  Yes.

             12        Q.  Do you think it was in 2014?

             13        A.  No, I don't -- I don't think it was.

             14        Q.  So either 2012 or 2013?

   04:47      15        A.  '12 or '13, yes.

             16        Q.  Okay.  How did you apply for this night

             17   supervisor position?  Was that -- did you put in, like,

             18   an electronic application through the company; or how

             19   did -- how did you do that?

   04:47      20        A.  I don't recall how I applied for it.

             21        Q.  Okay.

             22        A.  I'm -- I -- I don't know.  I thought it was in

             23   paper but -- on paper, but I -- I'm not sure.

             24        Q.  Who would you have submitted your application

   04:47      25   to?

         1        A.   I think I actually submitted it to Andy.

         2        Q.   You submitted it to Andy, but he said he didn't

         3   know that you were going to apply for it?

         4        A.   Yes.

04:48    5        Q.   Okay.  Did -- other than what -- (coughing)

         6   excuse me -- the comment where you said Andy said, "Why

         7   didn't you tell me you were going to apply for the night

         8   supervisor position," did Andy Woods do anything else

         9   that made you feel like he was discriminating against

04:48   10   you?

        11        A.   He -- there was one time we -- I don't recall

        12   what -- what we were talking about.  We had a meeting

        13   and it just -- to me it felt like he had -- he was --

        14   had something else on his mind, but it just never --

04:48   15   never felt like he was really paying -- listening to

        16   what I was saying when I was talking to him.

        17        Q.   Was this before or after the night supervisor

        18   conversation that you-all had?

        19        A.   This was -- this was before that.  Wait, wait.

04:49   20   I -- I'm not sure.  I -- I'm not sure.

        21        Q.   You're not sure if it was before or after?

        22        A.   If it was before or after.

        23        Q.   And it was a meeting that you and Andy -- just

        24   a meeting --

04:49   25        A.   Yeah, just --

1          Q.  -- between the two of you?

2          A.  -- me and Andy, yes.

3          Q.  And you were talking to him, but you felt like

4     he had something else on his mind and he wasn't

04:49    5     listening to you?

6          A.  Yeah, like he wasn't -- he -- I didn't have all

7     of his attention, like he was just kind of going through

8     the motion to -- to -- just to say he was listening, but

9     he really didn't.

04:49   10          Q.  And you felt like that was discriminatory?

11          A.  I felt like that was -- like it was not giving

12     me an equal chance because it was -- I mean, he was --

13     it just didn't -- it didn't -- I don't know.

14                Chevron -- Chevron always had -- their

04:50   15     thing always was, you know, you can -- how did it go?

16     When you -- and it's in the way of, "When -- when you

17     talk, we'll listen," you know, not to overlook you or

18     just dismiss you or anything and it just -- I didn't get

19     that feeling with Andy.

04:50   20          Q.  In that meeting you didn't feel like he was

21     listening, correct?

22          A.  Correct.

23          Q.  And you thought that that was discriminatory?

24          A.  I thought it was -- it was very -- just -- what

04:50   25     is the word I'm looking for?  Just -- I can't think of

1    the word now.

2         Q.  Well, do you think it was discriminatory when

3    he -- when you say you were talking but he wasn't

4    listening, do you think that was discriminatory?

04:51    5         A.  Not necessarily discriminatory but just --

6    "dismissive" is the word.

7         Q.  Okay.  Okay.  So other than this meeting where

8    you felt like he wasn't listening to you and what you

9    said was dismissive but you didn't think it was

04:51   10    discriminatory and then the time where he talked to you

11    about the night supervisor position, do you think --

12    what else -- did Andy Woods do anything else that you

13    thought might have been discriminatory?

14         A.  I don't think so.

04:51   15         Q.  Okay.  Other than Andy Woods and Keith

16    Bravenec, anyone else in management you think did

17    something to you that you thought was discriminatory?

18         A.  Well, I kind of thought when -- when Lisa

19    didn't -- when she didn't tell the truth at -- in the

04:52   20    arbitration, that that was to somewhat -- to some extent

21    discriminatory.

22         Q.  Okay.  Is Lisa in management?

23         A.  Yes.

24         Q.  Okay.

04:52   25         A.  Lisa Laurin.

