# EXHIBIT D

IN THE MATTER OF ARBITRATION BETWEEN

| | |
|---|---|
| CHEVRON PHILLIPS CHEMICAL COMPANY LP, Company ) ) ) And ) ) ) INTERNATIONAL BROTHERHOOD ) OF ELECTRICAL WORKERS, ) LOCAL 716, ) Tyrrell Sherwin Wright, Grievant ) | T. Zane Reeves, PhD  FMCS Case No. 15-52517-3 |

## BACKGROUND

The Grievant, Tyrrell Sherwin Wright, was terminated from his position as an Electrician with the Company on December 23, 2014. The Grievant had been an electrician since 1994; he became a journeyman electrician upon graduation from the IBEW Local 716 apprenticeship program in 1999. The Grievant began employment with the Company at its Pasadena Plastics Complex in April 2008. In May 2011, the Grievant was seriously injured in a motorcycle accident, and hospitalized with a traumatic brain injury. Following a course of rehabilitation at the Institute for Rehabilitation and Research, the Grievant was released to return to work in March of 2012.

Following his discharge, the Grievant and his union filed a grievance of appeal at Step 1 on December 2, 2014. The grievance was denied by Lisa Laurin, HR Manager on December 23, 2014 and the Grievant moved the grievance to arbitration on the same day.

The Arbitrator, T. Zane Reeves, was selected by the Chevron Phillips Chemical Company, LP (hereinafter "the Company") and the International Brotherhood of Electrical Workers, Local 716, (hereinafter "the Union") under auspices of the Federal Mediation and Conciliation Service. The Arbitrator convened an evidentiary hearing on June 10, 2015, at the Doubletree by Hilton, 8181 Airport Boulevard, Houston, Texas 77061, pursuant to the Working Agreement (the "Agreement") between the Company and the Union. The Company was represented by Marlene

Williams, Esq. and the Union was represented by Patrick Flynn, Esq. The Grievant also was present. The Court Reporter was Toyloria Lanay Hunter, CSR-RPR, and her transcript constitutes the official record of the proceeding. The Parties agreed to provide the Arbitrator with post-hearing briefs by August 13, 2015.

## THE ISSUE, CHARGES, AND REQUESTED REMEDY

The Company and the Union have stipulated that the issue is as follows:

Whether the Company had just cause to discharge the Grievant and, if not, what is the appropriate remedy?

The Union's requested remedy, as stated in the Step 1 grievance, is that the Grievant be reinstated to his original position and made whole with full back pay, benefits, and seniority and the disciplinary action removed from his employment record.

The Company terminated the Grievant's employment for allegedly violating Plant Working Rule II.O and related procedures when he failed to properly report his absence from work. At the time of the Grievant's termination, he was subject to both a Final Written Warning for violating the Company's Lock, Tag, Try procedures as well as a Last Chance Letter for allegedly sleeping on the job. The Company argues that, because of the Grievant's repeated violations of various Company Working Rules in such a short timeframe, its termination of his employment was proper under the Agreement.

## FINDINGS OF FACT

As indicated, the Grievant was employed as an Electrician at the Company's Pasadena Plastics Complex from approximately April 2008 until his termination in December 2014. The Grievant was discharged by the Company because of three incidents that occurred in 2014, as follows:

3

First incident:

1. On October 8, 2014, the Company was implementing its Plant 8 Margin Improvement Project ("the Project"), which included several modifications to the process unit at the Pasadena Plant. (T. 20). As part of this turnaround project, the Plant 8 process unit was shut down so that maintenance and other work could be completed. (T. 20). The Project required a variety of electrical work, including the OSHA-mandated process of "Lock, Tag, Try", where all affected energy sources are brought to a safe state and de-energized before actual maintenance work could begin. (Tr. 20-23). The Lock, Tag, Try Procedure is a sufficiently important safety rule that the Company specifically identifies it in its Working Rules and indicates violations could result in immediate termination. (M-3, Section I.G).

