# APPENDIX

# APPENDIX – 1

*Arrington v. Sw. Bell Tel. Co.*,
93 Fed. Appx. 593 (5th Cir. 2004)(per curiam)(unpublished*)*

 **LexisNexis®**


Positive
As of: Jun 12, 2017

**DICK W ARRINGTON, Plaintiff - Appellant v. SOUTHWESTERN BELL TELE-
PHONE CO, Defendant - Appellee**

**No. 03-50656**

**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

*93 Fed. Appx. 593; 2004 U.S. App. LEXIS 3775*

**February 26, 2004, Filed**

**NOTICE:** [**1] RULES OF THE FIFTH CIR-
CUIT COURT OF APPEALS MAY LIMIT CITATION
TO UNPUBLISHED OPINIONS. PLEASE REFER TO
THE RULES OF THE UNITED STATES COURT OF
APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** US Supreme Court certio-
rari denied by *Arrington v. Southwestern Bell Tel. Co.,
2004 U.S. LEXIS 5598 (U.S., Oct. 4, 2004)*

**PRIOR HISTORY:** Appeal from the United States
District Court for the Western District of Texas. No.
MO-00-CV-57.

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee
sued defendant employer, asserting disability discrimina-
tion and retaliation claims under the Americans with
Disabilities Act. The United States District Court for the
Western District of Texas granted summary judgment in
favor of the employer. The employee appealed.

**OVERVIEW:** The employee, who had diabetes, worked
as a customer services technician, installing and repair-
ing phones and phone lines for customers at their homes
and places of business. The employer repeatedly coun-
seled the employee for absenteeism and productivity

problems. The employer provided evidence that it termi-
nated the employee due to his troubled performance his-
tory and the receipt of numerous customer complaints
regarding his appearance. demeanor, and working skills.
The court determined that the employer was entitled to
summary judgment. The disability discrimination claim
failed because the employee attempted to prove that he
suffered from a disability simply by referring to his
medical diagnosis of diabetes; he did not explain how his
diabetes limited any of his major life activities. Also, the
employee failed to claim that he was incapable of per-
forming a range of jobs due to his diabetes. The retalia-
tion claim failed because the employee failed to provide
evidence that the employer's explanation that he was
fired for poor productivity and customer complaints was
merely pretext for retaliation.

**OUTCOME:** The appellate court affirmed the judgment
of the district court.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Appellate Re-
view > Standards of Review*
*Civil Procedure > Appeals > Standards of Review > De
Novo Review*
[HN1] The appellate court reviews a district court's grant
of summary judgment de novo, applying the same stand-
ard as the district court.

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN2] Summary judgment is appropriate when the record demonstrates no genuine issue of material fact and where the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c).*

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Opposition > General Overview*
[HN3] Although in the court's review of the record the court must draw all reasonable inferences in favor of the nonmoving party, the moving party is entitled to a judgment as a matter of law if the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. Moreover, the nonmoving party does not demonstrate the existence of a genuine issue of fact (and does not thereby avoid summary judgment) by asserting some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.

*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview*
*Labor & Employment Law > Discrimination > Disability Discrimination > Proof > Circumstantial Evidence*
*Labor & Employment Law > Discrimination > Disability Discrimination > Proof > Direct Evidence*
[HN4] A plaintiff may prove intentional discrimination under the Americans with Disabilities Act either by presenting direct evidence of discrimination or by utilizing the familiar McDonnell Douglas burden-shifting method of proof. Where the plaintiff provides only circumstantial evidence of discrimination, the court reviews his claim under the latter standard. To establish a prima facie case of disability discrimination, the plaintiff must show that he (1) suffers from a disability; (2) was qualified for the job; (3) was subject to an adverse employment action, and (4) was replaced by a non-disabled person or treated less favorably than non-disabled employees.

*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > Disabilities > Impairments > Major Life Activities*
*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > Disabilities > Regarded With Impairment*
*Labor & Employment Law > Discrimination > Disability Discrimination > Employment Practices > General Overview*
[HN5] Under the Americans with Disabilities Act, a "disability" is defined as (A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. *42 U.S.C.S. § 12102(2).*

*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > Disabilities > Impairments > Major Life Activities*
*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > Qualified Individuals With a Disability*
[HN6] A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently "substantially limits" a major life activity. Instead, whether a person is disabled under the Americans with Disabilities Act (ADA) depends on whether the limitations an individual with an impairment actually faces are in fact substantially limiting. Assessing diseases in their untreated state would require courts to, for example, treat all diabetics as disabled per se, a result which is contrary to both the letter and the spirit of the ADA. It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment; instead, plaintiffs are required to offer evidence of the extent of the limitation in terms of their own experience.

*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > Disabilities > Impairments > Major Life Activities*
*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > Qualified Individuals With a Disability*
[HN7] While it is recognized that "working" is a major life activity for the purposes of the Americans with Disabilities Act, evidence of disqualification from a single position or a narrow range of jobs will not support a finding that an individual is substantially limited from the major life activity of working.

*Evidence > Procedural Considerations > Burdens of Production*
*Labor & Employment Law > Discrimination > Disability Discrimination > Proof > Burdens of Proof > Employee Burdens*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN8] To establish a prima facie case of retaliation, a plaintiff must prove that (1) he engaged in an activity protected by the Americans with Disabilities Act, (2) he was subjected to an adverse employment action, and (3) a causal connection existed between his participation in the protected activity and the adverse employment action. Once the plaintiff has proven a prima facie case, the burden of production shifts to the defendant to come forward with a legitimate, non-discriminatory reason for the adverse employment action. If such a reason is provided, then the plaintiff must proffer evidence that the given reason is pretextual. In essence, the plaintiff must show that "but for" the protected activity, the adverse employment action would not have occurred.

**JUDGES:** Before KING, Chief Judge, and BENAVIDES and CLEMENT, Circuit Judges.

**OPINION**

[*594] PER CURIAM: *

* Pursuant to *5TH CIR. R. 47.5*, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in *5TH CIR. R. 47.5.4*.

Plaintiff-Appellant Dick W. Arrington appeals the district court's grant of summary judgment to Defendant-Appellee [*595] Southwestern Bell Telephone Company ("SW Bell") on his disability discrimination and retaliation claims. For the following reasons, we AFFIRM.

**I. BACKGROUND**

Arrington was employed by SW Bell from 1974 to 1998. Beginning in 1979, Arrington worked as a Customer Services Technician ("CST"), installing and repairing phones and phone lines for [**2] SW Bell's customers at their homes and places of business. Arrington was diagnosed with diabetes in 1986, and his supervisor, Junior Brown, admits that he and the company were aware of this diagnosis. In fact, in December 1995, Arrington had to take disability leave due to problems associated with diabetic ulcers on his feet. After a dispute over his date of return, Arrington was discharged and filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). Arrington and SW

Bell subsequently settled their dispute, and Arrington was reinstated to his position as a CST in January 1997.

SW Bell repeatedly counseled Arrington for absenteeism and productivity problems beginning in 1987. In addition, the company began to receive numerous complaints from customers about Arrington's physical appearance, attitude, and skill level in 1988, for which Arrington was also repeatedly counseled. In 1995, Arrington was informed by SW Bell that, because of his low productivity and tendency to waste time on the job, he was ineligible to work overtime until there was a "noticeable improvement" in his performance. This restriction continued to apply after Arrington was reinstated in January [**3] 1997.

In November 1997, SW Bell placed Arrington on Decision Making Leave due to a customer's complaints that Arrington mistakenly cut the customer's doorbell wire, that his appearance upset the customer's daughter, and that he had a poor attitude. Under the Leave, Arrington was given a day to decide whether to return to work at SW Bell. He agreed to return and was placed on probation for one year, during which he was subject to dismissal for unsatisfactory performance of his job duties. Then, on June 24, 1998, Junior Brown visited a job site listed on Arrington's schedule, but he could not find Arrington. Both parties agree that Brown contacted the customer, Ms. Prickle, the next day to determine whether Arrington had, indeed, worked there. According to Brown, Prickle complained about Arrington's inability to finish the job and his rude behavior; Brown also contends that Arrington improperly coded his work for Prickle, in violation of company policy. As a result, Arrington was suspended from his CST position, and SW Bell later offered him a Supplies Attendant position, which did not involve either customer contact or productivity requirements. When Arrington refused to accept this [**4] position, SW Bell dismissed him.

After his second termination from SW Bell, Arrington initiated the present lawsuit, alleging that SW Bell violated the *Americans with Disabilities Act* ("ADA") by subjecting him to disparate treatment and eventually firing him because of his diabetes. Arrington also alleges that his treatment and discharge from SW Bell were improperly motivated by retaliation for his filing of an EEOC complaint in 1996. For example, Arrington believes that SW Bell solicited all of the customer complaints against him and that other, less efficient CSTs were neither disciplined nor counseled, as he was, for poor productivity.

In January 2003, SW Bell filed a motion for summary judgment, asserting that Arrington had failed to establish either that he suffered from a legally cognizable "disability" or that SW Bell's proffered reasons [*596]

for firing him were pretextual. The district court agreed, and granted summary judgment in favor of SW Bell on both the disability discrimination and retaliation claims in May 2003. Arrington appeals both of these decisions.

## II. STANDARD OF REVIEW

[HN1] We review a district court's grant of summary judgment de novo, applying the [**5] same standard as the district court. *Seaman v. CSPH, Inc., 179 F.3d 297, 299 (5th Cir. 1999).* [HN2] Summary judgment is appropriate when the record demonstrates no genuine issue of material fact and where the moving party is entitled to a judgment as a matter of law. *FED. R. CIV. P. 56(c).* [HN3] Although in our review of the record we must draw all reasonable inferences in favor of the nonmoving party, "the moving party is entitled to a judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)* (internal quotation marks omitted). Moreover, we have stated that the nonmoving party does not demonstrate the existence of a genuine issue of fact (and does not thereby avoid summary judgment) by asserting "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)* (en banc) [**6] (citations and internal quotation marks omitted).

## III. DISCUSSION

### A. Disability Discrimination

[HN4] A plaintiff may prove intentional discrimination under the ADA either by presenting direct evidence of discrimination or by utilizing the familiar McDonnell Douglas burden-shifting method of proof. *Seaman, 179 F.3d at 300.* Because Arrington provides only circumstantial evidence of discrimination, we review his claim under the latter standard. To establish a prima facie case of disability discrimination, Arrington must show that he "(1) suffers from a disability; (2) was qualified for the job; (3) was subject to an adverse employment action, and (4) was replaced by a non-disabled person or treated less favorably than non-disabled employees." *Id.;* see also *42 U.S.C. § 12112(a) (2000).*

The parties dispute whether Arrington has met his burden of proof regarding the first element of the prima facie case. [HN5] Under the ADA, a "disability" is defined as

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual;
>
> (B) a record of such an impairment; or
>
> (C) being [**7] regarded as having such an impairment.

*42 U.S.C. § 12102(2) (2000).* Arrington asserts that he meets either definition (A) or definition (B) because he suffers from diabetes. ² Specifically, he argues that this circuit held, in *Gonzales v. City of New Braunfels, 176 F.3d 834, 837 (5th Cir. 1999),* that insulin-dependent diabetes is a "disability" as that term is defined in the ADA. SW Bell disagrees, and contends that Arrington must produce evidence suggesting that his diabetic condition "substantially limits" at least one of his "major life activities." See *42 U.S.C. § 12102(2)(A); EEOC v. R.J. Gallagher Co., 181 F.3d 645, 655 (5th Cir. 1999)* (holding that, for a plaintiff to prove that he has a "record of impairment" under *42 U.S.C. § 12102(2)(B),* [*597] "there must be a record of an impairment that substantially limits one or more of [his] major life activities").

> 2 Arrington concedes that he was not regarded as disabled.

[**8] SW Bell correctly identifies the flaws in Arrington's position. *Gonzales* does not stand for the proposition that diabetes is a disability per se; rather, *Gonzales* merely noted that, at that time, this circuit's precedents required a plaintiff's claim that he suffered a "disability" to be evaluated by considering the impact of the plaintiff's untreated impairment on his major life activities. *176 F.3d at 837.* Under that test, the *Gonzales* court observed that insulin-dependent diabetes would qualify as a disability because, if someone with this disease is deprived of insulin, he will lapse into a coma. *Id.* But this observation was mere dicta, and the *Gonzales* court cautioned that the Supreme Court was currently considering whether disabilities should, in fact, be measured without reference to mitigating factors. Id. Thus, not only is this observation not binding precedent, but its logical force has been undermined by the Supreme Court's subsequent determination, in *Sutton v. United Air Lines, Inc., 527 U.S. 471, 482-83, 144 L. Ed. 2d 450, 119 S. Ct. 2139 (1999),* that [HN6] "[a] person whose physical or mental impairment is corrected by medication [**9] or other measures does not have an impairment that presently 'substantially limits' a major life activity." Instead, whether a person is disabled under the ADA "depends on whether the limitations an individual with an impairment actually faces are in fact substantially limiting." *Id. at 488.* ³

3 Moreover, Sutton specifically cautioned that assessing diseases in their untreated state would require courts to, for example, treat all diabetics as disabled per se, a result which the Court noted "is contrary to both the letter and the spirit of the ADA." *527 U.S. at 484*; see also *Waldrip v. GE, 325 F.3d 652, 656 (5th Cir. 2003)* ("Neither the Supreme Court nor this court has recognized the concept of a per se disability under the ADA . . . .").

In *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184, 151 L. Ed. 2d 615, 122 S. Ct. 681 (2002)*, the Supreme Court further clarified that "it is insufficient for individuals attempting [**10] to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment"; instead, plaintiffs are required to offer evidence of the "extent of the limitation . . . in terms of their own experience." *Id. at 198* (citation and internal quotation marks omitted). Therefore, because Arrington attempts to prove that he suffers from a disability simply by referring to his medical diagnosis of diabetes, Arrington's claim must fail. He has not explained, in either his opposition to summary judgment or his brief on appeal, how his diabetes has limited any of his major life activities.

