## Page 1

```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
                       HOUSTON DIVISION

    SHERWIN T. WRIGHT,        )
          Plaintiff,          )
                              ) CIVIL ACTION
    VS.                       )
                              ) NO.: 4:15-cv-02363
    CHEVRON PHILLIPS CHEMICAL )
    COMPANY, LP,              )
          Defendant.          ) JURY DEMANDED
    ---------------------------------------------
             ORAL AND VIDEOTAPED DEPOSITION OF

                   SHERWIN TYRRELL WRIGHT

                     FEBRUARY 23, 2017
    ---------------------------------------------

        ORAL AND VIDEOTAPED DEPOSITION OF SHERWIN TYRRELL
    WRIGHT, produced as a witness at the instance of the
    Defendant, and duly sworn, was taken in the above-styled
    and numbered cause on the 23rd of February, 2017, from
    10:18 a.m. to 5:01 p.m., before Stacie M. Conner, CSR in
    and for the State of Texas, reported by machine
    shorthand, at the offices of Smith Reed & Armstrong,
    PLLC, 1920 Country Place Road, Suite 350, Pearland,
    Texas, pursuant to the Federal Rules of Civil Procedure
    and the provisions stated on the record or attached
    hereto.
```

## Page 2

```
                         APPEARANCES

    FOR THE PLAINTIFF:

        Mr. Marrick Armstrong
        SMITH REED & ARMSTRONG, PLLC
        1920 Country Place Parkway, Suite 350
        Pearland, Texas  77584
        281.489.3934
        marrick@srapllc.com

    FOR THE DEFENDANT:

        Ms. Marlene C. Williams
        Mr. John Hays
        JACKSON WALKER, LLP
        1401 McKinney, Suite 1900
        Houston, Texas  77010
        713.752.4200
        mwilliams@jw.com
        jhays@jw.com

    ALSO PRESENT:

        Mr. Brent Moore, Videographer
        Ms. Karen Monroe
        Ms. Lisa Laurin
```

[EXHIBIT C sticker]

## Page 3

```
                            INDEX
                                                    PAGE
    Appearances........................................ 2

    Stipulations....................................... 4

    SHERWIN TYRRELL WRIGHT
        EXAMINATION BY MS. WILLIAMS.................... 4

    Signature and Changes............................ 247
    Reporter's Certificate........................... 249

                           EXHIBITS
    NO.        DESCRIPTION                          PAGE

    Exhibit 1    Record of Wright's training at
                 Chevron............................. 55
    Exhibit 2    Working Rules & Discipline Policy
                 for Pasadena Plastics Complex....... 59
    Exhibit 3    Employee Acknowledgment of Receipt
                 of Plant Working Rules.............. 60
    Exhibit 4    10/27/14 e-mail from Wright to
                 Cella, subject "PLEASE
                 READ_Pasadena, Tx Facility"........ 110
    Exhibit 5    10/27/14 e-mail from Cella to
                 Wright, subject "PLEASE
                 READ_Pasadena, Tx Facility"........ 110
    Exhibit 6    Isolation List #42................. 112
    Exhibit 7    10/30/14 letter to Wright Re: "Final
                 Written Warning and Two-week
                 suspension"........................ 117
    Exhibit 8    11/18/14 letter to Wright Re: "Last
                 Chance Letter"..................... 143
    Exhibit 9    Pasadena Plastics Complex Employee
                 Process for Reporting Off Of and
                 Returning to Work.................. 154
    Exhibit 10   PowerPoint presentation titled
                 "Total Absence Management"......... 157
    Exhibit 11   12/8/14 EEOC Charge of
                 Discrimination filed by Wright..... 188
    Exhibit 12   8/9/15 EEOC Charge of Discrimination
                 filed by Wright.................... 192
```

## Page 4

```
 1              (The reading of Federal Rule 30(b)(5)(A)
 2   into the record was waived by all parties present)
 3              THE VIDEOGRAPHER:  Today's date is
 4   February 23, 2017.  The time is 10:18 a.m., and we are
 5   now on the record.
 6              THE REPORTER:  Would y'all like to state
 7   stipulations for the record?
 8              MS. WILLIAMS:  By the Rules.
 9              MR. ARMSTRONG:  Just by the Rules is fine.
10              THE REPORTER:  Signature?
11              MR. ARMSTRONG:  Yes.
12              SHERWIN TYRRELL WRIGHT,
13   having been first duly sworn, testified as follows:
14                       EXAMINATION
15   BY MS. WILLIAMS:
16       Q.  Would you state your full name, please?
17       A.  My full name is Sherwin T. Wright.
18       Q.  What is the T for?
19       A.  T is for Tyrrell.
20       Q.  And that's T-Y-R-E-L-L?
21       A.  Two R's, T-Y-R-R-E-L-L.
22       Q.  Okay.  Have you gone sometimes by just Tyrrell
23   Wright?
24       A.  Yes.
25       Q.  Okay.  You understand that you've just given an
```

### Page 37

| | | |
|---|---|---|
| | 1 | A. The same people, yes, because there were -- |
| | 2 | there were normally two supervisors there, two or more, |
| | 3 | because, as I said, they were -- were separated into two |
| | 4 | facilities. There was a polyethylene unit and a |
| 10:58 | 5 | polypropylene unit. |
| | 6 | Q. Okay. Do you remember the title -- and I know |
| | 7 | you -- you could not recall the person, but when you |
| | 8 | started, do you recall the title of -- that your |
| | 9 | supervisor had when you started as a maintenance |
| 10:58 | 10 | electrician? Did that person have a specific title, |
| | 11 | that you remember? |
| | 12 | A. As far as I remember, just maintenance -- |
| | 13 | maintenance electrical supervisor. |
| | 14 | Q. Okay. And was that always the case, that you |
| 10:58 | 15 | reported to a maintenance electric -- electrical |
| | 16 | supervisor through -- until the time of your |
| | 17 | termination? |
| | 18 | A. Yes. |
| | 19 | Q. Okay. |
| 10:58 | 20 | A. (Coughing) excuse me. |
| | 21 | Q. Do you recall the names of any of your |
| | 22 | supervisors during your employment at Chevron Phillips |
| | 23 | Chemical? |
| | 24 | A. Yes. I know -- as I said, I'm -- I'm cloudy at |
| 10:59 | 25 | the beginning but I know at the end, Darryn Barnes was a |

### Page 38

| | | |
|---|---|---|
| | 1 | supervisor -- was one of my supervisors and also Jerry |
| | 2 | Kelly was a supervisor. |
| | 3 | Q. And Jerry and Darryn both were maintenance |
| | 4 | electrical supervisors or something -- |
| 10:59 | 5 | A. Yes. |
| | 6 | Q. -- similar to that? |
| | 7 | A. Correct. |
| | 8 | Q. Do you know who they reported to? |
| | 9 | A. Who did they report to? I'm not sure exactly |
| 11:00 | 10 | who they reported to, no. I'm sorry. |
| | 11 | Q. Okay. As your supervisors, then at some point |
| | 12 | Darryn Barnes would have been evaluating your work, |
| | 13 | correct? |
| | 14 | A. Correct. |
| 11:00 | 15 | Q. And when Jerry Kelly was your supervisor, he |
| | 16 | also would have been evaluating your work, correct? |
| | 17 | A. Correct. |
| | 18 | Q. Okay. Which one of these was the last |
| | 19 | maintenance electrical supervisor you had? |
| 11:00 | 20 | A. Darryn Barnes was my last supervisor. |
| | 21 | Q. You did not report to any operators, correct? |
| | 22 | A. Report to an -- |
| | 23 | Q. Yeah. I mean, they weren't your boss? |
| | 24 | A. No. Operators -- |
| 11:00 | 25 | Q. Okay. |

### Page 39

| | | |
|---|---|---|
| | 1 | A. -- were not our boss, no. They were in charge |
| | 2 | of the equipment on -- in each facility, but they were |
| | 3 | not our bosses. |
| | 4 | Q. Okay. Do you know who the operators reported |
| 11:01 | 5 | to? |
| | 6 | A. Yes. The operators had a -- an operations |
| | 7 | supervisor that they reported to. |
| | 8 | Q. Did any of the operators report to the |
| | 9 | maintenance electrical supervisors? |
| 11:01 | 10 | A. Report to them? |
| | 11 | Q. Were the maintenance electrical supervisors the |
| | 12 | bosses of the operators? |
| | 13 | A. No. |
| | 14 | Q. Okay. |
| 11:01 | 15 | A. (Coughing) excuse me. |
| | 16 | Q. I'm probably going to jump around a little bit, |
| | 17 | but I want to kind of just capture some period -- a few |
| | 18 | chunks of time before we get into the details related to |
| | 19 | your lawsuit. |
| 11:01 | 20 | But from 2008 to 2011, you were working in |
| | 21 | one of these two units that we described as a |
| | 22 | maintenance electrical super -- maintenance electrician, |
| | 23 | correct? |
| | 24 | A. Correct. |
| 11:02 | 25 | Q. In 2011 I understand you had an -- a motorcycle |

