Lisa Laurin
May 24, 2017

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SHERWIN T. WRIGHT            )
    Plaintiff,            )
                             )
vs.                          )  Civil Action NO. 4:15-cv-02363
                             )
CHEVRON PHILLIPS CHEMICAL    )
COMPANY, LP                  )
    Defendant            )

ORAL DEPOSITION

LISA LAURIN

MAY 24, 2017

    ORAL DEPOSITION OF LISA LAURIN, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 24th day of May, 2017, from 2:20 p.m. to 4:20 p.m., before Melinda Barre, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Jackson Walker LLP, 1401 McKinney Street, Suite 1900, Houston, Harris County, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



Stratos Legal Services
800-971-1127

1  morning?
2      A.   Yes.
3      Q.   Did you-all investigate whether that was the
4  case for the T lead operation, that two electricians
5  should have been involved in that?
6      A.   I can't say because I wasn't in the
7  investigation.
8      Q.   Okay.  And your reporters didn't report that to
9  you as part of your findings that you based your
10 ultimate decisions on?
11     A.   I don't recall that being in there.
12     Q.   Are there transcripts of investigations done
13 when you interview -- for instance, if Virginia
14 interviewed Mr. Barnes and Adam interviewed Mr. Donnell,
15 will there be transcripts generated from those
16 interviews?
17     A.   No.
18     Q.   This morning we were talking with Mr. Higgins;
19 and one of the points that he restated several times was
20 that there were no clear directives given to Sherwin
21 Wright about what he should have been doing in the unit,
22 what his job entailed.
23          Do you know if your investigators had any
24 conversations with anyone about the directives that
25 Mr. Wright was given?

A.   I don't know.

Q.   Have you seen or do you know whether they did any investigation into why there was no work order generated and given to Mr. Wright?

A.   I don't know.

Q.   You don't know whether you've seen it or heard it, or have you not heard it or seen it?

A.   **You're going to have to ask a different question. It's no.**

Q.   Okay. Has anybody told you that those two issues were investigated?

A.   No.

Q.   And you didn't investigate them yourself?

A.   No.

Q.   Has anybody told you why there was no permit generated for the work that Mr. Wright was doing?

A.   No.

Q.   And you didn't investigate that independently?

A.   No.

Q.   Previously Mr. Wright testified -- I think you were present for that deposition as well, correct?

A.   Yes.

Q.   And do you recall that he stated he had initialed the isolation list, gave it to Billy Donnell. He asked for it back. Billy Donnell didn't give it back

Lisa Laurin
May 24, 2017

Page 25

1  to him. Do you recall that testimony?
2      A.  I do.
3      Q.  Prior to your decision to suspend him, did
4  anybody tell you anything about that incident?
5      A.  No.
6      Q.  Did you ask Billy Donnell anything about
7  whether that incident occurred? Independently yourself
8  have you had that conversation with Billy Donnell?
9      A.  Since the --
10     Q.  No, no. Before you made the decision to
11 suspend him, Mr. Wright.
12     A.  No.
13     Q.  Okay. So the result of your investigation is
14 what we'll attach as Exhibit 1.
15             (Exhibit 1 marked)
16     Q.  (By Mr. Armstrong) Which is your letter
17 dated -- actually I'll say it's a letter dated
18 October 30, 2014. Have you seen this letter before?
19     A.  Yes.
20     Q.  And it's signed by Andy Woods, who was the
21 maintenance manager, right?
22     A.  He was.
23     Q.  And was Andy Woods involved in this
24 investigation of Mr. Wright?
25     A.  No.

1  electrician is to provide electrical maintenance to the
2  plant, correct?
3       A.   Yes.
4       Q.   Okay.  There's an aspect of his job that says,
5  You have to know what the safety procedures are, right?
6       A.   Yes.
7       Q.   But his job is not -- when he goes and puts
8  tools to a piece of equipment, he's doing something that
9  probably goes way over my head.  It's something an
10 electrician knows how to do, right?
11      A.   Ask me that again, please.
12      Q.   Electricians perform electrical maintenance
13 work.  Fair?
14      A.   Yes.
15      Q.   Okay.  If he violated a safety process, doesn't
16 it make sense that his retraining or certification
17 should have been on that safety process as opposed to
18 being recertified on being an electrician?
19      A.   Yes.
20      Q.   So why was he to be recertified as an
21 electrician instead of just recertified on that
22 lock/tag/try process?
23      A.   Well, he would have been retrained on the
24 procedures, all safety procedures.  The recertification
25 process was something the union, IBEW, with our

maintenance training coordinator was completing that per the contract. It was not ready yet. It was going through the validation process.