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | Q.   Okay.   So earlier I asked for -- you said                    |
|       | 2  | people in management and people in HR and so you                   |
|       | 3  | separated those.   Is it your understanding that Lisa's            |
|       | 4  | in management?                                                     |
| 04:52 | 5  | A.   I do.   I --                                                  |
|       | 6  | Q.   Okay.                                                         |
|       | 7  | A.   -- wasn't clear on it --                                      |
|       | 8  | Q.   I just want --                                                |
|       | 9  | A.   -- at first.                                                  |
| 04:52 | 10 | Q.   -- to make sure.                                              |
|       | 11 | A.   Okay.                                                         |
|       | 12 | Q.   Okay.   You're putting her in the management                  |
|       | 13 | group and --                                                       |
|       | 14 | A.   I was -- I thought she was in HR.                             |
| 04:52 | 15 | Q.   Okay.                                                         |
|       | 16 | A.   So...                                                         |
|       | 17 | Q.   Okay.   So she's one of the people that,                      |
|       | 18 | nevertheless, you think discriminated against you?                 |
|       | 19 | A.   Yes.                                                          |
| 04:53 | 20 | Q.   Okay.   And you think she discriminated against               |
|       | 21 | you because of what she did in the arbitration?                    |
|       | 22 | A.   Uh-huh.                                                       |
|       | 23 | Q.   Yes?                                                          |
|       | 24 | A.   Yes.                                                          |
| 04:53 | 25 | Q.   And the arbitration happened after your                       |

1    termination, correct?

2        A.   Yes.

3        Q.   Okay.   While you were employed at Chevron

4    Phillips Chemical, did Lisa do something that you

04:53    5    thought was discriminatory towards you?

6        A.   While -- no, not while I was employed.

7        Q.   And what do you think Lisa didn't tell the

8    truth about in the arbitration?

9        A.   When I sent the letter to Pete Cella.

04:53    10        Q.   What did Lisa say in the arbitration that you

11    thought was not truthful?

12        A.   She said she didn't know about it.

13        Q.   How do you know that wasn't the truth?

14        A.   Because Virginia testified a few minutes later

04:53    15    that she did know about it.

16        Q.   Okay.   So Virginia thought Lisa knew about it,

17    Lisa said she didn't know about it; but you think that

18    when Lisa said that, that she was being discriminatory

19    towards you?

04:54    20        A.   Somewhat, yes.

21        Q.   Okay.   Anything else?

22        A.   No, that's it.

23        Q.   Okay.   Other than Keith Bravenec, Lisa Laurin,

24    and Andy Woods, anybody else you think discriminated

04:54    25    against you?

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|

1        Q.   -- was in that meeting and presented you with

2   that letter?

3        A.   It was from -- I don't know what -- exactly

4   what it --

04:58   5        Q.   I think if you look at the --

6        A.   Yes, okay.

7        Q.   -- first paragraph --

8        A.   For -- yes --

9        Q.   Okay.

04:58  10        A.   -- for sleeping.

11        Q.   And you're saying Lisa was in that meeting and

12   gave you that letter?

13        A.   She was in the -- she didn't particularly hand

14   me the letter, but she was in that meeting.

04:58  15        Q.   Okay.  And you think that as a part of that

16   meeting, she was retaliating against you because you had

17   e-mailed Pete Cella?

18        A.   Yes.

19        Q.   Okay.  She was not in the final written warning

04:58  20   meeting that was on October 3rd that's --

21        A.   I don't recall.

22        Q.   Is Lisa Laurin your manager?

23        A.   No.

24        Q.   Who was your manager?

04:59  25        A.   My manager was Andy.  Andy was my manager.  He

1          was not requested by the deponent or a party

2    before the completion of the deposition.

3          That pursuant to information given to the

4    deposition officer at the time said testimony was taken,

5    the following includes counsel for all parties of record

6    and the amount of time used by each party at the

7    deposition:

8          Mr. Marrick Armstrong, 0:00, Attorney for

9    Plaintiff;

10          Ms. Marlene C. Williams, 4:56, Attorney for

11    Defendant;

12          I further certify that I am neither counsel for,

13    related to, nor employed by any of the parties to the

14    action in which this testimony was taken.

15          Further, I am not a relative or employee of any

16    attorney of record in this cause, nor do I have a

17    financial interest in the action.

18          Subscribed and sworn to on this the 10th day of

19    March, 2017.

20          _Stacie M. Conner_

21          _____

22          STACIE M. CONNER, Texas CSR 5381
           Expiration Date: 12/31/18
           DepoTexas, Inc.
23          Firm Registration No. 95
           13101 N.W. Freeway, Suite 210
24          Houston, Texas 77040
           888.893.3767

25