2. The performance issues that ultimately led to the Grievant's termination started during the 2014 Project, when he committed what the Company considered to be a life-threatening safety violation. The Union did not dispute that the Grievant committed a safety error, although Chief Steward Michael Reedy testified that it was not a *serious* offense (Tr. 236-239). Keith Bravenec, who at the time was the Instrument & Electrical Controls Maintenance Superintendent at the Pasadena Plant, testified that at the start of the Project, all electrical isolation sources were identified and placed on an Isolation List so that the electrical breakers associated with those sources could be properly de-energized. (T. 21-22). Because certain electrical breakers were actually being replaced during the Project, Bravenec testified that the only way to safely de-energize those breakers was to remove the T-leads, *i.e.*, the wires leaving the breakers that feed a particular device or piece of equipment, so that the breakers were completely de-energized before removal. (Tr. 22-24).

3. The Grievant was assigned to assist the Operations group in completing a portion of the isolation work for the turnaround. (Tr. 33-34). The Grievant was provided an Isolation List, which instructed him to disconnect the T-leads from a number of breakers. (Tr. 30-33; M-1). The specific tasks assigned to the Grievant were highlighted in yellow and marked by capital letters to emphasize the importance of *physically* disconnecting the T-leads at issue, as opposed to just turning the breakers to the off position. (T. 23, 31; M-1).

4. The Company asserts that the Grievant not only failed to disconnect the T-leads as instructed but also falsely verified with his initials that the tasks were properly completed. (Tr. 36-38). As indicated, it also contends that the Grievant's violation of the Lock, Tag, Try safety rule could have resulted in serious injury. (Tr. 23-24).

5. Shortly thereafter, Bravenec received information that certain lockout procedures identified on the Isolation List were not properly completed. (T. 34). Bravenec specifically learned that a proper Lock, Tag, Try had not been completed and T-leads had not been removed on a number of breakers identified on the Isolation List, as directed. (T. 35-36). Bravenec began to collect facts regarding the incident and notified Virginia Hubbard, Human Resources ("HR") Business Partner, who started a joint investigation. (T. 100). After reviewing the Isolation List, Bravenec learned that the Grievant was the electrician who falsely verified that the T-leads had been removed. (T. 36).

6. As part of the investigation, Bravenec and Hubbard reviewed the Isolation List and interviewed witnesses involved in the incident, including the Grievant. (T. 36-41; 102). During the investigation, the Grievant did not dispute that he was assigned to disconnect the T-leads and that he had signed his initials on the Isolation List. (T. 102-103). Virginia Hubbard testified regarding whether the Grievant understood the instructions on the Isolation List:

A. When he was questioned -- when he was shown the isolation list that had his initials on it and Mr. Brabenec [sic] asked him, did you read what you initialed, and he said no, he guess he didn't pay attention to --- he just signed off on it after he de-energized the breakers.

Q. He did not dispute that those were his initials on the isolation list; is that correct?

A. Right. Yes.

Q. And did he indicate during this meeting that he was confused about the instructions on the isolation list?

A. He did make a statement that he was maybe confused because he didn't go back and actually read it.

Q. So his confusion was based on -- during this meeting, what you heard from him was that his confusion was based on the fact that he didn't read the list?

A. Or he didn't completely read the list to understand what was completely to be done.

7. Management asserts that the Grievant did not provide a clear explanation for his failure to follow the highlighted instructions on the Isolation List. (T. 38; 102). He also never indicated that he had questions about the instructions on the Isolation List or that he was somehow confused about the tasks assigned to him. (T.38, 40-41; 105). As indicated, the Grievant admitted that he probably did not pay attention to the instructions on the Isolation List. (T. 102).

8. After two interviews with the Grievant, the Company suspended him without pay during the pendency of the investigation. (T. 41-42; 110). After the Company completed its fact finding investigation, Hubbard met with her boss, Lisa Laurin, Human Resources Manager, to discuss the Company's findings. (T. 108). Laurin subsequently met with the Pasadena Plant's leadership team to discuss the investigation and the proper discipline. (T. 109; 205).