Nevertheless, in his deposition, Arrington complained that, when he worked at SW Bell, his diabetes affected his "production." [4] Viewing the record in the light most favorable to Arrington, he may have been attempting to argue that his diabetes qualifies as a disability because it substantially limited his major life activity of "working." But this argument fails as a matter of law. [HN7] While we have recognized that "working" is a major life activity for the purposes of the ADA, *R.J. Gallagher Co., 181 F.3d at 654*, this court has also explained [**11] that "evidence of disqualification [*598] from a single position or a narrow range of jobs will not support a finding that an individual is substantially limited from the major life activity of working." *Talk v. Delta Airlines, Inc., 165 F.3d 1021, 1025 (5th Cir. 1999)*; accord *Sutton, 527 U.S. at 491*. Thus, because he does not claim that he was incapable of performing a range of jobs due to his diabetes, Arrington has not demonstrated that he has either a disability or a record of impairment under the ADA. [5]

4 Additionally, in his motion for summary judgment, Arrington stated that SW Bell should have accommodated his disability by allowing him additional time to complete his jobs. But Arrington also conceded that he never requested that SW Bell provide him with any reasonable accommodations.

5 To the extent that Arrington's response to SW Bell's motion for summary judgment can be read to imply that the diabetic foot ulcers on his feet substantially limited his major life activity of "walking," it fails as a matter of law. Cf. *Talk, 165 F.3d at 1025* (holding that a plaintiff's ability to walk was not substantially limited simply because she walked with a limp, moved slower than other people, and was required to wear special orthopedic shoes).

## [**12] B. Retaliation

[HN8] To establish a prima facie case of retaliation, a plaintiff must prove that (1) he engaged in an activity protected by the ADA, (2) he was subjected to an adverse employment action, and (3) a causal connection existed between his participation in the protected activity and the adverse employment action. *Seaman, 179 F.3d at 301*. Once the plaintiff has proven a prima facie case, the burden of production shifts to the defendant to come forward with a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If such a reason is provided, then the plaintiff must proffer evidence that the given reason is pretextual. Id. In essence, the plaintiff "must show that 'but for' the protected activity, the adverse employment action would not have occurred." Id.

We need not decide whether Arrington has established a prima facie case of retaliation because he has failed to demonstrate a genuine issue of fact regarding whether SW Bell's legitimate, non-discriminatory reason for firing him was pretextual. SW Bell has provided evidence that Arrington was discharged due to his troubled performance history and the company's receipt [**13] of numerous customer complaints regarding Arrington's appearance, demeanor, and working skills. In addition, SW Bell has shown that, in an attempt to help Arrington improve his performance and prevent his termination, SW Bell placed Arrington on five different Performance Improvement Plans, offered him assistance from the company's Employee Assistance Program (he declined), and offered him two days of "ride along" assistance from a training manager (he refused to participate on the second day). Yet, after he was placed on one year of probation and warned that further problems would warrant immediate dismissal, Arrington was the subject of another customer complaint. But because Arrington's difficulties were centered on interaction with customers and his level of productivity, SW Bell asserts, and Arrington concedes, that instead of being immediately fired he was offered the Supplies Attendant position, which he declined. Thus, SW Bell has met its burden of providing a legitimate, non- discriminatory reason for discharging Arrington.

In rebuttal, Arrington provides only a scintilla of evidence that SW Bell's proffered reasons are pretextual. Arrington claims that, after he returned [**14] to work in 1997, SW Bell unfairly disciplined him for his poor performance while the company's other employees with similar productivity levels were not disciplined. For support, Arrington provides a statement from Clay Everett, Arrington's union supervisor, that refers to Arrington's job productivity as in the "middle of the pack" compared [*599] to other SW Bell employees. ⁶ Yet, both Everett and Arrington have also admitted that Arrington was once one of the slowest employees in Midland and that, although his performance was improving, he had not achieved the "mark where he needed to be" before he was terminated.

> 6    Everett's statement refers to a document comparing the number of jobs performed per day by many of SW Bell's employees. Because this document has not been made a part of the summary-judgment record, it is impossible for this court to know whether that document compared a variety of SW Bell's statewide employees, only SW Bell's CSTs or, more specifically, only those CSTs who worked in the Midland office. In addition, the record does not reflect whether any of the employees on this list were subject to discipline nor does it reflect the number of customer complaints associated with each employee.

[**15]  In addition to contesting SW Bell's view of his productivity, Arrington alleges that the customer complaints lodged against him were improperly solicited by SW Bell's employees. But other than the Prickle incident, where Arrington challenged his supervisor to call the customer and check that he was really working at her home, Arrington provides no evidence to support his claim of solicitation. The remainder of Arrington's examples of disparate treatment--that he was sent home for wearing footwear that another CST was allowed to wear, that he was given an un-air-conditioned van rather than the cable truck driven by other CSTs, that his tools were substandard, that his supervisors made rude comments about his age and productivity, and that he was subjected to more extensive medical evaluations than his fellow CSTs--are not relevant to the issue at hand: whether SW Bell's explanation that Arrington was fired for poor productivity and customer complaints is merely pretext for retaliation.

In support of his claim of pretext, Arrington also contends that SW Bell did not follow its standard practice of allowing a union supervisor to investigate the customer complaints lodged against him. [**16]  Arrington buttresses his argument by pointing out that Ev-erett has similarly expressed his belief that the final customer complaint, involving Prickle, was not "objectively" investigated. ⁷ Moreover, Arrington and Everett dispute SW Bell's version of the Prickle incident, asserting that the customer was mainly upset that Arrington did not complete the job, which they believe was caused by his ineligibility to work overtime. Yet, the summary-judgment record contains admissions from both Arrington and Everett that Arrington did not use an official SW Bell code when he filed the paperwork regarding his inability to complete the Prickle job, although neither thinks that this "offense" was serious.

> 7    Everett did not claim to have personal knowledge that the other customer complaints lodged against Arrington were improperly investigated.

Viewed in its entirety, Arrington's evidence of pretext and retaliatory treatment is insufficient to permit a reasonable jury to conclude that Arrington would not have been terminated [**17]  "but for" his filing of an EEOC complaint in 1996. Arrington fails to identify any similarly situated employees (i.e., those with a history of numerous customer complaints and a similarly low productivity level) who were neither disciplined nor discharged for their poor job performance. Arrington believes that he was not a poor CST, but "merely disagreeing with an employer's negative performance assessment is insufficient to show pretext." *Perez v. Region 20 Educ. Serv. Ctr., 307 F.3d 318, 325 (5th Cir. 2002).* Moreover, Arrington's subjective belief that SW Bell solicited the customer complaints, without more, is also insufficient to [*600]  cast doubt on SW Bell's proffered reason for his termination. See *Auguster v. Vermilion Parish Sch. Bd., 249 F.3d 400, 403 (5th Cir. 2001)* ("This court has consistently held that an employee's 'subjective belief' of discrimination' alone is not sufficient to warrant judicial relief." (citations omitted)). ⁸ Therefore, the district court properly held that SW Bell was entitled to summary judgment on Arrington's retaliation claim.

> 8    The one factor in Arrington's favor is his evidence from Clay Everett, who also believes that Arrington was treated unfairly. Yet Everett admitted that Arrington had a history of poor productivity and customer complaints, and he did not claim to have personal knowledge that the complaints against Arrington were either baseless or solicited by Arrington's supervisors at SW Bell.

[**18]  **IV. CONCLUSION**

Accordingly, we AFFIRM judgment of the district court.

# APPENDIX – 2

*Cervantez v. KMGP Servs. Co.,*
349 Fed. Appx. 4 (5th Cir. 2009)(unpublished)



Positive
As of: Jun 12, 2017

EFRAIN CERVANTEZ, Plaintiff - Appellant v. KMGP SERVICES COMPANY INC., Defendant - Appellee

No. 08-11196

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

*349 Fed. Appx. 4; 2009 U.S. App. LEXIS 20702; 107 Fair Empl. Prac. Cas. (BNA) 369*

September 16, 2009, Filed

**NOTICE:** PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** [**1]
Appeal from the United States District Court for the Northern District of Texas. USDC No. 5:07-CV-165.

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee sued defendant former employer, alleging age discrimination, in violation of the Age Discrimination in Employment Act of 1967 (ADEA), *29 U.S.C.S. § 621 et seq.* The United States District Court for the Northern District of Texas granted summary judgment in favor of the employer. The employee appealed.

**OVERVIEW:** The employer provided a shared computer in a break room which could be accessed by employees. The employer uncovered a large number of "cookies" indicating that the employee's User ID and password had been used to access pornographic websites. The employer confirmed that the employee worked on two particular dates and terminated him. A more comprehensive log of website access that was produced later included dates when the employee did not work. The appellate court determined that the employer was properly granted summary judgment. The employee's ADEA claim failed because (1) the employer's proffered reason for firing the employee, violation of its computer-use policy, constitutes a legitimate, nondiscriminatory reason for his discharge, and (2) he did not show the existence of a genuine issue of material fact on age discrimination since, inter alia, the mere existence of a second, more comprehensive log did not establish a disputed material fact regarding the truth or falsity of the employer's stated ground for his firing, and it was not error to disregard a manager's allegedly discriminatory comment as a stray remark.

**OUTCOME:** The appellate court affirmed the district court's grant of summary judgment in favor of the employer.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
*Civil Procedure > Summary Judgment > Standards > Appropriateness*
[HN1] An appellate court reviews de novo a district court's grant of summary judgment. Summary judgment is appropriate if the record, taken as a whole, shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Page 2

349 Fed. Appx. 4, *; 2009 U.S. App. LEXIS 20702, **;
107 Fair Empl. Prac. Cas. (BNA) 369

*Fed. R. Civ. P. 56(c)*. On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.

***Labor & Employment Law > Discrimination > Age
Discrimination > Coverage & Definitions > General
Overview***
***Labor & Employment Law > Discrimination > Age
Discrimination > Employment Practices > Discharges
& Failures to Hire***
***Labor & Employment Law > Discrimination > Age
Discrimination > Proof > General Overview***
[HN2] Under the Age Discrimination in Employment Act of 1967 (ADEA), *29 U.S.C.S. § 621 et seq.*, it is unlawful for an employer to discharge an employee because of such individual's age. *29 U.S.C.S. § 623(a)*. To establish an ADEA claim, a plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the "but-for" cause of the challenged employer decision.

***Labor & Employment Law > Discrimination > Age
Discrimination > Coverage & Definitions > General
Overview***
***Labor & Employment Law > Discrimination > Age
Discrimination > Employment Practices > Discharges
& Failures to Hire***
***Labor & Employment Law > Discrimination > Age
Discrimination > Proof > Burdens of Proof***
***Labor & Employment Law > Discrimination > Age
Discrimination > Proof > Circumstantial Evidence***
[HN3] Where a plaintiff's Age Discrimination in Employment Act of 1967 (ADEA), *29 U.S.C.S. § 621 et seq.*, claim is based on circumstantial evidence, the McDonnell Douglas burden-shifting framework applies. Under this standard, the employee must first establish a prima facie case of discrimination. A prima facie case requires that the employee prove that he (1) belongs to the protected group of persons over the age of forty; (2) was qualified for his position; (3) was discharged; and (4) was replaced with someone younger or outside the protected group. *29 U.S.C.S. § 631. Section 631* applies the ADEA only to individuals at least forty years old. The burden then shifts to the employer to produce evidence that the employee was discharged for a legitimate, nondiscriminatory reason. This burden is one of production, not persuasion; it can involve no credibility assessment. If the employer is able to meet this burden, the McDonnell Douglas framework -- with its presumptions and burdens -- disappears, and the sole remaining issue is discrimination vel non.

***Labor & Employment Law > Discrimination > Age
Discrimination > Proof > Burdens of Proof***
[HN4] The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. And in attempting to satisfy this burden, the plaintiff -- once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision -- must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence. The issue at the pretext stage is whether the defendant's reason, even if incorrect, was the real reason for the plaintiff's termination -- Courts do not try the validity of good faith beliefs as to an employee's competence. Motive is the issue. Yet, evidence demonstrating the falsity of the defendant's explanation is likely to support an inference of discrimination even without further evidence of the defendant's true motive. Thus, the plaintiff can survive summary judgment by producing evidence that creates a jury issue as to the employer's discriminatory animus or the falsity of the employer's legitimate nondiscriminatory explanation.

***Labor & Employment Law > Discrimination > Age
Discrimination > Proof > Burdens of Proof***
[HN5] In the context of the McDonnell Douglas burden-shifting framework, the question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive.

***Labor & Employment Law > Discrimination > Age
Discrimination > Coverage & Definitions > General
Overview***
***Labor & Employment Law > Discrimination > Age
Discrimination > Proof > Burdens of Proof***
[HN6] The Age Discrimination in Employment Act of 1967, *29 U.S.C.S. § 621 et seq.*, cannot protect older employees from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated. Even if the trier of fact chose to believe an employee's assessment of his performance rather than the employer's, that choice alone would not lead to a conclusion that the employer's version is a pretext for age discrimination.

Page 3

349 Fed. Appx. 4, *; 2009 U.S. App. LEXIS 20702, **;
107 Fair Empl. Prac. Cas. (BNA) 369

*Labor & Employment Law > Discrimination > Age
Discrimination > Employment Practices > Discharges
& Failures to Hire*
*Labor & Employment Law > Discrimination > Age
Discrimination > Proof > Burdens of Proof*
[HN7] Violating a company policy is a legitimate,
non-discriminatory rationale for terminating an employee.

*Labor & Employment Law > Discrimination > Age
Discrimination > Proof > Burdens of Proof*
[HN8] A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. The higher standard of "pretext plus," which requires a plaintiff not only to disprove an employer's proffered reasons for the discrimination but also to introduce additional evidence of discrimination, has been rejected.

*Labor & Employment Law > Discrimination > Age
Discrimination > Employment Practices > Discharges
& Failures to Hire*
*Labor & Employment Law > Discrimination > Age
Discrimination > Proof > Burdens of Proof*
[HN9] In the context of the McDonnell Douglas burden-shifting framework, a fired employee's actual innocence of his employer's proffered accusation is irrelevant as long as the employer reasonably believed it and acted on it in good faith.

*Labor & Employment Law > Discrimination > Age
Discrimination > Employment Practices > Discharges
& Failures to Hire*
*Labor & Employment Law > Discrimination > Age
Discrimination > Proof > General Overview*
[HN10] It is true that a discriminatory comment may be probative of discrimination even where it is not in the direct context of the termination and even if uttered by one other than the formal decision maker, provided that the individual is in a position to influence the decision. Yet, a comment is not evidence of discrimination if it is the sole proof of pretext, or if it is not made in temporal proximity to the adverse employment decision.

**COUNSEL:** For EFRAIN CERVANTEZ, Plaintiff -
Appellant: Durwood Douglas Crawford, Goins, Underkofler, Crawford & Langdon, Dallas, TX.

For KMGP SERVICES COMPANY, INC., Defendant -
Appellee: James Alfred Southerland, Ogletree Deakins, Houston, TX.