### Page 40

| | | |
|---|---|---|
| | 1 | accident? |
| | 2 | A. Correct. |
| | 3 | Q. And you were away from work on leave from 2011 |
| | 4 | to 2012, correct? |
| 11:02 | 5 | A. Correct. |
| | 6 | Q. Okay. Can you just give us in general a |
| | 7 | description of the motorcycle accident, what happened? |
| | 8 | A. I can give you what I have -- what I have read |
| | 9 | and been told about it because I -- I still -- I don't |
| 11:02 | 10 | remember the accident to this day. |
| | 11 | Q. Okay. Can you just generally -- and I -- I |
| | 12 | don't need specific details -- |
| | 13 | A. Okay. |
| | 14 | Q. -- but what you've read in general what -- what |
| 11:02 | 15 | occurred -- |
| | 16 | A. Okay. |
| | 17 | Q. -- in the accident? |
| | 18 | A. What I read was that a person ran a stop sign |
| | 19 | adjacent to a road that I was traveling on and what I |
| 11:03 | 20 | understand is that I swerved to miss him and I was in |
| | 21 | the oncoming traffic so I swerved back and when I |
| | 22 | swerved back, I hit a guardrail at a small bayou. The |
| | 23 | bike and I flipped over. The bike flipped over into the |
| | 24 | bushes. I flipped up and hit a tree and landed down on |
| 11:03 | 25 | the side of the bayou. |

### Page 41

| | | |
|---|---|---|
| | 1 | So then the person who caused the accident |
| | 2 | was -- from what I have read, was -- he had enough |
| | 3 | decency there for a moment, he called the ambulance for |
| | 4 | me, but at some point he robbed me. But he did stay |
| 11:03 | 5 | there until the ambulance got there. He gave them his |
| | 6 | name and number and everything and then -- and that |
| | 7 | is -- that's how my -- that was the gist of my accident. |
| | 8 | Q. Were you wearing a helmet at the time of your |
| | 9 | accident? |
| 11:04 | 10 | A. No, I was not. |
| | 11 | Q. Were you hospitalized for some period after the |
| | 12 | accident? |
| | 13 | A. Yes, I was. |
| | 14 | Q. For about how long? |
| 11:04 | 15 | A. Seemed like forever. It was -- oh, God, I |
| | 16 | was -- I'm not -- I'm not sure exactly how long it was, |
| | 17 | but I would say about -- about seven months, I think. |
| | 18 | Q. And when I say "hospital," is this -- this is |
| | 19 | not TIRR? |
| 11:04 | 20 | A. No, this is not TIRR. |
| | 21 | Q. Okay. |
| | 22 | A. This is just the hospital. |
| | 23 | Q. Okay. But at some point you started receiving |
| | 24 | treatment at TIRR? |
| 11:04 | 25 | A. That's correct. |

### Page 42

| | | |
|---|---|---|
| | 1 | Q. Okay. As a result of this accident, you -- you |
| | 2 | endured some brain injury or head injury? |
| | 3 | A. Yes, I -- I received what is called traumatic |
| | 4 | brain injury. |
| 11:05 | 5 | Q. And I think you were saying earlier that it |
| | 6 | affects your short-term memory? |
| | 7 | A. It affects my short-term, yes. |
| | 8 | Q. I assume you -- you -- you suffered other |
| | 9 | injuries in the accident, as well? |
| 11:05 | 10 | A. Well, just bruising and scratches. |
| | 11 | Q. Okay. Did you -- was there a lawsuit related |
| | 12 | to this accident? Did you file a lawsuit, or did anyone |
| | 13 | file a lawsuit in connection with this accident? |
| | 14 | A. No. |
| 11:05 | 15 | Q. Did you make any type of claims in connection |
| | 16 | with this accident, you know, with an insurance company |
| | 17 | or with -- against anybody personally? |
| | 18 | A. No. Well, I was unconscious for three weeks; |
| | 19 | and then I was in the hospital for, like I said, about |
| 11:06 | 20 | seven months. |
| | 21 | Q. Okay. But just so that I'm clear, you didn't |
| | 22 | pursue any insurance claims in connection with this |
| | 23 | lawsuit [sic]? |
| | 24 | A. No. |
| 11:06 | 25 | Q. Did anybody make any claims against you in |

### Page 43

| | | |
|---|---|---|
| | 1 | connection with this lawsuit [sic]? |
| | 2 | A. No. |
| | 3 | Q. You -- you understand that while you were out |
| | 4 | recovering from your injuries, that you were placed on |
| 11:06 | 5 | leave at Chevron Phillips Chemical? |
| | 6 | A. Yes. |
| | 7 | Q. Okay. |
| | 8 | A. Yes. |
| | 9 | Q. You did not have any issues with respect to |
| 11:06 | 10 | your leave at Chevron Phillips Chemical. They granted |
| | 11 | you the leave that you needed and requested to recover, |
| | 12 | correct? |
| | 13 | A. Correct. |
| | 14 | Q. Okay. Did you have any problems with the |
| 11:06 | 15 | company associated with the leave that you took? |
| | 16 | A. Now, that, I can't say because I -- I really |
| | 17 | don't recall. That part is -- I'm not -- I'm not very |
| | 18 | clear on that part of it still. |
| | 19 | Q. Sitting here today, you don't recall that there |
| 11:07 | 20 | were ever any issues that you had getting the leave that |
| | 21 | you needed from Chevron Phillips Chemical after your |
| | 22 | accident; is that correct? |
| | 23 | A. No, I don't recall that, no. |
| | 24 | Q. Okay. And I think I -- I mentioned earlier |
| 11:07 | 25 | that after you were released from the hospital, you |

### Page 44

| | | |
|---|---|---|
| | 1 | received treatment at TIRR, T-I-R-R, correct? |
| | 2 | A. Correct. |
| | 3 | Q. And how long were you receiving treatment from |
| | 4 | TIRR? |
| 11:07 | 5 | A. I don't remember exactly how long it was. It |
| | 6 | was -- oh, God, it was months and months. |
| | 7 | Q. Were you still receiving treatment at TIRR when |
| | 8 | you returned to work at Chevron Phillips Chemical? |
| | 9 | A. No. When I returned to Chevron, I was -- they |
| 11:08 | 10 | said that they had went as far as I needed to go -- or |
| | 11 | as they could go with me, I should say. |
| | 12 | Q. When you were released to go back to work |
| | 13 | following your accident, did you have any restrictions? |
| | 14 | A. Yes. |
| 11:08 | 15 | Q. What were those restrictions? |
| | 16 | A. Those restrictions, that was something -- the |
| | 17 | way I understand it, it was worked out between TIRR and |
| | 18 | Chevron that I would work with a second electrician at |
| | 19 | all times. |
| 11:08 | 20 | Q. Where did you get this understanding from? |
| | 21 | A. From my -- oh, God, what was she? She was my |
| | 22 | physical therapist at TIRR. |
| | 23 | Q. Do you recall her name? |
| | 24 | A. I knew you were going to ask. Christine |
| 11:09 | 25 | Heckman, I think it was. I'm not -- don't ask me how to |

## Page 45

1 spell it.
2   Q. Okay. So Christine Heckman told you that it
3 had been worked out between TIRR and Chevron Phillips
4 Chemical that when you returned to work, that you would
5 work with a second electrician at all times?
6   A. At all times, yes.
7   Q. How long was that restriction supposed to last?
8   A. She never told me a -- a limit or a time limit
9 as to how far -- how long that was going to be. She
10 just said that Chevron wanted that at all times I would
11 be with a second electrician.
12   Q. She told you Chevron Phillips Chemical wanted
13 that?
14   A. Yes. That was their -- that is what -- how
15 they agreed that I would come back into the plant.
16   Q. Okay.
17   A. But never how long it would last.
18   Q. Did you work with the -- under that restriction
19 from the time you returned in 2012 until your
20 termination in December, 2014?
21   A. Yes.
22   Q. So you were always working with a second
23 electrician?
24   A. Yes.
25   Q. Did you have any problems with this arrangement