Q. So at the time of this letter, when this letter was written and given to Mr. Wright, there was no actual recertification process in place?

A. There was no test in place.

Q. Okay. And so in October of 2014 when you guys issued this letter to him and said, You have to recertify, you really didn't even have an understanding of what you were asking him to do. Is that fair?

A. No.

Q. What were you asking him to do when he recertified?

A. That he would take the test.

Q. That didn't exist, right?

A. It did exist.

Q. Okay. So what parts of this recertification process were in place on October 30, 2014?

A. There was nothing in place in October of 2014.

Q. Is there a separate document that says, Mr. Wright, as part of your recertification testing, here are the things that we want you to focus on and these are the individuals, whether it be Keith Bravenec or somebody else, who are going to test you after this

1  time period of recertification and then you will be
2  either recertified or not?
3      A.   No.
4      Q.   No document like that exists?
5      A.   No.
6      Q.   Okay. So what was the plan in October 30 --
7  well, October 30th of 2014. What was your plan for how
8  long it was going to take for him to return to work if
9  he had to recertify first?
10     A.   He would take the test first, and then any
11 areas where he was deficient he would remediate.
12     Q.   And how long did you guys anticipate that that
13 was going to take?
14     A.   We didn't anticipate.
15     Q.   Okay. So you didn't give him any guidelines or
16 anything as to, You're off; you're suspended; this is
17 how you return to work; this is how long it's going to
18 take you to get back to work?
19     A.   No.
20     Q.   Tom Shomette was who?
21     A.   Maintenance training coordinator.
22     Q.   And Tom Shomette was tasked with doing what in
23 relation to the recertification process?
24     A.   He would administer the test and the
25 remediation.

1  Q.  Okay. At any time after October 30, 2014 did
2  he administer the test?
3  A.  No.
4  Q.  No?
5  A.  No.
6  Q.  Why not?
7  A.  **Because the test has to be validated to be**
8  **considered legal and it was in the validation process**
9  **and it wasn't returned until after Tyrell was**
10 **terminated.**
11 Q.  Okay. And so had Mr. Wright -- let's just say
12 none of the other situations would have occurred, the
13 other two situations that we'll talk about later. Just
14 say this was the only disciplinary action that was ever
15 taken against him. He would have had to wait until
16 sometime after December 2014 to return to work. Fair?
17         MS. WILLIAMS: Objection, mischaracterizes
18 her testimony. Go ahead.
19 Q.  (By Mr. Armstrong) So let me restate this
20 because I want to be clear.
21         If the validation of the test did not
22 occur until after Mr. Wright was terminated in December
23 of 2014, had he gone through this certification process,
24 he couldn't have taken the test because it wasn't
25 validated, so he would not have come back until after

1  December of 2014?
2              MS. WILLIAMS:  Objection, vague.  It
3  mischaracterizes her testimony.
4              You can go ahead and answer.
5     A.  You keep saying "return to work."  He was at
6  work after the suspension.
7     Q.  (By Mr. Armstrong)  But he wasn't able to
8  return to the field as an electrician?
9     A.  That's correct.
10    Q.  And his primary job title was a maintenance
11 electrician, correct?
12    A.  Yes.
13    Q.  And so he would have been sitting in a cubicle
14 until sometime after December of 2014?
15    A.  Yes.
16    Q.  Okay.  What was the curriculum for the
17 recertification process?
18    A.  I don't know.  You can't answer that until
19 after the test has been administered.
20    Q.  Okay.  And so during that time period before
21 the test is administered, he would not have even had a
22 curriculum to study while he's sitting in the cubicle.
23 True?
24    A.  When you say "a curriculum," are you asking me
25 did he have an outline of what he was given?

Lisa Laurin
May 24, 2017

Page 38

1  Q.  Yes.
2  A.  I don't know.
3  Q.  Okay. It says, "The purpose of this final
4  written warning and suspension without pay is to change
5  your behavior, ensuring that you will comply with the
6  company's work rules, policies and practices."
7       What behavior did you anticipate or was
8  the purpose to change?
9  A.  I can't tell you that.
10 Q.  Did you read this letter before it was given to
11 Mr. Wright?
12 A.  Yes.
13 Q.  So you were familiar with the contents of this
14 letter before it was given to Mr. Wright?
15 A.  I am.
16 Q.  Okay. So do you know what the behavior was
17 that you guys were trying to change in Mr. Wright?
18 A.  **I would have to speculate that the behavior**
19 **they're trying to change is him not following the**
20 **correct process and procedures when de-energizing**
21 **equipment.**
22 Q.  Okay. When you say "speculate," you had no
23 personal opinion or thought process as to what the
24 behavior was y'all were trying to change at the time
25 that you guys were giving him this letter?