9. Following a review of the evidence produced during the investigation, the Company concluded that the Grievant committed a serious safety violation when he: (1) failed to

follow the Lock, Tag, Try procedure, (2) did not remove the T-leads according to the instructions on the Isolation List and (3) improperly verified that the work had been completed as directed. (T. 109).

10. The Company asserts that it could have immediately terminated the Grievant under its Working Rules for violating the Lock, Tag, Try safety procedure. However, the Company ultimately concluded that the Grievant should receive a suspension for two weeks, retraining, and a Final Written Warning. (T. 111; 205; 240; M-2). Hubbard subsequently prepared a letter dated October 30, 2014 describing the Company's investigation, its findings and the discipline issued to the Grievant, which was deemed a Final Written Warning. (T. 111; M-2). The Grievant signed the letter under protest, indicating that he disagreed with its condition that he undergo recertification training as an electrician.

Second incident:

11. The Grievant was subsequently assigned to report to the Central Business Office at the Pasadena Plant to undergo a remedial training for the Lock/Tag process. (T. 207). Tom Shomette was assigned as the Grievant's Training Representative during the retraining process. (M-2). However, Shomette took a leave of absence and John Smith was appointed as his Training Representative near the end of November 2014. (T. 74). Bravenec was told by Smith that this type of training curriculum did not exist and could be developed, but in the meantime the Grievant could read some materials. No one approached the Union about developing a training curriculum. The Grievant was simply instructed to report to the facility's Central Office Building, in the cubicle area, where he was directed to read old booklets, texts, and electrical manuals and answer questions following each chapter.

12. Two weeks after he was disciplined for violating the Company's Lock, Tag, Try procedures, the Grievant was charged with sleeping on the job, in violation of the Company's Working Rules. (M-3, Section I.A). Specifically, on November 11, 2014, two contract employees of Zachary International reported to their supervisor, Dean Merritt, that someone was snoring loudly in a cubicle near their offices. (T. 59; 61). Upon receiving the report, Merritt testified that he made his way to the cubicle and heard the snoring upon approaching the area. (T. 59-60). Merritt stated that he observed the Grievant leaning back, snoring and sleeping in the cubicle. (T. 59-60). Merritt testified that he tried to awaken the Grievant orally, to no avail. (T. 59). Merritt stated that he subsequently nudged the Grievant, which caused him to finally wake up. (T. 59-61). Merritt documented his observations in a written statement, which he provided to Adam Sainato, HR Business Partner. (T. 62).

13. Sainato, along with Virginia Hubbard, conducted an investigation, which included interviews with Merritt, the two Zachary contract employees who reported the incident to Merritt, and the Grievant. (T. 116; 118). According to the investigation, one of the Zachary contract employees was on a phone call when she first heard someone snoring outside her office. (T. 170171). When she completed her call, she and the other Zachary contract employee, who also heard the snoring, notified Merritt of the incident. (T. 171). When Sainato and Hubbard met with the Grievant, both testified that he initially denied "sleeping" but eventually admitted that he may have "dozed off." (T. 119; 172). When Hubbard informed the Grievant that he would be sent home pending the Company's investigation and review, Wright changed his story again and indicated that he had not fallen asleep or dozed off. (T. 172: 24-25).

14. Adam Sainato prepared a report regarding his fact finding and subsequently met with his boss, Lisa Laurin, regarding the investigation. (T. 173-174). Lisa Laurin reviewed the

Company's findings with the Plant Leadership team, who ultimately determined that the Grievant should be suspended and given a Last Chance Warning (LCW) regarding his second violation of the Company's Working Rules. (T. 207209). Laurin prepared a letter presenting the Company's findings, the suspension and the LCW; she presented the letter to the Grievant on November 18, 2014. (T. 208-209; M-4).