**JUDGES:** Before WIENER, GARZA, and ELROD,
Circuit Judges.

**OPINION**

   [*6]  PER CURIAM: *

   *   Pursuant to *5TH CIR. R. 47.5*, the court has
   determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in *5TH CIR. R. 47.5.4.*

Plaintiff-Appellant Efrain Cervantez sued his former employer Defendant-Appellee KMGP Services Company Inc. ("KMGP"), alleging that it fired him because of his age, in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), *29 U.S.C. § 621 et seq.* The district court granted summary judgment in favor of KMGP after concluding that Cervantez had failed to establish a genuine issue of material fact that would call into question KMGP's legitimate, nondiscriminatory reason for discharge -- that his computer User ID and password had been used to access pornographic websites from one of KMGP's  [**2]  shared computers. Holding that the district court correctly determined that Cervantez had failed to establish a genuine issue of material fact, we affirm.

**I. FACTS AND PROCEEDINGS**

Until he was fired in November 2006, Cervantez had worked as a field operator at KMGP's Scurry Area Canyon Reef Oil Companies ("SACROC") Unit oil field in Scurry County, Texas. Beginning in 1975, Cervantez worked for various owners and operators at the SACROC Unit, and he was hired by KMGP [1] in 2000 when it acquired the unit.

   1   KMGP is a subsidiary of Kinder Morgan,
   Inc.

In June 2000, Cervantez attended a KMGP new-hire orientation during which he received the company's policy manual and Information Security User Policy ("ISUP").

The ISUP states in relevant part:

   Violation of this policy may result in
   disciplinary action, including possible
   termination, and/or legal action.

   . . . .

   [I]ndecent, profane, obscene, intimidating, or unlawful material may not be sent or downloaded by any form of elec-

Page 4

349 Fed. Appx. 4, *; 2009 U.S. App. LEXIS 20702, **;
107 Fair Empl. Prac. Cas. (BNA) 369

tronic means or displayed on or stored in the Company's computers or printed.

. . . .

System Users are responsible for safeguarding their passwords for each system. Individual passwords should not be printed, stored on-line, or [**3] given to others. System Users are responsible for all transactions made using their passwords.

Cervantez signed an acknowledgment of KMGP's ISUP, confirming that he "underst[ood] that failure to comply with this [*7] Policy may result in disciplinary action, which may include termination of [his] employment."

KMGP also maintains additional policies relating to its employees' computer usage. For example, the policy titled "The Workplace" informs employees that the "Internet and other communications systems are to be used for business purposes only. . . . Improper use of Companies' communication services and equipment may result in disciplinary action up to and including termination."

KMGP provides a shared computer in the SACROC Unit's break room which can be accessed by the unit's 200 employees. Brian Spence, a KMGP employee charged with ensuring that all SACROC Unit computers run properly, testified that in November 2006 he checked the break-room computer for possible viruses. Spence stated that he uncovered a large number of "cookies" indicating that Cervantez's User ID and password had been used to access pornographic websites. Spence testified that he did not know Cervantez.

Mary Ann Long, [**4] the former director of human resources for Kinder Morgan, Inc.. then received notice that Cervantez's User ID and password had been used to access pornographic websites from a KMGP computer. According to Long, she instructed Bradley Lewis, the human resources representative with responsibility over a region that includes the SACROC Unit, to determine, *inter alia,* whether Cervantez had been at work on August 22 and 23, 2006, two dates on which his User ID was used to access hundreds of prohibited websites. Lewis claims that, as instructed, he confirmed that Cervantez worked on both dates. According to KMGP, Lewis recommended that Cervantez be terminated and Long agreed.

In late November 2006, Lewis advised Cervantez that he was being fired because his User ID and password had been used on August 22 and 23 to access pornographic websites, which Cervantez denies having vis-

ited. Lewis possessed a log detailing the websites allegedly visited, but, at that time, he prohibited Cervantez from seeing it.

KMGP replaced Cervantez with Paul Navarete, who was 43 years old and had been employed at KMGP for five to six months. Cervantez, who was then 57 years old, offered no initial indication that [**5] he believed he was discharged because of his age.

Cervantez applied for unemployment compensation from the Texas Workforce Commission ("TWC"). During the TWC proceedings, Cervantez had access for the first time to the log of websites allegedly visited with his User ID and password. According to Cervantez, in addition to showing access to inappropriate websites at times when he was at work on August 22 and 23, the log includes many entries for the evening of August 23, long after his shift had ended. As the initial log did not contain Cervantez's name or other identifying information, the TWC hearing officer requested the production of documents that would associate Cervantez's User ID and password with the log. KMGP thus produced a second, more comprehensive log that specifically identified Cervantez. [2] The second log showed attempts to access prohibited websites on many other dates, including dates when Cervantez did not [*8] work. Even though both logs contain information about times when Cervantez was not at work, they also list websites that were accessed when he was present.

> 2   Cervantez construes the record as establishing that Spence conceded that KMGP "manually," i.e., arbitrarily, [**6] added Cervantez's name to the list. In fact, the record confirms that Spence merely used the word "manually" in the context of instructing software to print the user's name, that of Cervantez, on the log.

In August 2007, Cervantez filed the instant suit in district court, alleging that KMGP had fired him because of his age in violation of the ADEA. In December 2008, the district court granted KMGP's motion for summary judgment. This appeal followed.

## II. ANALYSIS

### A. Standard of Review

[HN1] We review *de novo* a district court's grant of summary judgment. [1] "Summary judgment is appropriate if the record, taken as a whole, 'show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" [4] "On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." [5]

Page 5

349 Fed. Appx. 4, *; 2009 U.S. App. LEXIS 20702, **;
107 Fair Empl. Prac. Cas. (BNA) 369

3    *Alaska Elec. Pension Fund v. Flowserve Corp., 572 F.3d 221, 227 (5th Cir. 2009)* (per curiam).

4    *Thermacor Process, L.P. v. BASF Corp., 567 F.3d 736, 740 (5th Cir. 2009)* (per curiam) (quoting *FED. R. CIV. P. 56(c)*).

5    *Deville v. Marcantel, 567 F.3d 156, 163-64 (5th Cir. 2009)* [**7] (per curiam).

## B. ADEA Framework

[HN2] Under the ADEA, it is unlawful for an employer to discharge an employee "because of such individual's age." [6] To establish an ADEA claim, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." [7]

6    *29 U.S.C. § 623(a).*

7    *Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343, 2351, 174 L. Ed. 2d 119 (2009).* The Supreme Court's recent decision in *Gross* rejected the application of Title VII's "motivating factor" standard to ADEA mixed-motive cases. *See id. at 2349-51.* That holding has no affect on today's analysis because, on appeal, Cervantez did not advance a motivating-factor theory.

[HN3] As Cervantez's ADEA claim is based on circumstantial evidence, the burden-shifting framework of *McDonnell Douglas Corp. v. Green* applies. [8] Under this standard, the employee must first establish a prima facie case of discrimination. [9] A prima facie case requires that the employee prove that he (1) belongs to the protected group of persons over the age of forty; (2) was qualified for his position; (3) was discharged; and (4) was replaced with someone younger or outside the protected group. [**8] [10]

8    *Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 896-97 (5th Cir. 2002)* (citing *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*; *see Cheatham v. Allstate Ins. Co., 465 F.3d 578, 582 (5th Cir. 2006)* (per curiam) (referring to this circuit's burden-shifting standard for ADEA claims as "well-settled"). *But see Gross, 129 S. Ct. at 2349 n.2* ("[T]he Court has not definitively decided whether the evidentiary framework of *McDonnell Douglas . . .*, utilized in Title VII cases is appropriate in the ADEA context.").

9    *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).*

10    *Sandstad, 309 F.3d at 897*; *see 29 U.S.C. § 631* (applying the ADEA only to individuals at least forty years old).

The burden then shifts to the employer to produce evidence that the employee was discharged "for a legitimate, nondiscriminatory reason. This burden is one of production, not persuasion; it can [*9] involve no credibility assessment." [11] If the employer is able to meet this burden, "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non.*" [12]

> [T]he [HN4] ultimate burden of persuading the trier of fact that the defendant [**9] intentionally discriminated against the plaintiff remains at all times with the plaintiff. And in attempting to satisfy this burden, the plaintiff -- once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision -- must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence. [13]

"The issue at the pretext stage is whether [the defendant's] reason, even if incorrect, was the real reason for [the plaintiff's] termination." [14] Courts "'do not try . . . the validity of good faith beliefs as to an employee's competence. Motive is the issue.'" [15]

> [Yet,] [e]vidence demonstrating the falsity of the defendant's explanation . . . is likely to support an inference of discrimination even without further evidence of defendant's true motive. Thus, the plaintiff can survive summary judgment by producing evidence that creates a jury issue as to the [**10] employer's discriminatory animus or the falsity of the employer's legitimate nondiscriminatory explanation. [16]

11    *Reeves, 530 U.S. at 142* (internal quotation marks and citation omitted); *see Sandstad, 309 F.3d at 897.*

Page 6

349 Fed. Appx. 4, *; 2009 U.S. App. LEXIS 20702, **;
107 Fair Empl. Prac. Cas. (BNA) 369

12  *Reeves, 530 U.S. at 142-43* (internal quotation marks and citation omitted).

13  *Id. at 143* (internal quotation marks and citations omitted); *see Sandstad, 309 F.3d at 897.*

14  *Sandstad, 309 F.3d at 899; see Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1091 (5th Cir. 1995)* ([HN5] "The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive.").

15  *Mayberry, 55 F.3d at 1091* (quoting *Little v. Republic Ref. Co., 924 F.2d 93, 97 (5th Cir. 1991)); see Bienkowski v. Am. Airlines, Inc., 851 F.2d 1503, 1508 (5th Cir. 1988)* ([HN6] "The ADEA cannot protect older employees from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated. Even if the trier of fact chose to believe an employee's assessment of his performance rather than the employer's, that choice alone would not lead to a conclusion that the employer's version is a pretext for age discrimination." (citation omitted)).

16  *Sandstad, 309 F.3d at 897* [**11] (citing *Reeves, 530 U.S. at 147-48*).

## C. Cervantez Failed to Establish a Genuine Issue of Material Fact

KMGP concedes that Cervantez has set forth a prima facie case under the *McDonnell Douglas* framework. We therefore begin our analysis by observing that KMGP's proffered reason for firing Cervantez -- violation of its computer-use policy -- constitutes a legitimate, nondiscriminatory reason for Cervantez's discharge. [17] The *McDonnell Douglas* burden-shifting thus evaporates, and we inquire whether Cervantez has shown the existence of a genuine issue of material fact on age discrimination. Cervantez [*10] asserts that the district court erred in three ways: (1) Its decision strayed from binding precedent by applying an erroneously high burden of proof; (2) it failed to recognize an issue of material fact among KMGP's alleged inconsistencies; and (3) it improperly discounted the significance of a KMGP manager's discriminatory comment. We reject each of Cervantez's points of error and determine, in our *de novo* review, that KMGP is entitled to summary judgment.

17  *See Twymon v. Wells Fargo & Co., 462 F.3d 925, 935 (8th Cir. 2006)* ([HN7] "[V]iolating a company policy is a legitimate, non-discriminatory rationale [**12] for terminating an employee.").

First, the district court applied the correct law. The Supreme Court's decision in *Reeves v. Sanderson Plumbing Products, Inc.* makes clear that [HN8] "'a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.'" [18] Cervantez is correct that *Reeves* rejected the higher standard of "pretext plus," which "require[d] a plaintiff not only to disprove an employer's proffered reasons for the discrimination but also to introduce additional evidence of discrimination." [19] Review of the district court's opinion and of the entire record makes clear, however, that the court's holding was a product of the law as it stands *post-Reeves.* For example the district court applied valid law in determining that Cervantez "has failed to come forward with summary judgment evidence to create a genuine issue of material fact that Defendant's 'stated grounds for his termination were unworthy of credence.'" (quoting our opinion in *Keelan v. Majesco Software, Inc.*). [20] In any event, we apply the correct standard in today's *de novo* review. [**13] Additionally, we emphasize -- contrary to Cervantez's argument -- that [HN9] a fired employee's actual innocence of his employer's proffered accusation is irrelevant as long as the employer reasonably believed it and acted on it in good faith. [21]

18  *Ratliff v. City of Gainesville, 256 F.3d 355, 361 & n.9 (5th Cir. 2001)* (quoting *Reeves, 530 U.S. at 148*).

19  *Kanida v. Gulf Coast Med. Pers. LP, 363 F.3d 568, 574 & n.4 (5th Cir. 2004).*

20  *407 F.3d 332, 345 (5th Cir. 2005)* (citing *Reeves, 530 U.S. at 143*).

21  *See Waggoner v. City of Garland, 987 F.2d 1160, 1165 (5th Cir. 1993).*

Second, KMGP's purported inconsistencies, considered in toto, do not create a genuine issue of material fact. Briefly, (1) the mere existence of KMGP's second, more comprehensive log -- which it produced for the TWC proceedings months *after* Cervantez's discharge -- does not establish a disputed material fact regarding the truth or falsity of KMGP's stated ground for this firing; (2) it is not significant with whom Lewis confirmed Cervantez's presence at the SACROC Unit on August 22 or 23, or even whether Lewis confirmed it at all; (3) considering that Lewis told Cervantez that he was being discharged because his User ID and password [**14] had been used to access prohibited websites -- the same reason KMGP advanced in the district court and on appeal -- Lewis's statement that he thought Cervantez had accessed the prohibited websites personally is immaterial; and (4) it is not material whether Lewis actually made the final decision to fire Cervantez or Long made it based on Lewis's recommendation.

Page 7

349 Fed. Appx. 4, *; 2009 U.S. App. LEXIS 20702, **;
107 Fair Empl. Prac. Cas. (BNA) 369

Third, the district court committed no error in disregarding a KMGP manager's allegedly discriminatory comment as a stray remark (if indeed, it was even discriminatory). According to Cervantez, in 2002 or 2003, his then-supervisor, Gary Norwood, told him that a member of KMGP's "top management," Pete Hagist, [*11] had said that KMGP would be expanding and "was going to start hiring young people." [HN10] It is true that a discriminatory comment may be probative of discrimination "even where [it] is not in the direct context of the termination and even if uttered by one other than the formal decision maker, provided that the individual is in a position to influence the decision." [22] Yet, a comment is not evidence of discrimination if it is the sole proof of pretext, [23] or if it is not made in temporal proximity to the adverse employment decision. [**15] [24] There are at least three reasons why Hagist's alleged comment fails to defeat KMGP's motion for summary judgment: (1) The passage of three to four years between the comment and Cervantez's discharge is beyond the time frame relevant to his claim; [25] (2) no reasonable factfinder could determine that Hagist, who left KMGP eighteen months *before* Cervantez's discharge, was "in a position to influence the decision" to terminate him; [26] and (3) as the *only* evidence of pretext, Hagist's stray remark is not probative of discriminatory intent. [27]

22 *Palasota v. Haggar Clothing Co., 342 F.3d 569, 578 (5th Cir. 2003)* (per curiam) (citations and footnote omitted).