## Page 46

1 working with a second electrician?
2   A. No, I didn't have any problem with it because
3 every electrician that -- that I worked with out there,
4 I had a really good relationship with.
5   Q. Okay. And when you say you were working with a
6 second electrician, how -- how -- how did that go? I
7 mean, what was the second electrician doing when you
8 were performing your work?
9   A. What was he -- he was working with me.
10 Whatever job that we were on, he would be working
11 directly with me.
12   Q. So you-all would share responsibilities for a
13 particular job?
14   A. Correct.
15   Q. Who were some of the second electricians that
16 worked with you during this time?
17   A. No one, not -- no one specific but every
18 electrician wherever -- any unit that I was in, I was
19 always with a second electrician.
20   Q. And when you say you were always with them,
21 does that --
22   A. I alway -- excuse me. I always worked with a
23 second electrician.
24   Q. And by "work," you mean that you-all are
25 sharing job responsibilities for whatever assignment

## Page 47

1 y'all were working on?
2   A. That's correct.
3   Q. Can you recall the names of any of the
4 electricians out there at this time who would have been
5 working with you?
6   A. Oh, yeah, there were a lot of electricians out
7 there who -- well, some of them were on shift but Dave
8 Higgins and Mike Smith, Ed Armand. Who else? Mario
9 Falcone. Who else did I work with out there? There
10 was -- I mean, I worked -- I think I worked with just
11 about every electrician out there at one time or
12 another.
13   Q. And you mean that they were working with you as
14 the second electrician?
15   A. Yes.
16   Q. Okay. All of these individuals that you just
17 named at some point would have been working with you as
18 a second electrician on the jobs that you were working?
19   A. Correct.
20   Q. Okay. And, again, that's from 2012 to 2014,
21 correct?
22   A. Correct.
23   Q. Did you ever request that this arrangement
24 where a second electrician worked with you, did you ever
25 request to stop that arrangement?

## Page 48

1   A. No.
2   Q. Were there times where you performed jobs where
3 there wasn't a second electrician working with you?
4   A. Just the one time and I got in trouble for --
5 ended up being terminated behind it.
6   Q. "The one time," what are you referring to?
7   A. When there was a -- a job where I was called
8 over the radio to go and perform a lockout/tagout and I
9 asked over the radio, "Is there another electrician?"
10     I was told, "No, you can do it."
11     And so I -- I mean, I wasn't going to
12 question it, my supervisor. I just -- I went and did
13 it.
14   Q. Who was your supervisor who called you about
15 this assignment?
16   A. Darryn Barnes.
17   Q. And Darryn Barnes specifically said to you,
18 "No, there's no other electrician. You can do it"?
19   A. Yes.
20   Q. Did you disagree with that?
21   A. No, I didn't dis -- I just -- I'm not -- I'm
22 not going to -- I'm not a person to question my
23 supervisor when he -- if he gives me a task, then, okay,
24 I'll perform my task.
25   Q. Did you think you were capable of performing

Page 49

1  the task without a second electrician?
2  A. I thought I was.
3  Q. Do you recall this particular incident? We're
4  going to talk about it in some more detail, but do you
5  recall when that occurred?    11:14
6  A. I don't remember when it occurred, no.
7  Q. Does September -- late September, early
8  October, 2014, sound about right to you?
9  A. I apologize. I --
10 Q. Okay.    11:15
11 A. I don't really recall.
12 Q. Okay. We'll -- we'll come back to that.
13     And so it's your testimony that this
14 particular incident where you went out alone for the
15 lockout/tagout -- and I'll just kind of state for the    11:15
16 record and we'll clear it up with some documents later,
17 but that this occurred sometime in late September, early
18 October, 2014. Okay?
19 A. Okay.
20 Q. This incident that you're referring to, you're    11:15
21 saying that's the only time that you ever -- from 2012
22 until the time of your termination, that was the only
23 occasion that you worked without a second electrician
24 with you?
25 A. Correct.    11:15

Page 50

1  Q. What is a lockout/tagout?
2  A. A lockout/tagout is -- it is a way of turning
3  off or de-energizing equipment so that it -- it will
4  not -- it cannot come back -- come back on or be turned
5  on without physically removing that equipment, that lock    11:16
6  and tag.
7  Q. What is the lock part of this process?
8  A. The lock part is to turn off the electricity --
9  the electrical -- hold on. Let me think of -- the
10 electrical -- the electricity being provided to that --    11:16
11 that equipment and locking that out with a physical lock
12 so that it cannot be turned back on.
13 Q. How do you actually turn off the electricity
14 that's being provided to the equipment as a part of this
15 process?    11:17
16 A. In the -- it's not a mechanical room. I'm
17 trying to think of the exact terminology of it. In
18 the -- in the MCCs we go over and we turn off at the
19 switchgear the power feeding that equipment and then
20 we -- there is a scissor hasp that we hang into the    11:17
21 lock -- lock part of it and hang a lock so that it
22 cannot be turned back on.
23 Q. And what did you say that hangs, a --
24 A. It's a -- it's called a -- a scissor -- it's a
25 scissor device where -- with holes in it so that you can    11:17

Page 51

1  hang a lock in those holes so that it can't be turned
2  back on.
3  Q. And so what you've been describing, is that the
4  lock part of the lockout/tagout?
5  A. Uh-huh.    11:18
6  Q. What's the tag part of the lockout/tagout?
7  A. The tag part is when you hang a -- when a
8  individual, whatever craft they are in, put -- hangs a
9  tag, a "do not operate" tag, on the equipment with their
10 name and craft identification on it, so that way they    11:18
11 can identify who turned the equipment off and what craft
12 they work for -- or they work in.
13 Q. Did Chevron Phillips Chemical have special
14 procedures for lockout/tagout of equipment?
15 A. Special procedures?    11:18
16 Q. Did they have a process that you were supposed
17 to follow for locking out and tagging out equipment?
18 A. Yes.
19 Q. Okay. Were you trained on the lockout/tagout
20 process at Chevron Phillips Chemical?    11:18
21 A. Yes.
22 Q. When were you trained on this process?
23 A. I was trained -- oh, God, it would have been
24 right after my initial hiring, is when I was trained and
25 we had -- yeah, it was right after -- I'm not sure    11:19

Page 52

1  what -- how to explain that correctly, but it was right
2  after I was initially hired.
3      You go through what's called an LMS
4  module -- modules where you -- there's training that
5  it -- it explains the steps that need to be taken for    11:19
6  the lockout/tagout procedure.
7  Q. And that's training you would have first taken
8  in 2008 right after you were hired?
9  A. Correct.
10 Q. Were there times throughout your employment    11:19
11 after 2008 where you were periodically retrained or
12 reminded about this process, where you would have to
13 kind of participate in these modules just to stay
14 up-to-date about the process?
15 A. Yes, there were computer modules that -- for    11:20
16 update training that we went through, yes.
17 Q. And you were -- you completed these computer --
18 A. (Coughing) excuse me.
19 Q. -- modules from time to time with respect to
20 the lockout/tagout process throughout your entire    11:20
21 employment at Chevron Phillips Chemical, correct?
22 A. Correct.
23 Q. And there were other topics that you were
24 trained on throughout your employment, as well, correct?
25 A. Correct.    11:20

## Page 61

| | | |
|---|---|---|
| | 1 | A. Yes, I do. |
| | 2 | Q. Okay. When you received the working rules, did |
| | 3 | you review those? |
| | 4 | A. Yes, I did. |
| 11:47 | 5 | Q. Were you familiar with and aware of what the |
| | 6 | working rules were at Chevron Phillips Chemical |
| | 7 | throughout your employment? |
| | 8 | A. Yes. |
| | 9 | Q. Okay. We were talking before the break about |
| 11:47 | 10 | the lockout/tagout issue that developed in September or |
| | 11 | October, 2014. Do you recall -- |
| | 12 | A. Yes. |
| | 13 | Q. -- that? Okay. |
| | 14 | A. Yes. |
| 11:47 | 15 | Q. And I think you indicated, you know, that there |
| | 16 | was some issue, obviously, that -- that developed with |
| | 17 | that with respect to the work that you did, correct? |
| | 18 | A. That's correct. |
| | 19 | Q. How did you learn that there had been an issue |
| 11:47 | 20 | regarding the work that you did on -- well, first of |
| | 21 | all, tell us what -- what the actual work was with |
| | 22 | respect to this lockout/tagout issue that developed. |
| | 23 | A. Tell us -- I'm sorry. Say it again. |
| | 24 | Q. What -- do you recall what your job assignment |
| 11:48 | 25 | was with respect to this lockout/tagout issue that |