1   A.    I have a personal opinion.
2   Q.    Okay.  What was your personal opinion of what
3   you guys were trying to change?
4   A.    What I previously stated about not following
5   procedures.
6   Q.    Okay.  How has that change in behavior been
7   documented?
8   A.    How is documenting something going to change
9   someone's behavior?
10  Q.    No.  Let me be a little more clear about that.
11              How were you planning to document whether
12  his behavior changed or not?
13  A.    I can't answer that question.
14  Q.    Okay.  And so are you familiar with what's
15  called a PIP?
16  A.    Yes.
17  Q.    A performance improvement plan?
18  A.    Yes.
19  Q.    Do you guys use those at your company?
20  A.    Yes.
21  Q.    And at the end of those PIPs there's usually --
22  and I can't speak to your specific process.  But there's
23  usually a follow-up session where a manager says, This
24  is what we've measured and this is what we've seen in
25  your performance since we put you on this plan.  You

1  have either met our expectations or not, and you're
2  either still on this plan or you're not or you're
3  terminated.
4           Did you have a process like that in place
5  and in mind for Mr. Wright to document whether or not
6  his behavior had changed?
7      A.   No.
8      Q.   During your tenure with HR, have you
9  disciplined any other employee for violating the work
10 rules other than Mr. Wright?
11     A.   **You're asking me has the company disciplined**
12 **anyone else?**
13     Q.   Well, have you been involved in the process of
14 disciplining a person who violated the work rules?
15     A.   Yes.
16     Q.   About how many times do you think you've been
17 involved in that process?
18     A.   I can't answer that.  It's many, many, many.
19     Q.   More than ten?
20     A.   Yes.
21     Q.   Okay.  For any of those times that you have
22 been involved in that process, has any other person been
23 required to recertify in their field as part of their
24 return to work?
25     A.   No.

1  Q.  Prior to Mr. Wright being required to
2  recertify, had there been anybody else who had been
3  required to recertify as return to work?
4  A.  **I'm sorry. Isn't that the same question you**
5  **just asked me?**
6  Q.  Yeah. I guess it is.
7  A.  **Still no.**
8  Q.  I was breaking those time periods up, but
9  you're right. That's the same question.
10         Had any other person been suspended
11 without pay without the process for objectively
12 determining whether the reason they were suspended had
13 been corrected or not?
14         MS. WILLIAMS: Objection, assumes facts
15 not in evidence, argumentative.
16         You can still answer.
17         THE WITNESS: I don't understand what he's
18 asking me.
19         MS. WILLIAMS: That, too. I'm sorry.
20         MR. ARMSTRONG: Yeah. That's a good
21 objection. She doesn't understand what you're asking.
22  Q.  (By Mr. Armstrong) So we just walked through
23 the question of whether there was a process in place
24 similar to a PIP to evaluate Mr. Wright afterwards,
25 right? Has any other employee been sent home without

1  A.  Never.
2  Q.  So on the date in question that he failed to
3  properly follow this management system, I think he
4  called multiple times to this management system; and
5  from the records we have Adam Sainato independently
6  verified that he did call in, right?
7  A.  Yes.
8  Q.  Other than calling through the system, who was
9  the person that Tyrell should have called on the date
10 that he called in?
11 A.  His supervisor.
12 Q.  Who was his supervisor that day?
13 A.  One of the two Darins.
14 Q.  Okay.  Did one or both of those two Darins
15 report to the cubicle where he would work every day, go
16 every day to read these recertification texts and
17 supervise that reading?
18 A.  That's a two-part question.  I don't know if he
19 went to the cubicle to talk to him or not, but I would
20 imagine he wasn't supervising any reading.
21 Q.  And so as for the certification process that
22 Mr. Wright was on, Darin probably wasn't the person who
23 was there every day giving him books and saying, Have
24 you read this item or read that item?
25 A.  That's correct.