15. The letter, for which the Grievant signed he had read, informed him that he was required to (M-4):

- "You must avoid any warning for your attendance and tardiness.
- A fully satisfactory level of performance in the Job is required at all times. Poor job performance will result in termination of employment. Upon your return to work, you will be expected to fulfill all aspects of your job in a safe manner.
- You must follow all procedures, policies and Work Rules.
- You must pass a recertification exam and walk-thru after reasonable efforts to remediate, as determined by the Company."

The Last Chance Letter also was signed by Andy Woods, Company Maintenance Manager, and concluded with the following warning to the Grievant, "Furthermore, you must understand that compliance with the above conditions represent a last chance to regain employment at Chevron Phillips. If you violate any of the above conditions your employment will be immediately terminated with no re-employment opportunities."

Third incident:

15. On November 20, 2014, the Grievant was charged with violating another Company Working Rule when he failed to contact his supervisor to report his absence from work. It has been a long-standing policy of the Pasadena Plant that an employee planning to be absent from work must notify his/her supervisor. (T. 180-181; M-3). This policy is not only reflected in the Pasadena Plant's Working Rules but is also separately outlined in a document entitled "Employee Process for Reporting Off Of and Returning to Work." (M-3; M-5). On or about November 20, 2014, John

9

Smith, Training Supervisor, notified Sainato and other members of the HR Group that the Grievant had not reported to work for the day. (T. 174; 7578).

16. When the HR Group confirmed that they had not heard from the Grievant, Smith contacted him by telephone, the Grievant indicated that he was not going to be at work that day. (T. 79; 175). Smith asked the Grievant if he had tried to contact Smith or any maintenance supervisors, and he confirmed that he had not. (T. 79-80). Instead, the Grievant contacted the University of Pittsburg Medical Center, Work Partners' Division (UPMC), a third party who had recently been hired to help monitor the Company's medical leave and Family and Medical Leave Act (FMLA) programs. (T. 79). Smith subsequently notified Sainato and the HR Group that he had reached the Grievant, who indicated that he would be absent from work that day. (T. 7980; 176). Smith also informed Sainato and HR that the Grievant indicated that he had called UPMC to report his absence. (T. 176).

17. After receiving the update from Smith, Sainato investigated the incident. (T. 176). As part of the investigation, Sainato personally contacted UPMC and learned that UPMC had a record of a call from the Grievant, although the call appeared to have been placed to a voicemail or message line. (T. 177). Sainato also learned that the Grievant had five (5) other similar absences in 2014 but never contacted UPMC to report those absences. (T. 177). Moreover, Sainato learned that the Grievant did not have any prior disciplinary history related to a violation of the Company's absence-reporting procedures (T. 178). All of these facts indicated to Sainato that the Grievant was not only aware of the policy requiring him to notify a supervisor of his absence, but had actually followed the procedure without any confusion for his earlier 2014 absences. (T. 178).

18. As a part of his investigation, Sainato also talked to the Grievant regarding the incident. (T. 179-180). During their discussion, the Grievant informed Sainato that he would not be at work that day and had plans to meet with his doctors. (T. 180). Sainato reminded the Grievant that he was

10

required to contact a supervisor regarding his absence. (T. 180). During his discussion with Sainato, the Grievant did not indicate that he was unaware of the Company's long-standing policy requiring employees to notify their supervisors of their absences from work. (T. 180). The Pasadena Plant's written process for reporting work absences requires, *in every case,* is that employees contact their supervisors to report their first-day absences from work. (M-5):

> "As soon as the employee knows he/she will be able to return to work, the employee must contact the Supervisor on shift, preferably 12 hours prior to the start of the employee's shift, but no later than two hours prior to the scheduled starting time. This will provide notification to the Supervisor of the employee's intent to return and will aid the chiefs in staffing the shift."