23 *Id. at 577.*

24 *Jenkins v. Methodist Hosps. of Dallas, Inc., 478 F.3d 255, 261 (5th Cir. 2007).*

25 *See Patel v. Midland Mem'l Hosp. & Med. Ctr., 298 F.3d 333, 344 (5th Cir. 2002)* (rejecting comments made two or more years before a doctor's suspension); *Brown v. CSC Logic, Inc., 82 F.3d 651, 656 (5th Cir. 1996)* (discounting a comment made sixteen months before an employee's discharge).

26 *See Palasota, 342 F.3d at 578.*

27 *See id. at 577.* It is even unclear whether the substance of the alleged remark supports Cervantez's claim. A plan to *expand* [**16] the SAC-ROC Unit and to hire young people is not necessarily analogous to a plan to *replace* older people with younger personnel. Cervantez's theory nevertheless alleges discriminatory firing without mentioning discriminatory *expansionist* hiring.

## III. CONCLUSION

We affirm the district court's grant of summary judgment in favor of KMGP because Cervantez failed to demonstrate the presence of a disputed issue of material fact.

AFFIRMED.

# APPENDIX – 3

*Mack v. John L. Wortham & Son, L.P.,*
2013 U.S. App. LEXIS 18507, 2013 WL 4758052 (5th Cir. Sept. 5, 2013)



Caution
As of: Jun 12, 2017

**EULA MACK, Plaintiff-Appellant v. JOHN L. WORTHAM & SON, L.P., also
known as J. Wortham, L.L.C., also known as Wortham Insurance & Risk Manage-
ment and Its Agents and Assigns, Defendant-Appellee**

No. 12-20798 Summary Calendar

**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

*541 Fed. Appx. 348; 2013 U.S. App. LEXIS 18507*

September 5, 2013, Filed

**NOTICE:** PLEASE REFER TO *FEDERAL RULES
OF APPELLATE PROCEDURE RULE 32.1* GOV-
ERNING THE CITATION TO UNPUBLISHED
OPINIONS.

**PRIOR HISTORY:** [**1]
Appeal from the United States District Court for the
Southern District of Texas. USDC No. 4:10-CV-04881.
*Mack v. John L. Wortham & Son, L.P., 2012 U.S. Dist.
LEXIS 159424 (S.D. Tex., Nov. 7, 2012)*

**CASE SUMMARY:**

**OVERVIEW: HOLDINGS:** [1]-In this Title VII and
ADEA action, the employee failed to establish a hostile
work environment where the actions of which the em-
ployee complained were infrequent, isolated incidents for
which reasonable explanations were given and she was
not threatened or humiliated; [2]-The employee failed to
show that either she was replaced by someone outside
the protected class or that others similarly situated were
treated more favorably; [3]-The employee failed to pre-
sent evidence that other employees were similarly insub-
ordinate, much less that other insubordinate employees
were not discharged; [4]-Because the employee had al-
ready been terminated, she could not claim that she was
retaliated against for filing an EEOC discrimination
charge against her supervisors; [5]-The employee had not

shown that she was replaced at all, let alone by someone
under fifty-five years of age.

**OUTCOME:** Employer's motion granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Appellate Re-
view > Standards of Review*
*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Standards >
General Overview*
[HN1] An appellate court reviews a district court's grant
of summary judgment de novo, applying the same stand-
ards as the district court. Summary judgment is appropri-
ate where the movant shows that there is no genuine is-
sue of material fact and that the movant is entitled to
judgment as a matter of law. In reviewing the record, all
facts and inferences are construed in the light most fa-
vorable to the non-movant. However, if the record, taken
as a whole, could not lead a rational trier of fact to find
for the non-moving party, then there is no genuine issue
for trial and summary judgment is proper.

*Civil Procedure > Summary Judgment > General
Overview*

[HN2] A court is required to state the reasons for granting or denying the motion for summary judgment, but does not need to address every statement made by the non-movant. *Fed. R. Civ. P. 56(a)*.

*Civil Procedure > Summary Judgment > Standards > General Overview*

[HN3] Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > General Overview*

[HN4] Under Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act of 1967, a discrimination claim not brought within 300 days of the alleged discriminatory act is time-barred. *42 U.S.C.S. § 2000e-5(e)(1); 29 U.S.C.S. § 626(d)*.

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > Continuing Violations*

[HN5] The continuing violations doctrine relieves a plaintiff of establishing that all of the complained-of conduct occurred within the actionable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period. If the plaintiff can demonstrate that the discrimination manifested itself over time rather than in a series of discrete acts, actions that would otherwise be time-barred may be considered by the court. However, where the employee complains of separate and varied acts and decisions that occurred at different times, and the record does not confirm an organized or continuing effort to discriminate, courts have declined to apply the continuing violations doctrine.

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > Continuing Violations*

[HN6] Even if specific actions were discriminatory, a plaintiff may not rely on the continuing violations doctrine to resurrect claims about discrimination concluded in the past, even though its effects persist. Thus, though the effects of an allegedly discriminatory act may persist, a claim based on that act is not actionable under Title VII of the Civil Rights Act of 1964 if the act occurred more than 300 days before the charge was filed.

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > Continuing Violations*

[HN7] To determine whether alleged discriminatory acts are related closely enough to constitute a continuing violation, courts use the following three non-exhaustive factors: (1) subject matter, (2) frequency, and (3) degree of permanence. If the alleged acts involve the same type of discrimination, occur frequently, and indicate to the employee that the continued existence of adverse consequences is likely, it is probable that they rise to the level of continuing violations.

*Labor & Employment Law > Discrimination > Disparate Treatment > Employment Practices > Adverse Employment Actions > General Overview*

[HN8] An adverse employment action requires, at a minimum, a demotion, a transfer to a lower or less desirable position, or a denial of a promotion.

*Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Burdens of Proof > General Overview*

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Burdens of Proof > General Overview*

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > Continuing Violations*

[HN9] In order for a hostile work environment claim to survive, the unlawful employment practice must have occurred over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Unlike demotion, the cumulative effect of the petty annoyances of daily harassment. constitutes a part of the same pattern of behavior that amounts to a continuous violation by rendering the employee's workplace a hostile environment. To determine whether an actionable hostile environment claim exists, a court examines all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > General Overview*

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > General Overview*

[HN10] The right to sue is lost if a claim is not filed within ninety days of the plaintiff's receipt of the right-to-sue letter. *42 U.S.C.S. § 2000e-5(f)(1).*

*Evidence > Inferences & Presumptions > Presumptions > General Overview*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > Right to Sue Letters*
[HN11] When there is a dispute as to the date the right-to-sue letter is received, courts presume it was received between three and seven days after the letter was mailed.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > General Overview*
[HN12] Under *42 U.S.C.S. § 2000e-5(f)(1)*, the scope of a Title VII of the Civil Rights Act of 1964 complaint is limited to the scope of the Equal Employment Opportunity Commission investigation which can reasonably be expected to grow out of the charge of discrimination.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > General Overview*
[HN13] An employee who wishes to bring a discrimination claim against her employer must first exhaust her administrative remedies by filing a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). Title VII of the Civil Rights Act of 1964 clearly contemplates that no issue will be the subject of a civil action until the EEOC has first had the opportunity to attempt to obtain voluntary compliance. Because the scope of an EEOC complaint is to be construed liberally, courts review a Title VII claim broadly and do not limit review to the scope of the administrative charge itself, but consider the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > General Overview*
[HN14] Because a failure to allege sex discrimination in a Equal Employment Opportunity Commission (EEOC) charge properly results in dismissal of a subsequent

complaint for lack of exhaustion, the omission of a culture discrimination claim from an EEOC charge is similarly a failure to exhaust.

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > General Overview*
[HN15] Title VII of the Civil Rights Act of 1964 makes it unlawful to discharge, refuse to hire, or discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. *42 U.S.C.S. § 2000e-2(a)(1).* In order to establish a prima facie case of discrimination, the employee must produce evidence that she: (1) is a member of a protected class; (2) was qualified for her position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, shows that others similarly situated were treated more favorably. If the plaintiff establishes a prima facie showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for terminating employment. However, the defendant need not persuade the court that it was actually motivated by the proffered reasons-it is sufficient that the defendant's evidence raises a genuine issue of material fact as to whether it discriminated against the plaintiff. If the employer meets this burden, the plaintiff must demonstrate that the given reason was mere pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence.

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burdens of Proof*
[HN16] To establish disparate treatment a plaintiff may show that the employer gave preferential treatment to another employee under "nearly identical" circumstances, which requires a showing that an employee outside of the protected class held the same job, title, and duties, was under the same supervisor, committed the same infractions, and was not discharged.

*Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof*
*Labor & Employment Law > Discrimination > Retaliation > Elements > General Overview*
[HN17] Under Title VII of the Civil Rights Act of 1964, it shall be an unlawful employment practice for an employer to discriminate against any of his employees. be-

cause the employee has opposed any practice made an unlawful employment practice by this title or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing. *42 U.S.C.S. § 2000e-3(a)*. A plaintiff bringing a retaliation claim has the burden of establishing that (1) she participated in statutorily protected activity; (2) she received an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action.

*Labor & Employment Law > Discrimination > Age Discrimination > Proof > Burdens of Proof*

[HN18] In order to establish a prima facie case under the Age Discrimination in Employment Act of 1967, the plaintiff must establish: (1) that she was discharged: (2) that she was qualified for the position; (3) that she was within a protected class at the time of the discharge; and (4) that she was replaced by someone outside the protected class, replaced by someone younger, or that her discharge was otherwise because of her age. Once the plaintiff establishes this, the burden shifts to the defendant to rebut the presumption of discrimination. Evidence relevant to a showing of pretext may include that employees outside of the protected class were engaged in the same nature and level of infraction as the plaintiff.

*Contracts Law > Breach > Causes of Action > Elements of Claims*
*Contracts Law > Formation > General Overview*

[HN19] To bring a successful breach of contract claim in Texas, a plaintiff must show: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. A valid contract requires (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, (5) execution and delivery of the contract with the intent that it be mutual and binding, and (6) consideration. The essential terms must be defined with sufficient precision to enable the court to determine the obligations of the parties. Furthermore, a meeting of the minds refers to a mutual understanding and assent to the agreement regarding the subject matter and the essential terms of the contract.

COUNSEL: For EULA MACK, Plaintiff - Appellant: Joseph G. Soliz, Esq., Soliz Law Firm, P.L.L.C., Houston, TX.

For JOHN L. WORTHAM & SON, L.P., also known as J. Wortham, L.L.C., also known as Wortham Insurance & Risk Management and Its Agents and Assigns, Defendant - Appellee: Jay Ronald Aldis, Attorney, Bracewell & Giuliani, L.L.P., Houston, TX.

JUDGES: Before SMITH, PRADO, and HIGGINSON, Circuit Judges.

OPINION

[*350]  PER CURIAM: *

> *    Pursuant to *5TH CIR. R. 47.5*, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in *5TH CIR. R. 47.5.4*.

This case arises out of two employment discrimination claims-one Title VII and one ADEA-made by Plaintiff-Appellant Eula Mack ("Mack") against her former employer, Defendant-Appellee John L. Wortham & Son, L.P. ("Wortham"). Because we determine that there is insufficient evidence from which a reasonable trier of fact could find for Mack, we AFFIRM the district court's grant of summary judgment for Wortham on all claims.

I. FACTUAL AND PROCEDURAL BACKGROUND

In November 2005, Mack was hired by Wortham as [**2] an administrative assistant to Peter Johnston in the Commercial Accounts Department. She held this position for one month, at which point Johnston decided she was not a good match for the job and suggested Mack apply for an open position in the Risk Management Department. Mack was offered a position as an assistant to Jim McCann and Bart Cannon in the Risk Management Department, which she accepted in December of 2005. Mack remained in the Risk Management Department until 2006, when Mack's supervisor decided that there was no longer a place for her there. Mack's supervisor then offered her the opportunity to transfer to the Marine Department, and she began work in the Marine Department in late 2006.

The parties disagree about the events leading to Mack's 2006 departure from the Risk Management Department. Mack alleges that Cannon had stopped assigning work to her, prompting her to ask to be trained for Joleen Norcini's position in anticipation of Norcini's resignation. McCann denied Mack's request and picked another employee, Jacqueline Huerta, for the position. Norcini, however, decided to remain in the Risk Management Department. According to Wortham, in light of this change in circumstances, [**3] McCann decided to allow Huerta and Norcini to remain in the department and terminate Mack. Mack alleges that McCann "coerced" her to quit by offering her severance pay and trying to help her find a new job. She also alleges that the partners did not want clients to see an African-American

woman sitting at the front desk. In contrast, Wortham claims that Mack was transferred because her lack of necessary computer skills had become apparent and because she was offered a more appropriate position in the Marine Department instead.

Mack alleges racial, sex, and age discrimination on the parts of Johnston, McCann, and Cannon. She admitted in her deposition that she never heard any of these individuals make discriminatory remarks based on race, sex, or age. She testified that she believed Johnston discriminated against her by refusing to give [*351] her work, but simultaneously claimed that he used a "nasty tone" when giving assignments to her. She alleged that McCann's denial of her request for training and Cannon's failure to assign work to her were discriminatory acts. She further testified that she felt these supervisors treated her differently than the other assistants but admits that all of [**4] the other assistants were female and concedes that she was replaced by another African-American woman in the Risk Management Department.

In 2006, Mack was transferred to an administrative assistant position in the Marine Department, where she worked primarily for Phil Dunn and Jerry Shelton until 2009. During this time, Mack was frequently late to work, even after being reprimanded and counseled by Charles Flournoy, the Vice-Chairman of the company, on multiple occasions. [1] On March 4, 2008, Mack was placed on probation by Al Hahn, the human resources manager. His memorandum to Mack explained that, because of her habitual tardiness and refusal to comply with the company's rules despite several counseling sessions, she would be placed on probation through April 30, 2008, and that during this period she was required to report to work by 8:15 a.m. on at least 80% of scheduled work days. The memorandum also made clear that if she did not comply with these requirements she would be terminated at the end of the probationary period.