## Page 62

| | | |
|---|---|---|
| | 1 | developed? |
| | 2 | A. Yes -- |
| | 3 | Q. Okay. |
| | 4 | A. -- I recall. |
| 11:48 | 5 | Q. What were -- what was your job responsibility? |
| | 6 | What were you supposed to be doing? |
| | 7 | A. The job responsibility was to go over and |
| | 8 | actually lock out -- lock and tag some equipment out for |
| | 9 | a contractor that was in the plant. |
| 11:48 | 10 | Q. What equipment did you have to lock and tag? |
| | 11 | A. I locked out -- it was the electrical -- an |
| | 12 | electrical disconnect switch that provided power to some |
| | 13 | equipment that was outside. |
| | 14 | Q. What equipment outside was it providing power |
| 11:48 | 15 | to? |
| | 16 | A. I'm not -- I don't know specifically what |
| | 17 | equipment it was providing power to. |
| | 18 | Q. So what -- you -- who -- and I think you said |
| | 19 | that Darryn Barnes contacted you and instructed you to |
| 11:49 | 20 | go over and perform this -- this function, correct? |
| | 21 | A. That's correct. |
| | 22 | Q. What do you recall Darryn Barnes telling you? |
| | 23 | A. He told me to go over and -- and lock out some |
| | 24 | equipment for -- for the -- I don't think he -- I don't |
| 11:49 | 25 | recall him saying the name. He just said he needed me |

## Page 63

| | | |
|---|---|---|
| | 1 | to go lock out some equipment. |
| | 2 | Q. And where -- where were you when you got the |
| | 3 | call? |
| | 4 | A. I don't remember exactly where I was. |
| 11:49 | 5 | Q. Where was the equipment? Was it in a different |
| | 6 | part of the facility or a different unit or anything -- |
| | 7 | A. No. The -- |
| | 8 | Q. -- like that? |
| | 9 | A. I'm sorry. |
| 11:49 | 10 | Q. That's okay. |
| | 11 | A. The equipment was -- it was on the unit that I |
| | 12 | was in, yes. |
| | 13 | Q. When you -- this was not the first time that -- |
| | 14 | I'm sorry. This was not the first time that you had |
| 11:50 | 15 | been given an assignment to go and lock out or -- and |
| | 16 | tag equipment, correct? |
| | 17 | A. That's correct. |
| | 18 | Q. When you -- what is the normal protocol when |
| | 19 | you get a call to go and lock out and tag out equipment? |
| 11:50 | 20 | What are the steps -- and I don't mean with respect to |
| | 21 | what you just described for us in terms of how you |
| | 22 | actually lock out and tag out, but how do you actually |
| | 23 | go about initiating that job? Is there paperwork that |
| | 24 | you're supposed to pick up, any paperwork that you're |
| 11:50 | 25 | supposed to review? How do you get that job started? |

## Page 64

| | | |
|---|---|---|
| | 1 | A. The way the job starts is I normally -- I or |
| | 2 | the other electricians will go, we will meet the -- the |
| | 3 | operator at the MCC because the operator is the owner of |
| | 4 | that equipment and the operator will let us know |
| 11:51 | 5 | specifically which equipment that he needs locked out. |
| | 6 | Q. When Darryn called you, did he tell you what |
| | 7 | specific equipment needed to be locked out or did he |
| | 8 | tell you just to go over to this area and talk to the |
| | 9 | operator or did something else occur? |
| 11:51 | 10 | A. No. He told me -- he asked me to go over to |
| | 11 | lock out some equipment. |
| | 12 | Q. Did you know what equipment it was? |
| | 13 | A. No, not at the time. |
| | 14 | Q. Did you know which operator you were supposed |
| 11:51 | 15 | to -- to talk to or see? |
| | 16 | A. No. |
| | 17 | Q. How did you find that out? |
| | 18 | A. I found out because when I got to the MCC, the |
| | 19 | operator was already there; and he -- he pointed out to |
| 11:52 | 20 | me what equipment that he needed locked out. |
| | 21 | Q. What does MCC stand for? (Coughing) excuse me. |
| | 22 | A. MCC is -- what is MCC? I'm drawing a blank. I |
| | 23 | apologize. |
| | 24 | Q. That's okay. If it comes to you later, you |
| 11:52 | 25 | can -- |

Page 77

1    A. If someone did that, yes, that would -- that
2    would not be correct. I wouldn't put my initials on
3    something that I haven't done.
4    Q. So after -- for this particular incident that
12:08  5    we're talking about in 2014, after you performed the
6    isolation -- or the lockout/tagout on this particular
7    equipment, at some point you heard back from the company
8    that there was an issue related to that work, correct?
9    A. Correct.
12:08  10   Q. Tell -- who did you hear from that there had
11   been an issue regarding that work?
12   A. I don't know. I don't remember who
13   specifically told me that there was a problem.
14   Q. Were you -- (coughing) excuse me. Were you at
12:08  15   work when you learned that there had been an issue?
16   A. Yes, I was at work.
17   Q. What did you learn -- well, at some -- do you
18   recall meeting with anyone in relation to this issue?
19   Did anybody call you into a meeting and say, "Let's talk
12:09  20   about something that happened with this lockout/tagout
21   process on this equipment"?
22   A. Yes, later -- later on someone did.
23   Q. Do you recall who that was?
24   A. I believe -- I'm not -- I can't say for sure --
12:09  25   for certain, but I believe it was Keith Bravenec.

Page 78

1    Q. And who is Keith Bravenec?
2    A. He is the instrument and electrical -- I think
3    his title is -- superintendent, I think is his title.
4    I'm not sure.
12:09  5    Q. Okay. Had you -- did you know Keith Bravenec
6    before this time in October or -- 2014, when he called
7    you in about the lockout/tagout issue?
8    A. Well, yes, we had -- we had seen each other
9    plenty of times, yes.
12:09  10   Q. Did you have any issues with Keith Bravenec?
11   A. No, I didn't have any issues with him.
12   Q. On what occasions would you have seen Keith
13   Bravenec before this incident in October of 2014?
14   A. How do you mean?
12:10  15   Q. Just -- would you have been working with him,
16   reporting to him, or would you just see him at the
17   facility?
18   A. I would see Keith -- he would come sometimes
19   to -- to our tailgate meetings. I would see him just in
12:10  20   passing. It was -- there would be various times I would
21   see him. Sometimes he may just be moving through the
22   facility and I would see him.
23   Q. Okay. So when you talked to Keith -- Keith
24   Bravenec about this lockout/tagout incident, what did he
12:10  25   tell you? What's your recollection of -- of the

Page 79

1    discussion that you had with him when you first learned
2    about -- that there had been an issue?
3    A. I apologize. I -- I don't remember exactly
4    what happened or what his specific comments --
12:11  5    conversation was.
6    Q. Well, in general what was he calling you in to
7    talk to you about?
8    A. He was calling me in because there was an issue
9    with the -- with the lockout/tagout.
12:11  10   Q. And do you recall what he said the issue was?
11   A. He said that there was not a lock and tag on
12   the equipment, at which point I tried to explain to him
13   what happened with the operator.
14   Q. What happened with the operator?
12:11  15   A. When I initialed that I did -- I had turned off
16   the equipment and tried -- I then went to try to get a
17   lock and tag and the operator told me, "No, don't do
18   that," because they were going to reuse that equipment.
19   And then he pointed at a sticker that was on the
12:12  20   equipment and I -- it was new. I had never seen that --
21   that sticker before. We had never -- in the facility --
22   I had never seen that in the facility before.
23   Q. Who pointed to a sticker, Keith or --
24   A. No, the -- Keith wasn't there. It was the
12:12  25   operator.

Page 80

1    Q. Who -- and that's --
2    A. Billy -- yes, Billy Donnell, Donnell. I'm not
3    sure how to say his name.
4    Q. Okay. So you told Keith that Billy Donnell
12:12  5    told you not to put the lock or tag on the equipment?
6    A. Because they were going to reuse it, yes.
7    Q. And that he also pointed to a sticker that you
8    had never seen before?
9    A. Correct.
12:12  10   Q. What -- what did -- what did the sticker look
11   like?
12   A. I don't remember exactly what it looked like.
13   I don't even -- I don't remember exactly what it looked
14   like, but it was --
12:13  15   Q. Do you remember a color?
16   A. It was -- it was just a little white sticker
17   with black letters, black lettering.
18   Q. And where was the sticker?
19   A. It was on the -- the actual -- the lock -- not
12:13  20   lockout but the -- oh, gah, what is that? What is it
21   called? It was on the -- the electrical disconnect
22   switch, and I later found out that that was something
23   brand-new. It was only supposed to be for the
24   operators.
12:14  25   Q. What was only supposed to be for the operators?