Lisa Laurin
May 24, 2017

Page 67

```
 1      Q.   And if he were not in the field, he wasn't
 2  being supervised in the field on that day, correct?
 3      A.   Correct.
 4      Q.   Just to summarize, you've got three instances
 5  that after October 1st were the subject of discipline.
 6  And this was the lock/tag/try, right?
 7      A.   Yes.
 8      Q.   Which under the work rules that was one of the,
 9  We can immediately terminate you if you do this, right?
10      A.   Yes.
11      Q.   And he wasn't terminated for failure of the
12  lock/tag/try.  Then by your reading of the work policies
13  he was asleep while on duty; and so that's an offense
14  that's immediately terminable, right?
15      A.   Yes.
16      Q.   And he wasn't terminated for that.  So what
17  ultimately got him was he misunderstood or failed to
18  properly follow the total absence management plan?
19      A.   Yes.
20      Q.   And that's not -- at least in these working
21  rules that's not listed as an immediately terminable
22  offense?
23      A.   It's listed on page 727.  "Rules which when
24  violated will be sufficient cause for disciplinary
25  action of warning, suspension or discharge depending
```

Lisa Laurin
May 24, 2017

Page 68

1 upon the circumstances involved and the seriousness of
2 the offense.  Failure to follow plant procedures for
3 reporting off from work."
4     Q.   What's that?  Where is it?
5     A.   On 728.
6     Q.   Where is that?
7     A.   Towards the top.
8     Q.   Okay.  For reporting off from work.  Okay.
9     And so your reading of this is even though
10 he called in but he did it improperly, he was subject to
11 disciplinary action?
12     A.   He didn't call in.
13     Q.   Well, I think we've established that he
14 actually called the UPMC total absence management.
15     A.   In our hand procedures for putting off from
16 work it states you must contact your supervisor.
17     Q.   Right.  Who was -- on that day you think it was
18 Darin Barnes?
19     A.   I know for a fact his supervisor is Darin
20 Barnes.
21     Q.   Okay.  Who was not supervising him on that day,
22 right?
23     A.   No.
24     Q.   Okay.  Was he ever counseled after he failed to
25 call in properly?  Did anybody ever pull him to the side

Stratos Legal Services
800-971-1127

1  and say, Why didn't you call UPMC instead of your
2  supervisor?
3      A.   He did call UPMC instead of his supervisor.
4      Q.   No.  That's what I'm saying.  Did you-all have
5  that conversation of, Why didn't you go that route
6  instead of calling Darin Barnes?
7      A.   Yes.  Adam asked him on the phone.
8      Q.   And what did he say to Adam, do you recall?
9      A.   I don't recall.
10     Q.   Did Adam report back to you in writing what was
11 said during that phone conversation?
12     A.   Not in writing.
13     Q.   And so Adam just left that phone conversation
14 with, He called in to something but he didn't follow us
15 exactly, so we're sacking him, right?
16     A.   No.
17     Q.   What did Adam come back and tell you about that
18 phone conversation?
19     A.   With Tyrell?
20     Q.   Yes, ma'am.
21     A.   He told me that he talked to Tyrell and that
22 Tyrell said he called in to UPMC.
23     Q.   Okay.  Was there any documentation of the
24 termination itself?  Like is there something in a file
25 that says, We terminated him based on this conversation

Lisa Laurin
May 24, 2017

Page 72

1  Q.  (By Mr. Armstrong)  I'm going to backtrack a
2  little bit just to clarify something.  Did Keith
3  Bravenec ever tell you how he determined that Tyrell had
4  done the lock, tag and try process improperly?
5  A.  Yes.
6  Q.  Okay.  How did he come to that conclusion?
7  A.  **There was a contractor in the field that**
8  **noticed it hadn't been done.  So he pulled the paperwork**
9  **that showed Tyrell signed off on the documentation that**
10 **the work had been done.**
11 Q.  Okay.  And then that's what triggered him to
12 come to you?
13 A.  **That's correct.**
14 Q.  Everything that we talked about?
15 A.  **Yes.**
16 Q.  Okay.  Was anyone else, either Billy Donnell or
17 Darin Barnes or anybody else, suspended as a result of
18 your investigation of this incident?
19 A.  **No.**
20 Q.  That's all we have for now.
21         MR. ARMSTRONG:  So we'll pass the witness.
22         MS. WILLIAMS:  We'll reserve for trial.
23         (Proceedings concluded at 4:20 p.m.)
24
25

Stratos Legal Services
800-971-1127