Moreover, the Company's Total Absence Management Program, which introduced UPMC as a third-party source for managing certain employee illness and work-related absences, was presented to all employees when it was rolled out in late 2013. The Program specifically instructs employees to notify their supervisors of any absences and to follow site-specific protocols for their absences from work. (T. 184-188).

## CONCLUSIONS

**Corrective and positive disciplinary actions**

A discharge must be sustained if it is supported by a "preponderance of the evidence" 5 U.S.C. § 7701(c) (1) (B) and 5 C.F.R. § 1201.56(a) (ii). The term "preponderance of evidence" means the degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that contested fact is more likely to be true than untrue. 5 C.F.R. § 1201.56(c) (2) (see also: Black, 1979: 1064). In *Cornelius v. Nutt,* 472 U.S. 648, 660-61, (1985), the Court noted that arbitrators must apply the preponderance of proof standard of proof in considering

11

adverse actions. Also, because this is an appeal of a disciplinary action, Chevron Phillips bears the burden of proof to demonstrate just cause.

Therefore, the issue in the instant matter is not simply whether the Grievant committed wrongdoing and there was just cause for disciplinary action. The Grievant is most guilty of wrongdoing in his negligent actions during the "turnaround incident" of September 30, 2014. However, the deeper issue is whether discharge of the Grievant was justified, or would a less severe disciplinary penalty have achieved the desired goal of corrective disciplinary action. In other words, does the evidence and testimony presented at the arbitration proceeding prove that the purpose of the disciplinary action by the "Management Team" at Chevron Phillips was positive and corrective in nature, or was it imposed to punish a "bad employee" for breaking the rules.

It must be emphasized that punishment and retaliation are completely unacceptable reasons for applying disciplinary action to an employee who has committed wrongdoing. Positive and corrective change should be the only goal of disciplinary action imposed by management. This means that normally the employer imposes a progression of disciplinary measures before deciding to discharge an employee for wrongdoing. A "reasonable person using common sense" must interpret this principle to mean that management should only respond with discharge when "it is "axiomatic that the degree of penalty should be in keeping with the offense" (Elkouri and Elkouri: 670). Simply demonstrating *cause* for disciplinary action does not answer the question of what constitutes a fair and reasonable penalty for employees who are guilty of wrongdoing.

Thus, in progressive discipline, discharge should only be imposed when less severe disciplinary penalties would be insufficient to accomplish the goal of corrective disciplinary action ---changing an employee's unacceptable performance or behavior. Arbitrator Whitney McCoy

(*Huntington Chair Corp.*, 24 LA 490, 491: 1955) offers criteria for classifying employee offenses by severity:

> "Offenses are of two general classes: (1) **those extremely serious offenses,** such as stealing, striking a foremen, persistent refusal to obey a legitimate order, etc., which usually justify summary discharge without the necessity of prior warnings or attempts at corrective discipline; (2) those **less serious infractions** of plant rules or of proper conduct, such as tardiness, absence without permission, careless workmanship, insolence, etc., which call not for discharge for the first offense (and usually not for the second or third offense) but for some milder **penalty aimed at correction.**" [Emphasis added]

Accepting Arbitrator McCoy's useful distinction between severe and less severe employee offenses, leads to the question of whether the three incidents involving the Grievant during October and November 2014 be reasonably classified as "extremely serious offenses" justifying discharge or "less serious infractions" meriting a progressive disciplinary penalty?

Thus, the issue before the Arbitrator is reframed as follows:

> "In the instant matter, did the Grievant's wrongdoing justify discharge as the only disciplinary penalty available to achieve corrective results?"

In order to assess whether the discharge of the Grievant was imposed for positive and corrective reasons, the tests of just cause are considered by the Arbitrator.