> 1   According to several e-mails sent in October 2006 between Flournoy and Al Hahn, the human resources manager, Mack regularly arrived to work twenty to thirty minutes [**5] late, and continued to arrive late following conversations with both Dunn and Flournoy. Wortham provided several of Mack's time sheets which indicate tardiness on thirteen work days in August 2007, six work days in November 2007, and over twenty work days in January and February of 2009.

During the probationary period Mack complied with the attendance requirements, but in January 2009 her supervisor documented that she had reverted to habitual tardiness. From January 5, 2009, through February 9, 2009, she was late to work every day.

In addition to being tardy, Mack was insubordinate and failed to comply with the company's overtime policy. In October 2006, Flournoy informed her that she needed to seek permission before working overtime. In March and November 2007, as well as in April 2008, Mack worked overtime without permission and in April 2008 was issued a warning by Flournoy to end this practice, which she disregarded. In November 2008 Mack again submitted overtime hours that she had worked without a supervisor's prior approval.

On January 6, 2009, another assistant, Leticia Martinez, informed Flournoy that Mack was inaccurately filling out checklists, indicating that she had completed [**6] tasks that had not been completed. In response, Flournoy sent an e-mail to the entire department reminding them of the proper procedure.

Mack alleges that she was also discriminated against by Rebecca Cox, Tobin Carlson, and Gavin Hurd. According to Mack, on June 10, 2008, Cox "harassed" her by singling her out over email. She does not allege specific facts or provide the email to which she refers. Mack claims that Carlson accused her of losing documents and defamed her via e-mail. However, again, she does not allege specific facts or provide the e-mail to which she refers. She also alleges that on December 22, 2008, Hurd demanded that she complete a certificate request for which she lacked the necessary information and yelled at her in the presence of the other assistants. [*352] Mack claims that she was then wrongfully reprimanded for insubordination.

According to Flournoy's memo of the same date regarding this exchange, on Friday, December 19, 2008, Hurd received a call from Wortham's Dallas office requesting a certificate of insurance for a client. Hurd pulled the file and placed the certificate request in the "Urgent Stack." On Friday afternoon, Mack picked up the request, saw that Hurd [**7] had not yet filled out the processing form with the information needed to complete the certificate, put a note on the file to complete the form, and placed the file on Carlson's desk, even though, according to Flournoy, it would have been clear to her that Hurd was the one working on the file. On Monday, December 22, 2008, Hurd received a follow-up call for the certificate and went to search for the file, but could not locate it in the certificate stack behind Mack's desk. He asked if anyone had seen the file, but the other assistants in the area said they had not, and Mack did not respond. Hurd returned to his office to look for the certificate, but could not find it, so he returned to the secretarial pool and asked again if anyone had seen the file. Again, the other secretaries told him that they had not seen it and Mack did not respond.

Hurd continued to search for the file in the file room and at the desks of several secretaries, including Mack's. As he was walking back to his office to search it again, he spotted the file on Carlson's desk. He read the note from Mack requesting that the processing form be filled out. Hurd filled out the form, returned the file to Mack, and told [**8] her to complete the certificate. Mack complained that Hurd should not speak to her with such disrespect, and Hurd repeated his instruction to complete the certificate. Mack then responded that she was not going to work on the certificate and that Hurd should do it himself. Hurd explained that he did not know how to prepare the certificate and that this was a secretarial task. Mack responded that he should perform the work himself if he wanted it done. Hurd then ended the discussion and went to his office. He returned to the secretarial pool after a few minutes and told Mack that if she was still unwilling to prepare the certificate he would reassign it. Mack agreed and Hurd asked her to return the file to him. She responded that she did not have the file. He asked her where it was, and she told him that it was on the counter behind her desk and that he should "fetch" it himself if he wanted it. Hurd retrieved the file and gave it to Flo Tuten, another assistant, to complete.

Later that day, Flournoy reprimanded Mack for her insubordination towards Hurd. Mack contends that she was reprimanded and treated differently on the basis of her age, race, and sex. She further claims that no other [**9] individuals were reprimanded for their alleged misconduct towards her, and that she would have been treated differently had she been of a different race, age, or sex. In February 2009, Mack was terminated from Wortham.

The parties disagree as to the circumstances surrounding Mack's termination from the company. Mack claims that she was terminated because of her race, age, sex, and culture, and alleges that she was replaced by a younger Hispanic female who was the friend of two other Hispanic employees who worked in the Marine Department. She alleges that this individual, Dreana Lemon, had been employed by Wortham for less than one year, and that Lemon spent part of this time period on maternity leave, but was allowed to remain at Wortham when Mack was terminated. Wortham's version of the events differs. Wortham alleges that in early 2009, one of [*353] the company's largest clients sold the majority of its properties, depriving the Marine Department of a significant portion of its business. The department's increased use of an automation system further reduced the workload. Two female employees in the department had been on maternity leave, and when one of them returned, the department was [**10] operating efficiently with one employee still out on leave, such that if the other employee returned from leave, the department would be

overstaffed. Flournoy decided one support staff member would be let go from the department and asked the non-support staff to rank all of the employees in the department. Because every staff member ranked Mack as the lowest-performing employee and because she was one of the highest-paid assistants, Flournoy decided to terminate her. Her position has not been filled by anyone else.

Mack filed a charge of discrimination based on race and age with the EEOC on March 24, 2009. The charge states that the discrimination began January 1, 2008 and ended February 13, 2009, and that she was laid off while another female assistant with less seniority was allowed to remain in her position. The EEOC mailed the dismissal and notice of rights to her on August 30, 2010.

She filed her complaint on December 2, 2010, alleging ongoing discrimination based on race, sex, age, and culture in each department in which she worked, and requesting $400,000 in compensatory damages and $1,000,000 in punitive damages. She alleges that she was terminated because of her race, sex, age, [**11] and culture and replaced by a younger Hispanic female with less seniority. She also includes a breach of contract claim, arguing that on December 2, 2005, she entered into a written contract with the company for annual performance reviews to determine pay increases, but that during her three years of employment she received only one review.

The district court granted Wortham's motion for summary judgment on all claims and issued a final judgment, dismissing the action with prejudice, on November 7, 2012. The court found that Mack's sex and culture discrimination claims were barred by her failure to meet the Title VII exhaustion requirement before filing suit. Mack's race and age discrimination claims arising out of events that occurred prior to May 28, 2008 were found to be time-barred by the EEOC 300-day filing limitation. With respect to her Title VII and ADEA claims that were not time-barred, the court determined that she had failed to raise a factual dispute and that Wortham had proffered a legitimate, nondiscriminatory justification for her termination. As to the breach of contract claim, the court decided that, because the alleged contract lacked essential terms and violated the [**12] statute of frauds, no valid contract was created as a matter of law.

## II. STANDARD OF REVIEW

[HN1] We review a district court's grant of summary judgment de novo, applying the same standards as the district court. *Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 257 (5th Cir. 2009)*. Summary judgment is appropriate where the movant shows that there is no genuine

issue of material fact and that the movant is entitled to judgment as a matter of law. *Id.* (citing *Fed. R. Civ. P. 56(a)*). In reviewing the record, all facts and inferences are construed in the light most favorable to the non-movant. *Lewis v. Ascension Parish Sch. Bd., 662 F.3d 343, 347 (5th Cir. 2011)*. However, "[i]f the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial and summary judgment is [*354] proper." *Weber v. Roadway Express, Inc., 199 F.3d 270, 272 (5th Cir. 2000)*.

## III. DISCUSSION

Mack argues that summary judgment was improper on several grounds. First, Mack alleges that the district court failed to consider evidence presented in her response to Wortham's motion for summary judgment. She argues that the court's failure to address issues she presented [**13] demonstrates a lack of consideration. Second, Mack contends that the district court granted summary judgment based on hearsay, referring to a statement made by another Wortham employee, Leticia Martinez. Third, she argues that her claims of discrimination arising out of acts that occurred in 2005, 2006, and 2007 are not barred by the EEOC 300-day limitation by virtue of the continuing violations doctrine, which allows the court to consider violations that occurred outside of the period of limitations if the plaintiff can show that these prior acts were part of a continuing system of discriminatory practices. She also alleges that her claims are not barred because she was subjected to a hostile work environment, another exception to the 300-day limitation. Mack also appeals the district court's finding that there was no breach of contract, arguing that the 2005 e-mail constituted a contract.

### A. Consideration of Evidence

With respect to the district court's consideration of evidence, Mack argues that ignored evidence she submitted in her response to Wortham's motion for summary judgment and instead relied on Wortham's submissions regarding Mack's 2002 termination from a prior position [**14] at a law firm for tardiness and failure to complete work assignments. Mack submitted the declaration of John Banks, Jr., a partner at the previous firm, dated September 4, 2012, which states that Mack voluntarily left her position at the firm and was not terminated, in addition to her own declaration in which she states that she left voluntarily. Wortham, however, contends that Mack was terminated for tardiness and refusing to complete assignments. Wortham presented several related pieces of evidence: a memorandum dated August 30, 2002, regarding Mack's first sixty days of probationary employment at the prior firm, written by John Banks, Jr.;

a performance review dated July 2, 2004, detailing Mack's unapproved absences and frequent tardiness, and stating that Mack had been told that two more absences would result in her immediate termination; and several pages of the firm's records documenting Mack's tardiness and absences.

The district court was not required to address each piece of evidence Mack presented. [HN2] The court is required to state "the reasons for granting or denying the motion" for summary judgment, but does not need to address every statement made by the non-movant. *Fed. R. Civ. P. 56(a)*.

Furthermore, [**15] [HN3] "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson, 477 U.S. at 248* (citing Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2725 (3d ed. 1983)). Because the question of whether Mack was terminated from her previous position is unrelated to Mack's termination from Wortham, it does not preclude summary judgment. Regardless of the amount of consideration the district court gave to John Banks, Jr.'s affidavit, the district court's basis for granting summary judgment was not Mack's termination from a previous job. Furthermore, her performance in prior positions, however satis [*355] factory, does not create a factual dispute as to her performance at Wortham. The fact that an employee left a previous position voluntarily is not evidence that she should not be terminated from future positions.

### B. Mack's Hearsay Claim

Mack contends that the district court improperly awarded summary judgment based on hearsay, referring to a statement made by another Wortham employee, Leticia Martinez, to Flournoy that [**16] Mack had failed to follow established procedures and had incorrectly filled out a checklist. We reject this argument because the district court did not consider Martinez's statement but rather relied on documentation submitted by Wortham, including the checklist Mack improperly completed, to determine that Mack had disregarded the company's procedures. Martinez did alert Flournoy that Mack was marking uncompleted tasks as completed, but the record demonstrates that Mack was disciplined based not on Martinez's statement, but on the actual document at issue. Wortham also provided a memorandum from Flournoy to Hahn dated January 6, 2009, indicating that Martinez had discovered that Mack had failed to follow the established procedures for these checklists. Any consideration made by the district court of this violation was made based on the documentation submitted by Wortham. Consequently, we agree with the district court

that it was appropriate to consider evidence of Mack's failure to follow established procedures and reject Mack's supposed hearsay claim.

## C. Claims Barred by 300-Day Limitation for Filing a Charge of Discrimination

Because all of the alleged unlawful acts that occurred in [**17] the Risk Management and Commercial Accounts Departments, as well as some that occurred in the Marine Department, took place outside of Title VII's 300-day limitation period, all of Mack's claims arising out of those events are barred.

[HN4] Under Title VII and the ADEA, a discrimination claim not brought within 300 days of the alleged discriminatory act is time-barred. *42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d); Washington v. Patlis, 868 F.2d 172, 175 (5th Cir. 1989).* To argue that discriminatory acts that occurred outside of the 300-day period should be considered, Mack raises two exceptions to this rule: the continuing violations doctrine and the hostile work environment theory. Although these exceptions, if applicable, allow a plaintiff to bring claims that would otherwise be time-barred, we agree with the district court that neither applies to Mack's case.

[HN5] The continuing violations doctrine "relieves a plaintiff of establishing that all of the complained-of conduct occurred within the actionable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period." *Messer v. Meno, 130 F.3d 130, 134-35 (5th Cir. 1997).* If the plaintiff can [**18] demonstrate that the discrimination manifested itself over time rather than in a series of discrete acts, actions that would otherwise be time-barred may be considered by the court. *Frank v. Xerox Corp., 347 F.3d 130, 136 (5th Cir. 2003)* (citing *Huckabay v. Moore, 142 F.3d 233, 238-39 (5th Cir. 1998)* (holding that whereas demotion and failure to promote are discrete events that should put an employee on notice that a cause of action has accrued, racial harassment manifested through unequal treatment of employees and fostering an atmosphere of racism weas sufficient to invoke the continuing violations doctrine)). However, where the employee complains of "separate and [*356] varied acts and decisions that occurred at different times," and the record does not confirm "an organized or continuing effort to discriminate," this Court has declined to apply the continuing violations doctrine. *Frank, 347 F.3d at 136.*

[HN6] Even if specific actions were discriminatory, this Court has stated that a plaintiff may not rely on the continuing violations doctrine "to resurrect claims about discrimination concluded in the past, even though its effects persist." *Berry v. Bd. of Supervisors of L.S.U.,*

*715 F.2d 971, 979 (5th Cir. 1983)* [**19] (quoting *Del. State Coll. v. Ricks, 449 U.S. 250, 257, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980)).* Thus, though the effects of an allegedly discriminatory act may persist, a claim based on that act is not actionable under Title VII if the act occurred more than 300 days before the charge was filed. *See Del. State Coll., 449 U.S. at 257-59* (holding that the denial of tenure was the alleged discriminatory act from which the 300-day limitation began, although the ultimate harm that resulted from the denial occurred later).