Page 81

```
         1   A. That sticker.
         2   Q. But you don't know what the sticker did or what
         3   it said or --
         4   A. I don't recall specifically what it said, no.
12:14    5   Q. And do you know what the purpose of the sticker
         6   was?
         7   A. No, I don't.
         8   Q. Did Billy Donnell -- or Donnell -- we'll say
         9   Donnell and if we're getting it --
12:14   10   A. Okay.
        11   Q. -- wrong, we'll apologize to him later.
        12      But did -- did he tell you not to lock and
        13   tag the equipment before you signed the isolation list?
        14   A. No. He told me after I signed the list. After
12:14   15   I initialed the list, he told me not to -- to -- to lock
        16   and tag it. Because I would not have signed it if I
        17   knew that I was not going to be able to lock and tag
        18   because that's the rule. When you sign something,
        19   you -- you sign it that you are actually performing a
12:15   20   lock and tag.
        21   Q. So you signed the isolation list saying that
        22   you had performed those functions before you had
        23   actually completed them?
        24   A. Before they were completed, yes.
12:15   25   Q. So when you signed it, the work had not been
```

Page 82

```
         1   done?
         2   A. Not com -- not fully, no.
         3   Q. And, in fact, according to you, the work never
         4   got done because you say that Billy Donnell told you not
12:15    5   to put the lock and tag on it; is that right? Is that
         6   your testimony?
         7   A. Yes, it never -- it was never completed.
         8   Q. And did you do anything to correct the initials
         9   that you put on the isolation list to reflect that you
12:15   10   did not do the work that you were actually initialing on
        11   the list that you had done?
        12   A. Did I do anything --
        13   Q. Did you correct the isolation list to -- to
        14   reflect that you had not done the work that you said you
12:15   15   had done on the isolation list?
        16   A. No, I didn't. He wouldn't give me the list
        17   back to get my initials off of it.
        18   Q. Did you ask for it back?
        19   A. Yes, I asked; but he wouldn't --
12:16   20   Q. When did you ask for it back?
        21   A. I asked for it -- when he wouldn't let me put a
        22   lock and tag on it, I asked for it back.
        23   Q. So you -- you had not completed the lock and
        24   tag; but you proceeded to go ahead and initial the
12:16   25   isolation list indicating that you had completed it,
```

Page 83

```
         1   correct?
         2   A. Not in that specific order, no.
         3   Q. Well, what's the order?
         4   A. The order was he -- he identified to me what
12:16    5   equipment that he needed locked and tagged. I got the
         6   isolation list to verify that the -- the name and
         7   numbers were corresponding and then I initialed it --
         8   I -- excuse me -- I turned it off and initialed the lock
         9   and -- the isolation list, gave it -- gave the list back
12:17   10   to Billy Donnell, then I went outside to go get a lock
        11   and tag and when I came back, he said, "Don't do that."
        12      And I asked again, I said, "Well, give me
        13   the -- let me get my initials off."
        14      He said, "No, it's -- I need this. I have
12:17   15   to go back to the -- the MC -- to the control room to
        16   finish the" isolation -- "to finish the lockbox."
        17   Excuse me.
        18   Q. Is it typical to wait until you sign the
        19   isolation list to go outside and get the lock and tag,
12:17   20   or do you normally get the lock and tag first and then
        21   sign the isolation list when it's complete?
        22   A. It's -- it's -- there's no specific way to do
        23   it. I mean, it's numerous -- it could be done either
        24   way. I've done it both ways because the operator is
12:17   25   there. He is not going to go anywhere until I hang a
```

Page 84

```
         1   lock and tag.
         2   Q. And so you said you went outside to get the
         3   lock and tag, you came back in to put the lock and tag
         4   on. Billy Donnell told you not to put the lock and tag
12:18    5   on?
         6   A. That's correct.
         7   Q. Okay. And then you said, "Well, give me the
         8   list back," correct?
         9   A. Yes. I said, "I -- I want to take my initials
12:18   10   off."
        11      He said, "Well, no, I need to go get --
        12   finish this lockbox up."
        13   Q. Okay. And -- and he -- did you say, "But, no,
        14   I need the list back because I've got to get my initials
12:18   15   off"?
        16   A. Yeah. That's why I asked back -- asked for it
        17   back, was I --
        18   Q. How many times did you ask for it back?
        19   A. I only told him once and -- I mean, I didn't
12:18   20   want to -- I didn't want to create a confrontation with
        21   him. I asked for it back. He told me no, and he was
        22   already moving to -- to leave from the -- from the MCC.
        23      The motor control center, that's what MCC
        24   is. It -- it just came back to me.
12:19   25   Q. Motor control center?
```

## Page 101

```
          1   Q. All right. And --
          2   A. Well, operators, mechanics, and all of those
          3   gentlemen.
          4   Q. Okay. And you said that -- (coughing) excuse
12:39     5   me -- Virginia -- you were sent home. She told you to
          6   call back on Monday. Did you -- during your suspension,
          7   did you talk to Virginia periodically?
          8   A. During the -- I called, but I -- I don't
          9   think I spoke with Virginia.
12:40    10   Q. You don't recall ever talking to her and her
         11   telling you that the company was still investigating the
         12   issue?
         13   A. I apologize. It's -- no -- at -- I don't
         14   recall that, no, not right --
12:40    15   Q. You're --
         16   A. -- here.
         17   Q. -- not saying that didn't happen; you just
         18   don't remember?
         19   A. No, I'm not saying it didn't happen; I just
12:40    20   don't remember.
         21   Q. Okay. And how long were you suspended?
         22   A. It would have been -- it would have been almost
         23   three weeks.
         24   Q. And you said it was strange that they never set
12:40    25   a time limit. Had you been suspended before?
```

## Page 102

```
          1   A. I had never -- I had never had any discipline
          2   before.
          3   Q. What do you mean no discipline?
          4   A. Zero discipline.
12:41     5   Q. I know, but what do you mean by "discipline"?
          6   A. I mean anything that -- any negativity as far
          7   as my performance or any violations of any kind.
          8   Q. Do you recall Mr. Kelly ever talking to you
          9   about any issues related to your performance?
12:41    10   A. Yeah, he -- I mean, he was my supervisor there
         11   for a while and he -- it was his job to evaluate
         12   every -- every one of his guys' performance.
         13   Q. Do you recall him ever talking to you about
         14   being tardy to meetings --
12:41    15   A. No.
         16   Q. -- and from breaks?
         17   A. No.
         18   Q. Were you tardy sometimes to meetings and coming
         19   back from breaks?
12:41    20   A. No.
         21   Q. Okay. How did you learn that your suspension
         22   was over and that you -- to come back to work?
         23   A. I learned by phone.
         24   Q. From who?
12:42    25   A. From The Woodlands. His name is -- I don't
```

## Page 103

```
          1   remember the gentleman's last name. His name is Reuben.
          2   I don't know his last name.
          3   Q. Okay.
          4   A. He was in The Woodlands.
12:42     5   Q. Do you know what department he worked in?
          6   A. Human resources.
          7   Q. And what did Reuben tell you?
          8   A. Reuben told me to return to work the next day.
          9   Q. Between the time that you were suspended and
12:42    10   sent home and then the time that Reuben called you, we
         11   said that there might have been -- you might have had
         12   some communications with Virginia Hubbard, correct?
         13   A. It's possible, yes.
         14   Q. Did you have any communications with anybody
12:42    15   else at the company during your suspension?
         16   A. Any verbal communications or --
         17   Q. Any kind.
         18   A. Yes.
         19   Q. With whom?
12:43    20   A. Pete Cella.
         21   Q. Who's Pete Cella?
         22   A. Pete Cella is the CEO of Chevron Phillips.
         23   Q. Okay. And tell us about your communica --
         24   how -- how many times did you communicate with Pete
12:43    25   Cella during your suspension?
```

## Page 104

```
          1   A. During my suspension, once.
          2   Q. And was that by phone, in writing? How was
          3   that communication?
          4   A. That was by e-mail.
12:43     5   Q. Who e-mailed whom?
          6   A. I e-mailed Pete, and I explained the situation
          7   to him. I did admit that I was partially at fault, but
          8   I explained to him that I did not believe that the way
          9   the situation was being handled was correct. And I
12:44    10   think he agreed with me.
         11   Q. Why do you think he agreed with you?
         12   A. Because he said someone -- when he e-mailed me
         13   back the same day, he said someone would be in contact
         14   with me that day to let me know when to go back to work.
12:44    15   Q. He never said, "I agree with what you're
         16   saying." He just said some --
         17   A. No, he didn't say that.
         18   Q. Let me finish.
         19   A. He just --
12:44    20   Q. I'm sorry.
         21   A. Oh, I'm sorry. Go ahead.
         22   Q. He never said, "I agree with what you're
         23   saying." He only said, "Somebody is going to be in
         24   contact with you," correct?
12:44    25   A. He -- I don't remember specifically how the
```

Page 105

12:44
1  e-mail went. It was something to the fact that what I
2  was saying was at least partially correct, and then he
3  said that someone would be in contact with me.
4     Q. Okay. And you said you explained the situation
5  to Pete Cella in your --
6     A. Yes.
7     Q. -- e-mail? What situation --
8     A. Correct.
9     Q. -- did you explain to him?