**Applying just cause principles**

It is undisputed that Chevron Phillips is obligated by Article VI of the Collective Bargaining Agreement to apply the principles of *just cause* when administering disciplinary action to its employees. Such is particularly the case when considering discharge or removal, which is the "capital punishment" for employees. The terms *cause* or *just cause* are synonymous and involve the same principles or "tests" (Elkouri and Elkouri, 6th. ed., 2003: 932). Thus, the Grievant had a

13

"property right" to his job and should have been discharged only for just cause. The Employer has a responsibility to provide the Grievant and all non-probationary employees with due process rights before imposing disciplinary action following a "Loudermill" hearing and a full grievance appeal hearing before an arbitrator.

The common tests for determining whether "just cause" exists were set forth by Arbitrator Carroll Daugherty in the 1966 *Enterprise Wire Company and Enterprise Independent Union* landmark case (46 LA 359, 1966 and 50 LA 83) and are widely accepted among arbitrators. The tests include consideration of the following factors, as applied in the instant matter:

> 1) *Did the employer give to the employee forewarning or foreknowledge of the possible or probable consequences of the employee's disciplinary conduct?*

The Company's Working Rules and Discipline Policy expressly provide that the rules described therein are "examples of unacceptable conduct and shall not limit management in its prerogative to maintain discipline and to apply disciplinary action for misconduct that is properly and customarily the subject of discipline action." (M-3). The Working Rules further state that while the discipline process typically involves four levels of discipline, those levels may be skipped depending on the nature of the violation. (M-3). The Working Rules clearly indicate that "sleeping while on duty" and "[v]iolations of, or disregard of safety rules, procedures, regulations, or common safety practices," including the Lock, Tag, Try procedure, are grounds for *immediate discharge*. (M-3). Moreover, the Working Rules identify "[f]ailure to follow plant procedures for reporting off from work" as grounds for *discharge* "depending upon the circumstances involved and the seriousness of the offense." (M-3).

> 2) *Was the employer's rule or managerial order reasonably related to: (a) the orderly, efficient, and safe operation of the employer's business, (b) and the performance that the employer might properly expect of the employee?*

14

There is no dispute that the Grievant's eventual termination occurred after the Company investigated and confirmed three separate violations of the Working Rules in a span of only two months. Although Chief Steward Michael Reedy attempted to downplay the significance of the Grievant's first violation, calling it a "safety error" and not a serious safety violation, he admitted that the Grievant's failure to follow the Lock, Tag, Try process was a violation of the Working Rules and could have, by itself, resulted in immediate termination. (T. 240-241). Instead of terminating the Grievant, however, after an investigation the Company offered him an opportunity to reform his performance by issuing a Final Written Warning and other discipline. (M-2). The Final Written Warning, which the Working Rules expressly permit as a form of discipline for the violation, informed the Grievant that any "failure to adhere to the Company's and/or Pasadena's Work Rules, Policies and/or Procedures" would result in his immediate termination. (M-2). Thus, the Grievant was specifically notified of the Company's expectations that he abide by the Working Rules at all times going forward.

> 3) *Did the employer, before administering discipline to an employee, make an effort to discover whether the employee did in fact violate or disobey a rule or order of management?*

This Arbitrator agrees with Arbitrator Thomas Levak (#W1N-5C-D 14005), as well as countless other arbitrators regarding "the basic function of an arbitrator in assessing the propriety of a particular penalty in a disciplinary case. The basic rule is that the determination of the proper penalty of misconduct, particularly serious misconduct, is properly a function of management; an arbitrator should hesitate to set aside or reduce a penalty in the absence of a showing by the labor organization that the penalty was arbitrary, made in bad faith, or clearly wrong." The role of an Arbitrator is not to "second guess" a manager's decision or provide consultation to management regarding what action should have been taken in a particular situation.

Nonetheless, an Arbitrator has an obligation to *assess* whether a particular disciplinary action taken by management is "arbitrary and capricious", or taken for just cause. The preponderance of evidence offered by the Employer at the arbitration hearing demonstrates by the preponderance of evidence that the Grievant was guilty of serious wrongdoing. The Employer had just cause to terminate the employment of the Grievant, after applying the steps of corrective and progressive disciplinary action.