[HN7] To determine whether alleged discriminatory acts are related closely enough to constitute a continuing violation, this Court has used the following three non-exhaustive factors: (1) subject matter, (2) frequency, and (3) degree of permanence. *Berry, 715 F.2d at 981.* If the alleged acts involve the same type of discrimination, occur frequently, and indicate to the employee that the continued existence of adverse consequences is likely, it is probable that they rise to the level of continuing violations. *Id.* Mack's transfers were infrequent, isolated incidents that did not indicate the possibility of permanent consequences. She remained employed by Wortham for almost three years following her third transfer, [**20] which was longer than she had worked in either of her prior departments. She has failed to demonstrate a connection between the incidents involving Hurd and Cox and her termination. Mack has alleged no facts showing that her transfers and denial of transfer were related acts, or that any of these acts was related to her termination, which is a prerequisite for the application of the continuing violations doctrine. The decisions to transfer her first from the Commercial Accounts Department and then from the Risk Management Department were made by different individuals in separate departments. Furthermore, assuming *arguendo* these claims were not time-barred, legitimate, nondiscriminatory reasons were given for both transfers: Johnston determined Mack was not a good match for the position and McCann cited Mack's lack of necessary computer skills as the primary reason for her termination. Both Johnston and McCann assisted Mack in obtaining positions in other departments within the company. Mack has thus failed to demonstrate a factual dispute as to whether Wortham's actions rose to the level of continuing violations. [2]

> 2 We also note that, had Mack brought a Title VII claim within 300 days [**21] of being transferred or being denied transfer she would not have been successful for lack of [HN8] an adverse employment action, which requires, at a minimum, a demotion, a transfer to a lower or less desirable position, or a denial of a promotion. Both transfers were lateral and neither involved a decrease in responsibility or salary and she was never denied a promotion. *See, e.g. Alvarado v.*

*Tex. Rangers, 492 F.3d 605, 613-14 (5th Cir. 2007).*

Because Mack's continuing violations theory fails, we now consider whether she has established a hostile work environment claim.[HN9]  In order for a hostile work environment claim to survive, the unlawful employment practice must have occurred "over a series of days or perhaps years and, in direct contrast to discrete [*357]  acts, a single act of harassment may not be actionable on its own." *Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)* (holding that managers' racial jokes, racially derogatory acts, and racial epithets created a hostile work environment and were part of the same actionable hostile environment claim). We have held that, unlike demotion, "the cumulative effect of the petty annoyances of daily harassment . . . constitute[s] a part [**22] of the same pattern of behavior that amounts to a continuous violation by rendering [the employee's] workplace a hostile environment." *Huckaby, 142 F.3d at 240*. To determine whether an actionable hostile environment claim exists, we examine all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Nat'l R.R. Passenger Corp., 536 U.S. at 116*.

The actions of which Mack complains were infrequent, isolated incidents for which reasonable explanations were given. She was not threatened or humiliated, and neither the transfers nor the disagreements she had with her superiors can be construed as interfering with her performance, which was already less than satisfactory from the beginning of her time in the Marine Department. Wortham's decisions to transfer Mack do not amount to the same kind of acts described in *Huckaby*, where the continuous racial harassment only manifested itself over time through relatively minor but frequent incidents and thus warranted the label of hostile work environment.  [**23] Mack was not exposed to a hostile work environment, and, as discussed above, the alleged discriminatory acts were neither adverse nor related.

Because Mack fails to establish an exception to the 300-day limitation, we only consider alleged discriminatory acts that occurred after May 28, 2008. We therefore affirm the district court's decision that her claim for relief based on her transfers from the Commercial Accounts and Risk Management departments, as well as Wortham's refusal to transfer her from the Marine Department in 2007, is barred by her failure to file the EEOC charge within 300 days of these incidents.

## D. Claims Barred by EEOC Ninety-Day Limitation for Filing Suit

[HN10] The right to sue is lost if a claim is not filed within ninety days of the plaintiff's receipt of the right-to-sue letter. *42 U.S.C. § 2000e-5(f)(1)*. The EEOC mailed the dismissal and notice of rights to Mack on August 30, 2010. Mack filed her complaint on December 2, 2010, ninety-four days after the mailing date. She asserts that she received the EEOC letter on September 3, 2010, and that her suit was timely filed. However, Wortham contends that, since Mack testified in deposition that she had "no reason to believe" [**24] she did not receive the letter within three days of its mailing, it is presumed that she received it by September 2, 2010, and she filed her claim ninety-one days after its receipt.

[HN11] When there is a dispute as to the date the right-to-sue letter is received, this Court has presumed it was received between three and seven days after the letter was mailed. *Stokes v. Dolgencorp, Inc., 367 F. App'x 545, 547-48 (5th Cir. 2010)* (citing *Taylor v. Books A Million, Inc., 296 F.3d 376, 379 (5th Cir. 2002))*. Mack's original complaint states that she received the right-to-sue letter on September 3, 2010. However, when asked "[s]o you have no reason to believe that [the right-to-sue letter] did not arrive in your mailbox within three days of August the [*358]  30th, 2010, correct?" [**25] in her deposition, she responded that she had no reason to believe that she did not receive the letter by September 2, 2010. Despite this discrepancy, we take all facts in the light most favorable to the non-movant at the summary judgment stage and presume that she received the letter some time between September 2, 2010 and September 6, 2010. Because she received the letter after September 2, 2010, her complaint was timely filed.

## E. Claims Barred by EEOC Charge

Wortham also alleges that Mack's claims of sex and culture discrimination are barred by *42 U.S.C. § 2000e-5(f)(1)*.[HN12]  Under that statute, the scope of a Title VII complaint is limited to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. *Young v. City of Hous., 906 F.2d 177, 179 (5th Cir. 1990)*. Mack's EEOC charge alleged age- and race-based discrimination, but her complaint alleged age, race, sex, and culture discrimination. As explained below, her age- and race-based discrimination claims are barred.

[HN13] An employee who wishes to bring a discrimination claim against her employer must first exhaust her administrative remedies by filing a charge of discrimination with the  [**26] EEOC. *Pacheco v. Mineta, 448 F.3d 783, 788 (5th Cir. 2006)*. "Title VII clearly contemplates that no issue will be the subject of a

civil action until the EEOC has first had the opportunity to attempt to obtain voluntary compliance." *Sanchez v. Standard Brands, Inc., 431 F.2d 455, 467 (5th Cir. 1970)*. Because the scope of an EEOC complaint is to be construed liberally, we review a Title VII claim broadly and do not limit our review to the scope of the administrative charge itself, but consider the scope of the EEOC investigation which "can reasonably be expected to grow out of the charge of discrimination." *Pacheco, 448 F.3d at 789* (quoting *Sanchez, 431 F.2d at 466*).

[HN14] Because this Court has held that a failure to allege sex discrimination in an EEOC charge properly results in dismissal of a subsequent complaint for lack of exhaustion, the omission of a culture discrimination claim from an EEOC charge is similarly a failure to exhaust. The district court was correct in its determination that investigation into Mack's race- and age-based discrimination charges would not reasonably lead the EEOC to investigate sex or culture discrimination charges. *See Kretchmer v. Eveden, Inc., 374 F. App'x 493, 495 (5th Cir. 2010)* [**27] (unpublished) (per curiam); *see also Thomas v. Tex. Dep't of Criminal Justice, 220 F.3d 389, 395 (5th Cir. 2000)*. We therefore affirm its decision that Mack's sex and culture discrimination claims are barred because she has failed to meet the exhaustion requirement.

### F. Failure to Establish Prima Facie Case of Discrimination

Because Mack's claims arising out of her transfers from the Commercial Accounts Department and the Risk Management Department, as well as her claims of discriminatory acts that occurred in the Marine Department before May 28, 2008, are barred by the 300-day limitation, we will focus only on her claims arising out of her termination from the Marine Department.

### 1. Title VII Claim

[HN15] Title VII makes it unlawful to discharge, refuse to hire, or discriminate against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a)(1)*. In order to establish a prima facie case of discrimination, the employee must produce evidence [*359] "that she: (1) is a member of a protected class; (2) was qualified for her position; (3) was subject to an adverse employment [**28] action; and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, shows that others similarly situated were treated more favorably." *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr., 245 F.3d 507, 512-13 (5th Cir. 2001)* (internal quotations omitted). If the plaintiff establishes a prima facie showing, the burden then shifts

to the employer to articulate a legitimate, nondiscriminatory reason for terminating employment. *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. However, the defendant need not persuade the court that it was actually motivated by the proffered reasons-it is sufficient that the defendant's evidence raises a genuine issue of material fact as to whether it discriminated against the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*. If the employer meets this burden, the plaintiff must demonstrate that the given reason was mere pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence. *Id. at 256*.

Assuming *arguendo* Mack can show the first three prongs of the prima facie case, she has failed [**29] to show that either she was replaced by someone outside the protected class or that others similarly situated were treated more favorably. She alleges in her EEOC charge that Dreana Lemon, a Hispanic female with less seniority, was allowed to remain in her position when Mack was terminated. However, Lemon was already employed by Wortham and merely returned from leave to her prior position-she did not replace Mack. Mack also stated in her deposition that she did not know who, if anyone, had replaced her. In fact, she was not replaced at all. Flournoy's affidavit explains the chain of events that led to Mack's termination. In 2008, one of Wortham's largest clients sold the majority of its properties, reducing the amount of business in the Marine Department. The adoption of an automation system further reduced the workload of the Marine Department. Two employees were out on leave at the time, and Flournoy decided that once both returned, the department would be overstaffed. To determine which employee to lay off, he asked each member of the technical and professional staff in the Marine Department to rank the department employees. Each ranking listed Mack as the lowest-performing employee. [**30] Mack's position was eliminated and she was not replaced.

Alternatively,[HN16] to establish disparate treatment a plaintiff may show that the employer gave preferential treatment to another employee under "nearly identical" circumstances, which requires a showing that an employee outside of the protected class held the same job, title, and duties, was under the same supervisor, committed the same infractions, and was not discharged. *Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1090 (5th Cir. 1995)*; *Okoye, 245 F.3d at 514* (holding that because other employees' violations differed from and did not rise to the level of those committed by plaintiff, plaintiff failed to establish disparate treatment).

Mack has not alleged that any other Wortham employee was similarly situated, and therefore cannot show that a similarly-situated employee was treated more favorably. Mack admitted in her deposition that she was tardy more frequently than anyone else in the Marine Department. She has also failed to present evidence [*360] that other employees were similarly insubordinate, much less that other insubordinate employees were not discharged. She has offered only her subjective belief that she would have been [**31] treated differently had she not been African American. However, a generalized statement of less-favorable treatment is insufficient to establish a factual dispute as to disparate treatment. *See Swanson v. Gen. Servs. Admin., 110 F.3d 1180, 1186 (5th Cir. 1997)* (holding that plaintiff's contention that he was "watched" more closely than white employees did not establish race-based discrimination in the absence of evidence that similarly situated white employees were also regularly tardy but not watched). Consequently, she cannot raise a genuine dispute of fact as to whether another similarly situated employee who committed the same infractions was treated more favorably.

Furthermore, assuming *arguendo* that Mack had successfully pleaded a prima facie case of discrimination, summary judgment would still have been proper based on Wortham's legitimate, nondiscriminatory reasons for its actions. Mack's consistent tardiness is well-documented and undisputed. The incidents of insubordination, even taken in the light most favorable to Mack, demonstrate conflicts between Mack and her supervisors. The record also demonstrates her failure to follow established procedures and her supervisors' instructions. [**32] Wortham's Vice-Chairman decided to lay off an employee in the Marine Department due to changed circumstances. He terminated the weakest employee in the department.

Mack has not rebutted any of these facts and thus has failed to demonstrate a genuine issue of fact as to whether Wortham's proffered explanation was pretextual. She has shown neither that her termination was more likely motivated by a discriminatory reason nor that Wortham's proffered explanation is implausible. She does not dispute that she could have been disciplined or even terminated for her tardiness alone and makes no showing that the reasons given for her termination were invalid.

### 2. Retaliation Claim

[HN17] Under Title VII, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this title . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing . . . ." *42 U.S.C. § 2000e-3(a).* A plaintiff bringing a retaliation claim has the burden of establishing that (1) she participated in statutorily protected activity; [**33] (2) she received an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. *Mayberry, 55 F.3d at 1092.*

Although Mack does not make this clear in her complaint, ostensibly the "statutorily protected activity" in which she participated and which she contends led to her termination consisted of her complaints against Hurd, Cox, and Carlson. Because she had already been terminated, she cannot claim that she was retaliated against for filing an EEOC discrimination charge against her supervisors. Even if we assume that the adverse employment action to which she refers was her termination from Wortham, she makes no reference in her complaint to any causal connection between her alleged informal complaints to other Wortham employees and the ultimate adverse employment action, and thus fails to make a prima facie showing of retaliation. Furthermore, [*361] as stated above, Wortham has demonstrated several legitimate, nondiscriminatory reasons for her termination from the Marine Department, which Mack has failed to rebut.

### 3. ADEA Claim

[HN18] In order to establish a prima facie case under the ADEA, the plaintiff must establish: (1) that she was discharged; [**34] (2) that she was qualified for the position; (3) that she was within a protected class at the time of the discharge; and (4) that she was replaced by someone outside the protected class, replaced by someone younger, or that her discharge was otherwise because of her age. *Young v. City of Hous., 906 F.2d 177, 182 (5th Cir. 1990).* Once the plaintiff establishes this, the burden shifts to the defendant to rebut the presumption of discrimination. *Id.* Evidence relevant to a showing of pretext may include that employees outside of the protected class were engaged in the same type and level of infraction as the plaintiff. *See McDonnell Douglas Corp., 411 U.S. at 804.*

The parties do not dispute that Mack was discharged from her position in the Marine Department. There is a disagreement as to whether Mack was qualified for her position, but because Wortham does not explain the minimum qualifications for her position, we assume without deciding that Mack was qualified. It is also undisputed that Mack, who was fifty-five years of age at the time of her termination, was within a protected class. *See 29 U.S.C. § 631(a).*

As explained above, Mack cannot satisfy the fourth prong of a prima facie case [**35] because she has not

shown that she was replaced at all, let alone by someone under fifty-five years of age. Furthermore, she has alleged no facts showing that her discharge was because of her age. This Court has held that "a plaintiff's subjective belief that his discharge was based on age is simply insufficient to establish an ADEA claim." *Waggoner v. City of Garland, 987 F.2d 1160, 1164 (5th Cir. 1993).* Mack has presented no support for her age discrimination claim other than her subjective belief that she would have been treated differently if she had been younger. Mack testified that she never heard any Wortham employee or supervisor make negative remarks based on age. Her allegation that she was replaced by Lemon, a younger Hispanic female, is false--Lemon was already an employee of Wortham and simply returned from maternity leave.

Because Mack cannot show that she was replaced, she has failed to raise a factual dispute as to whether she was replaced by an individual outside of the protected class, and she has not met her burden of establishing a prima facie case of age discrimination. As described above, even if she had met this burden, because Wortham articulated legitimate, nondiscriminatory [**36] reasons for her termination which Mack has not rebutted as pretextual, summary judgment would still have been proper.