12:44
10    A. The situation -- just the outline of how the --
11 the suspension went about -- or came about.
12    Q. What -- were -- and what were you asking Pete
13 Cella to do, if anything?
14    A. I was asking Pete to just look into the

12:45
15 situation and tell me that it was -- the way it was
16 being handled was correct.
17    Q. And by "the way it was being handled," do you
18 mean the amount of time that you were on suspension?
19    A. I mean the whole situation, the way it was

12:45
20 being handled.
21    Q. Okay. And -- so "whole situation," is what in
22 your mind? I want to understand.
23    A. Is the -- is the entire situation, the
24 suspension, the -- just the -- the entire situation.

12:45
25    Q. So you were telling him -- the situation that

Page 106

1  you told him you didn't think was being handled
2  correctly was the fact that you had been suspended; is
3  that right? I mean -- I mean, that's one of the things?
4     A. Wait. Say that again. I'm sorry.

12:46
5     Q. The situation that you were telling Pete Cella
6  you did not think was correct was the fact that you had
7  been suspended? That was a part of the situation that
8  you were describing to him?
9     A. No, not the fact that I had been suspended but

12:46
10 that I had been suspended and no one could tell me how
11 long I was going to be suspended.
12    Q. Okay. Other than telling him that -- that you
13 disagreed with the fact that you had been suspended and
14 no one could tell you how long you would be suspended,

12:46
15 did you tell him that you had issues with anything else?
16    A. With anything -- no, I don't think I did.
17    Q. And I think you testified earlier the next day
18 you got a call from Reuben, you believe?
19    A. No, the same day.

12:47
20    Q. You e-mailed Pete Cella, Pete Cella responded
21 to you the same -- responded to you the same day, and
22 then that same day you got a call from Reuben in HR?
23    A. Correct.
24    Q. Had you talked to Reuben before?

12:47
25    A. Yes, because Reuben -- I had talked to him just

Page 107

1  casually in the halls. He used to be -- he used to work
2  at Pasadena before he moved to The Woodlands.
3     Q. Had you met Pete Cella before you e-mailed him?
4     A. Yes. Yes, I had. Pete Cella, actually he met

12:48
5  me.
6     Q. You guys met each other?
7     A. No. He met me.
8     Q. Okay.
9     A. He -- I was in the -- in the COB doing some --

12:48
10 my LMS updates because I had been out for a long time
11 and as I was leaving the restroom walking down the hall,
12 he walked up behind me and said, "Hey, you're -- you're
13 that fellow that had the wreck on the motorcycle."
14          And it was really strange because you --

12:48
15 you know how you've seen someone before but you -- you
16 don't know them and you can't really place them. And
17 I'm -- I have this -- it's almost -- I don't know if
18 déjà vu is the right word but it's -- it's kind of
19 spooky, like, "I know you, but I don't know you."

12:49
20    Q. Uh-huh.
21    A. Because the only place I had ever seen him was
22 on the computer when he would put out videos for
23 everybody.
24          And I finally caught it; and I'm like,

12:49
25 "You're -- you're Pete."

Page 108

1     Q. Uh-huh.
2     A. "You're -- you're the CEO."
3          And he shook my hand and everything. He
4  said, "Yeah, I'm Pete Cella. Good to meet you."

12:49
5          And I'm just standing there like, I'm
6  amazed to meet you.
7          And he -- he reached into his pocket. He
8  said, "If you ever have a problem, I want you to call
9  me."

12:49
10         And I'm thinking to myself, okay, but
11 you're the CEO of Chevron Phillips. I'm never going to
12 call you. What am I going to call you? You have an
13 electrician in Pasadena of the tens of hundreds of
14 thousands of people that work for you that has a

12:49
15 problem. What am I going to call you and say?
16         And it just so happened I -- I had an issue
17 that I -- I actually needed help and so I -- I e-mailed
18 him.
19    Q. Okay. And Pete was responsive to your e-mail,

12:50
20 correct?
21    A. Yes.
22    Q. And from your perspective, do you think that
23 you were called back to work because of your e-mail to
24 Pete Cella?

12:50
25    A. I believe so.

Page 125

1  by you."
2      That's also correct, right?  The "T" leads
3  had not been removed even though the isolation list was
4  signed off by you, correct?
5      A.  That is correct.
6      Q.  Okay.  And then it's also correct that you had
7  a meeting with Keith, Virginia, and David Higgins,
8  correct, to discuss this incident?
9      A.  That's correct.
10     Q.  Do you disagree that that meeting happened on
11 October 8, 2014?
12     A.  No, I don't disagree.
13     Q.  Okay.  And it's also correct -- do you agree
14 that you told them during the meeting that you looked at
15 the numbers on the list but you never read anything in
16 the highlighted section about the "T" leads to be
17 disconnected?  Do you recall telling them that in the --
18 the meeting?
19     A.  Yes, I recall that.
20     Q.  So -- so that's accurate, correct?
21     A.  That's correct.
22     Q.  And then do you also recall telling them that
23 you only did the de-energizing part?
24     A.  Yes, that's correct --
25     Q.  Okay.

Page 126

1      A.  -- also.
2      Q.  All right.  And so at least if we're numbering
3  the paragraphs and we're looking at the third par -- the
4  second paragraph starting "on September 30, 2014,"
5  everything in that paragraph is accurate, correct?
6      A.  I'm sorry.  Say it again.
7      Q.  The second paragraph of the final written
8  warning that starts "on September 30, 2014," we just
9  went through each of the sentences; and you agreed that
10 everything there was accurate, correct?
11     A.  Yes.
12     Q.  And then we just went through the third
13 paragraph that starts "during an investigatory meeting
14 on October 8th" and you -- you just agreed everything
15 there was accurate, correct?
16     A.  Correct.
17     Q.  All right.  You do understand that not
18 following the lock, tag, try procedure is a violation of
19 the company's safety rules, correct?
20     A.  Wait.  Say it again.  I'm sorry.  I was
21 reading.
22     Q.  Not following the lock, tag, and try procedure,
23 that's a violation of company work rules, correct?
24     A.  Yes, I understand that.
25     Q.  Okay.  And so the fourth paragraph says that

Page 127

1  this incident is a violation of the working rules.
2      That's also accurate, correct?
3      A.  That's correct.
4      Q.  Is it correct that your carelessness could have
5  resulted in an employee being seriously injured?
6      A.  Yes, that's -- that's possible, yes.
7      Q.  Okay.  Is it correct that you have had several
8  coaching and counseling about your work ethics?
9      A.  Wait.  Say it again.
10     Q.  In the fourth paragraph the last sentence says,
11 "You have had several coaching and counseling about your
12 work ethics"; is that correct?
13     A.  That's partially correct.
14     Q.  Okay.
15     A.  Because it's not that I was being -- my
16 coaching and -- about the coaching and counseling of my
17 work ethics, it's not that they were at -- there was
18 anything wrong with them.  It was that that is included
19 in the -- the coaching and counseling form.
20     Q.  Okay.  Coaching you --
21     A.  That was -- yes, that's not anything personal
22 that -- that was affecting me.
23     Q.  Okay.  Okay.  So those are the paragraphs that
24 I see that kind of recount just the company's position
25 about what happened and what you did wrong from the

Page 128

1  company's perspective.  So -- and you've just agreed
2  with me that those things are accurate.  So I'm trying
3  to just pinpoint exactly specifically what you disagreed
4  with when you said, "I disagree with what is stated in
5  this letter."
6      A.  I don't recall exactly the situation that --
7  that -- what -- the situation -- what the situation was
8  when I wrote this under the bottom.  I don't recall that
9  right now.
10     Q.  Okay.  All right.  So after you received this
11 final written warning and notice that you were going to
12 go through recertification, what happened next with
13 respect to your work?  Did you go back out and perform
14 electrician work?
15     A.  I'm sorry.  Say it again.
16     Q.  After you received this final written
17 warning --
18     A.  Uh-huh.
19     Q.  -- did you go back out immediately and start
20 performing electrician work at the Pasadena complex?
21     A.  No, I don't think I did.
22     Q.  What did you do?
23     A.  I think I was -- I was removed from working --
24 being out in the -- the working area of the plant and
25 placed in the COB to start doing computer modules for

Page 129

1  retraining.
2  Q. That's a part of the recertification that's
3  described in this final written warning letter?
4  A. Yes.
01:37  5  Q. What's COB?
6  A. The central office building.
7  Q. It's the central office building at the
8  Pasadena complex?
9  A. Correct.
01:37  10  Q. And so you were required to report to the COB
11  for retraining for some period of time?
12  A. Correct.
13  Q. How long were -- was the retraining?
14  A. I don't recall exactly. It was -- it took
01:38  15  quite some time. I don't remember exactly how long.
16  Part of it was because they didn't -- they didn't
17  actually have updated or current information for me to
18  retrain on, was part of the problem.
19  Q. Was it your understanding that they -- the
01:38  20  company was working with the union to come up with that?
21  A. Yes, it was my understanding.
22  Q. When you were engaged in this retraining or
23  recertification as a part of your discipline for the
24  lockout/tagout incident, to whom were you reporting at
01:39  25  that time?