4) *Was the employer's investigation conducted fairly and objectively?*

Investigator Virginia Hubbard and her colleagues interviewed a number of witnesses and observers to gather evidence and make findings of fact regarding what happened regarding the Grievant in October and November, 2014. There is no dispute that the Grievant's eventual termination occurred after the Company investigated and confirmed three separate violations of the Working Rules in a span of only two months.

5) *At the investigation, did the "judge" obtain substantial evidence or proof that the employee was guilty as charged?*

Within two short weeks of the Final Written Warning, the Grievant broke another Working Rule when he was found sleeping on the job. Notably, the Grievant did not take responsibility for his actions and admitted that he provided inconsistent and allegedly false information to the Company during its investigation. Initially, the Grievant denied that he was sleeping, then admitted that he may have "dozed off," then denied that he was sleeping at all. Even assuming the Grievant did not "doze off" as he once stated during the investigation, the Company's findings during the investigation supported the determination that the Grievant was asleep at work. Numerous witnesses corroborated that the Grievant was not only sleeping, but snoring loudly, indicating more than a "dozing off." Sleeping on the job is widely recognized as a serious infraction. *Pratt &*

*Whitney*, 118 LA (BNA) 1537, 1539 (Chandler, 2003). Indeed, "[t]here can be no question that sleeping on the job constitutes a serious offense," and "[t]herefore, a pecuniary loss to the company or some kind of damages need not be proven to justify the imposition of a serious penalty." *Id.* (citing *Contico Internat'l*, 93 LA (BNA) 530, 535 (Cipolla, 1989). Moreover, the Company's Working Rules expressly provide that "sleeping while on duty" is a violation that could result in immediate termination. (M-3).

Despite the available disciplinary option of immediate termination, the Company again provided the Grievant another opportunity to remediate his behavior by issuing him a last chance letter. Like the Final Written Warning before it, the last chance letter informed the Grievant that the Company expected him to abide by its Working Rules and avoid future violations, including those related to absenteeism. (M-4). Thus, on his second violation the Grievant received yet another opportunity to improve his performance or else face termination.

> 6) *Has the employer applied its rules, orders and penalties even handedly and without discrimination to all employees?*

The issue of whether Chevron Phillips has consistently applied the rules and disciplinary penalties to other employees at the Pasadena Plastics Complex was not seriously raised during the arbitration proceedings.

> 7) *Was the degree of discipline administered by the employer in a particular case reasonably related to: (a) the seriousness of the employee's proven offense, (b) and the record of the employee in his service with the employer?*

Arbitrator McCoy's useful distinction between severe and less severe employee offenses, leads to the question of whether the incidents committed by the Grievant in October and November can be reasonably classified as "extremely serious offenses" justifying discharge or "less serious infractions" meriting a progressive disciplinary penalty. The answer is that there is no indication

17

that a less severe disciplinary action would have persuaded the Grievant to improve his performance and attentiveness to job duties.

Thus, in considering the seven tests of just cause, Chevron Phillips management met its burden of proof to demonstrate just cause for disciplinary action and that the discharge imposed was fair and appropriate.

## AWARD

Having heard argument, considered the credibility of witnesses, and weighed the evidence presented at the arbitration proceedings, the Arbitrator finds that the Employer met its burden of proof to demonstrate just cause through the preponderance of evidence to discharge the Grievant. His third violation of the Company's Working Rules in a matter of two months is sufficient to warrant the Grievant's termination. Reinstatement is not a reasonable remedy for an employee who has violated multiple Working Rules, including a safety-sensitive rule that has the potential for life-threatening injuries. Moreover, the Grievant demonstrated a disregard for his responsibilities at the Company and an inability to comply with important Working Rules, which undermines the propriety of reinstatement in this matter.

Accordingly, the grievance is dismissed as lacking demonstrable merit.

Respectfully submitted,

*[signature]*
T Zane Reeves, PhD

September 2, 2015
Albuquerque, New Mexico