### G. Breach of Contract

Mack argues that on December 2, 2005, she and Wortham entered into a written contract which stipulated that Mack's supervisor would give her annual reviews. She complains that because she only received one review during more than three years of employment, Wortham breached this contract. The "contract" is in the form of an e-mail sent to Hahn by J.M. Jones (and copied to Mack) which states:

> This e-mail will confirm our telephone conversation yesterday regarding an "annual" performance review for Eula Mack. You indicated that you had already [*362] marked Eula's personnel file to review her job performance annually.

Because breach of contract is a state law claim, Texas law applies. [HN19] To bring a successful breach of contract claim in Texas, a plaintiff must show: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Mullins v. TestAmerica, Inc., 564 F.3d 386, 418 (5th Cir. 2009).* A valid contract requires [**37] (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, (5) execution and delivery of the contract with the intent that it be mutual and binding, and (6) consideration. *Angelou v. African Overseas Union, 33 S.W.3d 269, 278 (Tex. App--Houston [14th Dist.] 2000, no pet.).* The essential terms must be defined "with sufficient precision to enable the court to determine the obligations of the parties." *New Process Steel, L.P. v. Sharp Freight Sys., No. 01-04-00764-CV, 2006 Tex. App. LEXIS 2967, 2006 WL 947764, at *3 (Tex. App.-- Houston [1st Dist.] Apr. 13, 2006, no pet.).* Furthermore, a meeting of the minds refers to a mutual understanding and assent to the agreement regarding the subject matter and the essential terms of the contract. *See Parker Drilling Co. v. Romfor Supply Co., 316 S.W.3d 68, 75 (Tex. App.--Houston [14th Dist.] 2010, pet. denied).* This e-mail lacks at least two requirements for a valid contract and therefore does not qualify as such. Even if the e-mail were an offer to Mack to perform an annual performance review, there is no evidence that she accepted the offer. Additionally, even if we did find a valid offer and acceptance, there is no consideration-there [**38] is no evidence of a bargained-for exchange of promises, which is the basis of a valid contract. *See Tex. Gas Util. Co. v. Barrett, 460 S.W.2d 409, 412 (Tex. 1970).* Mack's agreement to work for Wortham was not induced by the promise of annual performance reviews, nor was Hahn's statement that Mack was to receive annual performance reviews induced by consideration from Mack. In the absence of a mutuality of obligation, there can be no enforceable contract. *Id.*

### IV. CONCLUSION

Because Mack has failed to raise genuine issues of material fact that her termination was the result of race- or age-based discrimination or that Wortham breached its contract with her, we AFFIRM the district court's grant of summary judgment to Wortham.

# APPENDIX – 4

*Sparks v. L.M. Berry & Co.*,
1999 U.S. App. LEXIS 40637 (5th Cir. June 8, 1999)(per curiam)(unpublished)

 LexisNexis®


Analysis
As of: Jun 12, 2017

**LAWRENCE W. SPARKS, Plaintiff-Appellant, VERSUS L.M. BERRY & COMPANY D/B/A THE BERRY COMPANY, Defendant-Appellee.**

**No. 98-60627 Summary Calendar**

**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

*1999 U.S. App. LEXIS 40637*

**June 8, 1999, Decided**

**NOTICE:** RULES OF THE FIFTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** [*1]

Appeal from the United States District Court for the Southern District of Mississippi. (3:97-CV-699-BN).
*Sparks v. L M Berry & Co., 184 F.3d 815, 1999 U.S. App. LEXIS 17414 (5th Cir. Miss., 1999)*

**JUDGES:** Before DAVIS, DUHÉ, and PARKER, Circuit Judges.

**OPINION**

PER CURIAM:*

    * Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Lawrence W. Sparks ("Sparks") filed a claim of age discrimination against his former employer, L.M. Berry & Company ("Berry"), under the Age Discrimination in Employment Act ("ADEA"), *29 U.S.C. § 621*, and under state law. The district court granted summary judgment in favor of Berry. Sparks appeals. We AFFIRM.

I. FACTS AND PROCEDURAL HISTORY

Berry sells telephone directory advertisements for various telephone companies and their affiliated directory publishers in 23 states. Berry is the authorized sales agency for BellSouth Advertising & Publishing Corporation. BellSouth Advertising publishes the BellSouth Real Yellow Pages in Kentucky, Tennessee, Louisiana, Alabama, and Mississippi.

Sparks had worked in the field of directory advertising sales for a number of years. Prior to working for Berry, Sparks worked in South Carolina in the field [*2] of directory advertising sales. When Sparks wanted to move to Mississippi, his manager in South Carolina put Sparks in contact with one of Berry's regional managers, Pete Loungo ("Loungo"). Loungo contacted the Mississippi Division manager, Ty Gettis.

Berry hired Sparks on January 3, 1993 to work in Berry's Mississippi Division as a premise sales representative. At the time of his hiring, Sparks was 53 years old and the oldest person hired by Berry during the six year period from 1992 to 1997.

As a sales representative, Sparks demonstrated considerable success. Sparks had customers all over the State of Mississippi, met sales goals, and made money for the company. In 1996, Sparks won the President's Club award for the top salesman in the district. Sparks also placed second among all salespersons in Memphis, Tennessee for work in the second half of 1996.

Berry, however, had a number of problems with Sparks' behavior and his handling of company accounts. Sparks received counseling sessions with managers because of his behavior. Berry reprimanded Sparks for violations of company procedures. In addition, Sparks was suspended for one day from his employment for improper handling of company [*3] guidelines and procedures. Further, Berry's customers reported a number of complaints with respect to the services that Sparks provided.

Berry contends that two serious ethical violations led to Sparks' termination. First, Berry contends that Sparks forged initials on an account with CPS Pools and Spas ("CPS"). Shirley Draughn, ("Draughn"), an employee at CPS, alleged that Sparks forged her signature on a consumer tips addendum of CPS' paperwork. Sparks' manager, Jody Washington ("Washington"), made a site visit and spoke with Draughn about the signature. Draughn stated that the signature had been initialed, but that she never initialed a signature. Draughn could not locate CPS' copy of the consumer tips addendum.

Upon investigating the alleged forgery within Berry, Washington spoke with Cindy Harrell ("Harrell"), a clerk at Berry. Harrell explained that she asked Sparks about the consumer tips addendum to the CPS account because Sparks did not turn it in with his paperwork. Harrell reported that Sparks said he would drive back to CPS, obtain the form, and give it to Harrell. Sparks returned with the form fifteen minutes later. Washington, however, believed that the drive would have [*4] taken approximately 40 minutes to CPS and back. Thus, Washington suspected that Sparks initialed the signature on the form.

Second, Berry investigated an ethical violation concerning Sparks' account at Healthcare Suppliers ("Healthcare"). Lisa Williamson ("Williamson"), an employee at Healthcare, complained that the Healthcare paperwork listed her as the authorized person on the account but that she did not authorize $1,484.00 in advertising. Further, Williamson said that she did not even speak with Sparks. Williamson's boss, David McNamara ("McNamara"), stated that the advertising had to be canceled because Healthcare had changed its name.

On January 10, 1997, Washington and Anita Moore ("Moore"), the Mississippi Operations Manager, met with Sparks to discuss the CPS and Healthcare accounts. Sparks denied Draughn's allegation that he had forged the signature. When asked about his return trip to CPS, Sparks replied that it was not fifteen minutes later, but simply later that day.

Sparks also explained that he spoke with McNamara regarding the Healthcare account. Sparks noted that McNamara gave him Williamson's name as the contact person on the Healthcare account. Further, Sparks explained [*5] that his manager, Bob Glass, gave Sparks permission to authorize the account via telephone ("per tel"), because Healthcare was renewing their account.

On January 14, 1997, Moore and Washington met with Sparks again. Moore questioned Sparks again about the signature on the consumer tips addendum. Sparks claimed that the signature belonged to Draughn. In this meeting, however, Sparks claimed that he did not return to the CPS office. Instead, Sparks explained that the addendum had been in his briefcase all along. When Sparks was questioned about the inconsistency in his stories, he denied telling Washington and Moore that he had made a return trip to CPS. At this time, Moore also told Sparks that he was responsible for documenting the correct name and information on the Healthcare account. Moore then terminated Berry on the basis of his ethical violations.

Sparks filed a complaint against Berry in federal court alleging that Berry terminated him in violation of the ADEA. Further, Sparks asserted state law claims for breach of contract and intentional infliction of emotional distress. Berry filed a Motion for Summary Judgment arguing that Sparks could not establish a prima facie case of [*6] age discrimination under the ADEA.

The district court found that Sparks did not establish a prima facie case of age discrimination. The district court also dismissed Sparks' state law claims as a matter of law.

II. DISCUSSION

A. Motion for Leave to File Notice of Appeal.

The district court granted summary judgment in favor of Berry in this action on August 4, 1998. Under *Fed. R. App. P. 4(a)(1)*, Sparks had thirty days, until September 3, 1998, to file a notice of appeal. On September 4, 1998, Sparks' counsel realized that the time to file the notice of appeal had passed.

Under *Fed. R. App. P. 4(a)(5)*, the district court may extend the time to file a notice of appeal if (i) a party so moves no later than 30 days after the time prescribed by the *Rule 4(a)* expires; and (ii) that party shows excusable neglect or good cause. Sparks' counsel filed a Motion for Leave to File Notice of Appeal with the district court pursuant to *Rule 4(a)(5)* on September 4, 1998. The district court granted Sparks' Motion for Leave to File Notice of Appeal, finding that Sparks' counsel demonstrated excusable neglect pursuant to *Fed. R. App. P. 4(a)(5)*. Berry contends that the district court abused its discretion [*7] in allowing Sparks to file a notice of appeal on the ground that Sparks had not demonstrated excusable neglect.

We review the district court's decision to extend the time to file a notice of appeal for abuse of discretion. *See Midwest Employers Casualty Co. v. Williams, 161 F.3d 877, 879 (5th Cir. 1998)* (reviewing magistrate judge's decision to extend time to file an appeal).

This Court has adopted the Supreme Court's standard of "excusable neglect" announced in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership, 507 U.S. 380, 395-97, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993). See Halicki v. Louisiana Casino Cruises, Inc., 151 F.3d 465, 469 (5th Cir. 1998).* In *Pioneer*, the Court concluded that the determination of excusable conduct is equitable and takes into account factors such as 1) danger of prejudice; 2) length of delay; 3) reason for delay; and 4) evidence of good faith. *See Pioneer, 507 U.S. at 395.*

The district court reviewed Sparks' Motion for Leave and found that the extenuating circumstances were sufficient to meet the standard of excusable neglect under *Pioneer*. As an equitable consideration, we hold that the district court did not abuse its discretion in granting Sparks' Motion for Leave to File [*8] Notice of Appeal. There was no danger of prejudice and the length of delay was minimal. Further, the affidavit of Sparks' counsel claimed a busy trial practice, an ill child, and a miscalculation of the days all led to the delay. Finally, Sparks' counsel demonstrated good faith by contacting the district court and Berry's counsel on the morning of September 4 to notify them of the missed deadline.

### B. State Law Claims

Sparks raised two state law claims against Berry in his complaint: breach of employment contract and intentional infliction of emotional distress. Berry contends that Sparks waived his state law claims because he failed to address them in his initial brief on appeal. Sparks, however, contends that his state law claims flow from the common nucleus of facts underlying his age discrimination claim. Citing *United Paperworkers Intern. AFL-CIO, CLC v. Champion Intern. Corp., 908 F.2d 1252, 1255 (5th Cir. 1990)*, Sparks suggests that this Court should logically deduce his state law claims from his age discrimination claim.

This Court has held that "[a]n appellant abandons all issues not raised and argued in its initial brief on appeal." *Cinel v. Connick, 15 F.3d 1338, 1345 (5th Cir. 1994).* [*9] Neither Sparks' initial brief nor his reply brief addresses any law or facts relating to intentional infliction of emotional distress or breach of employment contract. We hold that Sparks waived his state law claims because he did not raise these issues on appeal in his initial brief. *See id.*

### C. Age Discrimination Claim

Sparks contends that the district court erred when it granted summary judgment in favor of Berry on his age discrimination claim under the ADEA. The district court found that Sparks did not establish a prima facie case of age discrimination.

This Court reviews a district court's grant of summary judgment *de novo. See Brown v. CSC Logic, Inc., 82 F.3d 651, 653 (5th Cir. 1997).* Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law." *Fed. R. Civ. P. 56(c).*

In order for Sparks to establish a prima facie case of age discrimination, he must show: (1) he was discharged; (2) he was qualified for his position; (3) he was within the protected class; and (4) he [*10] was replaced by someone outside the protected class, someone younger, or was otherwise discharged because of his age. *See Brown, 82 F.3d at 654.*

Sparks satisfies the first three elements of his prima facie case. Berry terminated Sparks. Sparks was qualified for his position and Sparks was fifty-seven. Sparks has not asserted that he was replaced by someone outside the protected class or by someone younger. Thus, Sparks must establish that he was discharged because of his age.

Sparks offers three separate grounds for showing that he was discharged on the basis of his age. First, Sparks contends he was hired to cover up Berry's previous age discrimination against another employee. Second, Sparks argues that he was treated less favorably than a similarly situated, younger employee. Finally, Sparks offers an assortment of other evidence to support his contention that Berry discharged Sparks because of his age.

### 1. Discriminatory Hiring

At the time of his hiring, Sparks was within the age group protected by the ADEA. Where a company hires an employee who is within the protected class and then discharges that employee, there is an inference that age discrimination was not the motivation. *See Brown, 82 F.3d at 658.* [*11] "Claims that employer animus exists in termination but not in hiring seem irrational." *Id.* (citing *Proud v. Stone, 945 F.2d 796, 797-98 (4th Cir. 1991)).*

Sparks asserts that Berry hired him for the purpose of testifying in a pending lawsuit against Berry. Specifically, Sparks states that Berry intended to use him to show that the company hires older people to combat an age discrimination suit by a former employee, Helen

Cantrell ("Cantrell"). Cantrell filed an EEOC charge of discrimination in August, 1992 and the lawsuit was served on Berry in June, 1993. The Cantrell lawsuit settled in October, 1995.

Sparks' facts do not establish that Berry hired him for a discriminatory purpose. Sparks, experienced in advertising sales, was qualified for the position at Berry and was successful in this position. The Cantrell lawsuit was not served on Berry until a few months after Berry hired Sparks. In addition, Sparks continued to work at Berry for more than a year after the Cantrell lawsuit settled.