Page 130

1  A. I was not reporting to anybody. I was --
2  Q. Were you working with anyone?
3  A. No, I was not working with anyone. I was
4  going -- I would come in in the mornings and a gentleman
01:39  5  named Tom Shomette, his -- he had his office door open.
6  He would have -- the booklets that I was to -- to go
7  through during the day, he would have those in his
8  office on his desk for me to just pick up so that I
9  could go to my cubicle and start -- and work those --
01:39  10  those booklets.
11  Q. So every day you would go to Tom Shomette's
12  office to get the -- the work that you were supposed to
13  work on for that day?
14  A. Yes, whether he was there or not.
01:39  15  Q. And so was it your understanding that you at
16  least had to report to him to get this material so that
17  you would know what to be working on a particular day as
18  a part of the retraining?
19  A. Not necessarily report to him, but the info --
01:40  20  the information was in his office.
21  Q. Did you have any discussions or other
22  interactions with Tom Shomette other than just picking
23  up the material and then going to the cubicle?
24  A. Well, yes, I mean, I'm -- I'm a people person.
01:40  25  I would -- just polite conversations with Tom and then

Page 131

1  there were times where he would tell me that he wasn't
2  exactly sure what Chevron was doing because they -- that
3  information really didn't exist for a -- a re -- re --
4  recertification training. So he was working with my
01:40  5  union officials to try to come up with work to -- to
6  somewhat rectify that situation.
7  Q. Okay. And it was your understanding that the
8  company and the union were working towards that?
9  A. Yes.
01:41  10  Q. Okay. At some point did you get updated
11  information while you were going through the retraining?
12  A. No.
13  Q. At some point did you ever participate in any
14  computer-based --
01:41  15  A. Yes, there was --
16  Q. -- programs --
17  A. -- some computer-based.
18  Q. -- training?
19  A. Yes.
01:41  20  Q. Was it always computer-based or was -- sometime
21  it was manuals, hard copy manuals and then sometimes
22  computer?
23  A. It was mostly manuals, older, obsolete manuals
24  that Chevron didn't even -- that info -- that complete
01:41  25  information was obsolete, but I still had to go through

Page 132

1  and read all of that information.
2  Q. And -- and when you were reading the
3  information, were you also required to answer questions?
4  A. Most of the time, no. It was just a matter of
01:41  5  reading that information. I think of the -- I don't
6  know how many books Tom had. And it was -- it was a
7  lot. It was maybe 20 or 30 different books, but I think
8  there might have been 2 or 3 tests out of those 30 books
9  of -- of obsolete information and --
01:42  10  Q. Did you go through all of those books?
11  A. Well, I had to. I mean, that was part of the
12  recertification.
13  Q. Okay. So, yes, you went through all -- the 20
14  to 30 books that Tom Shomette had?
01:42  15  A. Yes.
16  Q. And in addition to going through those books,
17  you also did some computer-based retraining?
18  A. Yes, I did some computer -- computer work,
19  also.
01:42  20  Q. At some point were you also back on -- in the
21  plant area observing employees doing work?
22  A. There was -- there were a -- a couple times. I
23  think maybe -- it wasn't many. Maybe two -- maybe three
24  or four times, I think it was. I'm not exactly sure how
01:43  25  many, but there were times that I would -- I could -- I

Page 133

         1  was allowed to go back into the plant to watch --
         2     Q. Okay.
         3     A. -- other electricians perform work.
         4     Q. Other than Tom Shomette did you work with
01:43    5  anybody else with respect to the retraining process?
         6     A. Other than Tom. Yes. Oh, God, what's his
         7  name? John, John Smith.
         8     Q. Okay.
         9     A. That's a name that's original, John Smith.
01:43   10     Q. Not generic at all, huh?
        11     A. No.
        12     Q. Tom Shomette, do you recall what his job
        13  position was or his title?
        14     A. I'm not sure of his exact title. He was
01:44   15  training -- something in training, a coordinator or
        16  something in training.
        17     Q. And what about John Smith?
        18     A. I have no idea. John was -- John was an
        19  operations supervisor or something.
01:44   20     Q. Do you recall John Smith taking over and
        21  working with you for the -- with the retraining after
        22  Tom went out on leave or was absent for some period?
        23     A. Yes, I remember John would -- his -- I started
        24  going to his office to pick up the booklets and I think
01:44   25  John was the one who actually started with the -- the

Page 134

         1  computer-based training.
         2     Q. Okay. Okay. After the final written warning,
         3  you had another incident where the company investigated
         4  another work rule violation. Do you recall that?
01:45    5     A. No.
         6     Q. You don't recall being investigated for
         7  violating any other work rules after the lockout/tagout
         8  incident?
         9     A. No.
01:45   10     Q. Do you recall being investigated for sleeping
        11  on the job?
        12     A. I recall that, yes.
        13     Q. Okay. You recall meeting with HR about that?
        14     A. Yes, with Virginia. And I explained to
01:45   15  Virginia that that was -- I was not who they thought was
        16  sleeping. I also explained to her that I actually --
        17  there was a gentleman who I walked up to who was
        18  sleeping and snoring in a cubicle. I somewhat described
        19  him to her.
01:45   20        He was a gentleman in a -- in a pink shirt.
        21  He was across the cubicle -- on the other side -- excuse
        22  me -- on the other side of the cubicle wall, like two
        23  cubicles down and he was snoring and I -- I woke him up.
        24     Q. This was on the same day as you were reported
01:46   25  to be sleeping?

Page 135

         1     A. Yes, the same -- and that's why I told her, I
         2  said, "Virginia, there -- not -- I wasn't sleeping, but
         3  I woke up a gentleman who was sleeping." And she -- she
         4  never said anything after that. Okay.
01:46    5     Q. When did you tell Virginia about this other
         6  person?
         7     A. I told her when we had -- she came to me, it
         8  was -- it was in the afternoon. She came to me because
         9  she said -- I will never forget it. She said, "You just
01:46   10  won't stay out of trouble."
        11        And it caught me. I was completely -- I
        12  was totally off. "What are you -- what are you talking
        13  about?"
        14        And she didn't say anything. She just
01:46   15  said, "We have to have another meeting. Come on."
        16     Q. Okay. So you first heard about this sleeping
        17  issue from Virginia Hubbard when she called you to her
        18  office?
        19     A. She didn't -- she didn't call me to her office.
01:47   20  She came to the cubicle where --
        21     Q. Okay.
        22     A. -- I was and told me that we were going to have
        23  to have another meeting. You know, and as I said, I --
        24  I was confused because I had -- I told her that I had
01:47   25  walked around the corner and -- around -- I say around

Page 136

         1  the corner -- to the next cubicle and woke up a
         2  gentleman who was -- who was sitting behind a desk
         3  sleeping --
         4     Q. Was this --
01:47    5     A. -- and snoring.
         6     Q. Was this gentleman sleeping -- well, let's back
         7  up a little bit.
         8     A. Okay.
         9     Q. You recall the day of the sleeping incident
01:47   10  that somebody came and -- and tapped you --
        11     A. Yes.
        12     Q. -- in your cubicle?
        13     A. Yes.
        14     Q. And when he tapped you -- did you know who this
01:47   15  gentleman was?
        16     A. I have no idea who he was.
        17     Q. Okay. You had never seen or met him before?
        18     A. No.
        19     Q. When this gentleman tapped you, what did you --
01:48   20  what -- did he say anything to you?
        21     A. When he tapped me, he startled me because I was
        22  sitting there and, I mean, I had this -- I was bored. I
        23  was just sitting there and he tapped me and it -- it
        24  kind of startled me because somebody had snuck up in
01:48   25  there. And I looked; and he was like, "Hey." And he --

Page 137

1  he turned and walked off.
2      And I'm like, what is that about?
3  Q. He just said "hey" and turned and walked off?
4  A. Exactly. So I stood up and I was getting ready
5  to go outside and that's when I heard this -- this guy
6  across the wall in the cubicle -- as I said, two -- two
7  cubicles down snoring. So I went around there and I
8  tapped this guy and I -- "Hey, man, you loud."
9      "Oh, man, thank" -- and he was -- "Thank
10  you. Was I loud?"
11      "Yes, sir, you were."
12      And he was an older gentleman in a pink
13  shirt, is what I -- that's how I remembered him. He --
14  he was sitting behind the desk in a pink shirt and I'm
15  thinking, this dude --
16  Q. So when -- when this gentleman came up to you
17  and tapped you and said "hey," this other gentleman was
18  in a cubicle snoring --
19  A. Snoring --
20  Q. -- at that same time?
21  A. At that same time.
22  Q. And you could hear it --
23  A. I could --
24  Q. -- while -- when you --
25  A. -- hear it.