2. Similarly-Situated Employee

Sparks contends that Berry discharged him on the basis of his age because he was treated less favorably than a similarly-situated, younger employee. Sparks argues that Berry [*12] terminated him but only suspended Ted Watson ("Watson"), age 40, under similar circumstances.

This Court has held that the plaintiff "must show that [the employer] gave preferential treatment to a younger employee under 'nearly identical' circumstances." *Hamilton v. Grocers Supply Co., Inc., 986 F.2d 97, 99 (5th Cir. 1993)* (citing *Little v. Republic Refining Co., Ltd., 924 F.2d 93, 97 (5th Cir. 1991)).* Sparks contends that Berry gave preferential treatment to Watson and that they are similarly situated. Sparks points to the fact that Berry terminated Sparks for falsifying information on two accounts but only suspended Watson for discrepancies on signatures on five accounts.

The extent of Sparks and Watson's similarities, however, end with their account falsifications. Watson received positive customer recontacts, had low complaints and adjustments, and had no prior history of improper handling of accounts. On the other hand, Berry offered evidence that Sparks had received counseling for his behavior at work, a reprimand for failing to follow company procedures, a one-day suspension for improper handling of an account, and a number of complaints from his accounts. Washington explained [*13] in her deposition testimony that she considered Sparks' history of customer complaints when she was considering Sparks' termination. Finally, in her memorandum, Moore referenced Sparks' history of excessive customer complaints.

The personnel records demonstrate that Berry considered Sparks' level of customer complaints in its decision to terminate him. Watson's lack of customer complaints was a factor in Berry's decision not to terminate him. Because of the difference in the level of customer complaints, we agree with the district court that Sparks and Watson's circumstances were not nearly identical, and for this reason, Berry's differential treatment of

Sparks does not establish age discrimination. *See Davin v. Delta Airlines, 678 F.2d 567, 571 (5th Cir. 1982)* (plaintiff failed to establish a *prima facie* case of gender discrimination based on disparate treatment of terminated female employee and retained male employee where employer considered female plaintiff's history of causing fear in other employees at ticket counter).

3. Other Proffered Evidence of Age Discrimination.

Sparks offers a number of alternative theories to establish that Berry discriminated against him because of his [*14] age. First, Sparks contends that a memorandum drafted by Loungo in 1989 demonstrates an atmosphere of age discrimination. The 1989 memorandum categorized Berry into three different categories of employees: (1) long-tenured representatives approaching retirement; (2) over 40 tenured sales reps; and (3) under 40 less-tenured reps. The memo expressed concern over the age, performance, and ability to terminate representatives in group 2.

In *Smith v. Berry Co., 165 F.3d 390, 394 (5th Cir. 1999),* this Court affirmed a jury's finding that Berry discriminated against a former employee because of her age. In part, the *Smith* court relied on the Loungo memorandum as evidence to support the finding of age discrimination. The relevance of the memorandum here, however, is too tenuous to support a finding of age discrimination. The memorandum was not related to the employment decision at issue in this case.

Second, Sparks contends that two age-related comments, along with other evidence of age discrimination, created an inference of a discriminatory atmosphere at Berry. Sparks, relying on *Atkinson v. Denton Publishing Co., 84 F.3d 144 (5th Cir. 1996),* argues that comments such as "Pops" and "an older, [*15] gray-haired gentleman," created a triable issue of age discrimination for a jury.

Sparks, however, fails to realize that the plaintiff in *Atkinson* had established a prima facie case of age discrimination. In *Atkinson,* the employee had demonstrated a prima facie case of age discrimination, the employer rebutted the presumption, then the district court granted summary judgment. *See id. at 149-50.* The *Atkinson* court reversed the district court's grant of summary judgment for the employer, holding that the employee's evidence had created a fact issue on the issue of whether age was a factor in his termination. *Id. at 150.*

In this case, the district court granted summary judgment when Sparks did not meet his burden of establishing a prima facie case of age discrimination. Sparks does not and cannot contend that the vague age-related comments are sufficient to prove that Berry terminated Sparks because of his age. *See EEOC v. Texas Instru-*

*ments, Inc., 100 F.3d 1173, 1181 (5th Cir. 1996)* (an age based comment must be direct and unambiguous); *Waggoner v. City of Garland, 987 F.2d 1160, 1166 (5th Cir. 1993)* ("old fart" comment does not establish age animus).

Finally, Sparks contends that the finding [*16] of the Mississippi Employment Security Commission ("MESC") infers that Berry dismissed Sparks because of his age. When Sparks was terminated, he filed for unemployment benefits with the MESC. Berry contested the unemployment benefits, claiming that Berry was discharged for mishandling accounts. The MESC awarded benefits to Sparks, finding that Berry did not show that he was discharged for the misconduct related to his job. The MESC finding, however, does not provide affirmative evidence that Berry discriminated on the basis of his age. Therefore, Sparks still has not established a *prima facie* claim of age discrimination.

## IV. CONCLUSION

For the reasons set forth above, we AFFIRM the district court's grant of summary judgment in favor of the defendant, L.M. Berry & Company.

# APPENDIX – 5

*Turner v. Novartis Pharm. Corp.*,
442 Fed. Appx. 139 (5th Cir. 2011) (unpublished)

 LexisNexis®



Positive
As of: Jun 12, 2017

**ANDRE TURNER, Plaintiff-Appellant v. NOVARTIS PHARMACEUTICALS CORPORATION, Defendant-Appellee**

**No. 11-30300 Summary Calendar**

**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

*442 Fed. Appx. 139; 2011 U.S. App. LEXIS 19583*

**September 22, 2011, Filed**

**NOTICE:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** [**1]
Appeal from the United States District Court for the Eastern District of Louisiana. USDC No. 2:10-CV-175. *Turner v. Novartis Pharms., 2011 U.S. Dist. LEXIS 25572 (E.D. La., Mar. 11, 2011)*

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant former employee sought review of a judgment of the United States District Court for the Eastern District of Louisiana that granted summary judgment in favor of appellee former employer in a Title VII action that claimed racial discrimination, hostile work environment, and retaliation.

**OVERVIEW:** The court held that the employee failed to establish a prima facie case of discrimination for being placed on a performance improvement plan (PIP) because he failed to show that the PIP was an ultimate employment decision. The district court correctly ruled that the employee did not exhaust his administrative remedies in relation to his hostile work environment claim. The employee filed two EEOC charges, one alleging discrimination and one alleging retaliation. Neither of the two charges reasonably encompassed his new claim of a hostile work environment. The district court properly granted summary judgment to the employer on the retaliation claim. Even if the employee could have established a prima facie case of retaliation, the employer provided a legitimate non-discriminatory reason for termination, which was a threat made by the employee to his sales partner. The employee did not provide any evidence that the reason was pretextual. Under the burden shifting framework of McDonnell Douglas, summary judgment for the employer was justified.

**OUTCOME:** The judgment was affirmed.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN1] An appellate court reviews a grant of summary judgment de novo, applying the same standards as the district court. *Fed. R. Civ. Proc. 56.*

*Labor & Employment Law > Discrimination > Actionable Discrimination*

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > General Overview*

[HN2] Under Title VII, a prima facie case of discrimination must establish that (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for his position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly situated employee not in the same protected class. The adverse employment action must be an ultimate employment decision. In the Fifth Circuit, an ultimate employment decision includes such things as hiring, granting leave, discharging, promoting, or compensating. Title VII does not cover every decision made by employers that arguably might have some tangential effect upon those ultimate decisions. Placing an employee on a performance improvement plan is not an ultimate employment decision.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > General Overview*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > Filing of Charges*

[HN3] An employee must file his charge with the EEOC and exhaust administrative remedies by requesting an investigation of the facts he claims support a Title VII claim. Exhaustion must precede a lawsuit.

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > Filing of Charges*

[HN4] The scope of an EEOC charge is both the charge itself and the investigation which can reasonably be expected to grow out of the charge of discrimination.

*Evidence > Procedural Considerations > Burdens of Proof > Burden Shifting*
*Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof*
*Labor & Employment Law > Discrimination > Retaliation > Elements > General Overview*
*Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Title VII of the Civil Rights Act of 1964 > General Overview*

[HN5] A plaintiff must establish a prima facie case of retaliation by showing: (1) he participated in a activity protected by Title VII, (2) he suffered an adverse employment action by his employer, and (3) there is a causal connection between the protected activity and the adverse action. If the plaintiff establishes this prima facie

case, the burden then shifts to the employer to give a legitimate non-discriminatory reason for termination. If the employer can provide such a reason, then the plaintiff must prove that the employer's grounds for termination were pretextual.

COUNSEL: ANDRE TURNER, Plaintiff - Appellant, Pro se, LaPlace, LA.

For NOVARTIS PHARMACEUTICALS CORP, Defendant - Appellee: Kim Maria Boyle, Esq., Brandon E. Davis, Esq., Phelps Dunbar, L.L.P., New Orleans, LA; Aaron R. Gelb, Megan Joyce Crowhurst, Esq., Vedder Price, P.C., Chicago, IL.

JUDGES: Before JONES, Chief Judge, and PRADO and ELROD, Circuit Judges.

**OPINION**

[*139] PER CURIAM: *

> *    Pursuant to *5TH CIR. R. 47.5*, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in *5TH CIR. R. 47.5.4*.

Andre Turner, proceeding pro se, appeals the district court's granting of summary [*140] judgment to the defendant on all of his Title VII claims. WE AFFIRM.

**BACKGROUND**

Andre Turner, an African American male, worked as a pharmaceutical representative for Novartis Pharmaceuticals starting in 2002. After Hurricane Katrina, Turner's sales numbers fell and he was ranked in the bottom ten percent of Novartis national employees. Turner contends that the reason for this decline was that his sales area, Louisiana, was devastated by the hurricane. In August [**2] 2007, Novartis placed Turner on a 90 day Performance Improvement Plan (PIP), which was extended by 30 days in November 2007 because of the time Turner spent on a scheduled vacation.

While Turner was on PIP, his sales partner was Roberta Power, a white female. Turner claims that Power was never placed on a PIP despite her failure to meet her quota. Power also allegedly had worse sales numbers than the Appellant. Turner filed an EEOC Charge alleging that he was the victim of discrimination.

After Turner filed his EEOC complaint, Novartis conducted an investigation of alleged violations of expense account protocol by Turner. Turner had made a remark to his supervisor that indicated that Turner allowed his customers to order lunch on Turner's expense account when Turner was not present. This activity is

considered misuse of the expense account. While the investigation was ongoing, Turner told Power that "if someone did something so despicable has [sic] to cause someone to loss [sic] their livelihoods they could come up missing." Turner claimed he did not know that Power was involved in the expense account investigation. Nevertheless, Power felt that Turner was threatening her because of [**3] her role in the investigation and informed her supervisor. Novartis flew Turner to corporate headquarters for an interview concerning this threatening remark. After this interview Turner was fired for admittedly making the statement in violation of company policy. Turner filed another EEOC Charge after his termination alleging that he was fired in retaliation for his first EEOC Charge.

Turner filed suit against Novartis claiming racial discrimination, hostile work environment, and retaliation. The district court entered summary judgment for the defendant and Turner appeals.

## DISCUSSION

[HN1] This court reviews the grant of summary judgment de novo, applying the same standards as the district court. *Fed. R. Civ. Proc. 56.*

### I. Discrimination

The district court properly entered summary judgment to Novartis on Turner's discrimination claim. [HN2] Under Title VII, a prima facie case of discrimination must establish that (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for his position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly situated employee not in the same protected class. *See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).*

The [**4] adverse employment action must be an "ultimate employment decision." In the Fifth Circuit, an ultimate [*141] employment decision includes such things as "hiring, granting leave, discharging, promoting, or compensating." *McCoy v. City of Shreveport, 492 F.3d 551, 559 (5th Cir. 2007).* Title VII does not cover "every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Banks v. E. Baton Rouge Parish Sch. Bd., 320 F.3d 570, 575 (5th Cir. 2003)* (quoting *Burger v. Cent. Apartment Mgmt., 168 F.3d 875, 878 (5th Cir. 1999)).* The district court was correct to find that placing an employee on PIP is not an ultimate employment decision. There is no evidence that Turner was demoted or received reduced compensation due to the PIP. Thus, Turner failed to establish a prima facie case of discrimi-

nation because he failed to show that a PIP was an ultimate employment decision.

### II. Hostile Work Environment

The district court correctly ruled that Turner did not exhaust his administrative remedies in relation to his hostile work environment claim. Since long before *McClain v. Lufkin Ind., Inc., 519 F.3d 264, 273 (5th Cir. 2008),* it has been clear that [HN3] an employee [**5] must file his charge with the EEOC and exhaust administrative remedies by requesting an investigation of the facts he claims support a Title VII claim. Exhaustion must precede a lawsuit. Turner filed two EEOC charges, one alleging discrimination and one alleging retaliation. Neither of the two charges reasonably encompasses his new claim of a hostile work environment. *See Pacheco v. Mineta, 448 F.3d 783, 788-89 (5th Cir. 2006)* (finding that [HN4] the scope of an EEOC charge is both the charge itself and the investigation which can "reasonably be expected to grow out of the charge of discrimination" (citation omitted)). Because Turner did not exhaust his administrative remedies, summary judgment was proper on the hostile work environment claim.

### III. Retaliation

The district court properly granted summary judgment to the defendant on Turner's retaliation claim. Under *Stewart v. Miss. Transp. Comm'n, 586 F.3d 321, 331 (5th Cir. 2009),* [HN5] a plaintiff must establish a prima facie case of retaliation by showing: (1) he participated in a activity protected by Title VII, (2) he "suffered an adverse employment action by [his] employer, and (3) there is a causal connection between the protected activity [**6] and the adverse action." If the plaintiff establishes this prima facie case, the burden then shifts to the employer to give a "legitimate non-discriminatory reason for termination." *Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 409 (5th Cir. 1999).* If the employer can provide such a reason, then the plaintiff must prove that the employer's grounds for termination were pretextual. *Id.*

Even if Turner may have established a prima facie case of retaliation, Novartis provided a legitimate non-discriminatory reason for termination: his threat upon Power. Turner does not provide any evidence that this reason was pretextual. Under the burden shifting framework of *McDonnell Douglas,* summary judgment for the defendant was justified. *See LeMaire v. La. Dep't of Transp. & Dev., 480 F.3d 383, 393 (5th Cir. 2007).*

After a careful review of the briefs, district court opinion, and the record, we find no reversible issue of law or fact.

**AFFIRMED.**