Page 138

1  Q. -- were tapped --
2      THE REPORTER: Wait, sir. I'm sorry.
3      THE WITNESS: Oh, I'm sorry. I'm sorry.
4      MS. WILLIAMS: It's okay.
5  Q. (BY MS. WILLIAMS) You could hear him snoring
6  when this other gentleman came in and tapped you and
7  said "hey"?
8  A. Yes, I could.
9  Q. Okay.
10  A. It was very obvious and that's why it -- I
11  guess that's part of what startled me, because he walked
12  up and he tapped me and, "hey," and he turned and walked
13  off. And I'm thinking, well, who was this.
14  Q. Okay.
15  A. So I stood up -- as I said, I stood up and I --
16  I could hear this guy. So I walked around to see what
17  was going on, and I see this guy sleeping. So I tap
18  him, "Hey, you're -- you're loud."
19      "Oh, well, thank you. Was I snoring?"
20  Well, he said, "Was I loud?"
21      "Yes, sir."
22  Q. Okay. And then after that, what happened?
23  Then -- did you see anybody else that --
24  A. After that, yes. It was -- I don't know
25  exactly how much longer but later on Virginia came by

Page 139

1  and that's when she made the comment, she said, "You --
2  you just won't stay out of -- you can't stay out of
3  trouble." And I'm thinking, what are you talking about?
4  And --
5  Q. And did she talk to you about the sleeping
6  incident while at your cubicle, or did she set up a
7  meeting where you-all met and talked later?
8  A. She said -- she set up a meeting when she
9  talked about the sleeping.
10  Q. When she came to your cubicle and said, "You
11  can't stay out of trouble," did she tell you what was --
12  what the issue was at that time?
13  A. No, she didn't. She didn't say anything.
14  She -- it was just -- it was -- she made it kind of
15  humorous, "You just -- you can't stay out of trouble."
16  Q. How --
17  A. And --
18  Q. -- did you know that you were going to have a
19  meeting with her?
20  A. Because she said I was going to have -- "We
21  have to have another meeting."
22  Q. Okay. And when did that meeting take place?
23  A. It was, I guess, maybe -- hell, maybe 20
24  minutes later after she came in and told me that.
25  Q. And who -- who were -- who participated in that

Page 140

1  meeting?
2  A. Oh, God, I -- now, that -- ouch. Excuse me.
3  Q. Virginia was there, correct?
4  A. Yes, Virginia. Virginia -- that was the
5  meeting where Ed came, Ed Armand. And I -- oh -- the
6  new guy. He was new then, Adam -- Adam -- he has a
7  funny last name.
8  Q. Sainato?
9  A. Sainato.
10  Q. Was he -- do you know what his position was?
11  A. I know he was something in the HR.
12  Q. Okay. And Ed Armand was at this meeting on --
13  regarding the sleeping incident?
14  A. Yes.
15  Q. Was he also at the lockout/tagout meeting in --
16  meeting on the lockout/tagout incident?
17  A. I could be getting those two confused.
18  Q. Okay. And so when you appeared for this
19  meeting with Virginia and Adam from HR and then Ed
20  Armand --
21  A. Uh-huh.
22  Q. -- tell me about that meeting. What did
23  Virginia -- did Virginia run that meeting? Did she
24  present the issue to you or did Adam?
25  A. She -- hold on a second. She started the

## Page 141

|  |  |
|---|---|
| 01:53 | 1  meeting, and then Adam took over and did most of the |
|  | 2  talking. Yeah. |
|  | 3  Q. Did they ask you questions about the incident? |
|  | 4  A. I don't -- I don't think she asked -- I don't |
|  | 5  think they asked me any questions. |
|  | 6  Q. Were you allowed to provide your side of the |
|  | 7  story during this meeting? |
|  | 8  A. Yes. I told her that I was not sleeping and |
|  | 9  that I had waken up another gentleman who was sleeping |
| 01:53 | 10 but she -- |
|  | 11 Q. And you're sure you told that to Virginia in |
|  | 12 this meeting? |
|  | 13 A. I'm positive. |
|  | 14 Q. Do you recall also during -- so you told |
| 01:53 | 15 Virginia that you were not -- and -- and Adam you were |
|  | 16 not sleeping, correct? |
|  | 17 A. Correct. |
|  | 18 Q. You told them about this other person that you |
|  | 19 said you heard sleeping? |
| 01:53 | 20 A. Yes. |
|  | 21 Q. Did you at some point during this meeting tell |
|  | 22 them that you thought you might have fallen asleep? |
|  | 23 A. No, I didn't tell them. I said that -- I told |
|  | 24 them -- the -- the way that they presented it to me, |
| 01:53 | 25 "Well, if you" -- how did she -- how did it go? "If you |

## Page 142

 1  were that bored, was it possible?"
 2        "It's possible, but I was not sleeping."
 3  Q. But do you recall at some point conceding with
 4  them that you might have actually fallen asleep?
01:54  5  A. No, I didn't -- I never said I might have. I
 6  said it was possible.
 7  Q. Okay. So is it true that it was possible that
 8  you might have fallen asleep?
 9  A. Yes, it was possible; but it -- it didn't
01:54  10 happen.
 11 Q. So why did you tell them it was possible if it
 12 didn't happen?
 13 A. Because the way it was presented to me was that
 14 it -- it -- it could have happened because --
01:54  15 Q. So it could have happened, that you might have
 16 fallen asleep?
 17 A. As I just said, it was possible, yes.
 18 Q. Okay. And this is what you told them when
 19 they're investigating the sleeping --
01:54  20 A. Right.
 21 Q. -- incident, correct?
 22 A. That's correct.
 23 Q. Okay. And so the information they received
 24 from you at first was that, "No, I didn't fall asleep";
01:54  25 but then you said, "It's possible that I might have

## Page 143

 1  fallen asleep"?
 2  A. Correct.
 3  Q. Okay.
 4  (Exhibit 8 marked)
01:55  5  Q. (BY MS. WILLIAMS) I'm going to show you what's
 6  marked as Exhibit 8.
 7  MS. WILLIAMS: (Tenders document)
 8  MR. ARMSTRONG: Thank you.
 9  Q. (BY MS. WILLIAMS) Do you recall receiving this
01:55 10 document? It's dated November 18, 2014, regarding "Last
 11 Chance Letter."
 12 A. Yes.
 13 Q. Do you recall receiving this as a result of the
 14 sleeping incident that the company investigated that
01:55 15 we -- we just discussed?
 16 A. Yes.
 17 Q. Okay. Now, the date of this last chance letter
 18 is November 18th, right?
 19 A. Correct.
01:56 20 Q. We looked at the final written warning. I
 21 think you have it in the front of you. That one's dated
 22 October 30, 2014, correct?
 23 A. Correct.
 24 Q. So the time between the final written warning
01:56 25 for the lockout/tagout incident and the last chance

## Page 144

 1  letter for the sleeping incident, it was approximately
 2  two or three weeks. Is that about right based on
 3  those --
 4  A. Yes --
01:56  5  Q. -- dates?
 6  A. -- about three weeks.
 7  Q. And you signed the last chance letter, correct?
 8  A. The last chance --
 9  Q. Exhibit 8 that's in front of you, you -- that's
01:56 10 your signature on the document --
 11 A. Oh, I'm --
 12 Q. -- correct?
 13 A. Yes.
 14 Q. Okay.
01:56 15 A. Correct.
 16 Q. Okay. And did you understand that this last
 17 chance letter was basically giving you another chance to
 18 improve your performance and not get in trouble in order
 19 to avoid being terminated?
01:57 20 A. Wait. Say it again, please.
 21 Q. Was it your understanding that the company gave
 22 you this last chance letter to give you another
 23 opportunity to improve your work so that you wouldn't
 24 get terminated?
01:57 25 A. That's actually not the way, at the time, that